FILED
MAR 29 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IMPRIMIS INVESTORS LLC, WEXFORD SPECIAL SITUATIONS 1997 INSTITUTIONAL, LP, TAX MATTERS PARTNER,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 07-209 T

**COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE SECTION 6226**

Plaintiffs, Imprimis Investors LLC ("Imprimis") and its Tax Matters Partner, Wexford Special Situations 1997 Institutional, LP ("Wexford"), file this Complaint for Readjustment of Partnership Items Under Section 6226 of the Internal Revenue Code of 1986 (the "Code"),[1] against the United States. In support of this Complaint, Plaintiffs allege, as follows:

PARTIES

1. Imprimis was organized as a limited liability company under the state laws of Delaware in June, 1997. For tax purposes, Imprimis is treated as a partnership. The principal place of business of Imprimis is at Wexford Capital LLC, 411 West Putnam Avenue, Greenwich, CT 06830. Imprimis' employer identification number is 06-1486378. Imprimis' U.S. Return of Partnership Income (IRS Form 1065) for the tax period ended December 31, 2000, was filed in Andover, MA.

[1] Unless otherwise specified, all references to "Section" are to the Internal Revenue Code of 1986 (26 U.S.C. *et seq.*), as amended for the period in issue.

2. During the tax year ended December 31, 2000, Imprimis had participating members, Wexford and Wexford Special Situations 1997, LP ("WSS"), and a non-participating member, Insight Venture Associates II, LLC ("Insight"). Other members included Wexford Spectrum Investors LLC and Wexford Partners Investment Company.

3. Wexford is the Tax Matters Partner of Imprimis under Section 6231(a)(7). Wexford is a limited partnership whose principal place of business is located at c/o Wexford Capital LLC, 411 West Putnam Avenue, Greenwich, CT 06830. Wexford's employer identification number is 06-1483925. Wexford's U.S. Return of Partnership Income (IRS Form 1065) for the tax year ended December 31, 2000 was filed in Andover, MA.

4. On February 12, 2007, a certification of selection of successor Tax Matters Partner for Imprimis for the tax year ended December 31, 2000 (the "Certification") was properly filed with the Internal Revenue Service ("IRS"). A copy of the Certification is attached hereto and marked as Exhibit 1. The Certification properly designated Wexford as the Tax Matters Partner for Imprimis. Under Treasury Regulation § 301.6231(a)(7)-1(k)(2), the selection became effective on March 14, 2007. Prior to March 14, 2007, WSS was the Tax Matters Partner for Imprimis.

5. Defendant is the United States of America.

## JURISDICTION

6. Defendant, through the IRS Appeals Office in New York, NY, mailed to "TAX MATTERS PARTNER IMPRIMIS INVESTORS LLC" a Notice of Final Partnership Administrative Adjustment ("FPAA"), dated January 2, 2007, setting forth

two "inconsistent positions" with respect to Imprimis' tax year ended December 31, 2000. A copy of the FPAA is attached hereto and marked as Exhibit 2.

7. As described more fully below, Plaintiffs contest each and every adjustment set forth in "Inconsistent Position B" set forth in the FPAA and agree completely with "Inconsistent Position A" set forth in the FPAA. "Inconsistent Position A" calls for no adjustments to the Imprimis tax return for the tax year ended December 31, 2000.

8. This court has jurisdiction over this Complaint pursuant to Section 6226(a)(3) and 28 U.S.C. § 1508.

9. Pursuant to Section 6226(e)(1), prior to the filing of this Complaint, Wexford 97 Advisors LLC ("Advisors"), the general partner of Wexford, deposited with the IRS the total amount of $6,778.65, representing the amount by which the tax liability of Advisors' members would be increased if the treatment of the "partnership items" on the members' tax returns were made consistent with the treatment of "partnership items" on the partnership return, as adjusted by the FPAA's "Inconsistent Position B." The deposit was made with the IRS on March 21, 2007 at IRS Ogden Service Center in Ogden, Utah. Attached hereto and marked as Exhibit 3 is a copy of the correspondence and check associated with this deposit.

## PRELIMINARY STATEMENT

10. The IRS examination, which led to issuance of the FPAA, commenced because the members of Insight prepared and filed Federal income tax returns which were inconsistent with the allocations of short term and long term capital gains set forth in the Amended and Restated Limited Liability Company Agreement of Imprimis

Investors LLC (the "Imprimis LLC Agreement"), and also inconsistent with the Imprimis U.S. Return of Partnership Income (IRS Form 1065) (the "Imprimis Partnership Return") for the tax year ended December 31, 2000 and the related Schedule K-1 (Partner's Share of Income, Deductions, Credits, etc.) issued to Insight.

