# EXHIBIT

# 5

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# IMPRIMIS INVESTORS LLC



CONFIDENTIAL

EXHIBIT
5

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF IMPRIMIS INVESTORS LLC

This Amended and Restated Limited Liability Company Agreement ("this Agreement") of Imprimis Investors LLC (the "Company") is made and entered into effective as of September 30, 1998 by and between Wexford Special Situations 1997, L.P. and Wexford Special Situations 1997 Institutional, L.P. (the "97 Funds") and Wexford Spectrum Investors LLC ("Spectrum") (collectively, along with any entities listed in such definition in the Exhibits hereto, as amended from time to time, the "Wexford Members") and Insight Venture Associates II, LLC ("Insight").

## RECITALS:

WHEREAS, the Company was initially formed under the name of Wexford 27 LLC as a limited liability company by the filing on June 4, 1997 of a Certificate of Formation ("Certificate of Formation") with the Secretary of State of the State of Delaware pursuant to the Delaware Limited Liability Company Act, 6 Del. C. §18-101 et seq. (the "Act").

WHEREAS, the name of the Company was changed to "Imprimis Investors LLC" by the filing of a Certificate of Amendment to the Certificate of Formation ("Certificate of Amendment") with the Secretary of State of the State of Delaware on June 12, 1997.

WHEREAS, the purpose and business of the Company shall be limited to that set forth in Section 2.3 of this Agreement and any other activities permissible under the Act. The parties to this Agreement desire to become members of the Company pursuant to the Act.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

The terms used in this Agreement with their initial letters capitalized shall have, unless the context otherwise requires, the meanings specified in this Article I.

1.1 "Affiliate" of a Person shall mean a Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question.

109965.1

1.2 "Available Cash" of the Company shall mean, as of any date, all cash funds of the Company on hand on such date from any source less the sum of (i) an amount sufficient for the payment of all expenses of the Company payable as of such time and (ii) reasonable reserves for the Company as determined by the Manager.

1.3 "Capital Account" shall mean the account maintained by the Company for each Member in a Class as provided in Section 4.4 below.

1.4 "Capital Contributions" shall mean all contributions to the capital of the Company made by Members pursuant to Article IV hereof.

1.5 "Certificate" shall have the meaning set forth in the recitals hereto.

1.6 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

1.7 "Distribution Share" shall mean with respect to each Class, the percentage interest of a Member listed on the exhibits hereto in distributions relating to such Class.

1.8 "Encumbrance" shall have the meaning set forth in Section 8.1 below.

1.9 "Fiscal Year" shall mean (except as may otherwise be required by applicable law) the twelve-month period ending December 31 of each year; provided that the initial Fiscal Year shall be the period beginning on the effective date of this Agreement and ending December 31, 1997, and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation and termination of the Company is completed and ending on the date such final liquidation and termination is completed.

1.10 "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement. The Interest of a Member shall be calculated by aggregating the Distribution Shares, if any, of such Member in each Class, as set forth on the Exhibits hereto, and dividing the total by the number of Classes.

1.11 "Investment" shall mean any investment made by the Company from time to time.

1.12 "Manager" means the Person which has been appointed to manage the Company in accordance with Article V below.

1.13 "Member" means any Person listed on Annex I hereto as of the date hereof, or hereafter admitted to the Company as a Member or a Non-Participating Member as provided in this

Agreement, and shall have the same meaning as the term "member" under the Act.

1.13A "Net Cash Flow" for any period means, with respect to the Investments or Class at issue, Net Profits or Net Losses for such period, increased by:

(i) the amount of depreciation deductions taken in computing such Net Profits or Net Losses;

(ii) all other receipts of the Company not included in Net Profits or Net Losses, exclusive of Capital Contributions, the proceeds of loans, similar capital receipts not provided for elsewhere and any interest deductions taken into account in computing Net Profits or Net Losses (whether due to imputed interest rules or otherwise) but not actually paid; and

(iii) any other funds deemed available for distribution, and designated as Net Cash Flow by the Manager, including any amounts previously set aside as reserves by the Manager which it no longer regards as necessary to maintain;

and, except to the extent funded by Capital Contributions, the proceeds of loans, and similar capital receipts, decreased by:

(i) all payments during such period on the obligations of the Company to the extent not deducted in determining such Net Profits or Net Losses;

(ii) expenditures for the acquisition of Company property and other capital expenditures not deducted in determining such Net Profits or Net Losses and any interest income taken into account in computing Net Profits or Net Losses (whether due to imputed interest rules or otherwise) but not actually received; and

(iii) amounts added to Company reserves as required under this Agreement or determined by the Manager to be reasonably necessary.

1.14 "Net Loss" shall have the meaning set forth in Section 7.2(a) below.

1.15 "Net Profit" shall have the meaning set forth in Section 7.2(a) below.

1.16 "Non-Participating Member" shall mean Insight and any other entity that may be admitted as a Non-Participating Member.

1.17 "Person" shall mean an individual, corporation, limited liability company, partnership, limited liability partnership, joint venture, trust, unincorporated organization or any other entity, including a government (domestic or foreign) or any agency or political subdivision thereof.

1.18 "Service" shall mean the Internal Revenue Service.

1.19 "TMP" shall have the meaning set forth in Section 10.3 below.

1.20 "Transfer" shall have the meaning set forth in Section 8.1 below.

1.21 "Wexford Members" shall have the meaning set forth in the recitals hereto.

ARTICLE II

ORGANIZATION

2.1 Formation. The Company has been organized as a Delaware limited liability company by the filing of the Certificate of Formation pursuant to the Act with the Secretary of State of the State of Delaware.

2.2 Name. The name of the Company is "Imprimis Investors LLC" and all Company business must be conducted under that name or such other names that comply with applicable law as the Manager may select from time to time.

2.3 Purpose and Scope. The purpose of the Company is to make investments, including without limitations, investments pursuant to Rule 144A of the United States Securities Act of 1933 and to engage in any other lawful act or activity for which limited liability companies may be organized under the Act and to do any and all activities necessary, desirable or incidental to the accomplishment of the foregoing; and nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

2.4 Registered Office; Registered Agent; Principal Office in the United States; Other Offices. The registered office of the Company in the State of Delaware shall be in the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Manager may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain there the records required to be maintained under Section 18-305 of the Act. The Company may have such other offices as the Manager may designate from time to time.

2.5 Term. The Company commenced on the date the Certificate was accepted for filing by the Secretary of State of the State of Delaware, and shall have an indefinite term, unless

dissolution occurs at an earlier time pursuant to the express provisions of Article IX below.

## ARTICLE III

## MEMBERS

3.1 Powers. Subject to the provisions of the Certificate, this Agreement, and the provisions of the Act, all powers shall be exercised by or under the authority of, and the business and affairs of the Company shall be controlled by, the Wexford Members pursuant to Section 3.5. No Non-Participating Member shall have any part in the management of the Company, nor shall any Non-Participating Member have any authority or right in its capacity as a Non-Participating Member to act on behalf of the Company as a result of profits participation or otherwise. Without prejudice to the general powers of the Wexford Members, it is hereby expressly declared that the Wexford Members shall have the following powers:

First - To select and remove the Manager and any successor Managers, agents and employees of the Company, prescribe such powers and duties for them as may be consistent with law, with the Certificate and this Limited Liability Company Agreement, fix their compensation, and require from them security for faithful service.

Second - To conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the law, with the Certificate and this Limited Liability Company Agreement.

Third - To change the registered office of the Company in Delaware from one location to another; to fix and locate from time to time one or more other offices of the Company; and to designate any place within or without the State of Delaware for the holding of any Members' meeting or meetings.

