# EXHIBIT

# 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| IMPRIMIS INVESTORS LLC and WI SOFTWARE INVESTORS LLC, Plaintiffs, | : | Index No. ______ |
| -against- | : | |
| INSIGHT VENTURE MANAGEMENT, INC., JEFFREY HORING, JERRY MURDOCK, INSIGHT VENTURE ASSOCIATES II, LLC, and INSIGHT VENTURE ASSOCIATES III, LLC, Defendants. | : | **COMPLAINT** |

Plaintiffs Imprimis Investors LLC ("Imprimis") and WI Software Investors LLC ("WISI" and, collectively with Imprimis, "Plaintiffs"), as and for their Complaint against defendants Insight Venture Management, Inc. ("Insight"), Jeffrey Horing ("Horing"), Jerry Murdock ("Murdock"), Insight Venture Associates II, LLC, ("Insight Venture II"), and Insight Venture Associates III, LLC ("Insight Venture III"), allege, on actual knowledge as to Plaintiffs' status, actions, and knowledge, and on information and belief as to all other matters, as follows:

## Nature of this Action

1. Through this action, Plaintiffs seek redress from Insight and the other Defendants for the wrongful diversion of highly valuable investment opportunities from Plaintiffs to Defendants. In so doing, Defendants, inter alia, breached contractual and fiduciary obligations to Imprimis and WISI and made repeated, material misrepresentations to Plaintiffs in an effort to hide their wrongdoing, thereby depriving

EXHIBIT
6

Imprimis and WISI of more than $540 million in investment profits that properly should have flowed to Plaintiffs.

2. Defendants' wrongdoing stems from Defendant Insight's breaches of two contracts — the "Agreements" — with WISI and Imprimis. Under the Agreements, among other things, Insight was required to provide WISI and, subsequently, Imprimis, with a right of first refusal to participate in up to 50 percent (or more under certain circumstances) of investments in the software and related industries identified by Insight in accordance with those Agreements (the "Investment Opportunities").

3. Despite its clear obligations, Insight failed to provide Plaintiffs with numerous Investment Opportunities identified by Insight as required by the Agreements. Instead, Insight and the other Defendants, <u>inter alia</u>, "cherry picked" the investments and diverted certain particularly lucrative Investment Opportunities to their own newly-formed managed limited partnerships and to prospective investors in those partnerships. Defendants' scheme was intended to facilitate the marketing of these new partnerships by: (i) permitting favored affiliates and others, who were in a position to invest in the new funds and/or encourage others to do so, to co-invest with Insight in the diverted Investment Opportunities; and (ii) allowing Insight to represent to prospective investors that its new funds would make investments in these lucrative Investment Opportunities. Key elements of this wrongful scheme were: (i) Defendants' intentional failure to provide Plaintiffs with notice of certain of the diverted Investment Opportunities; (ii) Defendants' actions in delaying the closings of other diverted Investment Opportunities until after the expiration of the Agreements; and (iii)

Defendants' false representations that Plaintiffs had no right to participate in the diverted Investment Opportunities.

4. Moreover, Defendants, for their own economic benefit, wrongfully caused valuable warrants acquired by WISI in connection with Plaintiffs' participation in one of the Investment Opportunities to be "assigned" to third parties. This "assignment" was entirely unauthorized by Plaintiffs and constituted the conversion of millions of dollars of WISI property. Defendants compounded this wrong by hiding this transaction and a related Investment Opportunity from Plaintiffs.

5. In addition, despite the obligations imposed by the Agreements, Insight, for its own benefit and for the benefit of the other Defendants, failed to pay over to Plaintiffs their pro rata share of board fees, break-up fees, consulting fees, other fees, options, and other benefits that were allocable to investments covered by the Agreements, including allocations in "hot issue" initial public offerings received by Horing, Murdock, and their affiliates from the various Investment Opportunities or from underwriters as a quid pro quo for investment banking business arising from, inter alia, the Investment Opportunities.

6. In light of the foregoing, Plaintiffs are entitled to compensatory damages of at least $540 million as a result of Defendants' breaches of contract and unjust enrichment, and compensatory and punitive damages as a result of the tortious interference (by Defendants other than Insight) with the Agreements, as well as the breaches of fiduciary duty, conversion, affirmative misrepresentations, and other fraudulent conduct of Defendants. Plaintiffs also are entitled to: (i) an accounting from Defendants of all Investment Opportunities that should have flowed to Plaintiffs under

the Agreements and of all fees, options, and other benefits, including allocations in "hot issue" public offerings, received by Defendants and/or their affiliates from, or in connection with, those investments; (ii) a mandatory injunction requiring Defendants and their affiliates to turn over to Plaintiffs all securities or other property still in their possession that rightfully belong to Plaintiffs; and (iii) the imposition of a constructive trust over the proceeds of such investments.

## The Parties

7. Plaintiff Imprimis is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. Imprimis was formed for the purpose of making various investments, including investments in companies engaged in the software and related industries. Non-party Wexford Management LLC ("Wexford") is Manager of Imprimis.

8. Plaintiff WISI is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. WISI is a wholly-owned subsidiary of Imprimis and was formed for the purpose of making investments in the software and related industries. Wexford is the Manager of WISI.

9. Defendant Insight is a Delaware corporation maintaining its principal offices at 527 Madison Avenue, New York, New York 10022. Pursuant to various agreements, Insight provides management and investment services to certain limited partnerships engaged in the business of making investments in the software and related industries. These limited partnerships include: Insight Capital Partners II, L.P. ("Insight II"); Insight Partners (Cayman) II, L.P. ("Insight Cayman II"); Insight Capital

Partners III, L.P. ("Insight III"); Insight Capital Partners III Co-Investors, L.P. ("Insight Co-Investors"); and Insight Capital Partners (Cayman) III, L.P. ("Insight Cayman III"). (Insight II, Insight Cayman II, Insight III, Insight Co-Investors, and Insight Cayman III are collectively referred to in this Complaint as the "Limited Partnership Affiliates.")

10. Defendant Horing is an individual maintaining his principal place of business at 527 Madison Avenue, New York, New York 10022. Horing is a principal and control person of Insight, Insight Venture II, Insight Venture III, and the Limited Partnership Affiliates, and a limited partner of the Limited Partnership Affiliates.

11. Defendant Murdock is an individual maintaining places of business at 527 Madison Avenue, New York, New York 10022 and 300 Puppysmith Street, Suite 205, Aspen, Colorado 81611. Murdock is a principal and control person of Insight, Insight Venture II, Insight Venture III, and the Limited Partnership Affiliates, and a limited partner of the Limited Partnership Affiliates.

12. Defendant Insight Venture II is a Delaware limited liability company maintaining its principal place of business at 527 Madison Avenue, New York, New York, 10022. Insight Venture II is the general partner of Insight II and Insight Cayman II. Defendants Murdock and Horing are the Managers of Insight Venture II.

13. Defendant Insight Venture III is a limited liability company maintaining its principal place of business at 527 Madison Avenue, New York, New York 10022. Insight Venture III is the general partner of Insight III, Insight Co-Investors, and Insight Cayman II. Defendants Murdock and Horing are the Managers of Insight Venture III.

## Venue

14. Venue is proper in this county pursuant to CPLR 503(a), (c), and (d) in that, inter alia, Defendants Insight, Insight Venture II, and Insight Venture III maintain their principal offices in this county.

## Facts Applicable to All Causes of Action

### The Relationship Among Insight and Plaintiffs

15. In late 1995, Horing was introduced to Wexford. Prior thereto, Horing and Murdock had established Insight to make investments in the software and related industries.

16. At the time Murdock and Horing were introduced to Wexford, Wexford had been in business since mid-1994, having been formed by experienced investment professionals, and Wexford had raised significant sums of money to make private equity investments. By late 1995, Wexford had established a significant reputation in the investment community and its principals were well known and respected.

17. After one of Wexford's principals made an initial small investment based on a recommendation by Horing and Murdock, Wexford and Insight agreed to establish a business relationship.

18. To develop their relationship further, Insight and Wexford agreed that they would enter into a consulting agreement pursuant to which Insight would provide advice to Wexford in connection with investments in the software and related industries, and Wexford would provide Insight with management fees and the reimbursement of expenses to help fund Insight's business. Wexford also initially

provided Insight with office space in Wexford's offices and the utilization of support services.

19. On or about June 1, 1996, notwithstanding the fact that Insight and Wexford had not yet entered into a formal consulting agreement, Insight began providing certain of the services contemplated by the parties. Moreover, on or about September 20, 1996, Wexford advanced to Insight $83,333, as a pro rata portion of the first year's fee.

20. Thereafter, Wexford, on behalf of a newly-formed Delaware limited liability company named Wexford Insight LLC ("Wexford/Insight"), entered into a consulting agreement with Insight, dated as of June 1, 1996, that required Insight to advise Wexford/Insight on investments in the software and other industries (the "Wexford/Insight Agreement").

21. Under the Wexford/Insight Agreement, for a period of one year, Insight was required to identify for Wexford/Insight at least three separate investment opportunities in the software and related industries and Wexford/Insight received a right of first refusal to the extent of at least 50 percent of the amounts invested over the first $1 million to be invested by Insight or its other affiliates.

22. In consideration of the right of first refusal and other rights granted to Wexford under the Wexford/Insight Agreement, Wexford agreed to pay Insight various fees and expenses, and provided Insight with certain proxy and indemnification rights.

23. The Wexford/Insight Agreement was a successful business arrangement for all parties concerned. Insight identified numerous investment

opportunities in the software and related fields to Wexford/Insight and Wexford/Insight made several investments through the exercise of its first refusal rights under the Wexford/Insight Agreement.

24. As a result of the relationship that had developed between Wexford and Insight and the prospects of additional successes, WISI, another entity managed by Wexford, and Insight entered into a new consulting agreement as of April 3, 1997 (the "WISI Agreement"). Thereafter, on or about September 30, 1998, Wexford, on behalf of Imprimis, entered into a consulting agreement with Insight (the "Imprimis Agreement") that superseded and replaced the WISI Agreement.

25. The relationship among the parties in the initial stages of WISI Agreement and Imprimis Agreement proceeded as contemplated. However, as more fully described below, when the Agreements were coming to a close, Insight, Horing, and Murdock devised and implemented a scheme to divert lucrative Investment Opportunities from Plaintiffs to themselves and their affiliates. The stealing of those Investment Opportunities by Defendants led to this action.

**The WISI Agreement**

26. On our about April 3, 1997, WISI and Insight entered into the WISI Agreement, a two-year contract pursuant to which Insight agreed to advise WISI regarding investments in the software and related industries.

27. To implement the WISI Agreement, Wexford formed WISI as a Delaware limited liability company, and the parties entered into a limited liability company agreement, dated as of April 3, 1997, with Wexford as the Manager, and WI Software Holding LLC and Insight Venture II as the members.

