**OPERATING AGREEMENT** dated as of July 31, 1997, of **INSIGHT VENTURE ASSOCIATES II, L.L.C.**, a Delaware limited liability company (the "Company"), among the parties listed on Schedule A.

The parties are entering into this Agreement for the purpose of forming a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act").

ACCORDINGLY, in consideration of the mutual covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Definitions; Rules of Construction.

(a) When used in this Agreement, the following capitalized terms have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, (i) a director or executive officer of such Person, (ii) a spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of any director or executive officer of such Person), and (iii) any other Person that, directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such Person. The term "control" means and includes the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Available Assets" shall mean as of any date the excess of the cash or cash equivalent items held by the Company over the sum of the amount of such items determined by the Board of Managers to be reasonably necessary for the payment of the Company's expenses, liabilities and other obligations (whether fixed or contingent), and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Company's business.

"Board of Managers" means the board of managers designated pursuant to Section 5.

"Capital Account" shall have the meaning set forth in Section 8(a).

"Capital Commitment" shall mean, with respect to any Member, the amount set forth opposite the name of such Member on Schedule A.



EXHIBIT
6

"Capital Contribution" shall mean, with respect to any Member or with respect to any Partner and a particular Portfolio Investment or Temporary Investment, as the case may be, the amount of capital contributed, or to be contributed, as the case may be, by such member to the Company pursuant to Sections 7(a) or 7(b) and the other provisions of this Agreement.

"Cumulative Incentive Distributions" shall mean those distributions paid to the Company pursuant to Section 4.6(a)(ii)(x) of the Fund Partnership Agreement.

"Delaware Act" has the meaning ascribed to such term in the first paragraph.

"Distributable Cash" shall mean for each period and each Member the excess of the sum of cash receipts of all kinds over cash disbursements for expenses of the Company, to the extent Distributable in accordance with Section 8.3.

"Event of Withdrawal of a Member" means the death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company.

"Fund Contribution" shall have the meaning set forth in Section 7(a).

"Fund Partnership Agreement" shall mean the Limited Partnership Agreement of InSight Capital Partners II, L.P. a Delaware limited partnership.

"Interest" means the ownership interest of a Member in the Company, consisting of (i) such Member's ownership of Interests and right to receive a portion of distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Delaware Act and (iii) such Member's other rights and privileges as herein provided.

"Interests" means collectively or individually, interests of the Company.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Managing Member" means a Member who is a Manager.

"Manager" means a member of the Board of Managers as designated in, or selected pursuant to, Section 5.

"Majority in Interest of Managing Members" means, at any time, the Managing Members who hold in the aggregate

greater than 50% of the profits and capital interest of the Company held by all Managing Members.

"Majority in Interest of Members" means, at any time, the Members who hold in the aggregate greater than 50% of the profits and capital interest of the Company.

"Members" shall mean any Person holding an Interest and who shall be admitted as additional or substituted Members pursuant to this Agreement, so long as they remain Members.

"Net Profits and Net Losses" means the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company.

"Partnership Percentage" shall mean those percentages set forth on Schedule A, as amended from time to time.

"Person" shall mean any individual, entity, corporation, partnership, association, joint-stock company, limited liability company, trust or unincorporated organization.

"Portfolio Company" shall have the meaning set forth in the Fund Partnership Agreement.

"Portfolio Investment" shall have the meaning set forth in the Fund Partnership Agreement.

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal law then in force.

"Sharing Percentage" shall mean those percentages set forth on Schedule A, as amended from time to time.

"Subsidiary" means with respect to any Person, any corporation of which the shares of stock having a majority of the general voting power in electing the Board of Directors of such corporation are, at the time as of which any determination is being made, owned by such Person either directly or indirectly through subsidiaries.

"Supermajority in Interest of Managing Members" means, at any time, Jeffrey Horing and Jerry Murdock.

"Transfer" shall have the meaning set forth in Section 11.

"Temporary Investment" shall have the meaning set forth in the Fund Partnership Agreement.

"Treasury Regulations" shall mean the Regulations of the Treasury Department of the United States issued pursuant to the Code.

(b) The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern the interpretation of any of the terms or provisions of this Agreement.

(c) The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require.

2. Name; Formation; Interests in the Company.

(a) The name of the Company shall be "Insight Venture Associates II, L.L.C.," or such other name as the Board of Managers may from time to time hereafter designate.

(b) The Company was formed upon the execution and filing by Jeffrey Horing (such Person being hereby authorized to take such action) with the Secretary of State of the State of Delaware of a certificate of formation of the Company (the "Certificate").

