# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# WI SOFTWARE INVESTORS LLC

Dated as of April 3, 1997

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# WI SOFTWARE INVESTORS LLC

LIMITED LIABILITY COMPANY AGREEMENT of WI Software Investors LLC, a Delaware limited liability company (the "Company"), dated as of April 3, 1997, by and among the persons and entities listed on Exhibit A hereto (the "Members").

## RECITALS

A. The Members desire to form a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, Del. Code tit. 6, Section 18-101, et seq., as amended from time to time (the "Act");

B. The Members hereby constitute themselves a limited liability company for the purposes and on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed by and among the parties hereto as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"Acquiring Entity" shall have the meaning set forth in Section 12.3.2 of this Agreement.

"Act" shall have the meaning set forth in the Recitals.

"Additional Members" shall have the meaning set forth in Section 10.1 of this Agreement.

"Additional Preferred Return" with respect to any Wexford Member shall mean an annual return of 40% compounded annually.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is otherwise treated as being obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affected Member" shall have the meaning set forth in Section 11.4.1 of this Agreement.

"Affiliate" shall mean any person who (i) directly or indirectly controls, is controlled by, or is under common control with a Member, or (ii) is any company for which a Member is an officer, director, partner or trustee. For this purpose, two entities, or a person and an entity, shall be an "Affiliate" of the other if either owns, directly or indirectly, a five percent (5%) or greater economic interest in the other.

"Agreement" shall mean this Limited Liability Company Agreement of Wexford Insight II LLC, as originally executed and as amended, restated, modified or supplemented pursuant to the provisions hereof.

"Capital Account" shall mean the account described in Section 9.1.1 of this Agreement.

"Capital Contribution" or "Capital Contributions" shall have the meaning set forth in Section 4.2.1 of this Agreement.

"Certificate" shall mean the Company's Certificate of Formation as defined in Section 2.1.2 of this Agreement.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended, or any successor provision of law.

"Company Minimum Gain" shall have the meaning for "Partnership Minimum Gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Company Percentage" of a Member at any time shall mean the percentage interest in the Company specified for such Member on Exhibit A hereto as amended as of such time.

"Company Property" shall mean all Property (as hereinafter defined) other than working capital.

"Consulting Agreement" shall mean that certain consulting agreement by and between Insight Venture Management, Inc. and the Company dated as of the date hereof as the same may be modified, supplemented or amended from time to time.

"Covered Person" shall mean the Manager, Members, officers, employees or agents of the Company, any Person who is or was serving at the request of the Company as a manager, director, officer, employee or agent of any other limited liability company, corporation, partnership (general or limited), joint venture, trust (including, without limitation, a business trust) or other enterprise or any Affiliate of any of the foregoing.

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for Federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Dissolution Event" shall have the meaning set forth in Section 2.4 of this Agreement.

"Effective Date" shall mean the date the first Capital Contributions to the Company are made by any Member or Members;

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"ERISA Member" shall mean (1) an employee benefit plan or trust or trustee thereof, as defined in Section 3(3) of ERISA, whether or not such plan is subject to the provisions of ERISA, (2) an entity whose underlying assets are deemed to include plan assets pursuant to 29 C.F.R. § 2510.3, or (3) a plan described in § 4975(e)(1) of the Code.

"Fair Market Value" means fair market value determined in the manner set forth in Section 9.4 of this Agreement.

"Federal" shall mean the United States Federal government.

"Fiscal Period" shall mean the period beginning on the day immediately succeeding the last day of the immediately preceding Fiscal Period (or, in the case of the first Fiscal Period, the date of this Agreement) and ending on the earliest to occur of the following:

(i) the last day of the Fiscal Year;

(ii) the day immediately preceding the day on which a new Member is admitted to the Company;

(iii) the day on which a Member withdraws, in whole or in part, the amount of his or its Capital Account from the Company which withdrawal is not made contemporaneously with withdrawals by all Members in proportion to their Capital Contributions; or

(iv) the date of dissolution of the Company in accordance with Article 12 of this Agreement.

"Fiscal Quarter" shall mean a fiscal quarter of the Company.

"Fiscal Year" shall mean the fiscal year of the Company, which shall be the calendar year.

"Gross Asset Value", with respect to any asset, shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset, as determined by reference to Section 9.4 below.

(ii) The Gross Asset Values of all Company Property shall be adjusted to equal their respective gross Fair Market Values, as determined by reference to Section 9.4 below, as of the following times: (a) the acquisition of an additional Interest or Interests by any new or existing Member in exchange for a Capital Contribution; (b) the distribution by the Company to a Member of Property as consideration for an Interest or Interests; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any Company Property distributed to any Member shall be adjusted to equal the gross Fair Market Value of such asset on the date of distribution as determined by reference to Section 9.4 below; and

(iv) The Gross Asset Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (iv) of the definition of "Net Profits and Net Losses" herein; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Manager determines that an adjustment pursuant to clause (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Indemnitee" shall have the meaning set forth in Section 8.4.1 of this Agreement.

"InSight" shall mean InSight Venture Associates II, L.L.C.

"Interest" shall mean a Member's share of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets.

"Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Securities" shall have the meaning set forth in Section 3.2.11 of this Agreement.

"Investments" means any Investment Securities acquired by the Company. All securities of the same issuer or Affiliates of such issuer shall constitute a single Investment and any securities of another issuer received in exchange for all or any portion of an Investment in a transaction in which gain or loss is not recognized in whole or in part under the Code shall be treated as part of the original Investment.

"Legal Change" means a change after the date hereof in applicable statutes, regulations, case law, judicial or administrative order or decree, or governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction.

"Majority in Interest" with respect to any specified group of Members (including with respect to the group consisting of all Members) shall mean Members holding Interests representing more than 50% of the Company Percentages.

"Manager" means Wexford Management LLC and its successors elected pursuant to Section 7.7.6 of this Agreement.

"Material Adverse Effect" means, in respect of any Person, a material adverse effect in respect of the business, operations, prospects or condition (financial or other) of such Person.

"Member Nonrecourse Debt" shall have the meaning for "Partner Nonrecourse Debt" set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" shall have the meaning for "Partner Nonrecourse Deductions" set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Members" means each of the parties who has executed this Agreement and each of the parties who may hereafter become Additional or Substitute Members as provided in this Agreement.

"Net Cash Flow" for any period means Net Profits or Net Losses for such period, increased by:

(i) the amount of Depreciation deductions taken in computing such Net Profits or Net Losses;

(ii) all other receipts of the Company not included in Net Profits or Net Losses, exclusive of Capital Contributions, the proceeds of loans, similar capital receipts not provided for elsewhere and any interest deductions taken into account in computing Net Profits or Net Losses (whether due to imputed interest rules or otherwise) but not actually paid; and

(iii) any other funds deemed available for distribution, and designated as Net Cash Flow by the Manager, including any amounts previously set aside as reserves by the Manager which it no longer regards as necessary to maintain;

and, except to the extent funded by Capital Contributions, the proceeds of loans, and similar capital receipts, decreased by:

(i) all payments during such period on the obligations of the Company to the extent not deducted in determining such Net Profits or Net Losses;

(ii) expenditures for the acquisition of Company Property and other capital expenditures not deducted in determining such Net Profits or Net Losses and any interest income taken into account in computing Net Profits or Net Losses (whether due to imputed interest rules or otherwise) but not actually received; and

(iii) amounts added to Company reserves as required under this Agreement or determined by the Manager to be reasonably necessary.

"Net Profits and Net Losses", shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code or expenditures or income pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Company Property is adjusted pursuant to clauses (ii) or (iii) of the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition thereof;

(vi) To the extent an adjustment to the adjusted tax basis of any Company Property pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in

liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Net Profits or Net Losses; and

(vii) Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 9.2.3 shall not be taken into account in computing Net Profits or Net Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.2.3 shall be determined by applying rules analogous to those set forth in clauses (a) through (f) above.

"Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" shall have the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"person" or "Person" shall mean a corporation, an association, a partnership (general or limited), a limited liability company, a joint venture, an individual, an estate, a trust (including without limitation a business trust), any other legal entity or an individual.

"Positive Basis" shall mean, with respect to any Member and as of any time of calculation, the amount by which its Capital Account exceeds its "adjusted tax basis" (not taking into account in computing such basis any Company debt allocated to such Member under Section 752 of the Code, and determined without regard to any adjustments made to such "adjusted tax basis" by reason or any transfer or assignment of such Member's Interest, including by reason of death).

"Positive Basis Member" shall mean any Member that withdraws from the Company under Sections 11.3 or 11.4 (other than due solely to a Transfer or other assignment by such Member of its Interest to another) and who has Positive Basis as of the effective date of (but immediately prior to) his or its withdrawal, but such Member shall cease to be a Positive Basis Member at such time as it shall have received allocations pursuant to Section 9.2.3.9 equal to its Positive Basis as of the effective date of its withdrawal.

"Preferred Return" with respect to any Wexford Member shall mean an annual return of 10% compounded annually.

"Property" means all real, personal and mixed properties, cash, assets, Investment Securities, interests and rights of any type owned by the Company. All assets acquired with Company funds or in exchange for Property shall be Property.

"Reduced Interest" shall have the meaning set forth in Section 11.4.6 of this Agreement.

"Regulatory Allocations" has the meaning assigned in Section 9.2.2.2 hereof.

"Subsequent Closing" shall have the meaning set forth in Section 10.1 of this Agreement.