11. Furthermore, the correctness of the allocation provisions was specifically the subject of litigation between Imprimis and the Insight parties in a lawsuit filed in the Supreme Court of the State of New York, County of New York (the "New York Lawsuit"). Pursuant to a settlement of the New York Lawsuit (the "Settlement Agreement"), the Insight parties resolved their claims pertaining to these very issues involving the very same tax allocations.

12. As a result of the IRS examination, the IRS concluded that no adjustments to the Imprimis Partnership Return, and related Schedules K-1, were warranted. However, in order to avoid the risk of being left unable to collect any tax if it only proceeded against Insight, the IRS issued an FPAA that set forth two "inconsistent positions" in the explanation of adjustments attached to the FPAA. In this regard, the IRS assumed the role of a stakeholder.

13. First, in "Inconsistent Position A," the IRS concluded that "[t]he original K-1 issued by Imprimis Investors LLC to Insight Venture Associates II LLC for year ending December 31, 2000 is deemed to be correct. Short-Term Capital Gain of $36,623,088 is the proper amount of short-term capital gain to be reported by Insight Investors II LLC for year ending December 31, 2000." Plaintiffs agree with this conclusion, which is consistent with the Imprimis LLC Agreement and the Settlement Agreement. Second, as set forth in "Inconsistent Position B," the IRS made a re-

allocation of short-term and long-term capital gains pertaining to Wexford, WSS, and Insight. As set forth below, Plaintiffs contend that the IRS erred with respect to "Inconsistent Position B," which is inconsistent with the Imprimis LLC Agreement and the Settlement Agreement.

## ASSIGNMENTS OF ERROR

14. Plaintiffs allege the following assignments of error:

a. The IRS erred in the conclusion stated in "Inconsistent Position B" that "[t]here is an increase in Net Short Term Capital Gain to (A) Wexford Special Situations 1997 L.P. in the amount of $12,136,668 and a corresponding decrease in Net Long Term Capital Gain of $12,136,668." Although Plaintiffs agree that if there is an increase in net short term capital gain to WSS then there must be a related reduction of net long term capital gain by the same amount, Plaintiffs disagree that these re-allocation adjustments are correct.

b. The IRS erred in the conclusion stated in "Inconsistent Position B" that "[t]here is an increase in Net Short Term Capital Gain to (B) Wexford Special Situations 1997 Institutional In [sic] the amount of $3,389,324 and a corresponding decrease in Net Long Term Capital Gain of $3,389,324." Although Plaintiffs agree that if there is an increase in net short term capital gain to Wexford then there must be a related reduction of net long term capital gain by the same amount, Plaintiffs disagree that these re-allocation adjustments are correct.

c. As reported on the Imprimis Partnership Return and related Schedules K-1, the correct net short term capital gain allocated to WSS was $49,384,376;

the correct net short term capital gain allocated to Wexford was $13,792,529; and the correct net short term capital gain allocated to Insight was $36,623,088.

d. As reported on the Imprimis Partnership Return and related Schedules K-1, the correct net long term capital gain allocated to WSS was $57,410,272; the correct net long term capital gain allocated to Wexford was $16,034,076; and the correct net long term capital gain allocated to Insight was $0.

e. In the Schedule of Adjustments, the IRS erred by stating that "as corrected," the correct amount of portfolio income was $24,678.00. The correct amount of portfolio income, as reflected in the "$00.00" adjustment in the same Schedule of Adjustments and on the Imprimis Partnership Return, was $21,678.00. The IRS Appeals Officer, who issued the FPAA, has orally acknowledged that the $24,678.00 figure in the Schedule of Adjustments was a typographical error.

f. In the Schedule of Adjustments, the IRS erred by stating that the "corrected" amount of net long term capital gain was $73,488,348.00. The correct amount of net long term capital gain was $73,444,348.00. The IRS Appeals Officer, who issued the FPAA, has orally acknowledged that the $73,488,348.00 figure in the Schedule of Adjustments was a typographical error.