Fourth - To borrow money and incur indebtedness on behalf of the Company from Managers, Members and others, and to cause to be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidence of debt and securities.

Fifth - To appoint an executive committee and other committees, and to delegate to the executive committee any of the powers and authority of the Wexford Members in the management of the business and affairs of the Company. Any such executive committee shall be composed of one or more Wexford Members.

3.2 Salaries to Members. The Company shall not have authority to pay to any Member or Manager any salary for any services provided to the Company. It is understood that the

Company shall not have any employment expenses.

3.3 Bank Accounts. From time to time, the Wexford Members may designate a person or persons, whether such persons be Members or not, to open and maintain one or more bank accounts; rent safety deposit boxes or vaults; sign checks, written directions, or other instruments to withdraw all or any part of the funds belonging to the Company and on deposit in any savings account or checking account; negotiate and purchase certificates of deposit, obtain access to the Company safety deposit box or boxes, and generally sign such forms on behalf of the Company as may be required to conduct the banking activities of the Company.

3.4 Other Ventures. It is expressly agreed that the Members and any affiliates, officers, directors, managers, stockholders, partners or employees of such members, may engage in other business ventures of every nature and description, whether or not in competition with the Company, independently or with others, and neither the Company nor the Members shall have any rights in and to any independent venture or activity or the income or profits derived therefrom.

3.5 Actions by the Members; Meetings; Quorum; Majority. All actions of the Members are taken only by the Wexford Members in proportion to their Interests at the time of the action taken. The Wexford Members may vote, approve a matter or take any action by the vote of Wexford Members at a meeting, in person or by proxy, or without a meeting by written consent. For any meeting of Members, the presence in person or by proxy of Wexford Members owning at least a majority of the Interests at the time of the action taken constitutes a quorum for the transaction of business. An action approved at a meeting by Wexford Members owning more than 50% of the Interests shall be the action of the Members.

3.6 Action by Written Consent. Any action may be taken by the Members without a meeting if authorized by the written consent of the Wexford Members. In no instance where action is authorized by such written consent need a meeting be called or noticed. However, a copy of the action taken by written consent must be immediately sent to all Members.

3.7 Meetings. Meetings of the Members, for any purpose or purposes whatsoever, may be called at any time by a Manager or by Wexford Members owning at least a majority of the Interests at the time of the action taken. Except in special cases where other express provision is made by statute, written notice of each such meeting signed by a Manager or by such other person or persons as the Wexford Members shall designate, shall be given to each Wexford Member entitled to vote at the meeting, either personally or by mail or other means of written communication, charges prepaid, addressed to each Wexford Member at his address appearing on the books of the Company or given by him to the Company for the purpose of notice. If a Wexford Member gives no address, notice shall be deemed to have been given him if sent by mail or other means of written communication addressed to the place where the principal office of the Company is situated. All such notices shall be sent to each Wexford Member entitled

109965.1

CONFIDENTIAL



W 00090107

thereto not less than one (1) nor more than sixty (60) calendar days before each meeting, and shall specify the place, the day and the hour of such meeting. Notices of any such meetings shall specify, in addition to the place, day and hour of such meetings, the purpose or purposes for which the meeting is called.

3.8 Format of Meetings. The Wexford Members may vote, approve a matter or take any action by the vote of Members at a meeting, in person or by Proxy, or without a meeting by written consent or otherwise. There are no requirements for frequency of meetings, annual or otherwise.

3.9 Adjourned Meetings and Notice Thereof. Any Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of a majority of the Interests, present in person or represented by proxy, but in the absence of a quorum no other business may be transacted at any such meeting. Other than by announcement at the meeting at which such adjournment is taken, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at any adjourned meeting. However, when any Members' meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting.

3.10 Admissions of New Members. New Members may be admitted to membership in the Company in the sole discretion of the Manager. A new Member must agree to be bound by the terms and provisions of the Certificate of Formation and this Limited Liability Company Agreement, as amended, and upon admission the new Member shall have all rights and duties of a Member or Non-Participating Member of such class, respectively, of this Company.

3.11 Wexford Members. Each of the Wexford Members is hereby admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Agreement. The Wexford Members shall hold the Distribution Shares in the Company set forth opposite their respective names on the exhibits hereto, as amended from time to time. Insight is hereby admitted to the Company as a Non-Participating Member effectively contemporaneously with the execution by Insight of this Agreement.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

4.1 Initial Capital Contributions. The Wexford Members have made capital contributions and commitments to the Company as set forth on the Exhibits hereto, as amended from time to time.

4.2 No Mandatory Additional Capital Contributions. No Member shall be required to make

109985.1



CONFIDENTIAL

W 00090108

any additional Capital Contributions to the Company, cure any deficit Capital Account, return all or any portion of any Capital Contributions distributed to the Member except as otherwise provided pursuant to applicable law or to lend any funds to the Company.

4.3 Discretionary Capital Contributions; New Interests. Subject to Section 12.6, the Manager may request additional Capital Contributions from then current Members and/or other Persons in exchange for Interests in the Company (including Distribution Shares that are preferred as to any return on, or of, capital) as the Manager deems appropriate. Such Interests may have any rights, powers, preferences and duties as determined by the Manager and allowed under the Act, including rights, powers, preferences and duties senior to existing Interests. The admission of new Members, if any, the additional Capital Contributions and such other items that the Manager deems necessary or appropriate shall be as set forth on the exhibits hereto, as amended from time to time.

4.4 Capital Accounts. Capital Accounts shall be established and maintained for each Member with an Interest in a particular Class on the Company's books representing each Member's respective capital contributions to the Company with respect to such Class and such Member's allocable share of the Company's Net Profit relating to such Class and from which shall be deducted distributions to such Interest holder of cash or other property relating to such Class, and such Member's allocable share of the Company's Net Loss relating to such Class. The term "Capital Account" shall mean the capital account maintained for such Member in accordance with the following provisions.

(a) Each Member's Capital Account with respect to a Class shall be increased by:

(i) The amount of the Member's cash or in-kind capital contributions to the Company relating to such Class;

(ii) The fair market value of any property contributed by the Member to the Company relating to such Class (net of liabilities contributed with respect to any such contributed property that the Company is considered to assume or take subject to for purposes of Section 752 of the Code);

(iv) The amount of Net Profits relating to such Class (or items thereof) allocated to the Member pursuant to Article VII hereof; and

(v) Any other increases required by Regulations pursuant to the Code, promulgated by the U.S. Treasury ("Regulations").

If Section 704(c) of the Code applies to property contributed by a Member of the Company, then the Member' Capital Accounts shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

109965.1

(b) Each Member's Capital Account with respect to a Class shall be decreased by:

(i) The amount of Net Losses relating to such Class allocated to the Member pursuant to Article VII hereof;

(ii) All amounts paid or distributed to the Member pursuant to Article VII hereof relating to such Class, other than amounts required to be treated as a payment for property or services under the Code;

(iii) The fair market value of any property distributed in kind to the Member relating to such Class (net of any liabilities secured by such distributed property that such Member is considered to assume or take subject to for purposes of Section 752 of the Code); and

(iv) Any other decreases required by the Regulations.

Before decreasing a Member's Capital Account (as described above) with respect to the distribution of any property to such Member, all Member's accounts shall be adjusted, as applicable, to reflect the manner in which the unrealized income gain, loss, and deduction inherent in such property (that has not been previously reflected in the Members' Capital Accounts) would be allocated among the Members if there were a taxable disposition of such property by the Company on the date of distribution, in accordance with Regulations Section 1.704-1(b)(2)(iv)(f).