28. Under the WISI Agreement, Insight, inter alia, agreed to identify for WISI "investment opportunities in the software and related industries" during the term of the WISI Agreement (each, an "Investment Opportunity"). The WISI Agreement further provided that:

> For each such Investment Opportunity, Insight or its affiliates shall give written notice to WISI of its right of first refusal to participate in such Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). WISI shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight.

WISI Agreement § 1. (A true and complete copy of the WISI Agreement is annexed hereto as Exhibit A and is incorporated by reference herein.)

29. Thus, pursuant to the WISI Agreement, for a two-year period commencing April 3, 1997, Insight was obligated to offer to WISI a right of first refusal to invest up to at least 50 percent of the total amount to be invested in all Investment Opportunities in software and related industries identified by Insight during the term of the WISI Agreement. Moreover, under the WISI Agreement, WISI had a right of first refusal to invest up to 100 percent in an Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share.

30. The WISI Agreement also provided that, after Insight furnished written notice of WISI's right of first refusal to participate in an Investment Opportunity, along with written details of the investment, if there was any change in the terms of the Investment Opportunity, Insight was required to notify WISI in writing of such "New Material Terms." WISI Agreement § 1.

31. Pursuant to the WISI Agreement, Insight also was obligated to allocate to WISI on a pro rata basis any "board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or any of its affiliates, but allocable in any manner to any investment by WISI in an Investment Opportunity pursuant to the terms of this agreement. . . ." WISI Agreement § 6.

32. This right of WISI to share fees and options arising out of Investment Opportunities identified under the WISI Agreement survived the termination of the Agreement. See WISI Agreement § 6.

33. In consideration of the rights and benefits afforded to WISI under the WISI Agreement, WISI agreed to pay Insight certain fees, reimburse on a pro rata basis certain due diligence expenses relating to Investment Opportunities, and to provide Insight with certain proxy and indemnification rights. See WISI Agreement §§ 2, 5, 7, 8.

34. As a result of the various agreements among the parties, Insight owed fiduciary duties to WISI.

35. After the commencement of the WISI Agreement, Insight identified for WISI a number of Investment Opportunities in the software and related industries. WISI exercised its right of first refusal with respect to several such Investment Opportunities.

__The Imprimis Agreement__

36. On or about September 30, 1998, Imprimis and Insight entered into the Imprimis Agreement. (A true and complete copy of the Imprimis Agreement is annexed hereto as Exhibit B and is incorporated by reference herein.)

37. To implement the Imprimis Agreement, Wexford created a new class of membership interests in Imprimis to invest in Insight-identified deals, and the parties entered into an amended and restated limited liability company agreement, dated as of September 30, 1998, with Wexford as the Manager, and three of Wexford's affiliates and Insight Venture II as the members.

38. The Imprimis Agreement, by its specific terms, superceded and replaced the WISI Agreement, and terminated on the same date the WISI Agreement would have ended, __i.e.__, April 2, 1999. __See__ Imprimis Agreement § 13.

39. Pursuant to the Imprimis Agreement, Insight, __inter alia__, agreed to "provide Imprimis with a right of first refusal for all investment opportunities in the software and related industries identified by Insight" during the term of the Imprimis Agreement (each, an "Investment Opportunity"). The Imprimis Agreement further provided that:

> For each Investment Opportunity, Imprimis' right of first refusal entitles it to participate in the Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). Imprimis shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight. For each proposed Investment Opportunity, Insight or its affiliates shall provide in a form satisfactory to Imprimis written details of such proposed Investment Opportunity.

Imprimis Agreement § 1.

40. Accordingly, pursuant to the Imprimis Agreement, Insight was obligated to provide Imprimis with its right of first refusal to invest up to at least 50 percent of the total amount to be invested in all Investment Opportunities in the software and related industries identified by Insight during the term of the Imprimis Agreement. Moreover, like the WISI Agreement, under the Imprimis Agreement, Imprimis had a right of first refusal to invest up to a 100 percent investment in an Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share.

41. Like the WISI Agreement, the Imprimis Agreement required Insight to provide written notice of Imprimis' right of first refusal to participate in an Investment Opportunity, along with written details of the investment, and, if there was any change in the Investment Opportunity thereafter, Insight was required to notify Imprimis in writing of any "New Material Terms."

42. Also, like the WISI Agreement, the Imprimis Agreement gave Imprimis the right to share, on a pro rata basis with Insight and its affiliates, all fees or other benefits paid to Insight or any of its affiliates by any third party in connection with an Investment Opportunity. As set forth in the Imprimis Agreement, § 6: "Any board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or an affiliate but allocable in any manner to any investment by Imprimis or WISI in any Investment Opportunity pursuant to the terms of this Agreement or the WISI Agreement shall be delivered by Insight to Imprimis in ten business days of Insight's receipt thereof. . . ."

43. In addition, again like the WISI Agreement, the Imprimis Agreement obligated Imprimis to pay Insight certain fees and share on a pro rata basis certain due diligence expenses incurred by Insight in connection with Investment Opportunities, and to provide certain proxy and indemnification rights to Insight. See Imprimis Agreement §§ 2, 5, 7, 8.

44. Under the terms of the Imprimis Agreement, Insight's obligation to turn over to Imprimis a pro rata share of fees and options arising out of Investment Opportunities survived the termination of the Imprimis Agreement. See Imprimis Agreement § 6.

45. As a result of the various agreements among the parties, Insight owed fiduciary duties to Imprimis.

46. After the commencement of the Imprimis Agreement, Insight identified for Imprimis a number of Investment Opportunities in the software and related industries. Imprimis exercised its right of first refusal with respect to several such Investment Opportunities.

**Defendants' Wrongful Actions and Inactions**

**Defendants' Wrongful Failure to Offer Wexford Investment Opportunities in Illuminet and HUON**

47. Sometime prior to July 1998, during the term of the WISI Agreement, Insight identified Illuminet Holdings, Inc. ("Illuminet") as an Investment Opportunity. Illuminet provides advanced intelligent network, database, and billing services to the telecommunications industry.

53. Insight, through Insight II, made a $4.8 million investment in HUON on December 21, 1998, i.e., during the term of the Imprimis Agreement. Again Insight failed to afford Imprimis its first refusal right to participate in the Investment Opportunity in HUON.

54. Plaintiffs first discovered that Insight had failed to advise Plaintiffs of an Investment Opportunity in Illuminet on or about August 25 or 26, 1999. At that time, an Insight partner advised Wexford that Illuminet had filed a form S-1 registration statement in connection with an initial public offering. Because Plaintiffs had never been presented with any Investment Opportunity in Illuminet or HUON by Defendants, Wexford began to make inquiries concerning Illuminet and HUON.

55. On August 29, 1999, in response to Wexford's inquiry requesting information regarding Illuminet and HUON, Defendant Horing first asserted that Illuminet had allegedly been "discussed" with Plaintiffs in January 1999. This statement, as Defendant Horing knew, or should have known, was completely false. Insight II's investments in Illuminet occurred in August and December 1998, and there was no reason for Defendants to have first discussed those investments with Plaintiffs in 1999, after the investments already were made. In any event, Insight later admitted that Defendants' alleged prior mention of Illuminet to Plaintiffs incorrectly described the size and desirability of an investment in Illuminet. Additionally, the alleged oral discussion did not comply with the express terms of the Agreements, which required Insight to present Plaintiffs with "written details" of each Investment Opportunity.

56. After receiving Defendants' initial excuse, Plaintiffs responded that their files contained no information on Illuminet or HUON and asked to be provided with any documents on Illuminet that allegedly had been sent to Plaintiffs.

57. On October 5, 1999, Defendant Horing responded by claiming that Illuminet and HUON had been "discussed" with Plaintiffs sometime in 1998, stating:

> We discussed both . . . I told you on Illuminet that it was a small (< $1.5 mm) deal in common stock that given the size and the fact that we were only able to do it by buying a secondary position from a friend, who was unlikely to sell to anyone else, that we would do it solo.
>
> I also mentioned HUON, which was done with Warburg, priced rich and in Europe. You are not missing anything.

58. On October 6, 1999, Plaintiffs again advised Defendant Horing that it had no information in its files regarding either Illuminet or HUON and that neither of these Investment Opportunities had been offered to Plaintiffs as the Agreements required. Plaintiffs asked Horing for an explanation.

59. In a telephone discussion on October 8, 1999, Defendant Murdock embellished on the purported discussions with Plaintiffs concerning Illuminet. In that communication, Murdock claimed that he told Plaintiffs about a potential Illuminet investment but recommended that Plaintiffs not participate because the investment was too small, Illuminet had no real financial statements, and had questionable management because its CEO had left. In addition, Murdock claimed that he told Plaintiffs in 1998 that the valuation of Illuminet was "tough."

60. Horing and Murdock had no such "discussions" with Plaintiffs about Illuminet in 1998 or early 1999. Even if there had been such "discussions," the descriptions of the Illuminet investment allegedly given by Horing and Murdock were

false and misleading. Contrary to the information these Defendants claimed to have given to Plaintiffs, and as Defendants well knew, Illuminet was not a "small deal," Illuminet had real financial statements, and its chief executive officer had not left.

61. Moreover, such alleged oral "discussions" were insufficient under the Agreements, because Insight was required to provide written details of the proposed Investment Opportunity and it admittedly did not do so. In addition, its alleged excuse that Illuminet was initially a small deal that later grew in size was both irrelevant, because there was no minimum size for an investment to qualify as an Investment Opportunity, and pretextural, because, under the Agreements, Insight was required to advise Plaintiffs of any material changes in an Investment Opportunity and submit to Plaintiffs a written notice of any New Material Terms. Even Horing and Murdock did not attempt to offer an excuse for Insight's failure to advise Plaintiffs of the second tranche of the Illuminet investment or to provide Imprimis with its right of first refusal as to that Investment Opportunity.

62. In the October 8, 1999 telephone conversation, Defendant Murdock effectively admitted that Insight's purported description of Illuminet in 1998 was inaccurate. Murdock also conceded that the Illuminet deal had grown in size and that Insight had not informed Wexford of either the increase in size of the investment or the second tranche of the investment that was purchased by Insight II in December 1998.

63. Also on October 8, 1999, Defendant Horing apologized to Plaintiffs about Insight's handling of the Illuminet Investment Opportunity, stating: "I am sorry about the confusion as well as the poor communication. I am sure that we will have ample opportunity to make it up to you."