(c) The Company shall be authorized to issue from time to time Interests, which may be issued pursuant to such agreements as the Board or a committee thereof shall approve, including pursuant to options or warrants. Interests shall entitle the holders thereof to such rights as shall be designated by the Board of Managers upon original issuance of such interest. The Board of Managers, upon the consent of a Supermajority in Interest of Managing Members shall have the right and authority to amend this Agreement to reflect the admission of additional holders of Interests and to reflect the rights of such holders hereunder.

(d) The parties hereto ratify and confirm the filing of the Certificate.

3. Purpose. The purpose of the Company shall be to engage in any lawful business that may be engaged in by a limited liability company organized under the Delaware Act, as such business activities may be determined by the Board of Managers from time to time.

4. Offices.

(a) The principal office of the Company, and such additional offices as the Board of Managers may determine to establish, shall be located at such place or places inside or outside the State of Delaware as the Board of Managers may designated from time to time.

(b) The registered office of the Company in the State of Delaware is located at 9 East Lookerman Street, Dover, County of Kent, Delaware 19901. The registered agent of the Company for service of process at such address is National Registered Agents, Inc.

5. Management of the Company.

(a) Subject to the delegation of rights and powers provided for herein and any rights delegated to a Supermajority in Interest of Managing Members, the Board of Managers shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company. The Board of Managers shall initially consist of three Managers consisting of Ramanan Raghavendran, Jeffrey Horing and Jerry Murdock (the "Initial Board"). The Initial Board shall serve until such time as removed by a Supermajority in Interest of Managing Members. Thereafter, the Board of Managers shall be selected by a Supermajority in Interest of Members. A member of the Board of Managers that is not an individual may act through its duly authorized representative.

(b) No Member, by reason of such Member's status as such, shall have any authority to act for or bind the Company but shall have only the right to vote on or approve the actions herein specified to be voted on or approved by such Member.

(c) The officers of the Company shall be, and shall be elected, removed and perform such functions, as determined by the Board of Managers (upon the direction of the Supermajority in Interest of Managing Members). The Board of Managers (upon the consent of the Supermajority in Interest of Managing Members) may appoint, employ, or otherwise contract with such other Persons for the transaction of the business of the Company or the performance of services for or on behalf of the Company as it shall determine in its sole discretion. The Board of Managers may delegate to any officer of the Company or to any such other Person such authority to act on behalf of the Company as the Board of Managers may from time to time deem appropriate in its sole discretion.

(d) Except as otherwise provided by the Board of Managers, when the taking of such action has been authorized by the Board of Managers, any Manager or officer of the Company or any other Person specifically authorized by the Board of Managers may execute any contract or other agreement or document on behalf of the Company and may execute and file on behalf of the Company with the Secretary of State of the State of Delaware any certificates of amendment to the Company's certificate of formation, one or more restated certificates of formation and certificates of merger or consolidation and, upon the dissolution and completion of winding up of the Company, at any

time when there are fewer than two Members, or as otherwise provided in the Delaware Act, a certificate of cancellation canceling the Company's certificate of formation.

(e) If a vacancy on the Board of Managers is not filled within 60 days after such vacancy occurs by a Supermajority in Interest of Managing Members, such vacancy may thereafter be filled by a majority of the Managers then in office. Managers shall serve until they resign, die, become incapacitated or are removed. Any Manager can be removed with or without cause by the vote of a Supermajority in Interest of Managing Members.

(f) Notwithstanding any of the provisions of this Agreement, or any agreement or any understanding to the contrary, no officer, Member or Managing Member of the Company shall, without the prior approval of the Supermajority in Interest of Managing Members:

(i) approve any expenditure in excess of $25,000; or

(ii) engage or terminate the engagement or employment of any employee or consultant of the Company; or

(iii) create a new direct or indirect subsidiary of the Company; or

(iv) approve of, effect or commit to effect any sale, merger, transfer or other disposition of a Portfolio Investment or Portfolio Company by the Fund; or

(v) make or commit the Company or the Fund to make any investment; or

(vi) make or commit the Company or the Fund to incur any liability in excess of $25,000; or

(vii) make or commit the Company or the Fund to issue securities or borrow money.

**6.** <u>Members; Representations of Members; Representations of Company</u>.

(a) The name and business, mailing or residence address of the initial Members of the Company are set forth on **Schedule A**. **Schedule A** shall be amended from time to time to reflect the names and business, mailing or residence address of each of Persons who shall become Members after the date hereof.

(b) Upon the acquisition of an Interest in the Company, each Member makes the following representations and warranties to the Company with respect to such Interest:

(i) Such Member has such knowledge and expertise in financial and business matters that he or it is capable of utilizing the information made available to the undersigned, to evaluate the merits and risks of an investment in the Company and to make an informed investment decision with respect thereto. The undersigned is aware that his or its purchase of Interests is highly speculative and he or it is able, without impairing his or its financial condition, to hold the Interest for an indefinite period of time and to suffer a complete loss of its or his or its investment.