"Substitute Member" means any transferee of a Member's Interests in the Company who is admitted as a Member in the Company pursuant to Article 11.

"Tax Matters Member" shall mean WI Software Holding LLC.

"Tax Percentage" shall mean 40%.

"Transfer" shall mean any sale, transfer, assignment, hypothecation, pledge or other disposition (including the granting of any option (within the meaning of Code § 382 and the Treasury Regulations promulgated thereunder)).

"Treasury Regulations" shall mean the rules and regulations promulgated under the Code by the United States Department of the Treasury.

"Unrecovered Capital Contributions" shall mean, with respect to any Wexford Member, the difference of (i) such Member's Capital Contributions and (ii) all cash (or the fair market value of other property) distributed to such Member under Section 9.3.1.2.

"Wexford Member" shall mean WI Software Holding LLC.

ARTICLE 2

ORGANIZATION AND TERM

2.1 Organization:

2.1.1 The Members agree to form and do hereby form a limited liability company pursuant to the provisions of the Act and this Agreement.

2.1.2 The Manager as an authorized person has executed or directed a Person, as an authorized person, to execute a Certificate of Formation pursuant to the provisions of the Act (the "Certificate") and caused the Certificate to be filed and recorded in all offices required by the Act. The Company shall prepare and file all amendments to the Certificate or additional certificates as may be required by this Agreement or by law. The Manager shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business. The Manager, as an authorized person within

the meaning of the Act, shall execute, deliver and file any certificates (and any amendments or restatements thereof), notices, statements, or other instruments required by law necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.2 Name of Company: The name of the Company shall be "Wexford Insight II LLC". The business of the Company may be conducted, upon compliance with all applicable laws, under any other name designated by the Manager.

2.3 Principal Office; Resident Agent; Registered Office: The principal office of the Company shall be c/o Wexford Management LLC, 411 West Putnam Avenue, Greenwich, Connecticut 06830 or such other place as the Manager may from time to time designate in writing to the Members. The name and address of the registered agent for service of process in the State of Delaware is The Prentice-Hall Corporation System, Inc., located in New Castle County, 1013 Centre Road, Wilmington, Delaware 19805-1297. The address of the registered office of the Company in the State of Delaware is c/o The Prentice-Hall Corporation System, Inc., 1013 Centre Road, Wilmington, Delaware 19805-1297. At any time, the Manager may designate another registered agent or registered office.

2.4 Term of the Company: The term of the Company shall commence on the date the Certificate is filed and shall continue until the earliest to occur of the following (each, a "Dissolution Event"):

2.4.1 December 31, 2025;

2.4.2 the dissolution of the Company pursuant to Section 7.7.3 of this Agreement;

2.4.3 the liquidation of substantially all the Company's Property;

2.4.4 such time as the Manager, in its sole discretion, determines in good faith that (A) a Legal Change (or any change in facts resulting in a change in the application of any statute, regulation, case law, judicial or administrative order or decree, or governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction) may have a Material Adverse Effect on the Company or the Manager or any of their respective Affiliates or (B) having made reasonable efforts to resolve matters without dissolving the Company, such action is necessary or desirable in order for the Company or the Manager or any of their respective Affiliates not to be in material violation of the Investment Company Act, the Investment Advisers Act or ERISA;

2.4.5 the death, insanity, retirement, resignation, expulsion, liquidation, dissolution or bankruptcy of a Member or any transferee of a Member or the occurrence of any other event which terminates the continued membership of a Member or any transferee of a Member in the

Company unless all of the remaining Members unanimously agree to continue the business of the Company within 90 days after the occurrence of such Dissolution Event; or

2.4.6 the entry of a decree of judicial dissolution under Section 18-802 of the Act.

ARTICLE 3

PURPOSES AND POWERS OF THE COMPANY

3.1 Purposes: The purpose of the Company shall be, directly or indirectly through subsidiaries or Affiliates, to make, hold and dispose of any lawful investments pursuant to the Consulting Agreement. The Company may take any appropriate actions in furtherance of such purpose, including investing in cash equivalents.

3.2 Powers of the Company: In furtherance of the purposes of the Company set forth in Section 3.1, the Company shall have the power and authority to do any and all things necessary, convenient or incidental to the achievement of its purposes, alone or with others, including, but not limited to, the power:

3.2.1 to hold, receive, mortgage, pledge, transfer, exchange, otherwise dispose of, grant options with respect to and otherwise deal in and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to all Property;

3.2.2 to invest and reinvest cash assets of the Company in money-market or other short-term investments;

3.2.3 to have and maintain one or more offices within or without the State of Delaware and, in connection therewith, to rent or acquire office space, engage personnel and compensate them and do such other acts and things as may be advisable or necessary in connection with the maintenance of such office or offices;

3.2.4 to open, maintain and close bank accounts and draw checks and other orders for the payment of moneys and to open, maintain and close accounts with brokers, custodians and others;

3.2.5 to engage employees (with such titles and delegated responsibilities as may be specified herein or determined by the Manager), accountants, auditors, custodians, consultants, attorneys and any and all other agents and assistants, both professional and nonprofessional, including Members and their Affiliates and to compensate them as may be necessary or advisable;

3.2.6 to form, cause to be formed, to participate in or to own the stock of or interests in one or more corporations, partnerships (general and limited), limited liability companies, trusts (including without limitation, business trusts) and joint ventures, whether foreign or domestic;

3.2.7 to participate in, influence, advise or otherwise affect the management of companies in which the Company has an interest, direct or indirect, and to take such other action as shall be necessary or advisable in connection with such companies;

3.2.8 to sue, prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment of claims against the Company, and to execute all documents and make all representations, admissions and waivers in connection therewith;

3.2.9 to distribute, subject to the terms of this Agreement, at any time and from time to time to Members cash or investments or other Property of the Company, or any combination thereof;

3.2.10 to lend funds or Property of the Company, either with or without security;

3.2.11 to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, other limited liability companies, trusts (including without limitation, business trusts) or individuals, or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them (collectively, "Investment Securities");

3.2.12 to register or qualify the Company under any applicable laws, or to obtain exemptions under those laws, if registration, qualification or exemption is deemed necessary or appropriate by the Manager; and

3.2.13 to borrow or raise money, with or without full recourse to Property of the Company, at such rates of interest as the Manager shall determine, issue Interests and Company notes, bonds and other obligations and secure the payment of any of its obligations by mortgage upon, or pledge of, all or part of the Property of the Company;

3.2.14 to indemnify a Member, Manager, officer or agent, former Member, Manager or officer or agent or member, manager, officer or agent of the Manager, and to make any other indemnification that is authorized by this Agreement or the Act;

3.2.15 to cease its activities, to dispose of all or part of its Property and assets and cancel its Certificate;

3.2.16 to bear all its own professional and operating expenses and all professional and operating expenses incurred by the Manager on behalf of the Company (including the fees and expenses of attorneys, accountants, consultants, experts or custodians retained by the Company or by the Manager on behalf of the Company) and shall bear all out-of-pocket expenses (including those incurred by the Manager) related to its actual and proposed investments;

3.2.17 to execute, deliver and perform all contracts and other undertakings, and engage in all activities and transactions, that the Company believes are necessary or advisable in carrying out the foregoing purposes of Article 3;

3.2.18 to take such other actions necessary or incidental thereto as may be permitted under applicable law; and

3.2.19 to have and exercise all powers now or hereafter conferred by the Act, any other applicable law or this Agreement.

3.3 Restrictions on Company Investments: Notwithstanding Section 3.2, the Company shall not invest in or become any company that (i) is a "bank" within the meaning of the Bank Holding Company Act of 1956, as amended or (ii) is subject to the supervision of any state or Federal authority regulating banks or savings institutions.

## ARTICLE 4

## CAPITAL CONTRIBUTIONS

4.1 Interests: The Manager is authorized, on behalf of the Company, to issue an Interest or Interests in the Company for such consideration (both as to amount and type) as shall be determined by the Manager in its sole discretion.

4.2 Contributions of the Members:

4.2.1 Each Member has made or shall make his or its respective Capital Contribution as set forth on Exhibit A hereto by contributing to the Company such consideration (both as to amount and type of consideration) for such Interests as shall be determined by the Manager in its sole discretion and as shall be listed or described on Exhibit A to this Agreement, as such Exhibit A may be amended from time to time. The "Capital Contribution" or "Capital Contributions" of a Member at any time shall be the contribution or contributions referred to in the preceding sentences actually made by such Member on or prior to such time.

4.2.2 All payments of Capital Contributions shall be made by official bank check, certified check or wire transfer or as otherwise approved by the Manager. The value of any Capital



CONFIDENTIAL

STIP0364

Contributions made in a form other than cash shall be determined by the Manager in its sole discretion. No Member shall be entitled to interest on its Capital Contributions.

ARTICLE 5

RIGHTS AND POWERS OF MEMBERS

5.1 Powers of Members: The powers of the Members hereunder shall be limited to:

5.1.1 as provided in Article 6 and Section 7.7.6, the power to remove the Manager and elect a successor Manager and fill a vacancy created by the removal or resignation of a Manager;

5.1.2 subject to Sections 7.7 and 7.8 the power to amend the Certificate or this Agreement, provided that such amendment complies with the Act;

5.1.3 as provided in Section 7.7, the power to approve the sale, exchange or other disposition of eighty percent (80%) or more of the Company's Property when such sale, exchange or other disposition is, or is part of, a single transaction or plan;

5.1.4 as provided in Section 7.8.3, the power to continue the business of the Company within 90 days after the occurrence of a Dissolution Event set forth in Section 2.4.5; and

5.1.5 as provided in Section 7.7, the power to dissolve the Company.