## STATEMENT OF FACTS

15. Plaintiffs rely on the following statement of facts on which the assignments of error are based:

### IMPRIMIS HIRES INSIGHT

a. Wexford Capital LLC ("Wexford Capital") is an investment advisor registered with the Securities and Exchange Commission. Wexford Capital was

formed in 1994 and manages a series of hedge funds and private equity funds from its Greenwich, Connecticut headquarters.

b. Imprimis is an investment vehicle which makes, holds, and manages investments on behalf of certain investment funds organized by Wexford Capital.

c. In September of 1998, Imprimis entered into a consulting agreement (the "Imprimis Consulting Agreement") with Insight Venture Management, Inc. ("Insight Venture"). The Imprimis Consulting Agreement is attached hereto and marked as Exhibit 4.

d. Pursuant to the Imprimis Consulting Agreement, Imprimis agreed to pay certain amounts to Insight Venture in return for consulting services provided by Insight Venture. There were two types of payments: (1) "fixed fees" that were payable upon the amount of funds invested by Imprimis in Insight Venture-identified investments; and (2) "performance-based fees," or "incentive fees," that were based upon the profits realized by Imprimis from those investments. Both kinds of fees paid to Insight Venture would be taxable at ordinary income tax rates.

THE IMPRIMIS LLC AGREEMENT

e. As an accommodation to Insight, Imprimis agreed to distribute the incentive fees by providing Insight Venture (or an Insight Venture affiliate) with a non-participating interest in Imprimis. Insight, an Insight Venture affiliate, was designated to become a non-participating member of Imprimis in order to receive the incentive fees.

f. Thereafter, on September 30, 1998, the parties entered into an amended and restated limited liability company agreement (the "Imprimis LLC Agreement"). The Imprimis LLC Agreement is attached hereto and marked as Exhibit 5.

g. Imprimis incorporated Insight's incentive fee into the Imprimis LLC Agreement as an accommodation to Insight Venture. The purpose of providing Insight with a non-participating membership interest was to reflect the professional relationship between the parties; that is, Imprimis was providing the capital and Insight was providing its investment advice.

h. To reflect the character and substance of Insight's compensation, the parties agreed to structure Insight's non-participating membership interest in a way that provided Insight long term capital gains only to the extent that ordinary income or short term capital gains were not realized by Imprimis. But for providing Insight with a non-participating membership interest, all fees paid to Insight by Imprimis would have been taxable at ordinary rates. Imprimis agreed to this structure, which had the potential to provide Insight with income that would not be taxed at ordinary income rates. However, the parties' agreement did not reflect tax allocations that would provide distributions of long term capital gain to Insight to the detriment of the other members of Imprimis (*i.e.*, those members who provided the capital).

i. The performance-based distribution, or incentive fee, was reflected in Section 3(f) of Exhibit B of the Imprimis LLC Agreement. This provision states (emphasis added):

> Net profits shall be allocated as follows: . . . (f) . . . 80% to the Wexford Members and 20% to Insight, . . . <u>however</u>, in the event [that] any Net Profits consist of <u>items of ordinary income</u>, then . . . a special gross allocation shall be made to Insight of <u>such items or ordinary income</u>. . ..

Thus, under this provision, ordinary income (or "such items" of income or gain treated as ordinary income) resulting from Insight-identified investments was allocated first to Insight. To the extent that the allocation of "items of ordinary income" did not provide Insight with 20 percent of Imprimis' total net profits, Insight was entitled to an allocation of any long term capital gains that were generated by Imprimis as a result of Insight-identified investments until its 20 percent allocation was satisfied. Under Section 704(b), the parties were permitted to structure an allocation in this manner.

j. Consistent with the language and intent of the Imprimis LLC Agreement, Insight received an allocation of $36,623,088 of short term capital gain for the tax year ended December 31, 2000, as that amount reflected items of income or gain treated as ordinary income and fell within the 20 percent limitation.

**THE NEW YORK STATE LAWSUIT**

k. Beginning in 1998, Insight Venture began a systematic effort to divert profitable investment opportunities from Wexford Capital, Imprimis, and other Wexford Capital entities. This effort included: (1) instances in which Insight Venture failed to inform Imprimis of attractive investment opportunities, and instead participated in the investments on its own account or directed the investments to the accounts of others; (2) instances in which Insight Venture presented an investment opportunity to Imprimis with unfavorable terms but then invested in the opportunity on it own account, under more favorable, renegotiated terms; and (3) instances in which Insight Venture reduced Imprimis' maximum allowable investment and directed the remaining portion of an available investment to itself or others.

l. On October 12, 2000, Imprimis and other Wexford Capital entities filed the New York Lawsuit against Insight Venture and related Insight Venture entities and individuals. A copy of the Complaint is attached hereto and marked as Exhibit 6.