(c) In determining the amount of any liability for purposes of Sections 4.4(a) and 4.4(b) hereof, there shall be taken into account Code Section 752 and any other applicable provisions of the Code and any Regulations promulgated thereunder.

(d) Members' Capital Accounts shall be adjusted in accordance with, and upon the occurrence of an event described in, Regulations Section 1.704-1(b)(2)(iv)(f), including but not limited to the addition of new Members or the receipt of additional capital contributions pursuant to Section 4.3 hereof, to reflect a revaluation of the Company's assets with respect to a Class on the Company's books. Such adjustments to the Members' Capital Accounts with respect to a Class shall be made in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss with respect to such revalued property.

(e) All provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b)(2)(iv), as amended, and shall be interpreted and applied in a manner consistent with such Regulations. The Members shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704.

4.5 Termination of Interests and Distribution Shares. The Manager shall have in its sole discretion the authority to require a Member to (x) withdraw as a Member or (y) relinquish a Distribution Share with respect to a Class, in each case with or without cause, except that Non-Participating Members may not be required to take any such actions without such Members' prior written consent. Upon such withdrawal, the Manager shall cause to be distributed to the withdrawing Member the balance of its Capital Account, in cash and/or in a deferred payment obligation bearing interest at the prime rate. Upon the relinquishment of a Distribution Share with respect to a Class, the Manager shall cause to be distributed to the relinquishing Member the Capital Account of such Member in that Class, in cash and/or in a deferred payment obligation bearing interest at the prime rate. Upon such distribution, the Member shall cease to have any interest in the Company or the Class, as the case may be.

4.6 No Interest on Capital Contributions. No Member shall receive any interest on its Capital Contributions to the Company or its Capital Account except as provided in Section 4.5.

4.7 Return of Capital Contributions. Except as expressly provided in this Agreement, no Member shall have the right to withdraw any Capital Contributions or to receive property, including cash, of the Company.

ARTICLE V

MANAGEMENT

5.1 Managers.

(a) The management of the Company's business shall be vested in the Manager(s) who shall be elected by the Wexford Members. The Wexford Members hereby elect Wexford Management LLC, a Connecticut limited liability company, to be the initial Manager and delegate all powers with respect to the management and operation of the business of the Company to the Manager and any additional Managers appointed from time to time to manage the Company. Should any additional Manager be elected, each Manager shall have the authority to sign agreements and other instruments on behalf of the Company without the joinder of any other Manager. The Manager(s) may employ sub-managers from time to time to provide such services as may be agreed upon between such parties.

(b) The Manager shall hold office until his successor has been elected and qualified.

(c) The Manager and any additional Managers elected hereunder (collectively, the "Managers") shall be obliged to devote only as much of their time to the Company's business as shall be reasonably required in light of the Company's business and objectives. A Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the

best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

(d) The Managers shall act by the affirmative vote of a majority of the Managers.

(e) Any action may be taken by the Managers without a meeting if authorized by the written consent of a majority of the Managers.

(f) Every Manager is an agent of the Company for the purpose of its business, and the act of every Manager, including the execution in the Company name of any instrument for apparently carrying on in the usual way the business of the Company, binds the Company, unless such act is in contravention of the Certificate of Formation or this Limited Liability Company Agreement or unless the Manager so acting otherwise lacks the authority to act for the Company and the person with whom he is dealing has knowledge of the fact that he has no such authority.

5.2 Powers of the Managers. The Managers shall have the right and authority to take all actions which the Managers deem necessary, useful or appropriate for the day-to-day management and conduct of the Company's business. The Managers may delegate any or all such duties to the officers of the Company.

The Managers may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Certificate of Formation or this Limited Liability Company Agreement directed or required to be exercised or done by the Members. All instruments, contracts, agreements and documents providing for the acquisition, mortgage or disposition of property of the Company shall be valid and binding on the Company if executed by one or more Managers. All instruments, contracts, agreements and documents of whatsoever type executed on behalf of the Company shall be executed in the name of the Company by one or more Managers.

5.3 Removal of Managers.

(a) The Wexford Members may remove all or any lesser number of Managers with or without cause at any time.

(b) Any removal of a Manager shall become effective on such date as may be specified by the Wexford Members voting in favor thereof and in a notice delivered to any remaining Managers or the Manager elected to replace the removed Manager (except that it cannot be effective on a date earlier than the date such notice is delivered to the remaining or newly-elected Manager(s)). Should a Manager be removed who is also a Member, such Member will continue to participate in the Company as a Member and receive his share of the Company's income, gains, losses, deductions and credits pursuant to this Limited Liability Company Agreement.

5.4 Resignation of Manager. A Manager may resign from his position as a Manager at any

time by notice to the Wexford Members. Such resignation shall be effective as set forth in such notice.

5.5 Vacancies. Any vacancies occurring in the group of Managers may be filled by written agreement of a majority of the remaining Managers. A Manager chosen to fill a vacancy shall serve the unexpired term of his predecessor in office. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by written agreement of a majority of the Managers then in office or by election at a meeting of Wexford Members called for that purpose. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the end of such term and until his successor has been elected and qualified.

5.6 Liability of the Manager.

(a) The Manager shall not be (i) personally liable for the debts, obligations or liabilities of the Company, including any such debts, obligations or liabilities arising under a judgement decree or order of a court; (ii) obligated to cure any deficit Capital Account; (iii) required to return all or any portion of any Capital Contribution; or (iv) required to lend any funds to the Company.

(b) The Manager and its agents, partners, employees, counsel or affiliates shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act (even if such action or failure to act constituted negligence on such Person's part) on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless such act or failure to act was performed or omitted willfully or intentionally and in bad faith.

5.7 Reimbursement of Manager. For any expenses attributable to one particular class of Investments, the Manager shall be entitled to be reimbursed by each Member in proportion to their respective Distribution Shares for all costs and expenses (including but not limited to legal expenses, auditing and external accounting expenses and custodial fees) incurred in acting as Manager of the Company from the distributions attributable to such class of Investments made to each Member in accordance with Section 7.1. For all other expenses not described in this Section 5.7 or Section 7.7, the Manager, in its good faith judgment, shall allocate among all the Classes such other expenses.

## ARTICLE VI

## OFFICERS

6.1 Number; Titles; Election; Term; Qualification. The officers of the Company shall be a

108965.1

CONFIDENTIAL



W 00090113

president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Managers shall determine), a secretary, and a treasurer. The Company may also have a chairman of the Managers, one or more assistant treasurers, one or more assistant secretaries, and such other officers and such agents as the Managers may from time to time elect or appoint. The Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present or whenever a vacancy exists. The Managers then, or from time to time, may also elect or appoint one or more other officers or agents as they shall deem advisable. Each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified. Any person may hold any number of offices. No officer or agent need be a Member, or Manager.

6.2 Removal. Any officer or agent elected or appointed by the Managers may be removed by the Managers whenever in their judgment the best interest of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of any officer or agent shall not of itself create contract rights.

6.3 Vacancies. Any vacancy occurring in any office of the Company may be filled by the Managers.

6.4 Authority. Officers shall have such authority and perform such duties in the management of the Company that a person holding that office in a corporation customarily has or as may be determined by resolution of the Managers not inconsistent with the Regulations.

## ARTICLE VII

## DISTRIBUTIONS, ALLOCATIONS AND EXPENSES

7.1 Distributions. Except as otherwise provided on Exhibit B or Exhibit C with respect to the investments identified on Schedule 1 and Schedule 2 of Exhibit A, the Company shall make distributions to Wexford Members pro rata in accordance with the Distribution Share of each Wexford Member with respect to the applicable Class. Distributions to Insight or to any other Non-Participating Member shall be made only as set forth on Exhibit B or Exhibit C.