64. On or about October 20, 1999, Horing confirmed to Plaintiffs that Insight should have provided Plaintiffs with the Investment Opportunity in Illuminet. As a result of various discussions between Plaintiffs and Insight concerning Insight's failure to provide a right of first refusal for Illuminet, Insight promised to "make up" to Plaintiffs for such failure by permitting Plaintiffs to participate in at least $1.5 million in "cherries," i.e., investments that had a high potential of a near-term liquidity event at a minimum ten times profit that otherwise would not be available to Plaintiffs because the Agreements had expired. Nonetheless, Insight only afforded Plaintiffs the opportunity to invest $500,000 in one in one such "cherry" and therefore failed to live up to its promise.

65. The Investment Opportunity in Illuminet that Insight diverted to Insight II was extremely profitable to Insight II. Insight II's total cost of its investment in Illuminet was $2,293,590. Imprimis should have received a right of first refusal in 50 percent of that investment. Illuminet completed an initial public offering on October 7, 1999 at $19 per share and the value of Illuminet shares increased significantly thereafter. Insight's failure to offer Imprimis its minimum 50 percent right of first refusal in Illuminet deprived Plaintiffs of a gain, as of September 30, 2000, of at least $9.7 million.

66. Plaintiffs at present lack knowledge or information sufficient to ascertain their damages, if any, as a result of the Defendants' wrongful failure to present HUON to them as an Investment Opportunity.

**Defendants' Scheme to Divert**
**Investment Opportunities**

67. By the fall of 1998, Insight's then-existing investment partnerships were close to being fully invested. Accordingly, Defendants decided to create a new

series of funds, named Insight Co-Investors, Insight Cayman III, and Insight III (the "New Funds"). At the same time, the Agreements with Plaintiffs were coming to a close. As a result of these factors, Insight, Murdock, and Horing devised and implemented a scheme to divert from Plaintiffs certain Investment Opportunities that had been identified during the term of the Agreement. The purpose of this scheme was to use such Investment Opportunities to facilitate the marketing of Insight's New Funds. In connection therewith, Defendants: (i) allowed favored parties, who were in a position to make significant investments in the New Funds and/or encourage other prospective investors to do so, separately to co-invest with Insight in these Investment Opportunities; (ii) represented to prospective investors in the New Funds that such New Funds would participate in these lucrative Investment Opportunities; and (iii) sought to make Plaintiffs believe that they had no right to participate in such Investment Opportunities by hiding the existence of such Investment Opportunities and delaying their closings until after the expiration of Agreements.

**Defendants' Wrongful Diversion of the**
**<u>Investment Opportunity in Quest Software</u>**

67. Sometime prior to January 1999 — well within the term of the Imprimis Agreement — Insight identified Quest as an Investment Opportunity. Quest is engaged in the business of providing database tools and e-commerce infrastructure.

68. However, Insight did not provide timely notice to Imprimis of such Investment Opportunity, nor did it provide any written details of such proposed Investment Opportunity as required by the Imprimis Agreement. Instead, Insight proceeded with its due diligence on Quest and, on December 11, 1998, prepared a "deal memo" for a proposed $33 million investment in Quest that anticipated a closing in

January 1999. On or about January 7, 1999, Insight, in fact, entered into an agreement with Quest to make an investment in that company.

69. On or about April 12, 1999, for the first time, Insight advised Plaintiffs of a proposed investment in Quest. In a telephone conference on April 18, 1999, among representatives of Plaintiffs and Murdock, Murdock took the position that the Quest investment was outside the Imprimis Agreement because the Agreement already had expired. Murdock also raised a number of other purported "excuses" for not permitting Plaintiffs the right to invest up to at least 50 percent in Quest, including "internal politics" at Insight, the alleged cash flow needs of Defendants Murdock and Horing, and the purported wishes of new institutional investors in Insight. Based on those excuses, Murdock initially stated that Insight could only offer Plaintiffs the opportunity to invest $2.5 million of what was then represented to be an $8.5 million total investment by Insight and its affiliates.

70. These excuses for the wrongful deprivation of Plaintiffs' full right of first refusal under the Agreements were pretextural. As Murdock and the other Defendants well knew, but at that time hid from Plaintiffs, Insight had entered into an agreement to make an investment in Quest in January 1999, months before the termination of the Imprimis Agreement. Thus, the Quest investment clearly had been "identified" as an Investment Opportunity during the term of the Imprimis Agreement, all that was required to entitle Imprimis to its full 50 percent right of first refusal — plus Plaintiffs' right of first refusal to invest up to 100 percent in any Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share. Murdock's representation to the contrary to Plaintiffs was false and misleading.

71. Indeed, Insight later charged Plaintiffs for 50 percent of the due diligence costs for its investigation of Quest, including expenses incurred in December 1998, clearly indicating that it believed that the Quest investment was covered by the Agreements.

72. Because Plaintiffs did not then know of the facts regarding the timing of the identification of the Investment Opportunity in Quest, and in reliance on Defendants' false representations, Plaintiffs agreed to a modified deal relating to Quest. Under that agreement, WISI was to be permitted to invest $4.5 million in Quest, allegedly 50 percent of the total Insight investment, and, in return, Imprimis gave Insight various fee modifications that significantly increased the benefits to Insight upon a liquidation of the investment.

73. In addition, in exchange for Plaintiffs agreeing to modify the fee arrangement with Insight for Quest, Murdock agreed that Plaintiffs would be permitted to: (i) invest between $5 and $10 million in Convergent Group ("Convergent"); and (ii) to make investments in Greenfield Online and Click Interactive (later known as Click Commerce) ("Click"), which Horing and Murdock represented also fell outside of the Agreements. Such representations were false and misleading, as more fully described below.

74. The purported "accommodation" that Insight allegedly gave Plaintiffs regarding Quest was illusory. Notwithstanding Defendants' representation that Plaintiffs' investment would be 50 percent of the total Quest investment, Plaintiffs actually were permitted to invest only 18 percent of the total $25 million financing arranged by Insight for Quest. At the same time that WISI was allowed to invest $4.5

million for 800,000 shares of Quest Series A Preferred Stock, (subsequently converted into common stock), Defendants allocated to Insight II and Insight Cayman II 888,889 shares of that Series A Preferred Stock, for a total purchase price of $5 million, or 20 percent of the total investment. Further, an affiliate and/or co-investor of Insight was allocated 977,778 shares of Quest Series A Preferred Stock, for a cost of $5.5 million, and 1,777,778 shares of Series B Redeemable Preferred Stock, for a cost of $10 million, or 62 percent of the total investment. In addition, at some point, Defendant Murdock personally acquired at least 265,000 shares of Quest common stock, either by outright purchases or in the form of options.

75. The investment in Quest was highly profitable. Quest completed its initial public offering on August 13, 1999, selling 4.4 million shares of common stock at $14 per share. That common stock, which had been purchased in April 1999 by Insight at the equivalent of $3.75 per share, rose to $102 per share on December 31, 1999.

76. On March 10, 2000, WISI sold 750,000 shares (pre-split) of Quest common stock for net proceeds of $100 million, and on June 14, 2000 WISI sold 50,000 shares (post-split) for net proceeds of $2.2 million. However, through their actions, Defendants wrongfully denied Plaintiffs their full right of first refusal in the Investment Opportunity in Quest, thereby depriving Plaintiffs of at least a $206.6 million gain, as of September 30, 2000, to which they are entitled.

**Defendants' Wrongful Diversion of the**
**<u>Investment Opportunity in Convergent</u>**

77. Sometime prior to July 1998 – during the term of the WISI Agreement – Insight identified Convergent as an Investment Opportunity. Convergent

is a provider of e-commerce systems integration services to the utility and public sectors.

78. Insight began meeting with Convergent prior to July 1998 and Insight's expense records reveal that Insight performed its due diligence for an investment in Convergent no later than December 1998, during the term of the Imprimis Agreement. Indeed, Insight's due diligence on Convergent had progressed so far that, on or about March 12, 1999 – almost a month before the April 2, 1999 termination of the Imprimis Agreement – Insight prepared a draft letter of intent for an investment in Convergent. Moreover, Insight later billed Wexford for 50 percent of its due diligence expenses for Convergent, clearly indicating that Insight believed this investment was within the Agreements.

79. Thus, Murdock's representation on April 18, 1999, described above, that Convergent was outside the Agreements was false and misleading when made. Plaintiffs did not know of the falsity of that representation and relied on Murdock's statement that Convergent was not an investment Opportunity under the terms of the Agreements.

80. Despite the clear terms of the Imprimis Agreement that granted Imprimis a right to receive a minimum 50 percent right of first refusal in Convergent, and Murdock's statement that Plaintiffs would be permitted to invest between $5 and $10 million in Convergent, Imprimis was allocated only $5 million of Insight's total $45.5 million investment in Convergent, or only 11 percent of the total financing for Convergent. Instead of providing Imprimis with its 50 percent right of first refusal (along with its right of first refusal to invest up to 100 percent if Insight (or its affiliates) did not

take Insight's full 50 percent share), Insight III, Insight Co-Investors, and Insight Cayman III, collectively invested $17.3 million of the total investment (more than three times the amount allocated to Imprimis), and other Insight co-investors and/or affiliates invested an aggregate of $23.2 million (more than four times the amount allocated to Imprimis).

81. Through their actions, Defendants failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Convergent, thereby depriving Plaintiffs of at least a $93.8 million gain, as of September 30, 2000, to which they are entitled.

**Defendants' Wrongful Diversion of the Investment Opportunity in Greenfield Online**

82. Sometime prior to March 1999 — before the termination date of the Imprimis Agreement — Insight identified an Investment Opportunity in Greenfield Online. Greenfield Online is a provider of internet-based marketing and research information services.

83. Instead of providing Imprimis with its 50 percent right of first refusal in the investment in Greenfield Online, as Insight was required to do under the Imprimis Agreement, on or about April 18, 1999, Murdock represented to Plaintiffs that Greenfield Online was outside of the agreement because the Imprimis Agreement had expired. The same representation was made to Plaintiffs by Horing on April 20, 1999.

84. Unknown to Plaintiffs at the time, these representations were false. In fact, after months of discussions, Insight signed a letter of intent for the investment in Greenfield Online on or about March 4, 1999 – a month before the termination date of the Imprimis Agreement. Indeed, on April 1, 1999, Insight prepared an investment

memorandum analyzing the "opportunity for Insight to invest in" Greenfield Online, clearly establishing that Insight had identified Greenfield Online as an Investment Opportunity within the term of the Imprimis Agreement. Although Insight delayed closing the investment until after the Imprimis Agreement expired, Insight later charged Plaintiffs for a percentage of the expenses incurred prior to April 2, 1999 for its investment in Greenfield Online, clearly indicating that Insight believed that such investment was covered by the Imprimis Agreement.