(ii) Such Member understands and acknowledges that the offering of Interests has not been considered or approved by any governmental or other entity.

(iii) Such Member recognizes that an investment in the Company involves certain risks, and has taken full cognizance of, and understands all of, the risk factors related to the purchase of Interests. Such Member has consulted with his or its professional, tax and legal advisors with respect to the Federal, state, local and foreign income tax consequences of the undersigned's participation as a Member of the Company.

(iv) The execution and delivery of this Agreement by such Member and has been duly authorized.

(v) Such Member understands that there is no public market for Interests in the Company and that the transferability of the Interests is restricted.

(vi) The Interests in the Company is being purchased by such Member for his or its own account only for investment and is not being purchased with a view towards its resale or further distribution. Such Member understands that the Interests are not registered for sale under the Securities Act or otherwise and that the Interests cannot be offered for sale or sold by such Member or by anyone acting for the undersigned's account or on the undersigned's behalf without the registration of the Interests and/or the fulfillment of other regulatory requirements.

7. Capital Contributions; Capital Commitments.

(a) Capital Contributions and Capital Commitments of the Members. Each Member shall contribute to the Company an aggregate amount equal to the Capital Commitment set forth opposite his or its name in Schedule A. If and when the Company shall be required pursuant to the terms of the Fund Partnership Agreement to make any capital contribution to the Fund (a "Fund Contribution"), the Managing Members shall call upon the Members to make Capital Contributions in an aggregate amount, in cash,

equal to the Fund Contribution no later than the date of the Drawdown (as defined in the Fund Partnership Agreement). Subject to Sections 7(b), Capital Contributions shall be made by the Members in proportion to their Capital Commitments.

(b) Clawback Capital Contributions. If and when the Partnership shall be required pursuant to the terms of the Fund Partnership Agreement to make any Fund Contribution to the Fund in connection with the general partner's obligations pursuant to Section 6.1(e) of the Fund Partnership Agreement, Capital Contributions shall be made by the Members in proportion to their Sharing Percentages at the time such investment or investments were made.

8. Capital Accounts; Distributions.

(a) Capital Accounts. There shall be established on the books and records of the Company a capital account (a "Capital Account") for each Member.

(b) Adjustments. As of the last day of each period, the balance in each Capital Account shall be adjusted by (a) increasing such balance by such Member's (i) allocable share of net profit and (ii) Capital Contributions, if any, and (b) decreasing such balance by (x) the amount of cash or the fair market value of property distributed to such Member and (y) such Member's allocable share of net loss. Each Member's Capital Account shall be further adjusted with respect to any special allocations pursuant to Section 8. The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(c) Distributions. Distributable Cash in respect of each Portfolio Investment or Temporary Investment (i) which constitutes Cumulative Incentive Distributions shall be distributed in accordance with each Member's Sharing Percentage and (ii) which does not constitute Cumulative Incentive Distributions shall be distributed to the Members promptly in accordance with each Member's Partnership Percentage.

(d) Overriding Provision. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Delaware Act.

(e) Distributions of Securities by Fund. Upon a distribution of securities by the Fund pursuant to the terms of the Fund Partnership Agreement, the proceeds of the sale deemed to have occurred by reason of Section 6.7 of the Fund Partnership Agreement shall be deemed to have been distributed to the Members for all purposes of this Agreement. Subject to

the following sentence of this Section 8(e), securities distributed in kind shall be distributed in proportion to the aggregate amounts that would be distributed to each Partner pursuant to Section 8(c); such aggregate amounts shall be estimated in the good faith judgment of the Managing Members. The Managing Members may cause certificates evidencing any securities to be distributed to be imprinted with legends as to such restrictions on transfers that they may deem necessary or appropriate, including legends as to applicable Federal or state securities laws or other legal or contractual restrictions, and may require any Member to which securities are to be distributed to agree in writing (i) that such securities will not be transferred except in compliance with such restrictions and (ii) to such other matters that the Managing Members may deem necessary or appropriate.

(f) Negative Capital Accounts. No Member shall be required to make up a negative balance in its Capital Account.

(g) Section 754 Election. The Managing Members may make the election with respect to the tax basis of assets of the Company provided for in Section 754 of the Internal Revenue Code.

(h) No Withdrawal of Capital. Except as otherwise expressly provided herein, no Member shall have the right to withdraw capital from the Company or to receive any distribution or return of such Member's Capital Contributions.