5.2 Transactions Between a Member or Manager and the Company: Except as otherwise provided by applicable law or this Agreement, any Member or Manager, and their respective Affiliates as such, may, but shall not be obligated to, lend money to the Company, act as surety for the Company, enter into the Consulting Agreement or other agreements with the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member or a Manager.

5.3 Other Activities Permitted: Except as otherwise provided by this Agreement and applicable law, this Agreement shall not preclude or limit in any respect the right of any Member or Manager or any of their respective Affiliates, associates or agents to engage in or invest in any business activity of any nature or description. The foregoing activities may include, without limitation, entering into contractual arrangements of any kind with, or investing in, companies in which the Company may from time to time invest, establishing a broker-dealer and investing in, financing, acquiring and disposing of interests in securities or other instruments in which the Company may from time to time invest, or in which the Company is able to invest or otherwise have any interest. Any such activity may be engaged in independently or with other Members or the Manager. No Member shall have the right, by virtue of the Certificate, this Agreement or the

relationship created hereby, to any interest in such other ventures or activities, or to the income or proceeds derived therefrom. The pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper and any Member or Manager shall have the right to participate in or to recommend to others any investment opportunity.

5.4 Partition: Each Member hereby irrevocably waives, until termination of the Company, any and all rights that it may have to maintain an action for partition of the Company's Property.

5.5 Resignations; Retirements: A Member may not resign or retire from the Company without the written consent of the Manager. If a Member is permitted to resign or retire pursuant to this Section and, following its resignation or retirement, there are less than two (2) remaining Members, an additional member shall be admitted to the Company, in accordance with Article 10 hereof, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately prior to the resignation or retirement referred to immediately above, and, immediately following such admission, the resigning or retiring Member shall cease to be a member of the Company. In such event, the Company shall not dissolve if the business of the Company is continued without dissolution in accordance with Section 7.8.3 hereof. The Company may recover damages for breach of this Section if any Member violates this Section and may offset the Company's damages against any amount owed to a resigning or retiring Member for distributions.

## ARTICLE 6

## MANAGER

6.1 Qualifications; Term of Office:

6.1.1 The management of the Company's business shall be vested in the Manager. The Manager is an authorized person of the Company within the meaning of the Act and an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with the powers set forth in this Agreement shall bind the Company. The Manager need not be a Member of the Company or resident of the State of Delaware. The initial Manager of the Company, designated by the Members, shall be Wexford Management LLC. Wexford Management LLC agrees to be bound the terms and conditions of this Agreement.

6.1.2 Upon the resignation of the initial Manager or the resignation or removal of any successor Manager, a successor shall be elected by the Members in the manner set forth in Section 7.7. The initial term of the initial Manager shall be from the founding of the Company to the date it shall have resigned and its successor shall have been elected.

6.1.3 The Manager may engage in other business activities as permitted by Section 5.3.



CONFIDENTIAL

6.2 Powers of the Manager:

6.2.1 The Manager shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Company's business. The Manager may exercise all powers of the Company and do all such lawful acts and things as are not by the Act or this Agreement, directed or required to be exercised or done by or with the consent of the Members. The Manager is authorized to delegate the day-to-day administration of the business of the Company to officers or employees of the Company who shall be appointed by the Manager. All instruments, contracts, agreements and documents of whatsoever type executed on behalf of the Company, other than the Certificate, shall be executed in the name of the Company by the Manager, or if so authorized, by an officer of the Company.

6.2.2 Without limiting the generality of the foregoing, except as otherwise provided herein, the Manager shall have full power and authority:

6.2.2.1 to amend this Agreement other than amendments to Sections 3.1 (Purposes), 7.7 (Majority Consent), 7.8 (Unanimous Consent), 9.2 (Allocations), 9.3 (Distributions) and Article 11 (Transfers);

6.2.2.2 to engage independent agents, attorneys, accountants and custodians as the Manager deems necessary or advisable for the affairs of the Company;

6.2.2.3 to receive, buy, sell, exchange, trade and otherwise deal in and with Investment Securities and other Property of the Company and to enter into the Consulting Agreement and other agreements with others with respect to those activities;

6.2.2.4 to open, maintain and close accounts, including margin accounts, with brokers and banks, to pay the customary fees and charges applicable to transactions in those accounts, and to draw checks and other orders for the payment of money by the Company;

6.2.2.5 to file, on behalf of the Company, all required local, state and Federal tax and other returns relating to the Company;

6.2.2.6 to cause the Company to purchase or bear the cost of any insurance covering the potential liabilities of the Manager and any Member, officer, employee or agent of the Company arising out of their actions on behalf of the Company or of an entity in which the Company has an investment or of which the Company is a creditor;

6.2.2.7 to commence or defend litigation or submit to arbitration any claim or cause of action that pertains to the Company or any Company Property;

6.2.2.8 to enter into, make and perform contracts, agreements and other undertakings, and to do that which is advisable for, or as may be incidental to, the conduct of the

business of the Company, including, without limiting the generality of the foregoing, contracts, agreements, undertakings and transactions with any Member or with any other person, firm or corporation having any business, financial or other relationship with any Member or Members;

6.2.2.9 to execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's Property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary or appropriate, in the opinion of the Manager, to the business of the Company;

6.2.2.10 to establish values for assets as provided in Section 9.4;

6.2.2.11 to admit Additional Members, subject to the limitations set forth in Article 10 of this Agreement;

6.2.2.12 to borrow money on behalf of the Company;

6.2.2.13 to appoint and establish the scope of authority of officers and to set the terms of employment of such officers; and

6.2.2.14 to do and perform all other acts as may be necessary or appropriate, in the opinion of the Manager, to the conduct of the Company's business.

6.2.3 The Manager will cooperate with the Members to monitor the business activities of the Company to ensure that they are conducted so that no Member will be subjected to any additional material regulatory burden by virtue of its or his interest in the Company.

6.3 Removal of Manager:

6.3.1 Any Manager may be removed from office, with or without cause, by a Majority in Interest in the manner set forth in Section 7.7. Any removal of the Manager shall become effective on such date as shall be specified by the Members voting in favor thereof. The office of said Manager shall forthwith become vacant until its successor is elected and qualified. Upon removing the Manager, the Majority in Interest shall at the same meeting or in the same written consent fill, in the manner set forth in Section 7.7, the vacancy caused by such removal.

6.3.2 Should a Manager be removed who is also a Member, such Member will continue to participate in the Company as a Member and receive his share of the Company's income, gains, losses, deductions and credits pursuant to this Agreement.

6.4 Resignation of Manager: A Manager may resign from its position as a Manager at any time by written notice to the Members. Such resignation shall become effective as set forth in such notice.

6.5 Vacancies: Any vacancies occurring as a result of the removal or resignation of the Manager shall be filled by the Members. A Manager chosen to fill a vacancy shall serve the unexpired term of its predecessor in office. A Manager chosen to fill such vacancy shall execute an instrument reasonably satisfactory to a Majority in Interest accepting and agreeing to the terms and conditions of this Agreement.

6.6 Reimbursement: The Company shall reimburse the Manager for all ordinary and necessary out-of-pocket expenses incurred by the Manager on behalf of the Company. Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing Net Profits or Net Losses and shall not be deemed to constitute a distributive share of profits or a distribution or return of capital to the Manager.

**ARTICLE 7**

**MEETING AND VOTING OF MEMBERS**

7.1 Ballots: Voting at meetings of Members need not be by written ballot.

7.2 Meetings: Meetings may be called by the Manager or by the Manager upon the request of Members representing not less than 25% of the total value of all Capital Accounts. Meetings shall be held by telephone or at the principal office of the Company or at such other place either within or without the State of Delaware as specified from time to time by the Manager and stated in the notice of such meeting. At a meeting, no business shall be transacted and no action shall be taken other than that stated in the notice of the meeting; provided, however, that matters not described in a meeting notice may be discussed at a meeting if the Members or their authorized representatives possessing a Majority in Interest are present at the meeting and may be voted upon if the Members or their authorized representatives possessing at least the required percentage necessary to approve such matter are present at the meeting. Each meeting of Members shall be conducted by the Manager or Member requesting such meeting or by such other Person that the Manager or Member requesting such meeting may designate.

7.3 Notice:

7.3.1 Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days nor more than 60 days before the date of the meeting, in the manner set forth in Section 15.1 hereof, by or at the direction of any Manager to each Member of record entitled to vote at such meeting.

7.3.2 When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

7.4 Waiver of Notice:

7.4.1 When any notice of a meeting is required to be given to any Member under the provisions of the Act or under the provisions of this Agreement, a waiver thereof in writing signed by the person entitled to such notice, whether before, at or after the time stated herein, shall be equivalent to the giving of such notice.

7.4.2 By attending a meeting, a Member (a) waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; and (b) waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

7.5 Proxies: Each Member may authorize any Person to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. Every proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

7.6 Action Without Meeting: Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Such writing may be executed in counterparts. Prompt notice of the taking of the Company action without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing.