m. Insight Venture and Insight filed a counter-suit against Imprimis and other Wexford Capital entities. On May 10, 2001, Insight filed its Amended Verified Answer, Affirmative Defenses, Counterclaims and Third-Party Complaint ("Amended Answer and Counterclaim") in the New York Lawsuit. A copy of the Amended Answer and Counterclaim is attached hereto and marked as Exhibit 7.

n. Insight's Amended Answer and Counterclaim specifically raised the issue pertaining to the Imprimis tax allocations of short term and long term capital gain. At paragraphs 248 through 251, Insight alleged:

> 248. Imprimis' 2000 earnings were comprised of $797,243 in "Interest Income," $97,991,181 in "short-term capital gains," and $91,458,825 in "long-term capital gains." After deduction of Imprimis' expenses, its total 2000 income was about $188 million.
>
> 249. At the end of March 2001 or the beginning of April 2001, Insight Venture II received from Imprimis a Schedule K-1 to IRS Form 1065, which reported Insight Venture II's shares of Imprimis' profits for 2000 (the "Insight Venture II K-1"). This K-1 reported Insight Venture II's share of Imprimis' interest income as $797,243 and its share of net short-term capital gain as $36,623,088. Insight Venture II was not allocated any long-term capital gains.
>
> 250. Imprimis' allocation to Insight Venture II of more than $36 million of short-term capital gains was wrongful. It substantially overstated the tax liabilities of the Members of Insight Venture II -- including Messrs. [Jeffrey] Horing, [Jerry] Murdock and [Peter] Sobiloff. This is because the highest marginal federal tax rate applicable to long-term capital gains is 20%, while the short-term marginal rate is 39.6%. Thus, by allocating to Insight Venture II more than $36 million in short-term capital gain (instead of approximately $18 million in short-term and $18 million in long-term capital gains), Imprimis improperly informed the Internal Revenue Service that Insight Venture II's Members owe for 2000 many millions of dollars more in taxes than they actually owe.

251. Imprimis has made no Distribution to Insight Venture II for the year 2000.

o. A review of the counterclaims indicates that Insight Venture and Insight were primarily seeking to (1) obtain the $36,623,088 distribution and (2) re-allocate such amount (contrary to the Schedule K-1) from short term to long term capital gain for Federal income tax purposes. In fact, of the fifteen counts brought by Insight, the majority focused on the $36,623,088 distribution and the tax characterization of the allocation. *See* Count III, ¶ 264; Count IV, ¶ 269; Count VI, ¶ 278; Count VII, ¶ 284; Count IX, ¶ 293; Count X, ¶ 296; Count XI, ¶ 301; Count XV, ¶ 318.

p. On June 10, 2002, Imprimis and other Wexford Capital entities filed an Amended Complaint. A copy of the Amended Complaint is attached hereto and marked as Exhibit 8.

q. The Amended Complaint sought at least $288.7 million in compensatory damages as a result of breach of contract and unjust enrichment, and compensatory and punitive damages as a result of tortious interference with the Imprimis Consulting Agreement, as well as breaches of fiduciary duty, conversion, affirmative misrepresentations, and other fraudulent conduct. Because of the outstanding claims against Insight Venture, and the right of set-off, Imprimis did not make a partnership distribution to Insight for the tax year ended December 31, 2000.

**THE SETTLEMENT OF THE NEW YORK LAWSUIT**

r. In May 2003, the parties began settlement discussions of the New York Lawsuit. The negotiations, conducted by commercially sophisticated individuals and their legal representatives, produced a settlement that was executed on July 14, 2003.

Much of the written correspondence during this negotiation period pertained to the tax issues.

s. As indicated in correspondence from Insight's counsel, Insight initially suggested that a settlement need not include a resolution of the tax allocation issues. Attached hereto and marked as Exhibit 9 is a copy of the May 29, 2003 correspondence reflecting Insight's assertion.

t. As indicated in correspondence from Imprimis' in-house counsel, Arthur Amron, Imprimis responded that a settlement must be comprehensive in all respects and specifically stated that the settlement resolve any and all disputes regarding the tax allocation issues. Attached hereto and marked as Exhibit 10 is a copy of the May 30, 2003 correspondence reflecting Imprimis' assertion.

u. Thereafter, the parties' settlement discussions proceeded with an understanding that any settlement would be comprehensive and would resolve all issues raised in the New York Lawsuit, including the tax allocation issues.