7.2 Determination of Fair Market Value. Except as otherwise provided in this Section 7.2, the Manager shall determine in good faith and in its sole discretion (or shall cause to be determined) the value of the assets of the Company or the fair market value of any Investments or of property received in exchange for any Investments or Interests as and when required by this agreement. Where a Non-Participating Member may be adversely effected by such determination, such Non-Participating Member shall have the right to require that such

109965.1

CONFIDENTIAL



W 00090114

determination of fair market value be made by an independent appraiser acceptable to such Non-Participating Member and the Wexford Members (or, if the parties cannot agree, by an appraiser selected pursuant to arbitration), the costs and expenses of which shall be borne 50% by the Wexford Members and 50% by such Non-Participating Member.

7.3 Allocation of Net Profit and Net Loss.

(a) The Net Profits and Net Losses for each Class set forth on the Exhibits hereto, as amended from time to time, shall be determined for each Fiscal Year in accordance with the accounting method used by the Company for federal income tax purposes. Except as otherwise provided on Exhibit B or Exhibit C with respect to the investments identified on Schedule 1 and Schedule 2 of Exhibit A, the Company shall make allocations of Net Profit or Net Loss to the Wexford Members pro rata in accordance with the Distribution Share of each Wexford Member with respect to the applicable Class. With respect to the Members, the terms "Net Profits" and "Net Losses" of the Company shall mean the net income or loss of the Company allocable to a Class, determined in accordance with Section 703 of the Code, and on a basis consistent with prior periods subject to the following adjustments:

(i) Any income of the Company allocable to a Class that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this Section shall be taken into account.

(ii) Any expenditures of the Company allocable to a Class described in Section 705(a)(2)(B) of the Code or treated as described therein pursuant to Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this Section shall be subtracted.

(iii) Any expenditure of the Company allocable to a Class that is deductible for federal income tax purposes subject to the application of a limitation based on a Member's gross income or adjusted gross income shall be deemed to be allowable as a deduction without regard to such limitation.

(b) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Company income and gain shall be specifically allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the adjusted capital account deficit of such Member as quickly as possible.

(c) Curative Allocations/Additional Allocations.

(i) The allocation set forth in Section 7.3(b) (the "Regulatory Allocations") is intended to comply with certain requirements of Regulation Section 1.704. Notwithstanding any other

provisions of this Section, the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

(ii) Notwithstanding the foregoing, if, upon the final dissolution and termination of the Company and after taking into account all allocations of Net Profit and Net Losses (and other tax items) under this Article VII, the distributions to be made in accordance with the positive Capital Account balance would result in a distribution that would be different from the distribution that would otherwise be made, then gross items of income and gain (and other items) for the taxable year of the final dissolution and termination (and, to the extent permitted under Section 761(c) of the Code, gross items of income and gain (and other tax items) for the immediately preceding taxable year) shall be allocated to the Members to increase or decrease Capital Account balances, as the case may be, so that the final distribution will occur in the same manner as the distribution that would otherwise be made.

(d) Allocations Under Section 704(c) of the Code. All items of income, gain, loss, deduction, or allowance attributable to, or requiring an adjustment to the basis of, any non-cash property contributed to the capital of the Company (or deemed to have been contributed to the capital of the Company following a termination under Section 708(b)(1)(B) of the Code) shall be allocated among the Members in accordance with Section 704(c) of the Code so as to take account of any difference between the adjusted basis of the property to the Company for federal income tax purposes and the fair market value of the property on the date of contribution or deemed contribution.

(e) Federal Income Tax. It is the intent of this Company and its Members that this Company will be governed by the applicable provisions of Subchapter K, of Chapter 1, of the Code.

(f) Allocation of Income and Loss in Respect of Transferred Interests. If any interest in the Company is transferred, or upon the admission or withdrawal of a Member, in accordance with the provisions of this Agreement during any calendar year, the income or loss attributable to such interest for such calendar year shall be divided and allocated between the Members based upon an interim closing of the Company's books or on a daily basis, as determined in the sole discretion of the Manager. For the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or any increase or decrease in, an interest in the Company which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (*e.g.*, sales and dispositions made during the first 15 days of any month will be deemed to have been made on the first day of the month and sales and dispositions thereafter will be deemed to have been made on the 16th day of the month).

(g) Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the Members owning interests in the Company as of the date such sale or other disposition occurs.

7.4 Allocation of Income and Loss and Distributions in Respect of Interests Transferred.

(a) If any Interest in the Company is transferred, each item of income, gain, loss, deduction or credit of the Company for such Fiscal Year shall be allocated between the transferor and transferee as determined by the Manager consistent with the provisions of section 706 of the Code.

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any Transfer or purported Transfer of ownership of any Interest in the Company.

7.5 Distribution on Dissolution and Liquidation. In the event of the dissolution and liquidation of the Company for any reason, after the payment of or provision for creditors and other applicable law, the Company's assets shall be distributed among the Members in accordance with Section 7.1 and also in accordance with Regulation Section 1.704-1(b)(2)(ii)(b)(2).

7.6 Deemed Sale of Assets. For all purposes of this Agreement, any property (other than cash) that is distributed or to be distributed in kind to one or more Members for a Fiscal Year (including, without limitation, all non-cash assets which shall be deemed distributed immediately prior to the dissolution and winding up of the Company so as to permit the unrealized gain or loss inherent in such assets to be allocated to the Member), or that is constructively distributed on termination of the Company pursuant to Section 708(b)(1)(B) of the Code and Section 7.7 hereof, shall be deemed to have been sold for cash equal to its fair market value, and the unrealized gain or loss inherent in such assets shall be treated as recognized gain or loss for purposes of determining the Net Profits and Net Loss of the Company to be allocated pursuant to Section 7.3 hereof for such Fiscal Year.

7.7 Deemed Termination. Any constructive termination of the Company pursuant to Section 708(b)(1)(B) of the Code shall be deemed to be a winding up and termination of the Company pursuant to which: (a) all assets of the Company are deemed to have been sold as provided in Section 7.6 hereof, with the unrealized gain or loss inherent in such assets being allocated

pursuant to Section 7.3, (b) the proceeds of the deemed sales being deemed distributed pursuant to Section 7.1 hereof, and (c) such assets being then deemed to have been recontributed to a new Company, and the Capital Accounts of the Interest holders shall be adjusted appropriately to reflect such deemed termination, sale, distribution, and reconstitution. This Section 7.7 applies solely for purposes of adjusting Capital Accounts.

7.8 Expenses. Except as otherwise provided in this Agreement, the Company will be responsible for all expenses, and the Manager, acting in its good faith judgement, will be responsible for allocating such expenses among the Classes and to the extent appropriate allocating a portion of such expenses to the Investments set forth on Schedules 1 and 2, including, without limitation:

(a) all expenses incurred by the Wexford Members or their affiliates in organizing the Company;

(b) all expenses related to the business of the Company and all routine administrative expenses of the Company, including the maintenance of books and records of the Company, the preparation and dispatch to the Interest holders of checks, financial reports, tax returns and notices required pursuant to this Agreement or in connection with the holding of any meetings of the Members;

(c) all expenses incurred in connection with any indebtedness or guarantees of the Company or any proposed or definitive credit facility or other credit arrangement;

(d) all expenses incurred in connection with any litigation or arbitration involving the Company (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith;

(e) all expenses for indemnity or contribution payable by the Company to any person;

(f) all expenses incurred in connection with the collection of amounts due to the Company from any person;

(g) all expenses incurred in connection with the preparation of amendments to this Agreement;

(h) all expenses incurred in connection with the liquidation, dissolution and winding up of the Company; and

(i) all expenses otherwise allocated in good faith to the Company or its Members by the Managers.