85. In reliance on the false representation of Defendants Horing and Murdoch that the investment Greenfield Online was outside the Imprimis Agreement, Imprimis agreed to invest only $2.5 million or 12 percent of the total investment arranged by Insight in Greenfield Online of $20.5 million. Instead of providing Imprimis with its minimum 50 percent right of first refusal and its right to invest a greater amount if Insight (or its affiliates) did not invest Insight's full 50 percent share, Insight allocated $8.25 million of the investment to Insight III, $2.5 million of the investment to Insight Cayman III, and $1.37 million of the investment to Insight Co-investors III. Insight also allocated to other co-investors and/or affiliates a total of $5.5 million of the Greenfield Online investment.

86. Through their actions, Defendants failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Greenfield Online, thereby depriving Plaintiffs of at least an $37.1 million gain, as of September 30, 2000, to which they are entitled.

**Defendants' Wrongful Diversion of**
**<u>the Investment Opportunity in Click</u>**

87. At some point prior to February 1999 — again during the term of the Agreements — Defendants identified Click as an Investment Opportunity. Click markets collaborative commerce solutions permitting automated information flows within multi-channel distribution networks for Fortune 1000 manufacturers.

88. As alleged above, in April 1999, when Plaintiffs agreed to a special deal on Quest, Murdock, on behalf of Insight, agreed to allow Plaintiffs to invest in Click, even though Murdock represented on or about April 18, 1999 that an investment in Click was not covered by the Agreements. As noted above, that assertion was false and misleading. Insight was working on the Click investment no later than February 1999, and Insight later sought reimbursement from Plaintiffs for due diligence costs for this investment that were incurred in February 1999, i.e., before the termination of the Imprimis Agreement.

89. In a telephone conversation between Plaintiffs and Defendant Horing on June 7, 1999, Horing asserted that there was "no room" for Plaintiffs in the Click investment, which Horing described as a "$5 million deal."

90. In June and July 1999, Insight III, Insight Co-Investors, and Insight Cayman III purchased an aggregate of 5,217,392 shares of its Series A Convertible Participating Preferred Stock from Click for an aggregate price of $6 million. Insight did not tell Plaintiffs of the closing of that investment.

91. On December 20, 1999, after learning that Insight had closed on an investment in Click, Plaintiffs inquired of Defendant Murdock as to why Plaintiffs were

not given the opportunity to invest in Click, as Murdock had promised. No reply was received to that communication.

92. In January 2000, Insight and its affiliates participated in a further financing for Click and purchased an additional 3,111,215 shares of Click stock for an aggregate price of approximately $16.33 million.

93. On January 30, 2000, Plaintiffs learned that Click had commenced the process for an initial public offering. Plaintiffs sent an e-mail to Defendant Murdock on February 1, 2000, noting that, as part of the "special deal" on Quest, Insight had agreed that Plaintiffs would be given an opportunity to invest in Click.

94. On February 1, 2000, in a telephone conversation among Plaintiffs and Defendant Murdock, Murdock attempted to explain away Defendants' failure to provide Plaintiffs with an Investment Opportunity in Click by making an amorphous reference to an unidentified "problem" with Compaq. He went on to concede that Click would be a "hot IPO." Murdock then proposed to make up, at least in part, for Plaintiffs' lost opportunity for a pre-IPO investment in Click by arranging to allocate to Plaintiffs an amount of Click stock in the initial public offering. Like many of Defendants' representations, Murdock never made good on this promise.

95. No stock in Click's IPO was made available to Plaintiffs, although there was a discussion of Plaintiffs being allowed to purchase $500,000 of Click stock from Insight. However, on April 11, 2000, Horing added a new condition and insisted that any allocation of Click stock to Plaintiffs be contingent upon a release of Plaintiffs' claims against Insight, a condition that Defendants knew would be unacceptable to Plaintiffs. Ultimately, Defendants abandoned their demand for a release of claims. In

June 2000, Plaintiffs were permitted to purchase $500,000 of Click stock from Insight (i.e., 3 percent of the $16.33 million in Click stock purchased by Insight in January 2000).

96. Insight's investment in Click was extremely profitable. By September 30, 2000, Insight's approximately $22 million investment in Click was worth an estimated $358 million.

97. Through their actions, Defendants failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Click, thereby depriving Plaintiffs of at least $185.9 million gain, as of September 30, 2000, to which they are entitled.

**Defendants' Wrongful Diversion of the**
**Investment Opportunity in Authorize.Net**

98. Sometime prior to February 1999, Insight identified Authorize.Net as an Investment Opportunity. Authorize.Net is a leading payment authorization service for online businesses. On July 1, 1999, Authorize.Net was acquired by Go2Net.com, an internet portal company whose stock is publicly traded on the Nasdaq market.

99. In violation of the Imprimis Agreement, Insight did not inform Imprimis of this Investment Opportunity, nor was Imprimis given an opportunity to participate in any investment in Authorize.Net. Plaintiffs later learned that Insight incurred due diligence expenses as early as February 1999 relating to this Investment Opportunity — well before the April 2, 1999 termination of the Imprimis Agreement.

100. Indeed, in or around April 1999 Insight III made two investments in Authorize.Net totaling $1.4 million.

101. Defendants' investments in Authorize.Net were highly profitable. In July, 1999 Insight received $778,643 in cash as part of the transaction in which Go2Net acquired Authorize.Net. In August 1999, Insight III sold 45,289 shares of Go2Net for total proceeds in excess of $3 million. In addition, Insight III retained shares of Authorize.Net.

102. Through their actions, Defendants failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Authorize.Net, thereby depriving Plaintiffs of at least a $2 million gain, as of September 30, 2000, to which they are entitled.

**Defendants' Wrongful Diversion of an Investment Opportunity in Altitude and <u>Wrongful "Assignment" of WISI's Altitude Warrants</u>**

103. At some time prior to July 1998 — during the term of the WISI Agreement — Insight identified Altitude Software, then known as Easyphone ("Altitude"), as an Investment Opportunity. Altitude develops and markets contact center management software.

104. In July 1998, WISI made a $2.75 million investment in Altitude; Insight made an equal investment. In connection with those investments, each of WISI and Insight received warrants to purchase 618,000 shares of Altitude stock at $4.45 per share, expiring in August 2003.

105. Thereafter, in or about July 1999, third-party private investors made an investment in Altitude. To facilitate this investment, Insight executed an "Investment Agreement" in connection with the transaction. No notice of, or information about, this

financing was provided by Defendants to Plaintiffs. In fact, Defendants affirmatively kept Plaintiffs in the dark about Altitude's July 1999 financing transaction.

106. This hidden financing transaction was in direct contravention of Plaintiffs' rights. As part of an "Investors Rights Agreement" entered into in connection with Plaintiffs' investment in Altitude, Plaintiffs were afforded a pre-emptive participation right, pro rata to Plaintiffs' ownership interest, with respect to any new financing by Altitude and a right of first refusal (with Insight) to purchase 100% of a private financing. Further, under the Investors Rights Agreement, Plaintiffs were entitled to written notice of any such financing and a 20-day period to respond. No such notice was provided to Plaintiffs.

107. Moreover, as Plaintiffs have only recently discovered, as part of that July 1999 financing transaction, Defendant Horing, acting on his own behalf and on behalf of the other Defendants, purported to "assign" to the new investors 12.5% of the warrants received by WISI as part of the consideration for WISI's investment in Altitude in the July 1998 financing.

108. To accomplish this purported "assignment," defendant Horing, acting on his own behalf and on behalf of the other Defendants, without notice to, or authorization from, WISI, executed the "Investment Agreement" for WISI, purportedly assigning WISI's Altitude warrants to the new investors.

109. At no time did Plaintiffs authorize or otherwise consent to any assignment of WISI's Altitude warrants to these new investors (or, for that matter, to any other person or entity). Indeed, Plaintiffs were entirely unaware of the "assignment" of WISI's warrants. Plaintiffs only learned of the purported "assignment" of WISI's

warrants when they obtained information in September 2000 regarding Altitude's capitalization in connection with Altitude's forthcoming initial public offering.

110. WISI received no consideration for the purported "assignment" of its Altitude warrants.

111. The acts of Defendants in: (i) failing to provide Plaintiffs with any notice of or information regarding Altitude's July 1999 financing transaction; (ii) failing to ensure that Plaintiffs received their pre-emptive pro rata rights to participate in that financing; (iii) executing the "Investment Agreement" on behalf of WISI effecting the wrongful "assignment" of WISI's Altitude warrants without authorization from, or notice to, Plaintiffs; and (iv) otherwise acting to steal Altitude warrants owned by WISI, wrongfully denied WISI a valuable Investment Opportunity, and wrongfully deprived WISI of warrants worth, as of September 30, 2000, approximately $4 million.

**Other Diverted Investment Opportunities**

112. On information and belief, Defendants wrongfully failed to inform Plaintiffs of other Investment Opportunities that Insight identified during the term of the Agreements, causing Plaintiffs additional damages, in amounts presently unknown to Plaintiffs.

**Defendants' Wrongful Diversion of the Fees and Options Due Plaintiffs That Flowed From Investment Opportunities**

113. As set forth above, pursuant to Section 6 of each of the WISI Agreement and the Imprimis Agreement, Defendants were obligated to share on a pro rata basis with Plaintiffs any and all fees or other benefits paid to Insight or any of its affiliates by any third-party in connection with any Investment Opportunity.

114. To date, Defendants have failed to comply with the terms of these provisions of the Agreements. Defendants have received a number of substantial management and board fees, and options, but have not provided Plaintiffs with their allocable share.

115. As but one example of Defendants' wrongful activities, in connection with the IPO of Convergent, Defendants received approximately $3 million in fees covered by the Agreements. Of that amount, Plaintiffs are entitled to approximately $1.5 million based on Imprimis's minimum 50 percent right of first refusal with respect to an investment in Convergent. Despite Defendants' acknowledgment that Imprimis is entitled to a portion of the fees received by Defendants, such funds have not been paid over to Plaintiffs.

116. In addition, Defendants, including Horing and Murdock, and/or their designees, are believed to have received allocations in "hot issue" IPOs as a result of business they directed to investment banks arising from Investment Opportunities in which Plaintiffs participated or were entitled to participate, as well as distributions of "friends and family" stock from Investment Opportunities (including an IPO allocation of Quest stock to Horing's mother-in-law) and stock as compensation for Murdock's service as a Quest board member. Nevertheless, neither Horing nor Murdock, nor any of the other Defendants, has turned over to Plaintiffs their share of the profits earned on any such allocations of "hot issue" IPO and "friends and family" stock.

**Defendants' Breach of Their Agreement to Participate in an Auditor's Analysis of Fees and Other Benefits Allocable to Plaintiffs Under the Agreements**

117. In an effort to resolve at least part of the dispute between Plaintiffs and Defendants, Plaintiffs proposed to retain outside auditors, Deloitte & Touche LLP, to analyze the transactions between Plaintiffs and Defendants in connection with the Agreements. Plaintiffs agreed to pay the professional fees and disbursements associated with this analysis.