(i) Allocations of Net Profit and Net Loss. With respect to each Fiscal Year, as of the end of such Fiscal Year each item of income, gain, loss, credit and deduction shall be allocated by the Managing Members in a manner that such items are shared and borne under the other provisions of this Section 8 and in accordance with applicable Treasury Regulations.

9. Liability for Return of Capital. No Member or Manager shall have any liability for the return of any Member's Capital Contribution, which Capital Contribution shall be payable solely from the assets of the Company at the absolute discretion of the Board of Managers, subject to the requirements of the Delaware Act.

10. Administrative Matters.

(a) The Company hereby designates Jeffrey Horing as the "Tax Matters Partner" for purposes of Internal Revenue Code Section 6231 and the regulations promulgated thereunder. The Tax Matters Partner shall promptly advise each Member of any audit proceedings proposed to be conducted with respect to the Company.

(b) It is the intention of the Members that the Company shall be taxed as a "partnership" for federal, state, local and foreign income tax purposes. The Members shall take all reasonable actions, including the amendment of this Agreement and the execution of other documents, as may reasonably be required in order for the Company to qualify for and receive "partnership" treatment for federal, state, local and foreign income tax purposes.

(c) The fiscal year of the Company shall be the calendar year. The books and records of the Company shall be maintained in accordance with generally accepted accounting principles and Internal Revenue Code Section 704(b) and the regulations promulgated thereunder.

11. Transfers of Interests. No Member may sell, assign, pledge or otherwise transfer or encumber (collectively, "Transfer") all or any part of its Interest, and no transferees of all or any part of the Interests of a Member shall be admitted as a substituted Member, without, in either event, having obtained the prior written consent of a Majority in Interest of the Members (excluding Managing Members that are transferring Interests), which consent may be withheld in their sole discretion. Any Transfer or attempted Transfer of any Interest in the Company in violation of any the provisions of this Section 11 shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Interests as the owner of such Interests for any purpose. The Board of Managers shall amend Schedule A hereto from time to time to reflect Transfers made in accordance with, and as permitted under, this Section 11.

12. Vesting.

(a) Notwithstanding anything contained in this Agreement to the contrary, the Sharing Percentage allocated to each Member that is an individual shall be subject to vesting as set forth herein. Any Sharing Percentage which is not Vested (as defined herein) as of the earlier of the time that such Member's employment with the Company as an officer, director, manager, or employee thereof (to the extent applicable) is terminated for Cause (as defined herein) by a Supermajority in Interest of Managing Members or terminated for any reason by such Member (a "Termination"), shall be automatically forfeited by such Member as of the effective time of such Termination, without any consideration being paid therefor, and Schedule A shall be automatically amended to reflect the reallocation to the remaining Members who had been previously allocated Sharing Percentages, in accordance with such Member's Sharing Percentage, of the forfeited Sharing Percentages. If any Member is terminated by a Supermajority in Interest of Managing Members as an officer, director, manager and employee of the Company (to the extent applicable) other than for Cause, any Sharing

Percentages held by such Member shall be Vested. For purposes of distributions, capital account allocations and calculations of a Supermajority in Interest of Managing Members made prior to any termination of employment, all Sharing Percentages shall be deemed Vested, and no Member made shall be obligated to return any distributions made to him prior to any such termination (except as may be required pursuant to Section 14(f)). For purposes of this Agreement, "Cause" means, in respect of any Member, (i) material dishonesty, fraudulent conduct or conduct which would constitute a felony violation of law, in each case, by such Member or (ii) the intentional breach by such Member of any representation, warranty or covenant provided by him in any agreement to which he and the Company or any of its Affiliates are parties. For purposes of this Agreement, Interests shall be "Vested" according to any schedule as may be set forth in any agreement between the Company and any Member, and the Board of Managers shall have the right to determine such schedule on behalf of the Company. Notwithstanding anything to the contrary contained herein, (a) no Member may transfer Sharing Percentages held by him or any interest therein to any person if such Sharing Percentages have not Vested at the time of such transfer, (b) a Member's employment as an officer, manager or employee of the Company (if applicable) may be terminated with or without Cause only by the affirmative vote of a Supermajority in Interest of the Managing Members and (c) a Member may be removed as a Managing Member of the Company (if applicable) only by the affirmative vote of a Supermajority in Interest of the Managing Members.

(b) Each Member that is an individual acknowledges and agrees that this Agreement does not create an obligation on the Company or any of its Affiliates or any other person or entity to continue his employment. Each Member that is an individual hereby acknowledges and agrees that his employment, if any, by the Company or any of its Affiliates is on an at will basis and that the Company or any of its Affiliates or related persons may terminate his employment, if any, for any reason.