7.7 Matters Requiring the Consent of a Majority in Interest: An affirmative vote by or on behalf of a Majority in Interest shall be required to approve or disapprove the following:

7.7.1 to cause the Company to become an entity other than a Delaware limited liability company;



CONFIDENTIAL

7.7.2 to sell, exchange or otherwise dispose of eighty percent (80%) or more of the Company's Property when such sale, exchange or other disposition is, or is part of, a single transaction or plan;

7.7.3 to dissolve the Company, to adopt a plan of liquidation by the Company, to take any action to commence any suit, case, proceeding or other action (x) under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or making a general assignment for the benefit of its creditors;

7.7.4 to merge, consolidate, divide or convert the Company where the Company is not the surviving entity;

7.7.5 to remove the Manager;

7.7.6 upon the resignation of the initial Manager or the resignation or removal of any successor Manager, to elect a successor Manager.

7.8 Matters Requiring Unanimous Consent of All Members: Except as otherwise specified in this Agreement, an affirmative vote by or on behalf of the Members representing 100% of total Capital Accounts of all the Members shall be required to approve or disapprove the following matters:

7.8.1 to determine the salary or other compensation payable by the Company to the Manager;

7.8.2 to amend the Certificate or this Agreement so as to:

7.8.2.1 enlarge the obligations of any Member, including requiring any additional contribution, assessment or payment by a Member, without the consent of such Member; or

7.8.2.2 modify the method of determining, allocating or distributing the Company's income, gains, losses, deductions and credits during the term of the Company or upon its liquidation other than such modifications which are authorized by this Agreement; or

7.8.3 to continue the business of the Company within 90 days after the occurrence of a Dissolution Event set forth in Section 2.4.5; or

7.8.4 to amend Section 3.1, 7.7, this Section 7.8, or Article 9.

7.9 Voting Expenses: The costs of calling and holding meetings called by the Manager shall be paid by the Company. Each Member shall be responsible for its own costs associated with attending and participating in a Meeting.

7.10 Record Date: For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

## ARTICLE 8

## *MEMBERS', MANAGER'S AND COVERED PERSONS' LIABILITY AND INDEMNITY*

8.1 Liability of Members:

8.1.1 A Member, as such, shall not be liable to a Manager, an officer of the Company, the Company or any other Member for the doing of any act or the failure to do any act, the effect of which may cause or result in loss, liability, damage or expense to a Manager, an officer of the Company, the Company or any other Member, except a Member may be so liable if it has not acted in good faith or has committed willful misconduct or was grossly negligent.

8.1.2 Except as otherwise provided by the Act or pursuant to this Agreement, a Member shall not be liable for any debts or bound by any obligations of the Company, the Manager or any other Member and the debts, obligations and liabilities of the Company shall be solely the debts, obligations and liabilities of the Company.

8.1.3 A Member shall be liable to the Company for any difference between its Capital Contribution actually paid in and the amount promised by any Member as set forth in Exhibit A hereto or any writing signed by the Member.

8.1.4 A Member who receives a distribution in violation of the Act and who knew at the time of the distribution that the distribution violated the Act shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of the Act and who did not know at the time of the distribution that the distribution violated the Act shall not be liable to the Company for the amount of the distribution.

8.1.5 A Member receiving a return of any portion of his Capital Contribution in violation of the Act or this Agreement shall be liable to the Company for a period of three years thereafter for the amount of the contribution wrongfully returned.

8.1.6 Each Member who is not the Manager, by execution of this Agreement, represents and warrants to every other Member and to the Company that such Member will not take any action which would cause such Member to become liable for the obligations of the Company or otherwise engage in conduct which would cause any other person reasonably to believe that such Member is a Manager, employee or agent of the Company, except as may be provided in the Consulting Agreement.

8.2 Liability of Manager:

8.2.1 A Manager shall not be liable to any other Manager, Member, officer or the Company for the doing of any act or the failure to do any act, the effect of which may cause or result in loss, liability, damage or expense to the Company, any Manager, any Member or any officer, when acting pursuant to his authority granted pursuant to this Agreement. A Manager may, however, be so liable if it has not acted in good faith or has committed willful misconduct or was grossly negligent. A Manager shall not be liable due to the negligence, dishonesty or bad faith of any broker or other agent of the Company.

8.2.2 The Manager does not in any way guarantee the return of any Member's Capital Contribution or a profit for the Members from the Company's business. The Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture regardless of whether such other business or venture competes with the Company or with a business in which the Company has invested or whether the Manager is active in the management or business of such other business or venture. Neither the Company nor any of the Members shall have any rights by virtue of the Certificate, this Agreement or any applicable law in or to the other business ventures of the Manager or to the income, gains, losses, deductions and credits derived therefrom by the Manager.

8.2.3 The debts, obligations and liabilities of the Company shall be solely the debts, obligations and liabilities of the Company, and no Manager shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being the Manager.

8.3 Fiduciary Duty.

8.3.1 To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

8.3.2 Unless otherwise expressly provided herein, (a) whenever a conflict of interest exists or arises between Covered Persons, or (b) whenever this Agreement or any other agreement

contemplated herein provides that a Covered Person shall act in a manner that is, or provides terms that are, fair and reasonable to the Company or any Member, the Covered Person shall resolve such conflict of interest, taking such action or providing such terms, considering in each case the relative interest of each party (including its own interest) to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the Covered Person, the resolution, action or term so made, taken or provided by the Covered Person shall not constitute a breach of this Agreement or any other agreement contemplated herein or of any duty or obligation of the Covered Person at law or in equity or otherwise.

8.3.3 Whenever in this Agreement a Covered Person is permitted or required to make a decision (a) in its "discretion" or under a grant of similar authority or latitude, the Covered Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (b) in its "good faith" or under another express standard, the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or applicable law.

8.4 Indemnification of Members, Manager, Officers, Employees and Agents:

8.4.1 The Manager, Members, officers, employees or agents of the Company, any Person who is or was serving at the request of the Company as a manager, director, officer, employee or agent of any other limited liability company, corporation, partnership (general or limited), joint venture, trust (including, without limitation, a business trust) or other enterprise or any Affiliate of any of the foregoing (each, an "Indemnitee") shall have no liability to the Company or to any Member for any loss suffered by the Company, the Manager, any other Members, officers, employees of agents of the Company which arises out of any action or inaction of such Indemnitee if such course of conduct did not constitute gross negligence or willful misconduct of the Indemnitee.

8.4.2 The Company, its receiver or trustee shall, to the fullest extent permitted by law, indemnify, save harmless and pay all judgments and claims, against any Indemnitee who was or is a party or has threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that it is or was an Indemnitee, including costs and reasonable attorneys' fees and any amount expended by them in settlement of any claim, loss or damage.

8.4.3 No Indemnitee shall be indemnified by the Company with respect to any action or failure to act that constitutes willful misconduct or gross negligence. The Company shall not exculpate, exonerate or indemnify against loss, the Manager or any Affiliate of the Manager for violations of Federal or state securities laws or any other intentional or criminal wrongdoing.

8.4.4 The Company shall advance the expenses incurred by an Indemnitee in defending a civil or criminal action, suit or proceeding brought by a party, other than a Member, against the Indemnitee that arises out of or in any way relates to the Company, its Property, business or affairs, upon receipt of an undertaking by the Indemnitee to repay the amount advanced by the Company if an adjudication or determination is made that the Indemnitee is not entitled to indemnification as provided in this Agreement.

8.4.5 The right of indemnification provided in this Section 8.4 shall be in addition to any rights to which an Indemnitee may otherwise be entitled and shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each Indemnitee.

8.4.6 The rights to indemnification and reimbursement provided for in this Section 8.4 may be satisfied only out of the assets of the Company. None of the Members shall be personally liable for any claim for indemnification or reimbursement under this Section 8.4, except to the extent of the Capital Contributions of the Members and distributions made to the Members if and only if such distributions were made in violation of this Agreement or the Act.

8.5 Remedies: The remedies of the Members hereunder are cumulative and shall not exclude any other remedies to which a Member may be lawfully entitled. The Members acknowledge that all legal remedies for any breach of this Agreement may be inadequate, and therefore they consent to any appropriate equitable remedy; provided, that any failure of a Member to abide by the terms of this Agreement, including, without limitation, any vote or consent that should bind a Member, or any other failure to adhere to the terms of this Agreement which cost the Company legal and court costs to enforce the same shall render the breaching Member liable to the Company for any such fees and costs.

8.6 Waiver: The failure of any Member to insist upon strict performance of a covenant or condition hereunder shall not be a waiver of its right to demand strict compliance therewith in the future.

ARTICLE 9

MEMBER ACCOUNTS; ALLOCATIONS AND DISTRIBUTIONS

9.1 Capital Accounts:

9.1.1 A separate capital account (a "Capital Account") shall be maintained for each Member. A Member's Capital Account shall equal such Member's initial Capital Contribution (as of the time made) and shall be maintained and adjusted, as the Tax Matters Member determines, in accordance with Treasury Regulation Section 1.704-1(b).

9.1.2 Upon the admission of a Substitute Member in accordance with the terms of this Agreement, the Substitute Member shall succeed to the Capital Account and Company Percentage of the transferor Member in proportion to, and this Agreement shall apply to the Substitute Member in respect of, that portion of the transferor Member's Interests that is transferred.