v. In July 2003, the parties executed a settlement of the New York Lawsuit. The Settlement Agreement provided for the net payment of $30 million from Imprimis to Insight. The Settlement Agreement is attached hereto and marked as Exhibit 11.

w. The fully executed Settlement Agreement contains the following provisions (emphasis added):

> WHEREAS, the parties hereto desire to settle and terminate all <u>of their disputes, including without limitation, their rights under the Relevant Agreements, all matters, claims counterclaims and third party claims that have been asserted or that could have been asserted in the Actions;</u>

* * * * *

2. Termination of Agreements and Sale of Interests.

(a) In consideration of the receipt by Imprimis of the payment described in 1(b) above, each of the Consulting Agreements shall terminate. Upon termination, no party shall have any further rights, liabilities or obligations to any other party under any of the Consulting Agreements and, to the extent that any of the Consulting Agreements provide for rights, liabilities or obligations that purport to survive termination of any such agreement (including but not limited to the obligation of any of the parties to indemnify any other party and/or the grant of any proxy), this Settlement Agreement shall be construed as an amendment to any such Consulting Agreement, terminating any such rights, liabilities or obligations.

(b) In consideration of the payments described in 1(a) and 1(c) above, the Insight Parties hereby sell, assign and convey the entirety of their interests, if any, in such sale, no party shall have any further rights, liabilities or obligations to any other party under any of the LLC Agreements and, to the extent that any of the LLC Agreements provide for rights, liabilities or obligations between the settling parties that purport to survive the sale by the Insight Parties of their interest in the relevant entities, this Settlement Agreement shall be construed as an amendment to such LLC Agreement, terminating any such rights, liabilities or obligations.

4. Mutual Releases.

(b) The Insight Parties' and Raghavendran's Release of the Wexford Parties.

Except for the obligations and rights created or arising under this Settlement Agreement, and upon the receipt by Insight Venture II of the payment described in 1(c) above, each of the Insight Parties and Raghavendran on behalf of each of themselves and all persons claims rights derivative of any of them, hereby releases and forever discharges each of the Wexford Parties . . . from any and all rights, claims, debts, promises, damages, causes of action, costs, losses, attorneys' fees, expenses, compensation, demands, liabilities or obligations of whatever kind or nature, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, existing or contingent, concealed or hidden, at law or in equity, under statute, rule, regulation, at common law or otherwise, which any of the Insight Parties or Raghavendran now has or may have had against any of the Wexford Parties, from the beginning of time through the date of this Settlement Agreement, including but not limited to (a) claims, rights, or obligations relating directly or indirectly to any of the Relevant Agreements and (b) any and all claims, counterclaims

<u>or third-party claims asserted or that could have been asserted in the Actions</u>.

x. The Settlement Agreement clearly contemplated a resolution of the tax allocation issues raised by Insight in the New York Lawsuit.

<u>**DESPITE THE SETTLEMENT AGREEMENT, INSIGHT PURSUES TAX REALLOCATIONS WITH THE IRS**</u>

y. After the Settlement Agreement was reached, unbeknownst to the Plaintiffs, members of Insight continued to pursue an allocation of short term capital gain and long term capital gain that was at odds with the Imprimis LLC Agreement, the Imprimis Partnership Return and the related Schedule K-1 (Partner's Share of Income, Credits, Deductions, etc.) issued to Insight, and the Settlement Agreement.

z. In response to Insight's inconsistent position, the IRS commenced a tax examination of Imprimis for its tax year ended December 31, 2000.

aa. Mr. Amron immediately raised concerns with Insight regarding Insight's attempt to disavow the terms of the Imprimis LLC Agreement and the Settlement Agreement. By letter of February 9, 2004, Mr. Amron wrote to Insight's counsel:

> We have recently had discussions with the IRS concerning the 2000 tax return filed by Imprimis. It appears from such discussions that Insight or certain of its members have filed, and continue to pursue, challenges to Imprimis' 2000 tax allocation to Insight. As you are aware, such challenges were also raised in the parties' lawsuit, and were settled pursuant to the settlement agreement. If the information we have received is correct that Insight is continuing to pursue challenges to the 2000 tax allocations, such conduct would be a serious breach of its obligations under the settlement agreement.