ARTICLE VIII

TRANSFERS OF INTERESTS IN THE COMPANY; RESIGNATIONS

8.1 Limitations on Transfers and Resignations by Members. No Member may, without the prior written consent of the Manager (which consent may be withheld by the Manager in its sole discretion), (i) "Transfer" or "Encumber" all or any part of its direct or indirect Interest in the Company or (ii) resign as a Member. Any attempt so to Transfer or Encumber any such Interest in the Company in violation of the provisions of this Article VIII shall be null and void *ab initio* except that it shall constitute a breach of this Agreement. "Transfer" of an Interest in the Company shall mean the sale, transfer, assignment or other disposition (except Encumbrance) of all or any part of an Interest in the Company including, by way of example and not limitation, an assignment of the right to receive distributions. "Encumbrance" of an Interest in the Company shall mean the pledging, mortgaging, hypothecation, or placing of any other encumbrance upon, or the permitting or suffering of any encumbrance, of all or any part of an Interest in the Company. Each transferee shall execute and deliver an instrument, in form reasonably acceptable to the Company, pursuant to which it assumes all obligations of its transferor hereunder.

8.2 Compliance with Laws; Effect of Consents. Without limiting the limitations set forth in Section 8.1 hereof, no Transfer of any Interest in the Company may be made unless, upon request by the Manager, the transferring Member delivers to the Company an opinion of counsel (reasonably satisfactory to the Manager) stating, or other evidence satisfactory to the Company, that (i) registration of the transferred Interest in the Company is not required under the Securities Act of 1933, as amended, and such Transfer will not violate applicable state securities or blue sky registration requirements in any respect, and (ii) such Transfer will not cause the Company to be treated as an association taxable as a corporation rather than as a partnership subject to the provisions of Subchapter K of the Code. Any such opinion of counsel shall be rendered by counsel reasonably acceptable to the Manager and all costs and expenses thereof shall be borne by the transferring Member.

ARTICLE IX

DISSOLUTION

9.1 Dissolution Events. Unless sooner terminated in accordance with the terms of this Agreement, the Company will be dissolved upon the first to occur of any of the following:

(i) The sale, exchange or other disposition of all or substantially all of the assets of the Company;

(ii) The unanimous agreement of the Members to dissolve the Company; or

(iii) The resignation, expulsion, bankruptcy, retirement, dissolution, death or insanity of a Member (a "Disabled Member") or the occurrence of any other event which terminates the continued membership of a Member in the Company.

9.2 Reconstitution of the Company. If the Company is dissolved pursuant to Section 9.1(iv) above, the Members (other than the Disabled Members) holding a aggregate of a majority of the Interests in the Company, may, within 90 days of the date of dissolution, vote or elect in writing to continue the business of the Company.

9.3 Termination and Winding Up of the Company. If the Company is dissolved and not reconstituted pursuant to Section 9.2 above, then the Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members who are creditors, in satisfaction of the liabilities of the Company, and then to the Members in accordance with Section 7.1 hereof.

ARTICLE X

BOOKS AND RECORDS; BANK ACCOUNTS

10.1 Books and Records. Proper and complete books and records of the Company shall, at the cost and expense of the Company, be kept or caused to be kept by the Company at the principal place of business of the Company. Such books and records will reflect all Company transactions and be appropriate and adequate for conducting the Company's business and use such method of accounting for federal income tax purposes as selected by the Manager that is consistent with applicable law. Each Member, at its own expense, will have the right upon reasonable notice to inspect the books and records of the Company during business hours at the principal place of business of the Company.

10.2 Tax Elections. Except as otherwise required by law, all elections required or permitted to be made by the Company under the Code shall be made by the Manager in such manner as in the Manager's reasonable judgment shall be most advantageous to the Members. Each of the Members shall upon request supply the information necessary to properly give effect to any such election.

10.3 Tax Controversies.

(a) The Members hereby intend and acknowledge that the Company will be treated as a partnership for federal income tax purposes.

(b) Subject to the provisions of this Section 10.3, Wexford Special Situations 1997, L.P. is hereby designated as the "tax matters partner" (as defined in the Code) of the Company (the "TMP") and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the TMP and to do or refrain from doing any or all things reasonably required by the TMP to conduct such proceedings.

(c) The Company will reimburse the TMP for all reasonable out-of-pocket expenses incurred by it in connection with any administrative or judicial proceeding with respect to the tax liabilities of the Company or the Members.

ARTICLE XI

INDEMNIFICATION

11.1 Indemnity. Subject to the provisions of Section 11.4 hereof, the Company shall indemnify any person who was or is a party (other than in their capacity as a plaintiff against the Company) or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, except an action by or in the right of the Company, by reason of the fact that such person is or was a Manager, Member, officer, director, controlling person, employee, legal representative or agent of the Company, or is or was serving at the request of the Company as manager, director, officer, partner, shareholder, controlling person, employee, legal representative or agent of another limited liability company, partnership, corporation, joint venture, trust or other enterprise, against expenses, including attorneys' fees, judgment, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding if such person acted in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to a criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful.

11.2 Indemnity for Actions By or in the Right of the Company. Subject to the provisions of Section 11.4 hereof, this Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the rights of this Company to procure a judgment in its favor by reason of the fact that he is or was a Member, Manager, director, officer, controlling person, employee, legal representative or agent of this Company, or is or was serving at the request of this Company as a Member, Manager, director, officer, partner, shareholder, controlling person, employee, legal representative or agent of another limited liability company, corporation, partnership, joint venture, trust or other

enterprise, against expenses, including amounts paid in settlement and attorneys' fees actually and reasonably incurred by such person in connection with the defense or settlement of the actions or suit if such person acted in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of this Company. Indemnification may not be made for any claim, issue or matter as to which such person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to the Company or for amounts paid in settlement to the Company, unless and only to the extent that the court in which the action or suit was brought or other court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnify for such expenses as the court deems proper.

11.3 Indemnity if Successful. The Company may indemnify a Member, Manager, employee or agent of the Company against expenses, including attorneys' fees, actually and reasonably incurred by him in connection with the defense of any action, suit or proceeding referred to in Sections 11.1 and 11.2 or in defense of any claim, issue or matter therein, to the extent that such person or entity has been successful on the merits.

11.4 Expenses. Any indemnification under Sections 11.1 and 11.2, as well as the advance payment of expenses permitted under Section 11.5 unless ordered by a court or advanced pursuant to Section 11.5 below, must be made by the Company only as authorized in the specific case upon a determination that indemnification of the Member, Manager, employee or agent is proper in the circumstances. The determination must be made:

(a) By the Wexford Members by a majority of a quorum consisting of Wexford Members who were not parties to the act, suit or proceeding;

(b) If a majority vote of a quorum consisting of those Wexford Members who were not parties to the act, suit or proceeding so orders, by independent legal counsel in a written opinion; or

(c) If a quorum consisting of Wexford Members who were not parties to the act, suit or proceeding cannot be obtained, by independent legal counsel in a written opinion.

11.5 Advance Payment of Expenses. The expenses of Members and Managers incurred in defending a civil or criminal action, suit or proceeding may be paid by the Company as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the Member or Manager to repay the amount if such Member or Manager is not able to provide the Company with an opinion of counsel, based on readily available facts and without having engaged in independent investigation, that such Member or Manager is not likely to be found not entitled to indemnification. The provisions of this subsection do not affect any rights to advancement of expenses to which personnel other than Members or Managers may be entitled under any contract or otherwise by law.