118. After lengthy negotiations, the parties agreed to the proposed Deloitte & Touche analysis. This Agreement was reflected in an August 8, 2000 engagement letter prepared by Deloitte & Touche and countersigned as "accepted" by Insight and Wexford Management LLC on behalf of Plaintiffs (the "August 8 Agreement").

119. Under the August 8 Agreement, Deloitte & Touche was to (i) interview the appropriate personnel at Insight, (ii) interview CEOs, CFOs, and/or controllers of 28 identified investments entered into under the Agreements (based on scripts that were to be pre-approved in writing by Insight), and (iii) review documentation relating to fees and compensation arising out of those investments.

120. Despite their written promise to participate in this process as reflected in the August 8 Agreement, including Insight's specific commitment "to cooperate with D&T [i.e., Deloitte & Touche] in the performance by D&T of its services [under the August 8 Agreement], including, without limitation, providing D&T with reasonable facilities and timely access to data, information, and personnel of Insight," Defendants failed to cooperate with Deloitte & Touche. In late September 2000,

Defendants indicated that they would not permit the Deloitte & Touche analysis to proceed.

The Damages to Plaintiffs

121. As a result of the foregoing, Plaintiffs have been denied the economic benefits to which they were entitled under the Agreements. As of September 30, 2000, Plaintiffs have been damaged as a result of Defendants wrongful conduct in at least the following amounts:

| Investment Opportunity | Minimum Damages to Plaintiffs |
|---|---|
| Illuminet | $ 9,745,000 |
| HUON | Unknown |
| Quest – Series A Preferred Stock | 188,637,000 |
| Quest – Series B Redeemable Preferred Stock | 600,000 |
| Quest – Defendant Murdock personal participation | 17,419,000 |
| Convergent Group | 93,812,000 |
| Greenfield Online | 37,118,000 |
| Click | 185,906,000 |
| Authorize.Net | 2,021,000 |
| Altitude - converted warrants | 4,069,000 |
| Convergent fees | 1,500,000 |
| Other fees | Unknown |
| IPO and other allocations of securities | Unknown |
| **TOTAL** | **At least $540,827,000** |

122. To date, many of the unliquidated Investment Opportunities wrongfully diverted to Insight II, Insight Cayman II, Insight III, Insight Co-Investment, and Insight Cayman III have significantly increased in value, thus enabling Defendants and their affiliates to reap additional tens of millions of dollars from Investment Opportunities stolen from Plaintiffs.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST INSIGHT VENTURE MANAGEMENT, INC.**

**(Breach of Contract)**

123. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 122 of this Complaint as if set forth in full herein.

124. By failing to provide Plaintiffs, in whole or in part, with their Investment Opportunities in Illuminet, Quest, Convergent, Greenfield Online, Click, Authorize.Net, and Altitude, Defendant Insight breached the Agreements.

125. In addition, by failing to provide Plaintiffs with their pro rata share of board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees, or other benefits arising out of Investment Opportunities covered by the Agreements, Defendant Insight breached the Agreements.

126. As a result of the foregoing breaches of the Agreements, Plaintiffs have been damaged in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST INSIGHT VENTURE MANAGEMENT, INC.**

**(Breach of Implied Duties of Good Faith and Fair Dealing)**

127. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 126 of this Complaint as if set forth in full herein.

128. By engaging in the wrongful scheme described herein in order to deny Plaintiffs the full benefits of the Agreements, Insight breached the duties of good faith and fair dealing implied by law in the Agreements.

129. As a result of the foregoing breaches of the Agreements, Plaintiffs have been damaged in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS OTHER THAN INSIGHT**

**(Tortious Interference)**

130. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 129 of this Complaint as if set forth in full herein.

131. Each of Defendants was aware of the contractual agreements between Insight and Plaintiffs as reflected in the Agreements.

132. Despite this knowledge, through the wrongful acts set forth herein, each of Defendants other than Insight, intentionally and knowingly acted to interfere with those relations by assisting in, or otherwise procuring, Insight's breach of the Agreements through the failure properly to advise Plaintiffs regarding Investment Opportunities identified by Insight during the term of the Agreements and to provide Plaintiffs with their full rights of first refusal.

133. The actions of Defendants other than Insight in this regard were taken for the wrongful purpose of diverting to Defendants valuable Investment Opportunities that should have been made available to Plaintiffs pursuant to the Agreements.

134. By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants other than Insight, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**AGAINST INSIGHT VENTURE MANAGEMENT, INC.**

**(Breach of Fiduciary Duty)**

135. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 134 of this Complaint as if set forth in full herein.

136. By virtue of its relationship as investment advisor to Plaintiffs pursuant to the terms of the Agreements, Defendant Insight owed the highest obligations and fiduciary duties to Plaintiffs. Insight was duty-bound to act in a responsible and lawful manner, and with utmost good faith, so as not to cause injury to Plaintiffs.

137. In particular, Insight owed duties to each of Plaintiffs to make full and candid disclosure of all material facts relating to Investment Opportunities identified by Insight, and to deal fairly and honestly with Plaintiffs. Insight was further obligated to refrain from any fraudulent or wrongfully self-benefiting conduct to the detriment of Plaintiffs or any of them.

138. In engaging in the systematic course of conduct alleged herein, and in collaborating with other Defendants in that wrongful conduct, Insight repeatedly breached its fiduciary and related obligations to Plaintiffs.

139. Insight's conduct was purposeful and malicious and departed in the extreme from the norms expected of an investment advisor in the position of Insight. Insight cavalierly disregarded its duties to, and the interests of, Plaintiffs.

140. Each of Plaintiffs has been damaged by the wrongful conduct of Insight in that, as a result of Insight's breaches of its fiduciary and related duties, Plaintiffs did not receive the full rights of first refusal to which they were entitled with respect to the Investment Opportunities described above, not did Plaintiffs receive their pro rata share of all fees, options, and other benefits obtained by Defendants in connection therewith, all to Plaintiffs' economic detriment.

141. Insight also breached its fiduciary duties to Plaintiffs when its principal and control person, Horing, wrongfully executed the "Investors Agreement" on behalf of WISI — without authorization from, or notice to, Plaintiffs — so as to cause the unlawful conversion of WISI-owned Altitude warrants worth millions of dollars.

142. By reason of the foregoing, Plaintiffs are entitled to a judgment against Insight, awarding them compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS OTHER THAN INSIGHT

(Aiding and Abetting Breach of Fiduciary Duty)

143. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 142 of this Complaint as if set forth in full herein.

144. Each Defendant knew or recklessly disregarded the fact that Insight owed fiduciary and other obligations to Plaintiffs, and each Defendant knew, or recklessly disregarded, the fact that Insight was breaching those obligations by engaging in the conduct alleged herein.

145. With such knowledge, Defendants other than Insight provided substantial assistance to, aided and abetted, and conspired to bring about Insight's breaches of its fiduciary obligations to Plaintiffs by, inter alia, encouraging and enabling Insight and its and their representatives and agents, including, without limitation, Defendants Murdock and Horing, to misrepresent the availability of Investment Opportunities under the Agreements and to "assign" WISI-owned warrants to third parties.

146. Plaintiffs have been damaged by the wrongful conduct of Defendants other than Insight in that such conduct, inter alia, caused them to be deprived of their rights under the Agreements to make investments in the Investment Opportunities identified by Insight that were diverted to Defendants and/or their affiliates.

147. The conduct of Defendants other than Insight, as alleged herein, was done purposely, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs.

148. By reason of the foregoing, Plaintiffs are entitled to a judgment against all Defendants other than Insight, jointly and severally, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Fraud and Misrepresentation)

149. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 148 of this Complaint as if set forth in full herein.

150. As more fully set forth above Defendants, through Horing and Murdock as their representatives and agents, made knowingly false and misleading statements of material facts, and omitted other facts necessary to make such statements not misleading, concerning the Investment Opportunities, including, inter alia, the following:

- By representing to Plaintiffs in statements made on August 29, 1999 (through Defendant Horing), on October 6, 1999 (by Defendant Horing), and October 8, 1999 (through Defendant Murdock) that the Illuminet Investment Opportunity had been discussed with Plaintiffs in 1998 or early 1999;
- By representing to Plaintiffs in statements on October 6, 1999 (through Defendant Horing) and October 8, 1999 (through Defendant Murdock) that the Illuminet deal was "small" and that

illuminet lacked real financial data, had a questionable management structure, and was "tough" to value;

- By representing on April 18, 1999 (through Defendant Murdock) that Quest was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on April 18, 1999 (through Defendant Murdock) that Convergent Group was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on or about April 18, 1999 (through Defendant Murdock) and on April 20, 1999 (through Defendant Horing) that Greenfield Online was not an Investment Opportunity subject to the terms of the Agreement; and
- By representing on or about April 18, 1999 (through Defendant Murdock) that Click was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on June 7, 1999 (through Defendant Horing) that there was no "room" for Plaintiffs in the Click investments, which was purported to be $5 million "deal"; and
- By representing on February 1, 2000 (through Defendant Murdock) that Defendants' failure to provide Plaintiffs with an Investment Opportunity in Click was caused by some unidentified "problem" with Compaq.

151. Each Defendant knew that the foregoing statements made by them or on their behalf constituted a fraud and deceit on Plaintiffs and would result in, and did result in, Plaintiffs' reliance thereon and forbearance in seeking to enforce its rights under the Agreements in response to Insight's wrongful allocation of Investment Opportunities, in whole or in part, to Defendants and/or their affiliates, to Plaintiffs' economic detriment. In particular, as a result of Defendants' misrepresentations, on which Plaintiffs relied, Plaintiffs did not demand its full investment rights with respect to the Investment Opportunities in Quest, Convergent Group, Greenfield Online, and Click.

152. In addition, Defendants intentionally omitted to inform Plaintiffs of Investment Opportunities in Illuminet, HUON, Authorize.Net, and Altitude.

153. Defendants made the material misrepresentations, and omitted to disclose the material facts, as alleged herein, with the intention of inducing Plaintiffs to acquiesce in Defendants' allocations, in whole or in part, of Investment Opportunities to Plaintiffs in amount less than their full right of first refusal to which they were entitled under the Agreements, to the economic detriment of Plaintiffs.

154. Plaintiffs have been damaged by Defendants' fraudulent conduct in that Plaintiffs did not act to enforce their full rights of first refusal to which Plaintiffs were entitled under the terms of the Agreements.

155. Further, Defendants perpetrated an additional fraud on Plaintiffs by "assigning" to third parties valuable warrants in Altitude owned by WISI, wrongfully executing an agreement to that effect for WISI, without authorization from, or notice to, Plaintiffs, and intentionally hiding from Plaintiffs that "assignment" and the Investment Opportunity of which it was a part.