(c) For purposes of the Operating Agreement, Sharing Percentages of Members who are individuals as of the date hereof shall be "Vested" as follows: (a) from and after December 1, 1997, 40% of the total Sharing Percentage allocated to such Member pursuant to this Agreement, and (b) on June 14, 1998 (the "Vesting Base Date") and at the end of each annual anniversary immediately succeeding the Vesting Base Date, an additional 10% of the total Sharing Percentage allocated to such Member issued pursuant to this Agreement, such that, subject to the terms of this Agreement, on the fifth anniversary of the Vesting Base Date, all of the Sharing Percentage allocated to such Member pursuant to this Agreement shall be "Vested"; provided, that, notwithstanding anything to the contrary contained herein, if any Member's employment with the Company is terminated by reason of the death or disability of such Member,

all of the Sharing Percentages held by such Member at the time of death or termination for disability shall be deemed Vested. Notwithstanding anything to the contrary contained herein, this Section 12 may not be amended without the consent of all parties to this Agreement.

13. Right of First Refusal.

(a) Without limiting any other restriction contained in this Agreement, no Member may Transfer any Interests except by will or the laws of descent and distribution, unless such Member first complies with the provisions of this Section. If at any time a Member (the "Offeree") receives a bona fide proposal from a third party to purchase any of his Interests and such Offeree desires to sell for cash or any other form of consideration (including a promissory note or other deferred consideration) any Interests beneficially owned by such Offeree, such Offeree shall submit a written offer (the "Offer") to sell such Interests (the "Offered Interests") to the other Members as provided herein. The Offer shall disclose the identity of the offeror, the Offered Interests proposed to be sold, the Interests owned by the Offeree, and the proposed terms and conditions, including price and payment terms of the proposed sale. The Offer shall further state that the Members may acquire, in accordance with the provisions of this Section, all of the Offered Interests for the price and upon the other terms and conditions, including deferred payment (if applicable), set forth therein.

(b) If a Member desires to purchase all or any portion of the Offered Interests at the price and on the payment terms set forth in the Offer, such Member shall deliver a written notice of his election to purchase such Interests to the Offeree and each other Member, which notice shall state the number of Offered Interests such Member desires to purchase and shall be delivered in person or mailed to the Offeree and each other Member within ten (10) days of the date of receipt of the Offer. Any Member not giving timely notice shall be deemed to have given notice that it does not wish to purchase any of the Offered Interests. In the event that less than all of the Offered Interests are subscribed for by the Members, such unsubscribed Interests shall be reofferred to the subscribing Members.

(c) If the Members give timely notice of their desire to purchase aggregate Interests greater than the Interests specified in the Offer, then the Offered Interests shall be allocated among and purchased by them (up to the Percentage Interest specified in each of their respective notices) in proportion to the Partnership Percentage of each Member (as then set forth in Schedule A hereto). The Offeree shall as soon as practicable notify the Members of Offered Interests, if any, to be purchased by each Member, as determined

in accordance with this Section. If all Offered Interests are to be purchased, the Members purchasing such Offered Interests shall specify a reasonable place and time, not less than 10 nor more than 30 days from the date of the Offeree's notice, for the closing of the purchase of the Offered Interests. If less than all Offered Interests are to be purchased, such closing shall be conditioned on, and shall occur contemporaneously with, the closing referred to in subsection (d). Such purchases shall be effected by the Offeree's delivery to each purchasing Member, if the Offered Interests to be sold to a purchasing Member by the Offeree shall be in certificated form, of a certificate or certificates evidencing such Offered Interests, duly endorsed for transfer to such purchasing Member, against payment to the Offeree of the purchase price therefor by such purchasing Member, and if Interests are not in certificated form, by the execution and delivery of an instrument assigning such Offered Interests to such purchasing Member against payment to the Offeree of the purchase price therefor by such purchasing Member.

(d) If the Members do not purchase all of the Offered Interests, the Offered Interests not purchased by the Members may be sold by the Offeree at any time within 90 days after the date the Offer was made, subject to the provisions of paragraphs (b), (c) and (d) hereof. Any such sale shall be at not less than the price, and upon other terms and conditions, if any, not more favorable to the purchaser than those, specified in the Offer. The Offeree shall provide at least 30 days' prior written notice of such sale (the "Notice") to each Member. Any Offered Interests not sold within the 90 day period shall again be subject to the requirements of this Section.

(e) The Members may assign their rights and obligations under this Section to the Company with the consent of the Board of Managers.

14. Withdrawal. No Member shall have the right to withdraw from the Company except with the consent of the Board of Managers and upon such terms and conditions as may be specifically agreed upon between the Company and the withdrawing Member. The provisions hereof with respect to distributions upon withdrawal are exclusive, and no Member shall be entitled to claim any further or different distribution upon withdrawal under Section 18-604 of the Delaware Act or otherwise.