9.2 Allocation of Net Profits and Net Losses.

9.2.1 Subject to Sections 9.2.3, 9.2.5 and Section 12, Net Profits and Net Losses shall be allocated as follows:

9.2.1.1 Net Profits shall be allocated as follows:

9.2.1.1.1 first, 100% to the Wexford Member in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Wexford Member in all prior Fiscal Years under Section 9.2.1.2.3 over (ii) the cumulative Net Profits allocated to the Wexford Member in all prior Fiscal Years under this Section 9.2.1.1.1;

9.2.1.1.2 second, 100% to the Members in an amount equal to the excess (if any) of (i) the cumulative Net Losses allocated to the Members in all prior Fiscal Years under Section 9.2.1.2.2 over (ii) the cumulative Net Profits allocated to the Members in all prior Fiscal Years under this Section 9.2.1.1.2 in the proportion in which such excess was allocated;

9.2.1.1.3 third, 100% to the Wexford Member until the Wexford Member has been allocated on a cumulative basis an amount of the Net Profits, pursuant to this Section 9.2.1.1.3, equal to the Preferred Return on the positive balances of its Unrecovered Capital Contributions outstanding from time to time;

9.2.1.1.4 fourth, 80% to the Wexford Member and 20% to InSight until the Wexford Member has been allocated on a cumulative basis an amount of Net Profits pursuant to Sections 9.2.1.1.3 and 9.2.1.1.4 that, in the aggregate, equals the Additional Preferred Return on the positive balance of its Unrecovered Capital Contributions outstanding from time to time;

9.2.1.1.5 fifth, 100% to Insight until Insight has been allocated 25% of the amount allocated to the Wexford Member under Section 9.2.1.1.3; and

9.2.1.1.6 thereafter, 80% to the Wexford Member and 20% to InSight; provided, however that in the event any Net Profits consist of items of ordinary income, then, in lieu of the above allocations (i) a special gross income allocation shall be made to InSight of such items of ordinary income (to the extent thereof) equal to the Tentative InSight Allocation (as defined below) and (ii) the resulting Net Profits, computed without regard to the items of gross income allocated under the preceding clause (i), shall be allocated:



CONFIDENTIAL

(A) if the initial allocation made in clause (i) above (the "Initial InSight Allocation") equals the Tentative InSight Allocation, to the Wexford Member, or

(B) if the Initial InSight Allocation is less than the Tentative InSight Allocation, an amount equal to such shortfall to InSight and the remainder to the Wexford Member.

For purposes of the preceding sentence the "Tentative InSight Allocation" shall mean the amount of Net Profits that would otherwise have been allocated to InSight under this Agreement absent the proviso of such preceding sentence.

9.2.1.2 Net Losses shall be allocated as follows:

9.2.1.2.1 first, Net Losses shall be allocated to the Members in an amount equal to the excess (if any) of (i) the cumulative Net Profits allocated to the Members in all prior Fiscal Years under Section 9.2.1.1 (other than Section 9.2.1.1.2) over (ii) the cumulative Net Losses allocated to the Members in all prior Fiscal Years under this Section 9.2.1.2.1 in the proportion in which such excess was allocated;

9.2.1.2.2 second, Net Losses shall be allocated to the Members in accordance with the positive balances in their Capital Accounts until the balance in the Capital Account of Insight is reduced to zero;

9.2.1.2.3 thereafter, Net Losses shall be allocated to the Wexford Member, provided, however, that in the event any Net Losses consist of items of ordinary deduction, then, in lieu of the above allocations (i) a special allocation shall be made to InSight of such items of ordinary deduction (to the extent thereof) not greater than the Tentative InSight Loss Allocation (as defined below) and (ii) the resulting Net Losses, computed without regard to the items of ordinary deduction allocated under the preceding clause (i), shall be allocated:

(A) if the initial allocation made in clause (i) above (the "Initial InSight Loss Allocation") equals the amount of Net Losses that would otherwise have been allocated to InSight under this Agreement absent this proviso (the "Basic InSight Loss Allocation"), to the Wexford Member, or

(B) if the Initial InSight Loss Allocation is less than the Basic InSight Loss Allocation, an amount equal to such shortfall to InSight and the remainder to the Wexford Member.

For purposes of the preceding sentence the "Tentative InSight Loss Allocation" shall mean the lesser of (I) the amount of Net Losses that would otherwise have been

allocated to InSight under this Agreement absent the proviso of such preceding sentence and (II) the excess (if any) of (A) the Initial InSight Allocation for all prior Fiscal Years over (B) the Initial InSight Loss Allocation for all prior Fiscal Years.

9.2.2 Special Allocations and Limitations.

9.2.2.1 The allocations set forth in Sections 9.2.3.1 through 9.2.3.2 (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations promulgated under Section 704 of the Code. The Regulatory Allocations shall be taken into account in allocating other Net Profits, Net Losses, and items of income, gain, loss, and deduction to each Member so that, to the extent possible, and to the extent permitted by Treasury Regulations, the net amount of such allocations of other Net Profits, Net Losses, and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each Member if the Regulatory Allocations had not been made.

9.2.2.2 The respective interests of the Members in the Net Profits, Net Losses, or items thereof shall remain as set forth above unless changed by amendment to this Agreement or by an assignment of an Interest authorized by the terms of this Agreement. Except as otherwise provided herein, for tax purposes, all items of income, gain, loss, deduction, or credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses; provided, however, that with respect to property contributed to the Company by a Member, such items shall be shared among the Members so as to take into account the variation between the basis of such property and its fair market value at the time of contribution in accordance with Section 704(c) of the Code.

9.2.2.3 The Capital Accounts of all Members shall be adjusted pursuant to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) upon the circumstances set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(5). Corresponding adjustments shall be made as provided for under Treasury Regulation 1.704-1(b)(2), including Section 1.704-1(b)(2)(iv)(g).

9.2.3 Other Special Allocations. The following special allocations shall be made in the following order:

9.2.3.1 Minimum Gain chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article 9, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

9.2.3.2 Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article 9, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

9.2.3.3 Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Company Percentages.

9.2.3.4 Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

9.2.3.5 Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits shall be in proportion to their Company Percentages for purposes of allocating Company Nonrecourse Liabilities among the Members pursuant to Treasury Regulation Section 1.752-3(a)(3), provided that the parties agree that each Member's interest in Company profits shall equal his Company Percentage.

9.2.3.6 To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Members shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

9.2.3.7 For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article 9, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated

to all Members. This Section 9.2.3.7 shall not alter the amount of allocations among the Members pursuant to this Article 9, but merely the character of income so allocated.

9.2.3.8 Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Treasury Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Treasury Regulations) with respect to such liability unless such arrangement has been approved by the Members.

9.2.3.9 If the Company recognizes net income for Federal income tax purposes for any Fiscal Year as of the end of which one or more Positive Basis Members withdraws from the Company pursuant to Sections 11.3 or 11.4 (other than due solely to a Transfer or other assignment by a Member of its Interest to another), the Tax Matters Member may elect to allocate such net income as follows: (i) among such Positive Basis Members, pro rata in proportion to the respective Positive Bases of each such Positive Basis Member, to the extent of such net income until the Positive Basis of each such Positive Basis Member shall have been eliminated, and (ii) any remaining such net income to the other Members in such manner as shall equitably reflect the amounts credited to such Members' respective Capital Accounts under Section 9.2 hereof.

9.2.3.10 Notwithstanding anything in Section 9.2.1 to the contrary, if, in any Fiscal Year, the balance in the Capital Account of any Member or Members (after adjustment for the allocations of Net Profits or Net Losses that would otherwise be required to be allocated pursuant to Section 9.2.1 for such Fiscal Year) is less than the amount of Net Cash Flow or other property that would be required to be distributed to such Members pursuant to Section 9.3.1 or Section 12.6 (the "Distribution Amount"), such Member or Members shall be specially allocated gross income in an amount necessary to increase the balance in such Member's or Members' Capital Accounts (taking into account such allocation and the remaining allocation of Net Profits or Net Losses) to the Distribution Amount.

9.2.4 The Members are aware of the income tax consequences of the allocations described by this Section 9.2 and hereby agree to be bound by the provisions of this Section 9.2 in reporting their respective shares of Company income and loss for income tax purposes.

9.2.5 It is the intention of the Company and its Members that the Company be taxed as a partnership for all purposes of the Code and similar income tax laws.

9.2.6 All matters concerning the valuation of securities (including the determination of Fair Market Value pursuant to Section 9.4 of this Agreement), the allocation of profits, gains and losses among the Members, including the taxes on those profits, gains and losses, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined in good faith by the Manager with regard to its fiduciary duty to the Members, whose determination shall be final, binding and conclusive upon all of the Members.

9.2.7 Except as otherwise provided in this Article 9, an allocation of Net Profits or Net Losses to a Member shall be treated for income tax purposes as an allocation to such Member of the same share of each item of taxable income, gain, loss and deduction taken into account in computing such Net Profits or Net Losses. Items of income, gain, loss and deduction as computed for income tax purposes shall be allocated consistently with allocations hereunder of Net Profits and Net Losses.