A copy of the February 9, 2004 letter is attached hereto and marked as Exhibit 12.

bb. On February 13, 2004, in an effort to conceal Insight's true strategy, Insight's counsel vaguely responded in a two-paragraph letter indicating "[Insight] know[s] of nothing in the Settlement Agreement that in any way requires Insight to withdraw or amend its tax returns." A copy of the February 13, 2004 letter is attached hereto and marked as Exhibit 13.

cc. In reply, Mr. Amron provided a detailed, four-page explanation as to where it was established that Insight was barred from re-litigating any dispute concerning the tax allocations in an IRS forum. Among other things, Mr. Amron unequivocally stated:

> To avoid any further real or feigned confusion on your part, please be advised that Imprimis believes that the challenges that Horing, Murdock and other Insight Partners raised to the 2000 tax allocations in their counterclaims were completely and finally resolved under the Settlement Agreement.
>
> * * * * *
>
> As you well know, the substance of the ultimate settlement, as reflected in the Settlement Agreement, incorporated this structure, and provided Insight an additional sum to resolve any possible remaining dispute over the tax allocations. The settlement included a full package of releases and dismissal with prejudice of all claims by all parties, including the Amended Counterclaims concerning the 2000 tax allocations.

A copy of the March 5, 2004 letter is attached hereto and marked as Exhibit 14.

dd. On March 16, 2004, in response to Mr. Amron's description of the tax allocation issue, Insight's counsel frankly admitted: "Of course, we settled our claims against Wexford involving the 2000 tax allocation issues, but the Settlement Agreement contains no requirement that Insight, Mr. Horing, or Mr. Murdock abandon any position with the I.R.S." A copy of the March 16, 2004 letter is attached hereto and marked as Exhibit 15.

ee. This statement is a clear admission that Insight, not Imprimis, is trying to "whipsaw" both the IRS and the other members of Imprimis. Having first disavowed the terms of the Imprimis LLC Agreement and then extracted an increased settlement payment from Wexford, Insight turned its back on its agreements in an attempt to avoid its Federal income tax obligations.

ff. Insight cannot now "whipsaw" the other members of Imprimis and claim a different tax allocation than that set forth in the Imprimis LLC Agreement and affirmed by the Settlement Agreement.

gg. In the FPAA's "Inconsistent Position B," the IRS set forth Insight's erroneous position. Therefore, Plaintiffs have brought this action contesting "Inconsistent Position B" and seeking a judgment from this Court that "Inconsistent Position A" is correct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, and any intervening parties, as follows:

1. That the Court make the following findings:

a. The IRS erred in the conclusion stated in "Inconsistent Position B" that "[t]here is an increase in Net Short Term Capital Gain to (A) Wexford Special Situations 1997 L.P. in the amount of $12,136,668 and a corresponding decrease in Net Long Term Capital Gain of $12,136,668;"

b. The IRS erred in the conclusion stated in "Inconsistent Position B" that "[t]here is an increase in Net Short Term Capital Gain to (B) Wexford Special

Situations 1997 Institutional In [sic] the amount of $3,389,324 and a corresponding decrease in Net Long Term Capital Gain of $3,389,324;"

c. As reported on the Imprimis Partnership Return and related Schedules K-1, the correct net short term capital gain allocated to WSS was $49,384,376; the correct net short term capital gain allocated to Wexford was $13,792,529; and the correct net short term capital gain allocated to Insight was $36,623,088;

d. As reported on the Imprimis Partnership Return and related Schedules K-1, the correct net long term capital gain allocated to WSS was $57,410,272; the correct net long term capital gain allocated to Wexford was $16,034,076; and the correct net long term capital gain allocated to Insight was $0;

e. In the Schedule of Adjustments, the IRS erred by stating that "as corrected," the correct amount of portfolio income was $24,678.00; and

f. In the Schedule of Adjustments, the IRS erred by stating that the "corrected" amount of net long term capital gain was $73,488,348.00;

2. That the Court find, in accordance with the FPAA's "Inconsistent Position A," the Imprimis U.S. Return of Partnership Income (IRS Form 1065) for the tax year ended December 31, 2000 and the related Schedules K-1 (Partner's Share of Income, Deductions, Credits, etc.) should be accepted, in all respects, as filed;

3. That Plaintiff be refunded $6,778.65, together with interest as provided by law; and

4. Such other and further relief which the Plaintiffs may be entitled.

Dated this 29th day of March, 2007.

Respectfully submitted,

CHARLES M. RUCHELMAN
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-7834
Facsimile: (202) 429-3301
Email: cmr@capdale.com
*Counsel of Record for Plaintiff*

CHRISTOPHER S. RIZEK
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-8852
Facsimile: (202) 429-3301
Email: csr@capdale.com
*Of Counsel*