11.6 Other Arrangements Not Excluded. The indemnification and advancement of expenses authorized in or ordered by a court pursuant to this Article XI:

(a) Does not exclude any other rights to which a person seeking indemnification or advancement of expenses may be entitled under the Certificate or any agreement, vote of Wexford Members or otherwise, for either an action in his official capacity or an action in another capacity while holding his office, except that indemnification, unless ordered by a court pursuant to Section 11.5 above, may not be made to or on behalf of any Member or Manager if a final adjudication established that his acts or omissions involved intentional misconduct, fraud or a knowing violation of the law and was material to the cause of action.

(b) Continues for a person who has ceased to be a Member, Manager, employee or agent and inures to the benefit of the heirs, executors and administrators of such a person.

## ARTICLE XII

## MISCELLANEOUS

12.1 Governing Law. This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

12.2 Binding Effect. This Agreement will be binding upon and inure to the benefit of the Members, and their respective distributees, successors and assigns; provided, however, nothing contained in this Section 12.2 shall limit the effectiveness of any restriction on Transfers of Interests contained herein.

12.3 Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.4 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

12.5 Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address set forth opposite the name of such Member in the exhibits hereto, and to the Company at its principal executive offices. Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

12.6 Amendments. Except as otherwise provided in this Section 12.6, this Agreement may be amended with the consent of a majority of the Wexford Members. Without consent or approval of the Members, the Manager may amend this Agreement to supplement the Exhibits, to reflect changes validly made (and permitted by this Agreement to be made by the Manager) in the membership of the Company and in the contributions of the Members to the Company, in priority returns on capital of any new Interests issued by the Company or any additional Capital Contributions made to the Company and to cure any ambiguity or to correct or supplement any provision herein that may be inconsistent with any other provision herein. All amendments made in accordance with this Section 12.6 shall be evidenced by a writing executed by the appropriate Persons. No amendment to this Agreement which affects (a) the proportionate ownership of Interests of any Member, (b) such Member's right to participate in allocations and distributions except as expressly provided for herein or in the Exhibits hereto, as amended from time to time, or (c) the limited liability of any such Member, shall be effective or binding upon such Member without the prior written consent of such Member. Nothing contained in this Section 12.6 shall in any way limit the Company's ability to admit new Members and amend this Agreement as provided herein.

12.7 Title to Company Property. Legal title to all property of the Company will be held and conveyed in the name of the Company.

12.8 Complete Agreement. This Agreement constitutes the complete agreement among the Members with regard to the subject matter hereof and supersedes all prior written and oral statements, discussions, and agreements relating to the subject matter hereof.

12.9 Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one agreement. The production of any executed counterpart of this Agreement shall be sufficient for all purposes without producing or accounting for any other counterpart thereof.

12.10 Further Assurances. The Members will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

IN WITNESS WHEREOF, the Members and the Manager have executed this Agreement on the date set forth opposite their signatures, effective as of the day and year first hereinabove written.

WEXFORD SPECIAL SITUATIONS 1997, L.P.
By: Wexford Management LLC, its Investment Manager

By: ____________________
Name: Arthur Amron
Title: SVP & General Counsel

WEXFORD SPECIAL SITUATIONS 1997 INSTITUTIONAL, L.P.
By: Wexford Management LLC, its Investment Manager

By: ____________________
Name: Arthur Amron
Title: SVP & General Counsel

WEXFORD SPECTRUM INVESTORS LLC
By: Wexford Management LLC, its Manager

By: ____________________
Name: Arthur Amron
Title: SVP & General Counsel

INSIGHT VENTURE ASSOCIATES II, LLC

By: ____________________
Name:
Title:

WEXFORD MANAGEMENT LLC, Manager

By: ____________________
Name: Arthur Amron
Title: SVP & General Counsel



CONFIDENTIAL

# EXHIBIT A
## TO LIMITED LIABILITY COMPANY AGREEMENT OF IMPRIMIS INVESTORS LLC

| Members with Interest in Class A | Distribution Share | Capital Commitment |
|---|---|---|
| 1. Wexford Members with an Interest in Class A: | | |
| Wexford Special Situations 1997, L.P.<br>411 West Putnam Avenue<br>Greenwich, CT 06830 | 78.1684% | $78,168,400 |
| Wexford Special Situations 1997 Institutional, L.P.<br>411 West Putnam Avenue<br>Greenwich, CT 06830 | 21.8316% | $21,831,600 |
| 2. Non-Participating Member with interest in Class A: | | |
| Insight Venture Associates II, LLC[1]<br>122 East 42 Street<br>New York, N.Y. 10168 | 0% | N/A |

[1] With respect to investments listed on Schedule 1, Insight shall receive allocations and distributions as provided in Exhibit B. With respect to investments listed on Schedule 2, Insight shall receive allocations and distributions as provided in Exhibit C. With respect to investments that are not listed on either Schedule 1 or Schedule 2, Insight shall not receive any allocation or distribution.

109965.1

CONFIDENTIAL



W 00090126

| Members with Interest in Class B | Distribution Share | Capital Commitment |
|---|---|---|
| Wexford Special Situations 1997, L.P.<br>411 West Putnam Avenue<br>Greenwich, CT 06830 | 7.8164% | N/A |
| Wexford Special Situations 1997 Institutional, L.P.<br>411 West Putnam Avenue<br>Greenwich, CT 06830 | 2.1836% | N/A |
| Wexford Spectrum Investors LLC<br>411 West Putnam Avenue<br>Greenwich, CT 06830 | 90% | N/A |

109965.1

# SCHEDULE 1

Investments for which Insight shall receive allocations and distributions pursuant to Exhibit B:

## Wexford Insight Software Investors LLC

| | |
|---|---|
| (1) Investment – | Harris & Jeffries Incorporated |
| Securities Owned – | 375,000 Shares of Series A Preferred Stock<br>$500,000 Convertible Note |
| Securities Purchase Price – | $2,000,000 |
| (2) Investment – | Systems Consulting Company |
| Securities Owned – | 1,011,775 Series A Preferred Shares<br>200,000 Warrants to purchase Series B Preferred Shares |
| Securities Purchase Price – | $3,000,000 |
| (3) Investment – | APP |
| Securities Owned – | 72,083 Shares of Common Stock<br>35,352 Shares of Series A Preferred Stock |
| Securities Purchase Price – | $748,473 |
| (4) Investment – | Optum Software |
| Securities Owned – | 549,451 Shares of Series C Preferred Stock |
| Securities Purchase Price - | $2,000,000 |
| (5) Investment – | Market Max |
| Securities Owned – | 29,166 Common Shares |
| Securities Purchase Price - | $250,000 |
| (6) Investment – | MBA Technologies Inc. |
| Securities Owned – | 1,176,471 Common Shares |
| Securities Purchase Price - | $1,000,000 |
| (7) Investment – | Globalphone Holding B.V. |
| Securities Owned – | 1,340,000 Series A Preferred<br>617,977 Warrants |
| Securities Purchase Price - | $2,750,000 |

In addition, Wexford Insight Software Investors LLC has paid expenses totaling $776,608 thru September 25, 1998. These expenses consist of management fees paid to Insight, T&E expenses, professional fees and other miscellaneous expenses.