156. Defendants' fraudulent conduct, as alleged herein, was done purposely, maliciously, and without regard for the rights and interests of Plaintiffs.

157. By reason of the foregoing, Plaintiffs are entitled to a judgment against all Defendants, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

**AS AND FOR A SEVENTH CAUSE OF**
**ACTION AGAINST ALL DEFENDANTS**

**(Aiding and Abetting Fraud or Misrepresentation)**

158. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 157 of this Complaint as is set forth in full herein.

159. Each Defendant played a significant role in the fraudulent activities described herein, with knowledge or reckless disregard thereof. Each Defendant knowingly and substantially assisted in the fraud and misrepresentations perpetrated on Plaintiffs.

160. The conduct of each Defendant proximately caused significant damages to Plaintiffs. The fraud and misrepresentations alleged herein could not have succeeded without the knowing and active participation of each Defendant.

161. The conduct of Defendants was purposeful and malicious, or reckless, and it departed in the extreme from the norms expected of commercial parties and their representatives. Defendants cavalierly disregarded their duties to, and the interests of, Plaintiffs.

162. Plaintiffs have been damaged by the wrongful conduct of all of Defendants in that Plaintiffs did not act to enforce their rights, including their full rights of first refusal under the terms of the Agreements.

163. By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants, jointly and severally, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

**AS AND FOR A EIGHTH CAUSE OF**
**ACTION AGAINST ALL DEFENDANTS**

**(Conversion)**

164. Plaintiffs repeat and realiege the allegations of paragraphs 1 through 163 of this Complaint as is set forth in full herein.

165. The actions of defendant Horing, which were taken on his own behalf and on behalf of the other Defendants, in causing the purported "assignment" of Altitude warrants owned by WISI to third parties was unauthorized by, and hidden from, Plaintiffs.

166. Defendants' wrongful actions in connection with the "assignment" of Altitude warrants held by WISI as aforesaid constituted the wrongful conversion of property owned by WISI.

167. The conduct of Defendants was purposeful and malicious, or reckless, and it departed in the extreme from the norms expected of commercial parties and their representatives. Defendants cavalierly disregarded their duties to, and the interests of, Plaintiffs.

168. By reason of the foregoing, Plaintiff WISI is entitled to a judgment against Defendants, jointly and severally, awarding Plaintiff WISI compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $4 million, together with interest and costs as allowed by law.

**AS AND FOR A NINTH CAUSE OF**
**ACTION AGAINST ALL DEFENDANTS**

**(Negligent Misrepresentation)**

169. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 168 of this Complaint as is set forth in full herein.

170. As more fully set forth above, Defendants, through Horing and Murdock, as their representatives and agents, negligently made false and misleading statements of material facts and omitted other facts necessary to make the statement made not misleading, relating to Defendants' obligations under the Agreements, in gross disregard of Plaintiffs' rights, including, inter alia, the following:

- By representing to Plaintiffs in statements made on August 29, 1999 by Defendant Horing, on October 6, 1999 (through Defendant Horing) and October 8, 1999 (through Defendant Murdock) that the Illuminet investment had been discussed with Plaintiffs in 1998 or early 1999;
- By representing to Plaintiffs in statements on October 6, 1999 (through Defendant Horing) and October 8, 1999 (through Defendant Murdock) that the Illuminet deal was "small" and that Illuminet lacked real financial data, had a questionable management structure, and was "tough" to value;

- By representing on April 18, 1999 (through Defendant Murdock) that Quest was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on April 18, 1999 (through Defendant Murdock) that Convergent Group was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on or about April 18, 1999 (through Defendant Murdock) and on April 20, 1999 (through Defendant Horing) that Greenfield Online was not an Investment Opportunity subject to the terms of the Agreement; and
- By representing on or about April 18, 1999 (through Defendant Murdock) that Click was not an Investment Opportunity subject to the terms of the Agreement;
- By representing on June 7, 1999 (through Defendant Horing) that there was no "room" for Plaintiffs in the Click investments, which was purported to be $5 million "deal"; and
- By representing on February 1, 2000 (through Defendant Murdock) that Defendants' failure to provide Plaintiffs with an Investment Opportunity in Click was caused by some unidentified "problem" with Compaq.

171. In addition, Defendants negligently or recklessly omitted to inform Plaintiffs of the Investment Opportunity or related investment rights in Illuminet, Authorize.Net, and Altitude in flagrant and gross disregard of Plaintiffs' rights.

Defendants also negligently or recklessly failed to inform Plaintiffs of the purported "assignment" of WISI's Altitude warrants.

172. Each Defendant should have known that the statements made to Plaintiffs were factually incorrect and would result in, and did result in, Plaintiffs' reliance thereon and acquiescence in Defendants' allocation of investment opportunities in whole or in part to themselves, despite the obligations of the Agreements, to Plaintiffs' economic detriment.

173. Defendants negligently or recklessly made the material misrepresentations, and omitted to disclose the material facts, as alleged herein, in flagrant and gross disregard of the rights of Plaintiffs.

174. Plaintiffs have been damaged by Defendants' grossly negligent and reckless conduct in that, inter alia, Plaintiffs did not act to enforce their full rights of first refusal under the terms of the Agreements, thus losing materially advantageous Investment Opportunities, or to block the "assignment" of WISI's valuable Altitude warrants to third parties.

175. By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants, jointly and severally, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law.

## AS AND FOR A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Unjust Enrichment)

176. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 175 of this Complaint as if set forth in full herein.

177. By virtue of Defendants' wrongful diversion of Investment Opportunities that rightfully should have been allocated to Plaintiffs as set forth herein, Insight, Horing, Murdock, Insight Venture II, Insight Venture III, Insight II, Insight Cayman II, Insight III, Insight Co-Investors, Insight Cayman III, and/or their affiliates have been unjustly enriched in the amount of at least $540 million.

178. By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants, jointly and severally, awarding them compensatory damages in an amount to be determined at trial, but believed to be no less than $540 million, together with interests and costs as allowed by law.

**AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**(Mandatory Injunction)**

179. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 178 of this Complaint as if set forth in full herein.

180. As a result of the wrongful actions of Defendants as set forth herein, Defendants and/or their affiliates have wrongfully acquired or retained property, in the form of securities, options, and other non-cash property, rightfully belonging to Plaintiffs.

181. A mandatory injunction should be issued requiring Defendants and/or their affiliates to turn over to Plaintiffs all such wrongfully obtained and/or retained securities, options, and other property.

182. Plaintiffs have no adequate remedy at law to obtain these securities, options, and other non-cash property because each of these securities, options, and other non-cash property has increased significantly in value since their

acquisition by Defendants and/or their affiliates and the opportunity to acquire those investments at the price they were acquired by Defendants and/or their affiliates no longer exists.

**AS AND FOR A TWELFTH CAUSE**
**OF ACTION AGAINST ALL DEFENDANTS**

**(Imposition of a Constructive Trust)**

183. Plaintiffs repeat and realiege the allegations of paragraphs 1 through 182 of this Complaint as if set forth in full herein.

184. By virtue of the investment advisor relationship created by the Agreements, Insight was in a confidential and/or fiduciary relationship with Plaintiffs.

185. As a consequence of the wrongs alleged herein, Defendants caused to be transferred to themselves or their affiliates Investment Opportunities rightfully belonging to Plaintiffs.

186. As a result of Defendants' wrongful diversion to themselves or their affiliates of Investment Opportunities that rightfully should have been allocated to Plaintiffs as set forth herein, Insight, the other Defendants, and/or their affiliates have been unjustly enriched and are in the possession of securities, options, and other property that rightfully belongs to Plaintiffs, or if they have liquidated those investments, of the proceeds thereof.

187. As a consequence of the foregoing, Plaintiffs are entitled to the imposition of a constructive trust on all investments, and/or any proceeds or profits therefrom, made or received by Defendants and/or their affiliates, with respect to Investment Opportunities as to which Plaintiffs were wrongfully denied their rights under the Agreements.

188. Plaintiffs have no adequate remedy at law.

## AS AND FOR AN THIRTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

**(Accounting)**

189. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 188 of this Complaint as if set forth in full herein.

190. In light of Defendants' wrongful actions as set forth herein, Plaintiffs are entitled to an accounting from Defendants regarding all Investment Opportunities, whether or not presented to Plaintiffs or otherwise allocated to them pursuant to the terms of the Agreements, setting forth all investments made in such Opportunities, the profits and/or appreciation received therefrom or in connection therewith, and regarding all board, break-up fees, closing fees, consulting fees, advisory fees, transaction fees, other fees, options, hot issue IPO allocations, or other benefits paid to or received by Defendants or any of their affiliates that in any way arise from Investment Opportunities subject to the Agreements.

191. Plaintiffs have no adequate remedy at law.

**WHEREFORE,** Plaintiffs respectfully demand judgment as follows:

i. on the First Cause of Action, compensatory damages against Defendant Insight Venture Management, Inc., in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

ii. on the Second Cause of Action, compensatory damages against Defendant Insight Venture Management, Inc., in an amount to be

established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

iii. on the Third Cause of Action, compensatory and punitive damages against all Defendants other than Insight Venture Management, Inc., in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

iv. on the Fourth Cause of Action, compensatory and punitive damages against Defendants Insight Venture Management, Inc., in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

v. on the Fifth Cause of Action, compensatory and punitive damages against all Defendants other than Insight Venture Management, Inc. in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

vi. on the Sixth Cause of Action, compensatory and punitive damages against all Defendants in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

vii. on the Seventh Cause of Action, compensatory and punitive damages against all Defendants in an amount to be established at

trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

viii. on the Eighth Cause of Action, compensatory and punitive damages against all Defendants in an amount to be established at trial, but believed to be no less than $4 million, together with interest and costs as allowed by law;

ix. on the Ninth Cause of Action, compensatory and punitive damages against all Defendants in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

x. on the Tenth Cause of Action, compensatory damages against all Defendants in an amount to be established at trial, but believed to be no less than $540 million, together with interest and costs as allowed by law;

xi. on the Eleventh Cause of Action, for a mandatory injunction requiring Defendants to turn over to Plaintiffs all securities, options, or other non-cash property that rightfully belongs to Plaintiffs;

xii. on the Twelfth Cause of Action, imposing a constructive trust on all investments, and/or proceeds or profits flowing therefrom to Defendants or their affiliates, in connection with Investment Opportunities that wrongfully were denied to Plaintiffs;

xiii. on the Thirteenth Cause of Action, for an accounting from Defendants regarding all Investment Opportunities under the

Agreements and all fees, options, hot issue IPO allocations, and other benefits received by Defendants; and

xiv. for such other and further relief as to the Court deems just and proper.

Dated: New York, New York
October 12, 2000

BERLACK, ISRAELS & LIBERMAN LLP

By: [signature]
Martin S. Siegel, Esq.
Andrew Dash, Esq.