15. Additional Members. The Board of Managers shall have the right to cause the Company to issue additional Interests and to admit additional Members upon the acquisition of such Interests upon such terms and conditions, at such time or times, and for such Capital Contributions as shall be determined by the Supermajority in Interest of Managing Members; provided, that, the prior consent of all of the Members shall be required for (i) the issuance by the Company of Interests and the admission of

additional holders of Interests after the second anniversary of the date hereof, and (ii) the issuance by the Company of Interests to any Member or any Affiliate of any Member after the date hereof. In connection with the admission of an additional Member, the Board of Managers shall amend **Schedule A** hereof to reflect the name and address the additional Member. Prior to the admission of any Person as a Member, such Person shall execute a counterpart to this Agreement and shall agree to be bound by the terms hereof.

16. Dissolution.

(a) Subject to the provisions of Section 15, the Company shall be dissolved and its affairs wound up and terminated upon the first to occur of the following:

(i) December 31, 2026;

(ii) the determination of the Board of Managers (upon the consent of Supermajority of Managing Members) and a Majority in Interest of Members to dissolve the Company; or

(iii) the occurrence of an Event of Withdrawal of a Member or any other event causing a dissolution of the Company under Section 18-801 of the Delaware Act.

(b) Upon dissolution of the Company, the Company's affairs shall be promptly wound up in accordance with the provisions of this Section 16. The Company shall engage in no further business except as may be necessary, in the reasonable discretion of the Board of Managers, to preserve the value of the Company's assets during the period of dissolution and liquidation.

(c) Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Board of Managers.

(d) The Net Profits and Net Losses of the Company during the period of dissolution and liquidation shall be allocated among the Members in accordance with the provisions of Section 8.

(e) The assets of the Company (including, without limitation, proceeds from the sale or other disposition of any assets during the period of dissolution and liquidation) shall be applied as follows:

(i) First, to repay any indebtedness of the Company, whether to third parties or the Members, in the order of priority required by law;

(ii) Next, to any reserves which the Board of Managers reasonably deems necessary for contingent or unforeseen liabilities or obligations of the Company (which reserves when they become unnecessary shall be distributed in accordance with the provisions of (iii), below); and

(iii) Next, to the Members in proportion to their respective positive capital account balances (after taking into account all adjustments to the Members' capital accounts required under Section 16(d)).

(f) Each Member agrees to restore any negative capital account to the extent that the aggregate distributions received by such Member from the Company exceed the total amount of the Capital Contributions made by such Member.

17. Continuation of the Company. Notwithstanding the provisions of Section 14, the occurrence of an Event of Withdrawal of a Member shall not dissolve the Company if within 90 days after the occurrence of such Event of Withdrawal of a Member the business of the Company is continued by a Majority in Interest of Members remaining after such Event of Withdrawal.

18. Limitation on Liability. The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager.

19. Amendments. This Agreement may be amended only upon the written consent of the Board of Managers and a Majority in Interest of Members provided that the consent of a Supermajority of Managing Members shall be required to amend any provision which would reduce or adversely affect such Person's rights hereunder.

20. Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**IN WITNESS WHEREOF**, the undersigned have duly executed this Operating Agreement as of the date first written above.

JEFFREY HORING

RAMANAN RAGHAVENDRAN

JERRY MURDOCK

INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.P.

By: INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.L.C. GENERAL PARTNER

By: Jeffrey Horing
Managing Member

**IN WITNESS WHEREOF**, the undersigned have duly executed this Operating Agreement as of the date first written above.

______________________________
JEFFREY HORING

______________________________
RAMANAN RAGHAVENDRAN

______________________________
JERRY MURDOCK

INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.P.

By: INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.L.C. GENERAL PARTNER

By: ______________________________
Jeffrey Horing
Managing Member

**IN WITNESS WHEREOF**, the undersigned have duly executed this Operating Agreement as of the date first written above.

________________________________
JEFFREY HORING

________________________________
RAMANAN RAGHAVENDRAN

________________________________
JERRY MURDOCK

INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.P.