9.3 Distributions.

9.3.1 Net Cash Flow shall be distributed to the Members as follows:

9.3.1.1 first, to each Member, not later than 90 days after the close of each Fiscal Year, in an amount equal to the local, state and Federal income tax liability of such Member (assuming that the highest marginal rates applicable to residents of New York City would apply to such Member) in respect of the excess of Net Profits over Net Losses allocated to such Member for such Fiscal Year (as shown on the Company's Federal income tax return), less all amounts previously distributed to such Member during such Fiscal Year, pursuant to this Section 9.3;

9.3.1.2 second, 100% to the Wexford Member until the Wexford Member has been distributed an amount which, combined with all other amounts distributed to it under this Section 9.3.1.2 and Sections 9.3.1.4 and 9.3.1.6 for prior Fiscal Years, equals the Preferred Return on the positive balance of its Unrecovered Capital Contributions outstanding from time to time.;

9.3.1.3 third, 100% to the Wexford Member until the balance of the Unrecovered Capital Contributions of the Wexford Member has been reduced to zero;

9.3.1.4 fourth, 80% to the Wexford Member and 20% to InSight until the Wexford Member has been distributed an amount which, combined with all other amounts distributed to it under Section 9.3.1.2 for the current and all prior Fiscal Years and under this Section 9.3.1.4 and Section 9.3.1.6 for all prior Fiscal Years, equals the Additional Preferred Return on the positive balances of its Unrecovered Capital Contributions outstanding from time to time;

9.3.1.5 fifth, 100% to Insight until Insight has been distributed an aggregate amount equal to 25% of the amount distributed to the Wexford Member under Section 9.3.1.2, above for the current and all prior Fiscal Years;

9.3.1.6 thereafter, 80% to the Wexford Member and 20% to InSight.

9.3.2 At the election of the Manager, distributions of Company Property may be distributed in accordance with Section 9.3.1, or may be retained by the Company.

9.4 Determination of Fair Market Value: Except as otherwise provided in this Section 9.4, the Manager shall determine in good faith and in its sole discretion (or shall cause to be determined)

the value of the assets of the Company or the Fair Market Value of any Investments or of Property received in exchange for any Investments or Interests as and when required by this Agreement. Where InSight may be adversely effected by such determination, InSight shall have the right to require that such determination of Fair Market Value be made by an independent appraiser acceptable to InSight and the Wexford Member (or, if the parties cannot agree, by an appraiser selected pursuant to arbitration), the costs and expenses of which shall be borne 50% by the Wexford Member and 50% by InSight.

ARTICLE 10

ADDITIONAL MEMBERS

10.1 Admission of Additional Members: The Manager, with the unanimous written consent of all Members, may admit one or more Persons as Members ("Additional Members") at one or more closings (collectively or individually, the "Subsequent Closing") at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named a Member on Exhibit A to this Agreement.

10.2 Each Additional Member shall:

10.2.1 agree to be bound by the provisions of this Agreement, and

10.2.2 execute and deliver such documents as the Company deems appropriate in connection therewith.

10.3 Each Additional Member shall have all the rights and obligations of a Member. The admission of any Additional Members shall not be a cause for dissolution of the Company.

ARTICLE 11

TRANSFERS; WITHDRAWAL OF A MEMBER

11.1 Transfer Restrictions:

11.1.1 No Member may transfer its Interest in the Company to any party.

11.1.2 Notwithstanding anything to the contrary in Section 11.1.1 above, each Member may transfer the economic attributes (including the right to all allocations of Net Cash Flow, Net Profits, Net Losses, and any other allocations provided for in Article 9) associated with its Interest (but not the right to become a substituted Member or to have any of the management, voting or consent rights associated with being a Member) (such economic attributes of any Interest referred to herein as "Economic Attributes" of such Interest), if such transferring Member receives

the prior written consent of a Majority in Interest of the non-transferring Members, which consent shall not unreasonably be withheld.

11.1.3 Transfers of Economic Attributes during any year shall become effective as of the date of any required approval, provided that the transferee and transferor have satisfied all the requirements of this Article 11.

11.1.4 Notwithstanding anything to the contrary, no Member may Transfer any Economic Attribute of an Interest, in whole or in part, in violation of the following restrictions and any such Transfer shall be void ab initio and of no effect:

11.1.4.1 No Transfer may be made if the Economic Attributes of Interests sought to be Transferred, when added to all other Economic Attributes Transferred within the period of twelve (12) consecutive months prior thereto, equals fifty percent (50%) or more of the total Economic Attributes of Interests in Company profits and capital, or otherwise would result in the termination of the Company as a partnership under the Code;

11.1.4.2 No Transfer may be made except in compliance with or pursuant to an exemption from the registration provisions of the Securities Act of 1933, as amended, and in compliance with or pursuant to an exemption from applicable state securities laws and the rules and regulations promulgated thereunder;

11.1.4.3 No Transfer may be made which would cause the Company to become an "investment company" under the Investment Company Act or which would require that a Member, a Manager or the Company register as an investment adviser under the Investment Advisers Act;

11.1.4.4 No Transfer may be made which would cause the Company to be deemed to be treated as an association, corporation or publicly traded partnership under the Code;

11.1.4.5 No direct Transfer may be made to a minor or incompetent in any respect unless made for their benefit to their guardian, trustee or other legal representative; and

At the option of the Manager, the transferor Member shall obtain a written opinion of counsel that such Transfer satisfies each of the conditions set forth above. Any opinion of counsel shall be provided by the transferring parties at their sole expense, shall be satisfactory in form and substance to the Manager and shall be from counsel satisfactory to the Manager.

11.2 Transfers With the Consent of a Majority of the Non-Transferring Members:

11.2.1 Following satisfaction of the requirements of Section 11.1, a proposed Transfer of Economic Attributes requiring approval by a Majority in Interest of the non-transferring Members shall be submitted to the non-transferring Members for their approval after:

11.2.1.1 the transferee has executed any documents and instruments the Company may require; and

11.2.1.2 the transferring parties have paid and have agreed to pay, as the Company shall determine, all reasonable expenses connected with such request and admission, including, but not limited to, any required opinion of counsel, the legal fees and costs associated with the preparation and filing of all other documents necessary to continue the Company's right to do business in the jurisdictions in which it is then doing business. The Company shall not be obligated to justify such expenses and for its convenience in lieu of itemizing such expenses, may select a reasonable amount to cover such expenses.

11.2.2 Upon satisfaction of Sections 11.1 and 11.2.1, the request for Transfer of Economic Attributes shall be submitted to the non-transferring Members for approval. The non-transferring Members shall determine whether or not to approve a proposed Transfer of Economic Attributes.

11.2.3 If a proposed Transfer of Interests is approved by a Majority in Interest of the non-transferring Members, the transferee shall be entitled to the Economic Attributes so transferred, but shall in no case be admitted as a substitute Member. At all times after the transfer of Economic Attributes, the transferring Member shall remain a Member of the Company and shall continue to have the rights and obligations (other than the Economic Attributes) associated with Membership under this Agreement.

11.2.4 In the event of any authorized Transfer which shall result in multiple ownership of any transferred Economic Attributes, the Manager may require one or more trustees or nominees to be designated to represent the entire Interest for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and exercising any rights which transferees of Economic Attributes may have pursuant to this Agreement.

11.3 Withdrawal of a Member; Termination of a Member's Interest:

11.3.1 A Member may not withdraw from the Company in whole or in part prior to the dissolution and winding up of the Company, except as otherwise provided herein. The withdrawal of a Member shall not be cause for dissolution of the Company.

11.3.2 In the event of bankruptcy or dissolution of a Member, and provided a Majority in Interest vote to continue the Company rather than allowing it to dissolve, any successor to the Interests of the affected Member as a result thereof shall be deemed to be the transferee of all the Interests of the affected Member and may be admitted upon the approval of the Manager as a Substitute Member upon satisfaction of the requirements of Article 10.

11.4 Mandatory Withdrawal of ERISA Member or Affected Member:

11.4.1 Any Member (a) which becomes an ERISA Member or (b) whose investment in the Company causes the Company to be adversely affected by the application of any statute, regulation, case law, judicial or administrative order or decree, or governmental license or permit, or the interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction (an "Affected Member"), shall, upon demand by the Manager, withdraw from the Company, at the time and in the manner hereinafter provided, if the Manager shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the ERISA Member or the Affected Member, as the case may be, and the Manager) to the effect that, (x) the continuation of the ERISA Member as a Member of the Company will result, or there is a material likelihood the same will result, in (i) a violation of ERISA, or (ii) all or any portion of the assets of the Company constituting the assets of an ERISA Member for the purposes of ERISA, or (y) the continuation of the Affected Member as a Member of the Company will result, or there is a material likelihood the same will result, in (i) a violation by the Company of applicable statute, regulation, case law, judicial or administrative order or decree, or governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction, or (ii) a Material Adverse Effect on a material operating business of the Company, due to the application of any statute, regulation, case law, judicial or administrative order or decree or governmental license or permit or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction. A copy of such opinion shall be given to the ERISA Member or Affected Member, as the case may be, together with the written demand of the Manager for withdrawal.

11.4.2 The withdrawal of the ERISA Member or the Affected Member shall then occur on the date which is the earlier of (a) the last day of the Fiscal Year of the Company during which the demand to withdraw is made or (b) a date for withdrawal (which in any event shall be the end of the Fiscal Quarter prior to such demand to withdraw or the end of any subsequent Fiscal Quarter) recommended by counsel in such opinion.

11.4.3 Upon such withdrawal, the Company shall distribute to such withdrawing Member in cash or in kind, in the Manager's sole discretion, an amount equal to the positive balance in such withdrawing Member's Capital Account, adjusted pursuant to Section 9.2.3 hereof; provided that no distributions in kind shall be made if the Manager determines that (a) the Affected Member would be in violation of the provisions of an applicable statute, regulation, case law, judicial or administrative order or decree, or governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction or in material breach of contractual obligations, as the case may be, as a result of receiving or holding such distribution, or (b) such distribution would violate any applicable Federal or state securities statute, regulation, case law, judicial or administrative order or decree, governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction, or any contractual obligation, applicable to the Company, the Manager, the Members, any issuer of Investment Securities or any of their respective Affiliates. The Manager shall notify the Affected Member as soon as practicable after they determine that such Member will not be paid entirely in cash within no more than 60 days after the date of such withdrawal. Pending any such cash distribution, the Interest of the Affected Member shall be deemed terminated for all other purposes

hereunder unless such interest is thereafter assigned pursuant to Section 11.2. Subject to clause (b) of the proviso to the first sentence of this Section 11.4.3, each Affected Member may, no later than ten Business Days after its receipt of a demand by the Manager to withdraw, cause the Manager, in respect of any distribution in kind, to (x) create, at such Member's expense, a liquidating trust or other appropriate entity to receive distributions in kind, which trust, or arrangement in respect of such other entity, will provide that the Company, as trustee or the equivalent, will attempt to dispose of such distributions in kind on terms and conditions reasonably satisfactory to such Member or (y) make such distributions in kind to such Member's nominee.