**Imprimis SB, L.P.**

| | |
|---|---|
| (1) Investment – | Optum Software |
| Securities Owned – | 549,451 Shares of Series C Preferred Stock |
| Securities Purchase Price - | $2,000,000 |
| (2) Investment – | Rockport Trade Systems Inc. |
| Securities Owned – | 200,000 Shares of Series A Preferred Stock |
| Securities Purchase Price - | $2,500,400 |
| (3) Investment - | Market Max |
| Securities Owned - | 92,490 Shares of Series A Preferred Stock |
| Securities Purchase Price - | $2,500,000 |
| (4) Investment – | Software Technologies Corporation |
| Securities Owned – | 474,332 Shares of Series A Preferred Stock |
| Securities Purchase Price - | $1,821,436 |
| (5) Investment – | MBA Technologies Inc. |
| Securities Owned – | 1,250,000 Series A Preferred Stock |
| Securities Purchase Price - | $1,250,000 |
| (6) Investment – | Media Passage Inc. |
| Securities Owned – | 700,000 Shares of Series B Preferred Stock<br>350,000 Warrants<br>42,000 Options |
| Securities Purchase Price - | $1,750,000 |

# SCHEDULE 2

Investments for which Insight shall receive allocations and distributions pursuant to Exhibit C:

**Imprimis Investors LLC**

| | |
|---|---|
| Investment – | Interactive Teleservices Corporation |
| Securities Owned – | 180 Shares of Series A Preferred Stock<br>90 warrants |
| Securities Purchase Price - | $1,333,398 |

**Imprimis SB, L.P.**

| | |
|---|---|
| Investment – | Interactive Teleservices Corporation |
| Securities Owned – | 270 Shares of Series A Preferred Stock<br>135 warrants |
| Securities Purchase Price - | $2,000,096 |

**EXHIBIT B**

Distributions and Allocations with Respect to Investments Identified on Schedule 1:

Definitions/Rule of Construction:

1. These additional definitions apply with respect to this Exhibit B.

"Additional Preferred Return" with respect to any of the Wexford Members shall mean an annual return of 40% compounded annually.

"Preferred Return" with respect to any of the Wexford Members shall mean an annual return of 10% compounded annually.

"Unrecovered Capital Contributions" shall mean, with respect to any Wexford Member, the difference of (i) such Member's Capital Contributions relating to the investments set forth on Schedule 1 and (ii) all cash (or the fair market value of other property) distributed to such Member in respect of such investments.

2. For purposes of calculating allocations of Net Income and/or Net Loss to Insight and calculating distributions to Insight under this Exhibit B all investments on Schedule 1 that were made through Imprimis SB, LP shall be treated as if the investments were made directly by the Company without any debt, equity or other participation by the Small Business Administration, and the remaining Net Income and/or Net Loss and remaining distributions shall be made to the Wexford Members, and the Unrecovered Capital Contributions of the Wexford Members shall be calculated if such investments were made in such manner.

Allocation of Net Profits and Net Losses.

3. Subject to Section 2 above, Net Profits shall be allocated as follows:

(a) first, 100% to the Wexford Members in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Wexford Members in all prior Fiscal Years under Section 2(c) over (ii) the cumulative Net Profits allocated to the Wexford Members in all prior Fiscal Years under this section 3(a).

(b) second, 100% to the Wexford Members in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Wexford Members in all prior Fiscal Years under Section 4(b) over (ii) the cumulative Net Profits allocated to the Wexford Members in all prior

109965.1

Fiscal Years under this Section 3(b) in the proportion in which such excess was allocated;

(c) third, 100% to the Wexford Members until the Wexford Members have been allocated on a cumulative basis an amount of the Net Profits, pursuant to this Section 3(c), equal to the Preferred Return on the positive balances of their Unrecovered Capital Contributions outstanding from time to time;

(d) fourth, 80% to the Wexford Members and 20% to Insight until each of the Wexford Members has been allocated on a cumulative basis an amount of Net Profits pursuant to Sections 3(c) and 3(d) that, in the aggregate, equals the Additional Preferred Return on the positive balance of its Unrecovered Capital Contributions outstanding from time to time;

(e) fifth, 100% to Insight until Insight has been allocated 25% of the amount allocated to the Wexford Members under Section 3(c); and

(f) thereafter, 80% to the Wexford Members and 20% to Insight; provided, however, that in the event any Net Profits consist of items of ordinary income, then, in lieu of the above allocations (i) a special gross income allocation shall be made to Insight of such items or ordinary income (to the extent thereof) equal to the Tentative Insight Allocation (as defined below) and (ii) the resulting Net Profits, computed without regard to the items of gross income allocated under the preceding clause (i), shall be allocated:

(i) if the initial allocation made in clause (f)(i) above (the "Initial Insight Allocation") equals the Tentative Insight Allocation, to the Wexford Members, or

(ii) if the initial Insight Allocation is less than the Tentative Insight Allocation, an amount equal to such shortfall to Insight and the remainder to the Wexford Members.

For purposes of the preceding sentence the "Tentative Insight Allocation" shall mean the amount of Net Profits that would otherwise have been allocated to Insight under this Agreement absent the proviso of such preceding sentence.

4. Subject to Section 2 above, Net Losses shall be allocated as follows:

(a) first, Net Losses shall be allocated to the Members in an amount equal to the excess (if any) of (i) the cumulative Net Profits allocated to the Members in all Prior Fiscal Years under Section 1 (other than Section 3(b)) over (ii) the cumulative Net Losses allocated to the Members in all prior Fiscal Years under this Section 4(a) in the proportion in which such excess was allocated;

(b) second, Net Losses shall be allocated to the Members in accordance with the position balances in their Capital Accounts until the balance in the Capital Account of Insight is reduced

109965.1

CONFIDENTIAL



W 00090132

to zero;

(c) thereafter, Net Losses shall be allocated to the Wexford Members, provided, however, that in the Event any Net Losses consist of items of ordinary deduction, then, in lieu of the above allocations (i) a special allocation shall be made to Insight of such items of ordinary deduction (to the extent thereof) not greater than the Tentative Insight Loss Allocation (as defined below) and (ii) the resulting Net Losses, computed without regard to the items of ordinary deduction allocated under the preceding clause (i), shall be allocated:

(i) if the initial allocation made in clause (i) above (the "Initial Insight Loss Allocation") equals the amount of Net Losses that would otherwise have been allocated to Insight under this Agreement absent this proviso (the "Basic Insight Loss Allocation"), to the Wexford Members, or

(ii) if the Initial Insight Loss Allocation is less than the Basic Insight Loss Allocation, an amount equal to such shortfall to Insight and the remainder to the Wexford Members.

For purposes of the preceding sentence the "Tentative Insight Loss Allocation" shall mean the lesser of (I) the amount of Net Losses that would otherwise have been allocated to Insight under this Agreement absent the proviso of such preceding sentence and (II) the excess (if any) of (A) the Initial Insight Allocation for all prior Fiscal Years over (B) the Initial Insight Loss Allocation for all prior Fiscal Years.

Distributions.

5. Subject to Section 2 above, distributions of Net Cash Flow shall be made as follows:

(a) first, to each Member, not later than 90 days after the close of each Fiscal Year, in an amount equal to the local, state and Federal income tax liability of such Member (calculated as if each Member was a individual taxpayer subject to the highest marginal rates applicable to residents of New York City) in respect of the excess of Net Profits over Net Losses allocated to such Member for such Fiscal Year (as shown on the Company's Federal income tax return), less all amounts distributed to such Member for the then current and all prior Fiscal Years pursuant to this Section 5;

(b) second, 100% to the Wexford Members until the Wexford Members have been distributed an amount which, combined with all other amounts distributed to them under this Section 5(b) and Sections 5(d) and 5(f) for prior Fiscal Years, equals the Preferred Return on the positive balance of its Unrecovered Capital Contributions outstanding from time to time;

(c) third, 100% to the Wexford Members until the balance of the Unrecovered Capital Contributions of the Wexford Members has been reduced to zero;

(d) fourth, 80% to the Wexford Members and 20% to InSight until the Wexford Members have been distributed an amount which, combined with all other amounts distributed to them under Section 5(a) and Section 5(b) for the current and all prior Fiscal Years and under this Section 5(d) and Section 5(f) for all prior Fiscal Years, equals the Additional Preferred Return on the positive balances of its Unrecovered Capital Contributions outstanding from time to time;

(e) fifth, 100% to Insight until Insight has been distributed an aggregate amount equal to 25% of the amount distributed to the Wexford Member under Section 5(b), above for the current and all prior Fiscal Years;

(f) thereafter, 80% to the Wexford Members and 20% to InSight.