120 West 45th Street
New York, New York 10036
(212) 704-0100
Attorneys for Plaintiffs

Exhibit A

CONSULTING AGREEMENT

This consulting agreement dated as of April 3, 1997, is by and between WI Software Investors LLC ("WISI"), a Delaware limited liability company having an address at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830, and InSight Venture Management, Inc. ("InSight"), a corporation organized and existing under the laws of the State of Delaware with an address at 411 West Putnam Avenue, Greenwich, Connecticut 06830.

WHEREAS, WISI has been formed as a Delaware limited liability company for the purpose of making investments in companies engaged in the software and other industries; and

WHEREAS, WISI desires to engage InSight to advise on investments in such industries, and InSight desires to advise WISI in such capacity, on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Investment Opportunities: During the period commencing on the date of this Agreement and ending on the second anniversary of the date hereof (the "Investment Period"), InSight shall identify for WISI investment opportunities in the software and related industries (each, an "Investment Opportunity"). For each such Investment Opportunity, InSight or its affiliates shall give written notice to WISI of its right of first refusal to participate in such Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by InSight or its affiliates (including investors therein). WISI shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by InSight. For each such proposed Investment Opportunity, InSight or its affiliates shall provide in a form satisfactory to WISI written details of such proposed Investment Opportunity. Within ten business days following receipt of such notice, WISI shall give notice to InSight as to whether it intends to invest in such Investment Opportunity and the amount of its proposed investment. In the event that any "New Material Terms" develop with respect to such Investment Opportunity following the original written notice, WISI's original acceptance or rejection shall be void and such New Material Terms shall constitute a new Investment Opportunity for which InSight or its affiliates shall submit a new written notice. For purposes of this agreement, "New Material Terms" shall mean a change in price of 10% or more, or a change in the proposed Investment Opportunity. For any Investment Opportunity that WISI declines to invest in, or for which WISI does not provide notice of its acceptance as set forth herein, InSight or its designee shall have the right to participate in up to 100% of such Investment Opportunity, subject to its requirement to submit a written notice to WISI in the event of any New Material Terms.

2. Proxy: WISI hereby constitutes and appoints InSight, or any nominee of InSight, with full power of substitution, prior to the Proxy Termination Date (as defined in the following sentence of this paragraph 2), as WISI's true and lawful attorney and irrevocable proxy, for and in WISI's name, place and stead, to vote each of the shares of capital stock or other equity interests in all Investment



57062.1

Opportunities as WISI's proxy, at every annual, special or adjourned meeting of the shareholders or equity holders of any Investment Opportunity (including the right to sign WISI's name to any consent, certificate or other document relating to any such Investment Opportunity) for any lawful purpose other than for "Significant Matters" as that term is defined below in this paragraph 2; WISI intends this proxy to be irrevocable (prior to the Proxy Termination Date) and coupled with an interest and will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy. WISI shall have the right to terminate the proxy given pursuant to this provision with respect to any security in an Investment Opportunity on the date (the "Proxy Termination Date") which is the earliest of: (v) six months after a public offering of at least twenty-five percent (25%) of the fully diluted capital stock of the Investment Opportunity which issued the securities held by WISI, (w) four years after the date of this Agreement; (x) a material breach by InSight of its obligations under this Agreement; (y) the dissolution, bankruptcy or legal incapacity of Insight or its permitted assignee hereunder or (z) the death, legal incapacity, legal disability or conviction of a felony of Jeffrey Horing or Jerry Murdock.

For "Significant Matters" (as specified in the following sentence) with respect to any Investment Opportunity, InSight agrees that it shall be required to provide prompt notice of such matters to WISI and to vote WISI's securities on such matters in the manner directed by WISI. For purposes of this Agreement, "Significant Matters" shall mean: (a) amendments to the certificate of incorporation of the Investment Opportunity requiring greater than a majority vote, or requiring a vote by a special class or series; (b) mergers (other than mergers among affiliates) or consolidations; (c) sale, lease, exchange or other disposition of all or substantially all of the Investment Opportunity's assets; or (d) dissolution of the Investment Opportunity.

WISI shall have the right to terminate the proxy given pursuant to this Paragraph 2 with respect to any vote on a Significant Matter with respect to an Investment Opportunity prior to the Proxy Termination Date.

3. <u>Minimum Number and Amount</u>: InSight agrees that during the Investment Period it will identify to WISI at least six separate Investment Opportunities, all of which if invested in by WISI would allow for a total aggregate investment by WISI of at least $20 million; <u>provided</u> that in the event of InSight's failure to identify such Investment Opportunities to WISI during the Investment Period, InSight agrees that it shall promptly return to WISI any Management Fees (defined in paragraph 5 below) paid pursuant to this Agreement prior to April 3, 1999 to the extent such fees exceed 2% of the Outstanding Principal Amount (defined below).

For purposes of this Agreement, "Outstanding Principal Amount" shall mean the amount of cash invested by WISI pursuant to this Agreement in any securities of any Investment Opportunity minus distributions in respect of such securities representing a return of capital to WISI in respect of such initial cash investment.

4. <u>Sole Discretion</u>: WISI shall have the right in its sole discretion to determine whether and to what extent to proceed with or participate in any Investment Opportunity originated by InSight. In the event that a WISI entity other than WISI InSight LLC shall directly participate in an Investment

Opportunity pursuant to this Agreement, such event shall be deemed a breach of this Agreement absent InSight's written approval of such investment.

5. Management Fee: In consideration of the rights and benefits afforded to WISI hereunder: (a) during the Investment Period, WISI shall pay to InSight or its designee an annual fee of the greater of: (x) $375,000; or (y) 2% of the Outstanding Principal Amount, which fee will be paid in monthly installments in advance beginning on April 3, 1997, and thereafter on the first day of each month ending with a payment on March 1, 1999, and (b) for the three-year period beginning April 3, 1999, WISI shall pay InSight or its designee an annual fee in the amount of 2% of the Outstanding Principal Amount invested pursuant to this Agreement, which fee will be paid in installments in advance on the first day of each month of such period, ending with a payment on March 1, 2002 (collectively, the "Management Fee"); provided, however, that the obligation to pay such Management Fee shall terminate prior to March 1, 2002 upon the earliest to occur of: (x) a material breach by InSight of its material obligations under this Agreement; (y) the dissolution, bankruptcy or legal incapacity of InSight or its permitted assignee; or (z) the death, legal incapacity, legal disability or conviction of a felony of Jeffrey Horing or Jerry Murdock.

6. Allocation of Fees: Any board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to InSight or an affiliate but allocable in any manner to any investment by WISI in an Investment Opportunity pursuant to the terms of this Agreement will be delivered by InSight to WISI within ten business days of InSight's receipt thereof, provided that any amounts of up to $25,000 allocated to WISI pursuant to this provision may be retained by InSight and credited against the Management Fee that is otherwise payable by WISI and then currently outstanding. The obligations under this Section 6 shall survive the termination of this Agreement.

7. Due Diligence Expense: Any due diligence expenses reasonably incurred by InSight in connection with the Investment Opportunity shall be borne pro rata by InSight and WISI in proportion to their respective amounts invested in the Investment Opportunity, provided, however, that for prospective investments that do not become Investment Opportunities, WISI agrees to bear 50% (up to $100,000) of such expenses, and amounts greater than $100,000 subject to WISI giving prior written approval for such expenses. In the event that WISI declines for any reason to invest in any Investment Opportunity, WISI shall have no obligation to bear any portion of such due diligence expense.

8. Indemnification: WISI shall indemnify InSight and each of its affiliates, advisors, officers, directors, shareholders, employees and agents from and against any and all material claims, losses and liabilities arising out of or resulting from (a) any breach by WISI of this Agreement; (b) any action or omission by WISI; or (c) any action or omission by InSight in reliance on any written communication believed to be genuine and to have been given by or on behalf of WISI (including, without limitation, any actions or inactions taken or not taken in any way related to the grant of the proxies contemplated hereby), except claims, losses or liabilities involving Insights gross negligence or willful misconduct. The obligations of WISI under this Section 8 shall survive the termination of this Agreement.

InSight shall indemnify WISI and each of its affiliates, advisors, officers, directors, shareholders, employees and agents from and against any and all material claims, losses and liabilities arising out of or resulting from (a) any breach by InSight of this Agreement; (b) any action or omission by InSight; or (c) any action or omission by WISI in reliance on any written communication believed to be genuine and to have been given by or on behalf of InSight, except claims, losses or liabilities involving WISI gross negligence or willful misconduct. The obligations of InSight under this Section 8 shall survive the termination of this Agreement.

9. Liquidation of Investments: At any time after five years from the date of this Agreement, WISI shall have the right to instruct InSight to liquidate any investments made pursuant to this Agreement, and InSight agrees to effect such liquidation as promptly as possible following such instruction, provided, however, that InSight shall use its reasonable best efforts to effectuate such liquidation within 180 days after WISI makes any such instruction. The obligations under this Section 9 shall survive the termination of this Agreement.

10. Life Insurance: InSight agrees to make Jeffrey Horing and Jerry Murdoch available as reasonably requested by WISI or its affiliate to obtain life insurance on Mr. Horing and Mr. Murdoch.

11. Notifications: Any notice required or permitted to be made hereunder shall be in writing and delivered to the appropriate party by hand or by overnight delivery service (such as Federal Express) at the address set forth above or at such other address as may be provided pursuant to this provision.

12. No Assignment: Neither party hereto shall be permitted to assign its rights or obligations under this Agreement without the prior written consent of the other party which consent shall not unreasonably be withheld.

13. No Amendment; Governing Law: This Agreement may not be amended or modified in any manner nor may any of its provisions be waived except by written amendment executed by the parties. This Agreement will be governed by the laws of the State of New York applicable to contracts made and performed within such state.

IN WITNESS WHEREOF, the parties have set their hands as of the date first written above.

| WI SOFTWARE INVESTORS LLC<br>By: Wexford Management LLC<br>as Manager | INSIGHT VENTURE MANAGEMENT INC. |
|---|---|
| By: [signature]<br>Name:<br>Title: | By: [signature]<br>Name: [signature]<br>Title: |



17062.1

Exhibit B

# CONSULTING AGREEMENT

This consulting agreement dated as of September 30, 1998 is by and between Imprimis Investors LLC (together with its direct and indirect subsidiaries, "Imprimis"), a Delaware limited liability company having an address at c/o Wexford Management LLC, 411 West Putnam Avenue, Greenwich, Connecticut 06830, and Insight Venture Management, Inc. ("InSight"), a corporation organized and existing under the laws of the State of Delaware with an address at 122 East 42 Street, New York, N.Y. 10168.