By: INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.L.C.
GENERAL PARTNER

By: ____________________________
Jeffrey Horing
Managing Member

Schedule A

| Name and Address of Member | Capital Commitment | Partnership Percentage | Sharing Percentage |
|---|---|---|---|
| Jeffrey Horing<br>411 West Putnam Avenue,<br>Suite 125<br>Greenwich, CT 06830 | $496,325 | 22.10% | 42.5% |
| Jerry Murdock<br>411 West Putnam Avenue,<br>Suite 125<br>Greenwich, CT 06830 | $496,325 | 22.10% | 42.5% |
| Ramanan Raghavendran<br>411 West Putnam Avenue,<br>Suite 125<br>Greenwich, CT 06830 | $297,803 | 13.28% | 15% |
| InSight Capital Partners II - Co-Investors, L.P.<br>411 West Putnam Avenue,<br>Suite 125<br>Greenwich, CT 06830 | $954,545 | 42.52% | 0% |

S:\2622\008\938968.SAM

# INSIGHT VENTURE ASSOCIATES II, L.L.C.

**AMENDMENT** dated as of May 1, 1998 to the **OPERATING AGREEMENT** dated as of July 31, 1997 (the "Operating Agreement;" capitalized terms have the meaning assigned therein), of **INSIGHT VENTURE ASSOCIATES II, L.L.C., a Delaware limited liability company** (the "Company").

Pursuant to Section 19 of the Operating Agreement, the undersigned parties hereby agree to amend Schedule A to the Operating Agreement to reflect the hereindescribed increases in the capital commitments of a member and the corresponding changes in the percentage interests of the members.

Accordingly, the parties agree as follows:

1. Amendment to Schedule A. As of May 1, 1998, the parties agree and confirm that Schedule A to the Operating Agreement shall be amended as set forth in Exhibit A hereto to reflect the increased commitment of InSight Capital Partners II - Co-Investors, L.P. and its resulting increased percentage interest.

2. Deemed Contribution. The parties acknowledge and agree that $369,090.75 of the Capital Commitment of InSight Capital Partners II - Co-Investors, L.P. shall be deemed to have been made to the Company as of the date hereof.

3. Miscellaneous.

a. Except as amended hereby, all other provisions of the Partnership Agreement shall continue in full force and effect.

b. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, with the same effect as if the parties had executed one counterpart.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year first above written.

INSIGHT CAPITAL PARTNERS II - CO-INVESTORS, L.P.

By: InSight Venture Associates II - Co-Investors, L.L.C.

By: ______________________
Name: ______________________
Title: Managing Member

______________________
Jeffrey Horing

______________________
Ramanan Raghavendren

______________________
Jerry Murdock

SCHEDULE A

| Name and Address of Member | Capital Commitment | Partnership Percentage | Sharing Percentage |
|---|---|---|---|
| Jeffrey Horing<br>122 East 42nd Street<br>Suite 2300<br>New York, NY 10168 | $496,325 | 18.73% | 42.50% |
| Jerry Murdock<br>122 East 42nd Street<br>Suite 2300<br>New York, NY 10168 | $496,325 | 18.73% | 42.50% |
| Ramanan Raghavendran<br>122 East 42nd Street<br>Suite 2300<br>New York, NY 10168 | $297,803 | 11.24% | 15.0% |
| InSight Capital Partners II-<br>Co-Investors, L.P.<br>122 East 42nd Street<br>Suite 2300<br>New York, NY 10168 | $1,359,500 | 51.30% | 0% |

Draft -- December 9, 1999

Amendment to Operating Agreement
of InSight Venture Associates II, LLC

WHEREAS, the undersigned are Members of InSight Venture Associates II, LLC, a Delaware limited liability company (the "Fund II GP);

WHEREAS, the Fund II GP is the general partner of InSight Capital Partners II, L.P., a Delaware limited partnership ("Fund II");

WHEREAS, the undersigned are parties to the Fund II GP Operating Agreement, dated as of July 31, 1997 (as amended through the date hereof, the "Fund II Operating Agreement"; capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Fund II Operating Agreement); and

WHEREAS, the Members of Fund II GP wish to amend the Fund II Operating Agreement so as to provide that Bill Doyle ("Doyle") will receive certain distributions in respect of the specific investment described herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Doyle shall be deemed to be a special member of the Fund II GP (a "Special Member") and in such capacity will have the rights and obligations expressly set forth herein (and no others).

2. Section 8(c) of the Fund II Operating Agreement shall be amended to add the following new sentences at the end thereof:

> "Notwithstanding anything in this Agreement to the contrary, Doyle (in his capacity as a Special Member) shall be entitled to receive Cumulative Incentive Distributions from the Fund II GP with respect to Fund II's investment in SCC Technologies Corp. (the "SCC Distributions") as if he had a 10% Sharing Percentage (the "SCC Sharing Percentage") with respect to any such distribution (it being understood that Doyle shall no interest in, and shall not be entitled to receive, any other distributions from the Fund II GP or in respect of any other Fund II investments). For purposes of this paragraph (c), (i) Doyle's right to receive his SCC Sharing Percentage of SCC Distributions shall be subject to vesting in the manner provided in Section 12 of the Fund II Operating Agreement (as modified by this Agreement) and (ii) (a) each reference to "Member" or "Members" in Section 12 of the Fund II Operating Agreement shall be deemed to include a reference to "Doyle" in his capacity as a Special Member and (b) each reference to "Sharing Percentage" in Section 12 of the Fund II Operating Agreement shall be deemed to include a reference to Doyle's "SCC Sharing Percentage". Notwithstanding anything in Section 12(c) of the Fund II Operating Agreement to the contrary, Doyle's SCC Sharing Percentage in all SCC Distributions shall vest on the schedule set forth on Annex A hereto. The distributions to be made to the Members (other than a Special Member) in respect of any SCC Distribution shall be reduced by an amount equal to Doyle's Vested SCC Sharing Percentage of such

SCC Distribution, pro rata based on the respective Sharing Percentages allocated to such Members (other than a Special Member) as of the date of such SCC Distribution.

3. The Fund II GP is authorized to (i) establish a capital account in Doyle's name herein and (ii) adjust the capital accounts of the Members, in each case to give effect to the terms set forth herein.

4. This Amendment shall be deemed to be effective as of October 28, 1999.

IN WITNESS WHEREOF, the undersigned have duly executed this Amendment.

Members

________________________________
Jeffrey Horing

________________________________
Jerry Murdock

________________________________
Ramanan Raghavendran

________________________________
Peter Sobiloff

Acknowledged and Agreed:

INSIGHT VENTURE ASSOCIATES II, L.L.C.

By: ____________________________
Name:
Title:

________________________________
Bill Doyle

Annex A

Doyle's SCC Vesting Schedule

On each of June 30, 2000, June 30, 2001, June 30, 2002, June 30, 2003 and June 30, 2004, 20% of Doyle's SCC Sharing Percentage shall be deemed to be Vested.

Execution Copy

Amendment to Operating Agreement
of InSight Venture Associates II, LLC

WHEREAS, the undersigned are Members of InSight Venture Associates II, LLC, a Delaware limited liability company (the "Fund II GP);

WHEREAS, the Fund II GP is the general partner of InSight Capital Partners II, L.P., a Delaware limited partnership ("Fund II");

WHEREAS, the undersigned are parties to the Fund II GP Operating Agreement, dated as of July 31, 1997 (as amended through the date hereof, the "Fund II Operating Agreement"; capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Fund II Operating Agreement); and

WHEREAS, the Members of Fund II GP wish to amend the Fund II Operating Agreement so as to provide that John Losier ("Losier") will receive certain distributions in respect of the specific investment described herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Losier shall be deemed to be a special member of the Fund II GP (a "Special Member") and in such capacity will have the rights and obligations expressly set forth herein (and no others).

2. Section 8(c) of the Fund II Operating Agreement shall be amended to add the following new sentences at the end thereof:

> "Notwithstanding anything in this Agreement to the contrary, Losier (in his capacity as a Special Member) shall be entitled to receive Cumulative Incentive Distributions from the Fund II GP with respect to Fund II's investment in Harris & Jeffries, Incorporated (the "H&J Distributions") as if he had a 5% Sharing Percentage (the "H&J Sharing Percentage") with respect to any such distribution (it being understood that Losier shall have no interest in, and shall not be entitled to receive, any other distributions from the Fund II GP or in respect of any other Fund II investments). For purposes of this paragraph (c), (i) each reference to "Member" or "Members" in Section 12 of the Fund II Operating Agreement shall be deemed to include a reference to "Losier" in his capacity as a Special Member and (ii) each reference to "Sharing Percentage" in Section 12 of the Fund II Operating Agreement shall be deemed to include a reference to Losier's " H&J Sharing Percentage". Notwithstanding anything in Section 12(c) of the Fund II Operating Agreement to the contrary, Losier's H&J Sharing Percentage in all H&J Distributions shall be deemed to be 100% vested as of the date hereof. The distributions to be made to the Members (other than a Special Member) in respect of any H&J Distribution shall be reduced by an amount equal to Losier's Vested H&J Sharing Percentage of such H&J Distribution, pro rata based on the respective Sharing Percentages allocated to such Members (other than a Special Member) as of the date of such H&J Distribution.

3. The Fund II GP is authorized to (i) establish a capital account in Losier's name herein and (ii) adjust the capital accounts of the Members, in each case to give effect to the terms set forth herein.

4. This Amendment shall be deemed to be effective as of May 24, 2000.

IN WITNESS WHEREOF, the undersigned have duly executed this Amendment.

Members

______________________________
Jeffrey Horing

______________________________
Jerry Murdock

______________________________
Peter Sobiloff

Acknowledged and Agreed:

INSIGHT VENTURE ASSOCIATES II, L.L.C.

By: ______________________________
Name:
Title:

______________________________
John Losier