11.4.4 If, pursuant to Section 11.4.3, the Manager determines that such a distribution cannot be made to the ERISA Member or the Affected Member, then the ERISA Member or the Affected Member, as the case may be, may with the consent of a Majority in Interest of non-transferring Members sell all but not less than all its Interest in the Company to another investor not later than 45 days after the ERISA Member or Affected Member is given notice of such determination by the Manager, but not to more than one investor without the prior consent of the Manager; provided that the ERISA Member or Affected Member shall deliver to the Company an opinion of counsel and certificate, in each case, satisfactory in form and substance to the Manager, to the effect specified in Section 11.1.

11.4.5. The ERISA Member or the Affected Member shall bear the cost of obtaining an opinion of counsel for the purposes of this Section.

11.4.6 If the Manager and the ERISA Member or Affected Member, as the case may be, concur that the criteria for withdrawal set forth in Section 11.4.1 will not continue to apply to such ERISA Member or Affected Member if the interest of such Member is reduced, the interest of such Member shall be reduced (instead of such Member withdrawing from the Company) (the amount of such reduction, the "Reduced Interest") and the provisions of Article XI shall apply with respect to such Reduced Interest as if such Member was withdrawing with respect thereto.

## ARTICLE 12

## DISSOLUTION AND WIND-UP

12.1 Dissolution and Winding-Up of the Company:

12.1.1 Members shall not have the right to the return of their Capital Contributions in the Company, except upon dissolution thereof and as expressly stated herein.

12.1.2 Upon the occurrence of a Dissolution Event set forth in Section 2.4, the Company shall be dissolved; provided, that, upon the occurrence of a Dissolution Event specified in Section 2.4.5, the remaining Members may elect, within ninety (90) days from the date of such event, to continue the Company, in which case the Company shall not be dissolved and terminated but shall continue. If the continuance of the Company is approved by or on behalf of all of the

remaining Members, no further or additional documentation to effect such action is required and all Members and others owning economic benefits in the Company shall automatically remain Members in the Company without any change in their respective rights and obligations. Unless otherwise agreed to by all of the remaining Members, the Certificate and this Agreement shall automatically constitute and remain the Certificate and the Agreement of the Company.

12.1.3 In the event the Company shall be dissolved, the Company shall promptly commence to wind up its affairs and execute a certificate of cancellation. Such certificate of cancellation shall be executed by one of the Managers. The Company shall cease to carry on its business, except insofar as may be necessary for the winding-up of its business, but its separate existence shall continue until a certificate of cancellation has been filed with the Delaware Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

12.1.4 Notwithstanding anything in this Agreement to the contrary and subject to applicable law, upon the occurrence of a Dissolution Event, the Manager may, in its sole discretion, elect to extend the initial term of the Company for up to three successive one-year periods in order to permit the orderly dissolution of the Company pursuant to this Article.

12.2 Authority to Wind-Up: In the event that winding-up is required hereunder, the winding-up activities shall be managed by the Manager.

12.3 Settlement and Distribution:

12.3.1 Upon dissolution of the Company, the Property and assets of the Company, unless recontributed by the Members, shall be liquidated or distributed to the Members as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice, subject to and conditional upon compliance with applicable law.

12.3.2 The Manager shall have the right, upon dissolution of the Company, to sell the assets of the Company to a new entity controlled by the Manager (the "Acquiring Entity"), provided that, (i) the sale price shall be for an amount not less than the Fair Market Value of such assets, as determined by an independent third-party appraisal, and (ii) each Member shall have the opportunity to invest in the Acquiring Entity on terms no less favorable than the terms offered to the Manager or any Affiliate of the Manager.

12.3.3 The proceeds from sales and all other assets of the Company shall be distributed in the following order of priority: (i) first, to creditors of the Company, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for distributions to Members; and (ii) second, to the Members in accordance with the positive balances in their Capital Accounts, as adjusted by the allocations specified in Section 12.6, below.

12.4 Termination: Upon completion of the distribution of the Company's Property as provided in this Article, the Company shall be terminated, and the Manager in charge of winding-up the Company's business shall cause the filing of the certificate of cancellation pursuant to the Act and shall take all such other actions as may be necessary to terminate the Company.

12.5 Claims of the Members: The Members shall look solely to the Company's Property for the return of their Capital Contributions, and if the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

12.6 Allocations: In the year of liquidation, items of income, gain, loss and deduction shall be allocated as follows: an allocation of gross income, and an allocation of Net Profits and Net Losses (computed in each case by excluding from the computation of such Net Profits or Net Losses such gross income so allocated) (or if no items of gross income, Net Losses alone) as the case may be, shall be made such as will result in the distribution pursuant to clause (ii) of Section 12.3.3, above, being as close as possible to the distribution that would occur if distributions were instead done pursuant to Section 9.3.1 hereof. If such gross income allocation is made to the Wexford Member, it shall first be an allocation of items of capital gain (and only thereafter, items of ordinary income); conversely, if such gross income allocation is made to InSight, it shall first be an allocation of items of ordinary income (and thereafter, items of capital gain); provided, however, that, if there are Net Losses (created as a result of the foregoing gross income allocation or otherwise) part or all of which are to be allocated to InSight, if such Net Losses consist of items of ordinary deduction, a special allocation of part or all of such items shall be made to InSight (and an allocation of the resulting Net Losses shall be made to the Wexford Member and/or the InSight Member) in an amount (or amounts) determined pursuant to the principles of (a) the proviso at the end of the first sentence of Section 9.2.1.2 and (b) the second sentence of Section 9.2.1.2 (but by reference to allocations of Net Losses that would otherwise have been made under this Section 12.6 (instead of Section 9.2.1.2)).

ARTICLE 13

BOOKS AND RECORDS

13.1 Accounting and Reports:

13.1.1 The records and books of account of the Company shall be determined by the Manager, in its sole discretion. The Company's accountants employed at any one time shall be the final authority with regard to any accounting questions that may arise during the course of the business of the Company. The fees of the accountants will be a normal Company business expense.

13.1.2 As soon as practicable but not later than 90 days after the end of each Fiscal Year, the Manager shall cause to be delivered to each person who was a Member at any time during that Fiscal Year all information deemed necessary by the Manager in its sole discretion for the preparation of the Member's tax return, including a statement showing the Member's share of deductions and credits for the year for Federal income tax purposes, and the amount of any distributions made to, or for the account of, the Member pursuant to this Agreement.

13.1.3 Within 120 days after the end of each Fiscal Year the Manager shall cause to be delivered to each person who was a Member at the end of the Fiscal Year, tax basis financial statements of the Company for such Fiscal Year.

13.1.4 The Tax Matters Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.

13.1.5 The Manager and the Company will cooperate with the Members to provide such information as the Members may reasonably request from time to time in order to assist the Members in estimating the effect of their interest in the Company on their income or franchise tax returns.

13.2 Books and Records: The Manager shall keep at the Company's principal office:

13.2.1 copies of books and records pertaining to the Company's business showing all its assets and liabilities, receipts and disbursements, realized profits and losses, the Members' Capital Accounts and all transactions entered into by the Company;

13.2.2 a current list of the full name and last known home, business or mailing address of each Member set out in alphabetical order;

13.2.3 a copy of the Certificate and all amendments to it, together with executed copies of any powers of attorney pursuant to which the Certificate and any amendments to it have been executed;

13.2.4 copies of the Company's Federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and

13.2.5 copies of this Agreement as may be amended from time to time.

13.3 Inspection: All books and records of the Company required to be kept under this Article 13 shall be available for inspection and copying at the reasonable request, and at the expense of, any Member during the Company's ordinary business hours for any purpose reasonably related to the Member's interest as one of the Members in the Company. Any request must be in writing and must state the purpose of the request. However, the Manager shall have the right to keep

confidential from Members for such period of time as the Manager deems reasonable any information which the Manager reasonably believes to be in the nature of trade secrets or other information the disclosure of which the Manager in good faith believes is not in the best interest of the Company or could damage the Company or its business or which the Company is required by law or by agreement with a third party to keep confidential.

## ARTICLE 14

## REPRESENTATIONS AND WARRANTIES

14.1 Representations and Warranties of the Members. Each of the Members represents and warrants to the Company and to each of the other Members as follows:

14.1.1 Authorization etc.

(a) Such Member has the full legal right, power and authority to enter into this Agreement and to perform its obligations hereunder. The execution, delivery and performance by such Member of this Agreement have been duly authorized by all requisite action on the part of such Member. This Agreement has been duly executed and delivered by such Member and is the valid and binding obligation of such Member, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(b) The execution, delivery and performance by such Member of this Agreement, the consummation of the transactions contemplated thereby, and the compliance by such Members with the provisions thereof, will not (i) violate, conflict with or constitute (with notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any encumbrance upon such Member's properties or assets pursuant to, the terms, conditions or provisions of any note, bond, lease, mortgage, indenture, license, agreement or other instrument or obligation to which such Member is a party or by which such Member or its properties or assets are bound, or (ii) violate any provision of law, statute, rule, regulation, order, judgment, award, writ, injunction or decree applicable to such Member or any of its properties or assets.

(c) No permit, authorization, consent or approval of or by, or notification of or filing with, any person (governmental or private) is required in connection with the execution, delivery or performance by such Member of this Agreement.

14.1.2 Investment by the Member.

(a) Such Member is acquiring the Interests for its own account, for investment and not with a view to the distribution thereof, nor with any present intention of distributing the same.

(b) Such Member understands that the Interests have not been, and will not upon issuance be, registered or qualified under the Securities Act of 1933, as amended (the "Securities Act'), or any applicable state securities laws, by reason of their issuance in a transaction exempt from the registration or qualification requirements of the Securities Act and such laws, and that the Interests must be held indefinitely unless a subsequent disposition thereof is registered or qualified
under the Securities Act and such laws or is exempt from such registration or qualification.

(c) Such Member understands that the exemption from registration afforded by Rule 144 ( the provisions of which are known to the Investor) promulgated under the Securities Act depends on the satisfaction of various conditions and that, if applicable, Rule 144 may only afford the basis for sales under certain circumstances and only in limited amounts.

(d) Such Member has generally such knowledge and experience in business and financial matters and with respect to investments in securities of privately held companies so as to enable the Investor to understand and evaluate the risks of and from an investment decision with respect to its or his investment in the Interests.

(e) Such Member has no need for liquidity in its investment in the Interests and is able to bear the economic risk of its investment in the Interests and the complete loss of all of such investments.

14.2 Representations and Warranties of the Company. The Company hereby represents and warrants to each Member as follows:

14.2.1 Organization. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own and lease its properties, to carry on its business as presently conducted and as proposed to be conducted and to carry out the transactions and perform its obligations contemplated hereby.

14.2.2 Liabilities, etc. The Company was formed under the laws of the State of Delaware, and since such formation the Company has not, directly or indirectly, engaged in any business, issued any capital securities (other than the Interests owned by the persons or entities listed on Exhibit (a) or incurred any obligations or liabilities of any nature, whether accrued, absolute, contingent or otherwise, other than obligations and liabilities incurred in connection with the transactions contemplated hereby. The Company is not a party to or bound by the terms of any commitment, arrangement, agreement or other instrument other than this Agreement and the other documents contemplated hereby relating to the Interests.

14.2.3 Authorization of Agreement. The execution, delivery and performance by the Company of this Agreement have been duly authorized by all requisite action by the Company, and this Agreement has been duly executed and delivered by the Company and constitutes the valid and binding obligation of the Company, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium, and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The execution, delivery and performance by the Company of this Agreement, the issuance, sale, and delivery of the Interests and the compliance with the provisions of hereunder by the Company, will not (a) violate any provision of law, statute, rule, regulation, order, judgement, award, writ, injunction or decree applicable to the Company or any of its properties or assets or (b) violate, conflict with or constitute (with notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any encumbrance upon any of the Company's properties or assets pursuant to, the terms, conditions or provisions this Agreement, or any note, bond, lease, mortgage, indenture, license, agreement or other instrument or obligation to which the Company is a party or by which it or any of its properties is bound or affected. Except for the filing of any notice which may be required under applicable federal or state securities law (which, if required, has been or shall be filed on a timely basis as may be so required), no permit, authorization, consent or approval of or by, or notification of or filing with, any person (governmental or private) is required in connection with the execution, delivery or performance of this Agreement by the Company.

14.2.4 Authorization and Sale of the Interests. The issuance, sale and delivery by the Company of the Interests have been duly authorized by all requisite action of the Company, and the Interests, when issued as contemplated hereby, will be validly issued and outstanding, with no personal liability attaching to the ownership thereof at the time of their issuance.

14.2.5 Offering Exemption. The offer, sale and issuance of the Interests pursuant to the terms of this Agreement do not require registration under the Securities Act or registration or qualification under any applicable state "blue sky" or securities laws (or if so required, have been so registered or qualified).

ARTICLE 15

AMENDMENTS

This Agreement may be amended by the Manager as provided in Article 6 and by the Members as provided in Article 7. Upon the approval of any amendment, all Members, whether or not they consented to such amendment, shall be deemed to have consented to and shall be bound by the terms and provisions thereof as if they had so consented.

## ARTICLE 16

## MISCELLANEOUS

16.1 Notices: Each Member will provide the Company, in writing, with its address and, if available, telephone number for receipt of facsimile transmission. Notices that may or are required to be given under this Agreement by any party to another must be in writing and sent (i) by facsimile; (ii) deposited in the United States mail, certified or registered, postage prepaid; or (iii) by overnight courier, in each case addressed to the respective parties at the address or facsimile number they have provided to the Company, in the case of any Member, or to the Company's principal office, in the case of any Manager, or to any other addresses or facsimile numbers designated by any Member by notice addressed to the Company, in the case of any Member, and to the Members, in the case of the Manager. Notices will be deemed to have been given when either (i) sent via facsimile; (ii) deposited in the United States mail within the continental United States; or (iii) delivered to an overnight courier. If three successive letters mailed or sent by overnight-courier to the last-known address of any Member are returned as undeliverable, or if three successive facsimiles fail to be received at the last known facsimile number, no further notices to such Member shall be necessary until another address or facsimile number for such Member is made known to the Company.

16.2 Agreement Binding Upon Successors and Assigns: This Agreement shall inure to the benefit of, and shall be binding upon, the heirs, executors, administrators or other representatives, successors and assigns of the Members.

16.3 Execution of Other Documents; Power of Attorney: Each of the Members agrees to execute upon demand such certificates, counterparts, instruments and documents, and amendments to the foregoing, as may from time to time be required to be filed or recorded by law. Each of the Members by execution hereof constitutes and appoints the Manager the true and lawful attorney for such Members to make, execute, sign and, if required, acknowledge and file any and all the foregoing documents, and such other agreements, instruments or documents as may be necessary or advisable to carry out the provisions of this Agreement.

16.4 Governing Law: This Agreement, and the rights of the Members under it, shall be governed by and construed in accordance with the laws of the State of Delaware.

16.5 Consents: Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and signed copies of them shall be filed and kept with the books of the Company.

16.6 Miscellaneous:

16.6.1 This Agreement, including Exhibit A appended hereto, constitutes the entire understanding and agreement of the Members as to the operation of the Company and supersedes any other agreement relating to the operation of the Company.

16.6.2 This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

16.6.3 Each provision of this Agreement is intended to be severable. A determination that a particular provision of this Agreement is illegal or invalid shall not affect the validity of the remainder of the Agreement.

16.6.4 Nothing contained in this Agreement shall be construed to establish any Member the agent of another Member, except as specifically provided in this Agreement, or in any manner to limit the Members in the carrying on of their own respective businesses or activities.

16.6.5 Except as may be expressly provided for herein, no person or entity not a party hereto shall have any rights or obligations hereunder.

16.6.6 All section or subsection titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the context of this Agreement.

16.7 Investment Representation: By executing this Agreement, each Member confirms that it (a) is acquiring its interest in the Company for its own account, for investment and not with a view to the distribution of the interest, (b) is fully able to bear the economic risks of becoming a Member and (c) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks inherent in becoming a Member.

16.8 Jurisdiction; Service of Process. Any action or proceeding to interpret, apply or enforce the provisions of this Agreement, or the duties, obligations or liabilities of the Company to the Members or Managers, or the duties, obligations or liabilities among Member or Managers and of Members or Managers to the Company, or the rights or powers of, or restrictions on, the Company, the Members or the Managers shall be brought in the Court of Chancery of the State of Delaware and the parties hereto consent to the exclusive jurisdiction of the Court of Chancery of the State of Delaware with respect to such matters. In furtherance thereof and not in limitation thereof, the Members and the Managers consent to be subject to the exclusive jurisdiction of the courts of the State of Delaware with respect to the matters set forth in the preceding sentence and each waives any objection to venue laid therein. Each Member and Manager hereby irrevocably designates and appoints TransAmerica Corporate Services, Inc., 800 Delaware Avenue, P.O. Box 410, Wilmington, Delaware 19899 (the "Service Agent"), as such Member's or Manager's, as the case may be, agent for service of process in the State of Delaware in conjunction with any action or proceeding referred to in the first Sentence of this Section. Any notice, process, pleading or other paper served upon the Service Agent shall at the same time be sent by registered or certified mail, return receipt requested, to the applicable Member or Manager, as the case may be, at the address set forth on Exhibit A

attached hereto. The parties hereto covenant, agree and consent that the aforesaid service shall be valid personal service upon each of them as if service of process were personally made upon each of them within the State of Delaware. Further, each of the parties hereto further covenants and agrees that, so long as this Agreement shall be in effect, each such party shall maintain a duly appointed agent for the service of summonses and other legal processes in the State of Delaware and will notify the other parties hereto of the name and address of such agent if it is no longer the Service Agent.

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first above written.

**MANAGER**

WEXFORD MANAGEMENT LLC

By: ______________________

**MEMBERS:**

WI SOFTWARE HOLDING LLC

By: ______________________

INSIGHT VENTURE ASSOCIATES II, L.L.C.

By: ______________________