6. At the election of the Manager, distributions of Company property may be distributed in accordance with Section 5, or may be retained by the Company.

7. Unless the Manager shall make a determination to the contrary, all allocations and distributions to the Wexford Members shall be made pro rata in proportion to their Distribution Shares with respect to Class A.

# Exhibit C

Distribution Method, Allocation of Net Profits and Net Losses and Tax Allocations for Investments listed on Schedule 2:

Definitions/Rule of Construction.

1. These additional definitions apply with respect to this Exhibit C.

"Preferred Return" with respect to any of the Wexford Members shall mean an annual return of 10% compounded annually.

"Unrecovered Capital Contributions" shall mean, with respect to any Wexford Member, the difference of (i) such Member's Capital Contributions relating to the investment set forth on Schedule 2 and (ii) all cash (or the fair market value of other property) distributed to such Member in respect of such investment.

2. For purposes of calculating allocations of Net Income and/or Net Loss to Insight and calculating distributions to Insight under this Exhibit C, all investments on Schedule 2 that were made through Imprimis SB, LP shall be treated as if the investments were made directly by the Company without any debt, equity or other participation by the Small Business Administration, and the remaining Net Income and/or Net Loss and remaining distributions shall be made to the Wexford Members, and the Unrecovered Capital Contributions of the Wexford Members shall be calculated if such investments were made in such manner.

Allocation of Net Profits and Net Losses:

3. Subject to Section 2 above, Net Profits shall be allocated as follows:

(a) first, 100% to the Wexford Members in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Wexford Members in all prior Fiscal Years under Section 4(c) over (ii) the cumulative Net Profits allocated to the Wexford Members in all prior Fiscal Years under this Section 3(a).

(b) second, 100% to the Wexford Members in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Members in all prior Fiscal Years under Section 4(b) over (ii) the cumulative Net Profits allocated to the Members in all prior Fiscal Years under this Section 3(b) in the proportion in which such excess was allocated;

109985.1

(c) third, 100% to the Wexford Members until the Wexford Members have been allocated on a cumulative basis an amount of the Net Profits, pursuant to this Section 3(c), equal to the Preferred Return on the positive balances of their Unrecovered Capital Contributions outstanding from time to time; and

(d) thereafter, 80% to the Wexford Members and 20% to Insight; provided, however, that in the event any Net Profits consist of items of ordinary income, then, in lieu of the above allocations (i) a special gross income allocation shall be made to Insight of such items or ordinary income (to the extent thereof) equal to the Tentative Insight Allocation (as defined below) and (ii) the resulting Net Profits, computed without regard to the items of gross income allocated under the preceding clause (i), shall be allocated:

(i) if the initial allocation made in clause (d)(i) above (the "Initial Insight Allocation") equals the Tentative Insight Allocation, to the Wexford Members, or

(ii) if the initial Insight Allocation is less than the Tentative Insight Allocation, an amount equal to such shortfall to Insight and the remainder to the Wexford Members.

For purposes of the preceding sentence the "Tentative Insight Allocation" shall mean the amount of Net Profits that would otherwise have been allocated to Insight under this Agreement absent the proviso of such preceding sentence.

4. Subject to Section 2 above, Net Losses shall be allocated as follows:

(a) first, Net Losses shall be allocated to the Members in an amount equal to the excess (if any) of (i) the cumulative Net Profits allocated to the Members in all Prior Fiscal Years under Section 3 (other than Section 3(b)) over (ii) the cumulative Net Losses allocated to the Members in all prior Fiscal Years under this Section 4(a) in the proportion in which such excess was allocated;

(b) second, Net Losses shall be allocated to the Members in accordance with the position balances in their Capital Accounts until the balance in the Capital Account of Insight is reduced to zero;

(c) thereafter, Net Losses shall be allocated to the Wexford Members, provided, however, that in the Event any Net Losses consist of items of ordinary deduction, then, in lieu of the above allocations (i) a special allocation shall be made to Insight of such items of ordinary deduction (to the extent thereof) not greater than the Tentative Insight Loss Allocation (as defined below) and (ii) the resulting Net Losses, computed without regard to the items of ordinary deduction allocated under the preceding clause (i), shall be allocated:

(i) if the initial allocation made in clause (i) above (the "Initial Insight Loss

109965.1

Allocation") equals the amount of Net Losses that would otherwise have been allocated to Insight under this Agreement absent this proviso (the "Basic Insight Loss Allocation"), to the Wexford Members, or

(ii) if the Initial Insight Loss Allocation is less than the Basic Insight Loss Allocation, an amount equal to such shortfall to Insight and the remainder to the Wexford Members.

For purposes of the preceding sentence the "Tentative Insight Loss Allocation" shall mean the lesser of (I) the amount of Net Losses that would otherwise have been allocated to Insight under this Agreement absent the proviso of such preceding sentence and (II) the excess (if any) of (A) the Initial Insight Allocation for all prior Fiscal Years over (B) the Initial Insight Loss Allocation for all prior Fiscal Years.

Distributions.

5. Subject to Section 2 above, distributions of Net Cash Flow shall be made as follows:

(a) first, to each Member, not later than 90 days after the close of each Fiscal Year, in an amount equal to the local, state and Federal income tax liability of such Member (calculated as if each Member was a individual taxpayer subject to the highest marginal rates applicable to residents of New York City) in respect of the excess of Net Profits over Net Losses allocated to such Member for such Fiscal Year (as shown on the Company's Federal income tax return), less all amounts previously distributed to such Member for the then current and all prior Fiscal Years pursuant to this Section 5;

(b) second, 100% to the Wexford Members, pro rata in proportion to their Distribution Share, until the Wexford Members have been distributed an amount which, combined with all other amounts distributed to them under this Section 5(b) and Section 5(f) for prior Fiscal Years, equals the Preferred Return on the positive balance of its Unrecovered Capital Contributions outstanding from time to time;

(c) third, 100% to the Wexford Members until the balance of the Unrecovered Capital Contributions of the Wexford Members has been reduced to zero;

(d) thereafter, 80% to the Wexford Members and 20% to InSight.

4. At the election of the Manager, distributions of Company Property may be distributed in accordance with Section 5, or may be retained by the Company.

5. Unless the Manager shall make a determination to the contrary, all allocations and distributions to the Wexford Members shall be made pro rata in proportion to their Distribution Shares with respect to Class A.

109965.1

## Annex I
## List of Members

Wexford Members:

Wexford Special Situations 1997, L.P.
411 West Putnam Avenue
Greenwich, CT 06830

Wexford Special Situations 1997 Institutional, L.P.
411 West Putnam Avenue
Greenwich, CT 06830

Wexford Spectrum Investors LLC
411 West Putnam Avenue
Greenwich, CT 06830

Non-Participating Member:

Insight Venture Associates II, LLC
122 East 42 Street
New York, N.Y. 10168