WHEREAS, Imprimis has been formed as a Delaware limited liability company for the purpose of making various investments, including investments in companies engaged in the software and other industries; and

WHEREAS, Imprimis desires to engage InSight to advise on investments in such industries, and InSight desires to advise Imprimis in such capacity, on the terms and conditions set forth herein.

WHEREAS, InSight has previously provided investment advice to WI Software Investors LLC ("WISI"), an affiliate of Imprimis pursuant to a Consulting Agreement (the "WISI Agreement") dated as of April 3, 1997 (the "Effective Date") by and between WISI and Insight.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Investment Opportunities</u>. During the period commencing on the date of this Agreement and ending on the second anniversary of the Effective Date (the "Investment Period"), InSight shall provide Imprimis with a right of first refusal for all investment opportunities in the software and related industries identified by InSight (each, an "Investment Opportunity"). For each Investment Opportunity, Imprimis' right of first refusal entitles it to participate in the Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by InSight or its affiliates (including investors therein). Imprimis shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by InSight. For each proposed Investment Opportunity, InSight or its affiliates shall provide in a form satisfactory to Imprimis written details of such proposed Investment Opportunity. Within ten business days following receipt of such notice, Imprimis shall give notice to InSight as to whether it intends to invest in such Investment Opportunity and the amount of its proposed investment. In the event that any New Material Terms (as defined below) develop with respect to an Investment Opportunity following the original written notice, Imprimis' original acceptance or rejection shall be void and such New Material Terms shall constitute a new Investment Opportunity for which InSight or its affiliates shall submit a new written notice. For purposes of this agreement, "New Material Terms" shall mean a change in price of 10% or more, or a change in the proposed Investment Opportunity. For any Investment Opportunity that Imprimis declines to invest in, or for which Imprimis does not provide notice of its acceptance as set forth

herein, InSight or its designee shall have the right to participate in up to 100% of such Investment Opportunity, subject to its requirement to submit a written notice to Imprimis in the event of any New Material Terms.

2. Proxy. Imprimis hereby constitutes and appoints InSight, or any nominee of InSight, with full power of substitution, prior to the Proxy Termination Date (as defined below), as Imprimis' true and lawful attorney and irrevocable proxy, for and in Imprimis' name, place and stead, to vote each of the shares of capital stock or other equity interests in all Investment Opportunities as Imprimis' proxy, at every annual, special or adjourned meeting of the shareholders or equity holders of any Investment Opportunity (including the right to sign Imprimis' name to any consent, certificate or other document relating to any such Investment Opportunity) for any lawful purpose other than for Significant Matters (as defined below). Except as otherwise expressly provided herein, Imprimis intends this proxy to be irrevocable (prior to the Proxy Termination Date) and coupled with an interest and will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy. Imprimis shall have the right to terminate the proxy given pursuant to this provision with respect to any security in an Investment Opportunity on the date (the "Proxy Termination Date") which is the earliest of: (v) six months after (I) a public offering of at least twenty-five percent (25%) of the fully diluted capital stock of the respective Investment Opportunity, (II) the acquisition of at least twenty-five percent (25%) of the fully diluted capital stock of the respective Investment Opportunity by a publicly traded company, or (III) the merger into a publicly traded company of the respective investment opportunity; (w) four years after the date of this Agreement; (x) a material breach by InSight of its obligations under this Agreement; (y) the dissolution, bankruptcy or legal incapacity of Insight or its permitted assignee hereunder or (z) the death, legal incapacity, legal disability or conviction of a felony of Jeffrey Horing or Jerry Murdoch.

Imprimis shall also have the right to terminate the proxy given pursuant to this provision prior to the Proxy Termination Date with respect to any vote on a Significant Matter. For Significant Matters with respect to any Investment Opportunity, InSight agrees that it shall be required to provide prompt notice of such matters to Imprimis and to vote Imprimis' securities on such matters in the manner directed by Imprimis. For purposes of this Agreement, "Significant Matters" shall mean: (a) amendments to the certificate of incorporation of the Investment Opportunity requiring greater than a majority vote, or requiring a vote by a special class or series; (b) mergers (other than mergers among affiliates) or consolidations; (c) sale, lease, exchange or other disposition of all or substantially all of the Investment Opportunity's assets; or (d) dissolution of the Investment Opportunity.

3. Minimum Number and Amount. InSight agrees that during the two year period following the Effective Date it will identify to Imprimis at least six separate Investment Opportunities, all of which if invested in by Imprimis would allow for a total aggregate investment by Imprimis of at least $20 million; provided that (a) any Investment Opportunity previously identified to WISI pursuant to the WISI Agreement shall be deemed to have been identified to Imprimis for purposes of this provision, and (b) in the event of InSight's failure to identify such Investment Opportunities to Imprimis during such period, InSight agrees that it shall promptly return to Imprimis any Management Fees (defined

in Section 5 below) paid pursuant to this Agreement prior to April 3, 1999 to the extent such fees exceed 2% of the Outstanding Principal Amount (as defined below).

For purposes of this Agreement, "Outstanding Principal Amount" shall mean the aggregate amount of cash invested by Imprimis pursuant to this Agreement and invested by WISI pursuant to the WISI Agreement, in each case in any securities of any Investment Opportunity minus distributions in respect of such securities representing a return of capital to Imprimis or WISI as the case may be in respect of such initial cash investments.

4. Sole Discretion. Imprimis shall have the right in its sole discretion to determine whether and to what extent to proceed with or participate in any Investment Opportunity originated by InSight. In the event that an entity affiliated with or controlled by Wexford Management LLC other than Imprimis shall directly participate in an Investment Opportunity pursuant to this Agreement, such event shall be deemed a breach of this Agreement absent InSight's written approval of such investment.

5. Management Fee. In consideration of the rights and benefits afforded to Imprimis hereunder, Imprimis shall pay to InSight or its designee (a) during the Investment Period, an annual fee of the greater of: (x) $375,000; or (y) 2% of the Outstanding Principal Amount, which fee will be paid in monthly installments in advance on the first day of each month ending with a payment on March 1, 1999, and (b) for the three-year period beginning April 3, 1999, an annual fee in the amount of 2% of the Outstanding Principal Amount, which fee will be paid in installments in advance on the first day of each month of such period, ending with a payment on March 1, 2002 (collectively, the "Management Fee"); provided, however, that the obligation to pay such Management Fee shall terminate prior to March 1, 2002 upon the earliest to occur of: (x) a material breach by InSight of its material obligations under this Agreement; (y) the dissolution, bankruptcy or legal incapacity of InSight or its permitted assignee; or (z) the death, legal incapacity, legal disability or conviction of a felony of Jeffrey Horing or Jerry Murdoch.

6. Allocation of Fees. Any board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to InSight or an affiliate but allocable in any manner to any investment by Imprimis or WISI in an Investment Opportunity pursuant to the terms of this Agreement or the WISI Agreement will be delivered by InSight to Imprimis within ten business days of InSight's receipt thereof, provided that any amounts of up to $25,000 allocated to Imprimis pursuant to this provision may be retained by InSight and credited against the Management Fee that is otherwise payable by Imprimis and then currently outstanding. The obligations under this Section 6 shall survive the termination of this Agreement.

7. Due Diligence Expense. Any due diligence expenses reasonably incurred by InSight in connection with the Investment Opportunity shall be borne pro rata by InSight and Imprimis in proportion to their respective amounts invested in the Investment Opportunity, provided, however, that for prospective investments that do not become Investment Opportunities, Imprimis agrees to bear 50% (up to $100,000) of such expenses, and amounts greater than $100,000 subject to Imprimis

giving prior written approval for such expenses. In the event that Imprimis declines for any reason to invest in any Investment Opportunity, Imprimis shall have no obligation to bear any portion of such due diligence expense.

8. Indemnification. Imprimis shall indemnify InSight and each of its affiliates and each of their advisors, officers, directors, shareholders, employees and agents from and against any and all material claims, losses and liabilities arising out of or resulting from (a) any breach by Imprimis or WISI of this Agreement or the WISI Agreement as the case may be; (b) any action or omission by Imprimis or WISI; or (c) any action or omission by InSight in reliance on any written communication believed to be genuine and to have been given by or on behalf of Imprimis or WISI (including, without limitation, any actions or inactions taken or not taken in any way related to the grant of the proxies contemplated hereby), except claims, losses or liabilities involving InSight's gross negligence or willful misconduct. The obligations of Imprimis under this Section 8 shall survive the termination of this Agreement.

InSight shall indemnify Imprimis and each of its affiliates and each of their advisors, officers, directors, shareholders, employees and agents from and against any and all material claims, losses and liabilities arising out of or resulting from (a) any breach by InSight of this Agreement or the WISI Agreement; (b) any action or omission by InSight; or (c) any action or omission by Imprimis in reliance on any written communication believed to be genuine and to have been given by or on behalf of InSight, except claims, losses or liabilities involving Imprimis' gross negligence or willful misconduct. The obligations of InSight under this Section 8 shall survive the termination of this Agreement.

9. Liquidation of Investments. At any time after five years from the Effective Date of this Agreement, Imprimis shall have the right to instruct InSight to liquidate any investments made pursuant to this Agreement or the WISI Agreement, and InSight agrees to effect such liquidation as promptly as possible following such instruction, provided, however, that InSight shall use its reasonable best efforts to effectuate such liquidation within 180 days after Imprimis makes any such instruction. The obligations under this Section 9 shall survive the termination of this Agreement.

10. Life Insurance. InSight agrees to make Jeffrey Horing and Jerry Murdoch available as reasonably requested by Imprimis or its affiliate to obtain life insurance on Mr. Horing and Mr. Murdoch.

11. Notifications. Any notice required or permitted to be made hereunder shall be in writing and delivered to the appropriate party by hand or by overnight delivery service (such as Federal Express) at the address set forth above or at such other address as may be provided pursuant to this provision.

12. No Assignment. Neither party hereto shall be permitted to assign its rights or obligations under this Agreement without the prior written consent of the other party which consent shall not unreasonably be withheld.

109914.1

13. WISI Agreement. The parties agree that this agreement shall supersede and replace the WISI Agreement in all respects and that notwithstanding any provision to the contrary in the WISI Agreement, with the sole exception of Section 2 of the WISI Agreement relating to the granting of proxies, no provision of the WISI Agreement shall survive.

14. No Amendment; Governing Law. This Agreement may not be amended or modified in any manner nor may any of its provisions be waived except by written amendment executed by the parties. This Agreement will be governed by the laws of the State of New York applicable to contracts made and performed within such state.

IN WITNESS WHEREOF, the parties have set their hands as of the date first written above.

IMPRIMIS INVESTORS LLC
By: Wexford Management LLC
as Manager

By: [signature]
Name: [signature]
Title: SVP & General Counsel

INSIGHT VENTURE MANAGEMENT INC.

By: [signature]
Name:
Title: