SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IMPRIMIS INVESTORS LLC and WI SOFTWARE INVESTORS LLC,

Plaintiffs,

-against-

INSIGHT CAPITAL PARTNERS II, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) II, L.P., INSIGHT CAPITAL PARTNERS III, L.P., INSIGHT CAPITAL PARTNERS III CO-INVESTORS, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) III, L.P., RAMANAN RAGHAVENDRAN, PETER SOBILOFF AND UBS CAPITAL II LLC,

Defendants.

Index No. 601519/02

Date Purchased:

Plaintiff's designate New York County as the place of trial.

*The basis of the venue is the residence of certain defendants.*

**SUMMONS**

NEW YORK COUNTY CLERK'S OFFICE

APR 19 2002

NOT COMPARED WITH COPY FILED

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' undersigned attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
April 19, 2002

BROWN RUDNICK BERLACK ISRAELS LLP

By: [signature]
Martin S. Siegel, Esq.
Andrew Dash, Esq.

120 West 45th Street
New York, New York 10036
(212) 704-0100

Attorneys for Plaintiffs
Imprimis Investors LLC and WI Software Investors LLC

EXHIBIT
20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| IMPRIMIS INVESTORS LLC and WI SOFTWARE INVESTORS LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>INSIGHT CAPITAL PARTNERS II, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) II, L.P., INSIGHT CAPITAL PARTNERS III, L.P., INSIGHT CAPITAL PARTNERS III CO-INVESTORS, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) III, L.P., RAMANAN RAGHAVENDRAN, PETER SOBILOFF, AND UBS CAPITAL II LLC,<br><br>Defendants. | **COMPLAINT** |

Plaintiffs Imprimis Investors LLC ("Imprimis") and WI Software Investors LLC ("WISI" and, collectively with Imprimis, "Plaintiffs"), as and for their Complaint against defendants Insight Capital Partners II, L.P. ("Insight II"), Insight Capital Partners (Cayman) II ("Insight Cayman II"), Insight Capital Partners III, L.P. ("Insight III"), Insight Capital Partners III Co-Investors, L.P. ("Insight Co-Investors"), Insight Capital Partners (Cayman) III, L.P. ("Insight Cayman III", and, collectively with Insight III and Insight Co-Investors, the "New Funds," and, collectively with Insight II, Insight Cayman II, Insight III, and Insight Co-Investors, the "Insight Funds"), Ramanan Raghavendran ("Raghavendran"), Peter Sobiloff ("Sobiloff"), and UBS Capital II LLC ("UBS") allege, on actual knowledge as to Plaintiffs' status, actions, and knowledge, and on information and belief as to all other matters, as follows:

## Nature of this Action

1. Through this action, Plaintiffs seek redress from Insight II, Insight Cayman II, the New Funds, Raghavendran, Sobiloff, and UBS for the wrongful conversion of highly valuable Investment Opportunities (as defined below) that belonged to Plaintiffs, and other tortious conduct committed by these Defendants. Defendants' wrongful conversion of these valuable Investment Opportunities was in derogation of Plaintiffs' contract rights under Consulting Agreements (as defined below) with non-party Insight Venture Management, Inc. ("Insight"), a defendant in a related action initiated by Plaintiffs that is pending in this Court.[1]

2. Under the Consulting Agreements, Insight was required to provide Plaintiffs with a right of first refusal of at least 50 percent, or in some circumstances, a greater percentage, for "all investment opportunities in the software and related industries identified by Insight" prior to April 3, 1999. Instead, valuable Investment Opportunities were diverted to and converted by the Insight controlled Insight Funds, and favored co-investors, including UBS.

---

[1] In October, 2000 Plaintiffs initiated an action entitled Imprimis Investors LLC and WI Software Investors LLC v. Insight Venture Management, Inc., *et al*, Index No. 00-604431, IAS Part 49 (Justice Cahn) ("the Related Action"). In the Related Action, as here, Plaintiffs assert that the defendants therein committed a variety of wrongs, including breach of contract, fraud, and other actionable tortious conduct. The parties to the complaint in the Related Action include entities and persons referenced herein: Insight, Jeffrey Horing ("Horing"), and Jerry Murdock ("Murdock"). In addition, two limited liability companies managed by Horing and Murdock, Insight Venture Associates II, LLC ("Insight Venture II") and Insight Venture Associates III, LLC ("Insight Venture III"), which are the general partners of the Insight Funds named as defendants herein, were dismissed, without prejudice, as defendants in the Related Action. Plaintiffs have moved for leave to amend their complaint in the Related Action to assert additional allegations against those entities. Sobiloff, as a third-party plaintiff, filed claims in the Related Action, and Raghavendran commenced his own action against Plaintiffs in this Court. See ¶¶ 14, 15 below.

3. The Insight Funds, Raghavendran, and Sobiloff also tortiously interfered with the consulting agreements between Plaintiffs and Insight, and through their agents and representatives, intentionally and/or negligently made misrepresentations to Plaintiffs, aided and abetted Insight and others in making misrepresentations to Plaintiffs, and aided and abetted Insight's breach of fiduciary duties owed to Plaintiffs.

4. As a result of such conversion and other wrongful conduct complained of herein, Plaintiffs are entitled to compensatory damages of at least $261 million, and punitive damages. Plaintiffs also are entitled to: (i) an accounting from defendants of all Investment Opportunities that should have flowed to Plaintiffs under the Consulting Agreements, and of all fees, options, and other benefits, including allocations in "hot issue" initial public offerings, received by defendants, and/or their affiliates, from, or in connection with, those investments; (ii) a mandatory injunction requiring defendants and their affiliates to turn over to Plaintiffs all securities or other property still in their possession that rightfully belong to Plaintiffs, or the value of the converted securities and other property; and (iii) the imposition of a constructive trust over investments, fees and benefits, or the proceeds thereof, with respect to Investment Opportunities as to which Plaintiffs were wrongfully denied their rights.

**The Parties and Other Persons and Entities Discussed Herein**

5. Plaintiff Imprimis is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. Imprimis was formed for the purpose of making various investments, including investments in companies engaged in the software and related

industries. Non-party Wexford Management LLC (now known as Wexford Capital LLC) ("Wexford") is the Manager of Imprimis.

6. Plaintiff WISI is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. WISI is a wholly-owned subsidiary of Imprimis and was formed for the purpose of making investments in the software and related industries. Wexford is the Manager of WISI.

7. Non-party Insight, a defendant in the Related Action, is a Delaware corporation maintaining its principal offices at 680 Fifth Avenue, 8th Floor, New York, New York 10019. Pursuant to various agreements, Insight provides management and investment services to certain limited partnerships engaged in the business of making investments in the software and related industries. These limited partnerships include, among others, defendants Insight II, Insight Cayman II, Insight III, Insight Co-Investors and Insight Cayman III.

8. Non-parties Horing and Murdock, defendants in the Related Action, are principals and control persons of Insight, and are the managing members of Insight Venture II and Insight Venture III, the limited liability companies that act as general partners of the various Insight Funds, including Insight II, Insight Cayman II and the New Funds. Raghavendran and Sobiloff, at all relevant times, also were members of those limited liability companies, and principals and control persons of Insight. In these capacities, Horing, Murdock, Raghavendran, and Sobiloff dominated and controlled the Insight Funds, and various wrongful acts and misrepresentations made by Horing and Murdock, described below, were made, *inter alia*, in their capacities as managers of the

Insight Funds, as partners with Raghavendran and Sobiloff, and on behalf of the Insight Funds, Raghavendran, and Sobiloff. Accordingly, the wrongful acts of Horing and Murdock described below are fully attributable to the Insight Funds, Raghavendran, and Sobiloff.

9. Defendant Insight II is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

10. Defendant Insight Cayman II is a limited partnership formed in the Cayman Islands with a place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

11. Defendant Insight III is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

12. Defendant Insight Co-Investors is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

13. Defendant Insight Cayman III is a limited partnership in the Cayman Islands that maintains a place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

14. Defendant Raghavendran is an individual maintaining a place of business in New York, New York. At all relevant times, Raghavendran was a principal of Insight and a member of Insight Venture II and Insight Venture III, the limited liability companies that are the general partners, of and control, the Insight Funds. On or about January 7, 2002, Raghavendran initiated an action (the "Raghavendran Action") against Plaintiffs in this action, as well as certain parties related to plaintiffs (the "Raghavendran

Defendants"). The complaint in the Raghavendran Action asserts, generally, that in contravention of various agreements, the Raghavendran Defendants did not distribute certain monies to Insight Venture II that were to have passed through to Raghavendran. These agreements at issue in Raghavendran Action also are at issue in the Related Action. The Raghavendran Defendants answered the complaint on or about February 15, 2002, denying the substantive allegations asserted by Raghavendran.

15. Defendant Sobiloff is an individual maintaining his principal place of business at 680 Fifth Avenue, New York, New York. At all relevant times, Sobiloff was a principal of Insight and a member of Insight Venture II and Insight Venture III, the limited liability companies that are the general partners of and control the Insight Funds. On or about May 10, 2001, in the Related Action, Sobiloff initiated a third-party complaint against Imprimis, WISI, and Wexford, alleging generally, breach of contract, breach of fiduciary duty, conversion, unjust enrichment, and tortious interference, arising out of the same general facts at issue in the Related Action, the Raghavendran Action, and in this action. On or about May 31, 2001, Imprimis, WISI, and Wexford answered the third-party complaint, generally denying the substantive allegations asserted by Sobiloff.

16. *In connection with the transactions complained of herein,* Insight, Horing, Murdock, the Insight Funds, Raghavendran, and Sobiloff all were alter egos of each other. Among other things, in connection with these transactions: (1) Insight, Horing, Murdock, Raghavendran, and Sobiloff did not always preserve the formalities and paraphernalia that are part and parcel of the corporate existence of Insight, the

limited liability company existence of non-parties Insight Venture II and Insight Venture III, the entities that Horing, Murdock, Raghavendran, and Sobiloff appointed as their nominees to act as nominal general partners of the Insight Funds, and the limited partnership existence of the Insight Funds; (2) Insight was inadequately capitalized and the Insight Funds were its nominees/designees in various Insight transactions; (3) in numerous instances, funds and/or investments were put in and/or taken out of one of the Insight Funds to be transferred or given to another of the Insight Funds, or to Insight, Horing, Murdock, Raghavendran, and/or Sobiloff, for the personal benefit of Insight, Horing, Murdock, Raghavendran, and/or Sobiloff, rather than for the benefit of the particular Insight Fund; (4) there was an overlap in ownership, officers, directors, members, and personnel among Insight and the Insight Funds; (5) Insight, the Insight Funds, Horing, Murdock, Raghavendran, and Sobiloff all shared common office space, address, and telephone numbers; (6) the Insight Funds had no independent business discretion, and virtually all decisions for those entities were made by Horing, Murdock, Raghavendran, and Sobiloff; (7) Insight, Horing, Murdock, Raghavendran, and Sobiloff did not deal with the Insight funds at arms' length; (8) in numerous respects, the Insight Funds were not treated by Horing, Murdock, Raghavendran, and Sobiloff as profit centers independent of Insight; (9) the Insight Funds paid various monies owed to or by Insight as a result of actions taken by Horing, Murdock, Raghavendran, and Sobiloff; and (10) the Insight Funds had their monies and other property used by Insight, Horing, Murdock, Raghavendran, and Sobiloff as if it was their own, and monies or other properties paid to Insight Venture II and Insight Venture III, the general partners of the

Insight Funds, passed through those entities to Horing, Murdock, Raghavendran, and Sobiloff.

17. Defendant UBS is a Delaware limited liability company with a place of business at 299 Park Avenue, New York, New York 10017.

## Venue

18. Venue is proper in this county pursuant to CPLR 503(a), (c), and (d) in that, *inter alia*, Defendants Insight II, Insight III, Insight Co-Investors, Raghavendran, Sobiloff, and UBS maintain their principal offices in this county.

## Facts Applicable to All Causes of Action

### The Relationship Among Insight and Plaintiffs

19. On April 3, 1997, Wexford, on behalf of a newly-formed Delaware limited liability company named WISI entered into a two-year consulting agreement with Insight (the "WISI Consulting Agreement"). On September 30, 1998, the WISI Consulting Agreement was superseded and replaced by a consulting agreement entered into by Imprimis and Insight (the "Imprimis Consulting Agreement"). Collectively, these agreements are referred to herein as the "Consulting Agreements."

20. Each of the Consulting Agreements required Insight to advise WISI and Imprimis, respectively, on all Investment Opportunities (as defined in the Consulting Agreements) in the software and related industries identified by Insight during the term of these Agreements, and provided WISI and Imprimis, respectively, with a right of first refusal to invest up to at least 50 percent, and potentially more, in each such Investment Opportunity.

**The WISI Consulting Agreement**

21. Under the WISI Consulting Agreement, Insight, *inter alia*, agreed to identify for WISI "investment opportunities in the software and related industries" during the term of the WISI Agreement (each, an "Investment Opportunity"). The WISI Consulting Agreement further provided that:

> For each such Investment Opportunity, Insight or its affiliates shall give written notice to WISI of its right of first refusal to participate in such Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). WISI shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight.

WISI Consulting Agreement § 1. (A true and complete copy of the WISI Consulting Agreement is annexed hereto as Exhibit A and is incorporated by reference herein).

22. Thus, pursuant to the WISI Consulting Agreement, for a two-year period commencing April 3, 1997, Insight was obligated to offer to WISI a right of first refusal to invest at least 50 percent of the total amount to be invested by Insight in all Investment Opportunities in software and related industries identified by Insight during the term of the WISI Consulting Agreement. Moreover, under the WISI Consulting Agreement, WISI had a right of first refusal to invest up to 100 percent in an Investment Opportunity if Insight, or its affiliates, did not invest Insight's full 50 percent share.

23. The WISI Consulting Agreement also provided that, after Insight furnished written notice of WISI's right of first refusal to participate in an Investment Opportunity, along with written details of the investment, if there was any change in the terms of the Investment Opportunity, Insight was required to notify WISI in writing of such "New Material Terms." WISI Consulting Agreement § 1.

24. Pursuant to the WISI Consulting Agreement, Insight also was obligated to allocate to WISI on a *pro rata* basis any "board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or any of its affiliates, but allocable in any manner to any investment by WISI in an Investment Opportunity pursuant to the terms of this agreement. . . ." WISI Consulting Agreement § 6.

25. This right of WISI to share fees and options arising out of Investment Opportunities identified under the WISI Consulting Agreement survived the termination of the Agreement. See WISI Consulting Agreement § 6.

26. As a result of the WISI Consulting Agreement, non-party Insight owed fiduciary duties to WISI.

27. Pursuant to the WISI Consulting Agreement, non-party Insight identified for WISI a number of Investment Opportunities in the software and related industries. WISI exercised its right of first refusal with respect to several such Investment Opportunities.

**The Imprimis Consulting Agreement**

28. The Imprimis Consulting Agreement, by its specific terms, superseded and replaced the WISI Consulting Agreement, and ended on the same date the WISI Consulting Agreement would have ended, *i.e.*, April 3, 1999. Imprimis Consulting Agreement § 13. (A true and complete copy of the Imprimis Consulting Agreement is annexed hereto as Exhibit B and is incorporated by reference herein).

29. Pursuant to the Imprimis Consulting Agreement, Insight, *inter alia*, agreed to "provide Imprimis with a right of first refusal for all investment opportunities in

the software and related industries identified by Insight" during the term of the Imprimis Agreement (each, an "Investment Opportunity"). The Imprimis Consulting Agreement further provided that:

> For each Investment Opportunity, Imprimis' right of first refusal entitles it to participate in the Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). Imprimis shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight. For each proposed Investment Opportunity, Insight or its affiliates shall provide in a form satisfactory to Imprimis written details of such proposed Investment Opportunity.

Imprimis Consulting Agreement § 1.

30. Thus, pursuant to the Imprimis Consulting Agreement, Insight was obligated to provide Imprimis with its right of first refusal to invest at least 50 percent of the total amount to be invested by Insight in all Investment Opportunities in the software and related industries identified by Insight during the term of the Imprimis Consulting Agreement. Moreover, like the WISI Consulting Agreement, under the Imprimis Consulting Agreement, Imprimis had a right of first refusal to invest up to 100 percent investment in an Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share.

31. Like the WISI Consulting Agreement, the Imprimis Consulting Agreement required Insight to provide written notice of Imprimis' right of first refusal to participate in an Investment Opportunity, along with written details of the investment, and, if there was any change in the Investment Opportunity thereafter, Insight was required to notify Imprimis in writing of any "New Material Terms."

32. Also, like the WISI Consulting Agreement, the Imprimis Consulting Agreement gave Imprimis the right to share, on a *pro rata* basis with Insight and its affiliates, all fees or other benefits paid to Insight or any of its affiliates by any third party in connection with an Investment Opportunity. As set forth in the Imprimis Agreement, § 6: "Any board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or an affiliate but allocable in any manner to any investment by Imprimis or WISI in any Investment Opportunity pursuant to the terms of this Agreement or the WISI Agreement shall be delivered by Insight to Imprimis in ten business days of Insight's receipt thereof. . . ."

33. Under the terms of the Imprimis Consulting Agreement, Insight's obligation to turn over to Imprimis a *pro rata* share of fees and options arising out of Investment Opportunities survived the termination of the Imprimis Consulting Agreement. See Imprimis Consulting Agreement § 6.

34. As a result of the Imprimis Consulting Agreement, non-party Insight owed fiduciary duties to Imprimis.

35. Pursuant to the Imprimis Consulting Agreement, Insight identified for Imprimis a number of Investment Opportunities in the software and related industries. Imprimis exercised its right of first refusal with respect to several such Investment Opportunities.

## Defendants' Wrongful Conduct

### Defendants' Scheme to Divert Investment Opportunities

36. By the fall of 1998, Insight's then-existing investment partnerships, including Insight II and Insight Cayman II, were close to being fully invested.

Accordingly, non-parties Insight, Horing, and Murdock, and defendants Raghavendran and Sobiloff, decided to create a new series of Insight controlled funds, named Insight III, Insight Co-Investors, and Insight Cayman III. Non-party Insight Venture III was the general partner of each of the New Funds. Horing and Murdock were the managers of, and controlled, Insight Venture III and its actions as general partner of the New Funds. Raghavendran and Sobiloff also were members of Insight Venture III, and held themselves out as general partners of the New Funds.

37. Around the same time that Insight was forming the New Funds, the Consulting Agreements with Plaintiffs were coming to a close. As a result of these factors, Insight, Horing, Murdock, Raghavendran, and Sobiloff, aided and abetted by, and with the active assistance of, their existing funds, including Insight II and Insight Cayman II, and the New Funds, devised and implemented a scheme to divert from Plaintiffs certain Investment Opportunities that had been identified during the term of the Consulting Agreements and to convert those Investment Opportunities to themselves and their co-investors. The purpose of this scheme was, *inter alia*, to use the diversion of such Investment Opportunities to: (i) enhance the value of Insight's then-existing funds, including Insight II and Insight Cayman II; and (ii) to facilitate the marketing of the New Funds by creating opportunities to invest for those funds, and for certain favored Insight co-investors, including defendant UBS, who were in a position to make significant investments in the New Funds, recommend to their clients and others that they make investments in the New Funds, and/or separately co-invest with Insight in Investment Opportunities that rightfully belonged to Plaintiffs.

38. In furtherance of this scheme, Insight, Horing, Murdock, Raghavendran, and Sobiloff, on behalf of Insight II, Insight Cayman II, and the New Funds, *represented to prospective investors in the New Funds that such New Funds* would participate in certain lucrative Investment Opportunities. Moreover, through misrepresentations made by Insight, Horing, and Murdock, on behalf of Raghavendran, Sobiloff, Insight II, Insight Cayman II, and the New Funds, Insight, Horing and Murdock made Plaintiffs believe that they had no right to participate in certain Investment Opportunities, hid the existence of certain Investment Opportunities from Plaintiffs, and delayed closings until after the April 3, 1999 date referenced in the Imprimis Consulting Agreement, thereby affording the Insight Funds and favored co-investors the opportunity to invest in Investment Opportunities that rightfully belonged to Plaintiffs.

39. UBS became a participant in this scheme in or around late 1998, during the term of the Consulting Agreements, when it co-invested with Insight in two transactions, HUON Holdings Ltd. ("HUON") and LPA Software, Inc., ("LPA"), each of which was an Investment Opportunity under the Consulting Agreements as to which Plaintiffs rightfully should have been afforded their contractual right of first refusal. Although UBS and Insight did not formally memorialize their co-investor relationship until 1999, UBS was well aware of the Consulting Agreements and Plaintiffs' rights thereunder well before then. Indeed, at least one draft of the UBS/Insight Co-Investment Agreement specifically acknowledged UBS' awareness of Imprimis' right of first refusal regarding Investment Opportunities identified by Insight.

**The Wrongful Conversion of the Investment Opportunity in Quest Software, Inc.**

40. In the fall of 1998 – well within the term of the Imprimis Consulting Agreement – Insight identified Quest Software, Inc. ("Quest") as an investment opportunity. Quest is engaged in the business of providing database tools and e-commerce infrastructure.

41. On December 11, 1998, Insight presented Plaintiffs with a "deal" or investment memorandum describing a proposed $33 million investment in Quest that anticipated a closing in January 1999. That deal memorandum stated: "InSight Venture Associates has the opportunity to invest $33.0 million in Quest Software, Inc. . . ." (Emphasis added.)

42. Upon receiving the Quest deal memorandum in December 1998, in accordance with the parties' practice relating to the manner in which Plaintiffs exercised their right of first refusal, Wexford advised Insight that it would exercise its right of first refusal to the fullest extent for the opportunity to invest in Quest.

43. In January 1999, Insight advised Wexford that the investment in Quest was "dead." However, shortly thereafter, Insight advised Wexford that the Quest Investment had merely "changed," and, on February 16, 1999, in response to an inquiry from Wexford asking to be updated on the Quest Investment, Horing sent an e-mail stating: "Quest will be pretty close to the same . . . ."

44. On April 9, 1999, only six days after April 3, 1999, Insight notified Wexford that "the [Quest] deal is back on" and that Wexford had to tell Insight how much it wanted to invest by the following week. That same day, Insight e-mailed Wexford the deal documents for the Quest investment. Among those documents was a

deal memorandum for the revived investment in Quest. That modified memorandum states: "InSight Venture Associates has the opportunity to invest $25.0 million in Quest Software, Inc. . . ." *(Emphasis added.)*

45. The "opportunity to invest" in Quest contained in the April 9, 1999 deal memorandum was virtually the same as that contained in the December 11, 1998 deal memorandum, except that the total size of the investment was reduced from $33 million to $25 million and the price of the preferred shares to be issued was lowered by 10 percent. In all other material respects, the economic terms of the revived "opportunity to invest" in Quest were substantially the same as the December 1998 "opportunity to invest" in Quest. Indeed, the "deal documents" used at closing for the revived Quest investment were substantially identical to the deal documents that Insight had forwarded to Wexford for the opportunity to invest in Quest in December 1998.

46. Although the April 9, 1999 deal memorandum stated that "InSight Venture Associates has the opportunity to invest $25 million in Quest Software, Inc.," on April 12, 1999, Horing told Plaintiffs that the total Insight investment in Quest would be only $10 million, and he proposed that Insight take $7 million and Imprimis take $3 million. Horing also stated that the other $15 million investment in Quest was to be made by UBS, which Horing, on behalf of Raghavendran, Sobiloff, and the two Insight funds that were to invest in Quest, Insight II and Insight Cayman II, represented as being an independent third-party investor, unrelated to Insight.

47. On that same day, Plaintiffs responded to Horing by e-mail, stating that Wexford was entitled to make a $5 million investment in Quest, which represented 50 percent of what Plaintiffs, based on representations made to it by Horing, on behalf

of Insight II, Insight Cayman II, Raghavendran, and Sobiloff, then believed was a $10 million Insight investment in Quest.

48. In a telephone conference on April 16, 1999 between Wexford and Murdock, Murdock, on behalf of Insight II, Insight Cayman II, Raghavendran, and Sobiloff, initially took the position that the Quest investment fell outside the scope of the Imprimis Agreement. Murdock also raised a number of other purported "excuses" for failing to offer Plaintiffs the full 50 percent participation in Quest, all of which were pretextual. Murdock initially stated that Insight wanted to offer Plaintiffs the opportunity to invest $2.5 million of what was then represented to be an $8.5 million total investment by Insight and its affiliates, which total investment amount later was changed to $9 million.

49. In the April 16, 1999 telephone conference, Wexford insisted that the Quest Investment Opportunity was covered by the Imprimis Consulting Agreement and that Plaintiffs were entitled to a full 50 percent participation with Insight and its affiliates. By the end of that conversation, Murdock stated that he agreed with Wexford.[2]

50. In that April 16, 1999 telephone conference, Murdock proposed that, if Wexford would modify Insight's "carry"[3] with respect to Quest, Plaintiffs would be permitted to: (i) invest between $5 and $10 million in another investment opportunity,

---

2 Insight later charged Plaintiffs for 50 percent of the due diligence costs for its investigation of Quest, including expenses incurred in December 1998, clearly indicating that Insight believed that the Quest investment was covered by the Imprimis Consulting Agreement.

3 "Carry" refers to the performance-based fee to which Insight's nominee, Insight Venture II, was entitled under the Imprimis LLC Agreement for investments in Investment Opportunities identified by Insight pursuant to the Consulting Agreements.

Convergent Group Corporation ("Convergent"); and (ii) make significant investments in two other investment opportunities, Greenfield Online, Inc. ("Greenfield Online") and Click Interactive (later known as Click Commerce ("Click"). Murdock, and later Horing, on behalf of the New Funds, Raghavendran, and Sobiloff, falsely represented that the opportunities to invest in Convergent, Greenfield Online and Click fell outside the Consulting Agreements. In reliance on those false representations, Wexford agreed to Murdock's proposal to modify Insight's "carry" on the Quest investment.

51. When Wexford agreed to the changes in the "carry" to be paid to Insight Venture II, and to the allocation to it of a $4.5 million investment in the Quest deal, it did not know that, contrary to Horing's representations, on behalf of Insight II, Insight Cayman II, Raghavendran, and Sobiloff, UBS was not an independent investor for purposes of the Quest investment.

52. Wexford also did not know at that time of the falsity of the representations by Murdock, and later Horing, on behalf of the Insight Funds, Raghavendran, and Sobiloff, that Convergent, Greenfield Online, and Click were not covered by the Imprimis Consulting Agreement. In fact, as Wexford later learned, Convergent, Greenfield Online, and Click each had been identified by Insight as Investment Opportunities before April 3, 1999, and thus were covered by the right of first refusal afforded Plaintiffs under the Imprimis Consulting Agreement.

53. After Murdock agreed that Wexford, on behalf of WISI, would be entitled to a full 50 percent right of first refusal on Insight's $9 million investment in Quest, Wexford asked him for copies of the deal documents so that it could review them. Instead, late in the evening on April 20, 1999, Wexford received what a Wexford

executive described at the time as a "panicked call from Jerry Murdock, . . . telling me he needed to have me sign signature pages for the Quest deal right away. When I told him we hadn't received final documents yet, he told me if we don't sign tonight the deal would blow-up."

54. Prior to the Quest closing, Wexford believed that WISI was receiving 50 percent of a $9 million Insight investment, and that the remaining $15.5 million investment by UBS was being made by an unaffiliated, third-party investor.

55. However, the purported "accommodation" that Insight allegedly gave Plaintiffs regarding Quest was illusory. Notwithstanding Murdock's representation, on behalf of the Insight funds, Raghavendran and Sobiloff, that Plaintiffs' $4.5 million investment would be 50 percent of Insight's total investment in Quest, Plaintiffs actually were permitted to invest only 18 percent of the total $25 million Quest financing arranged by Insight. At the same time that WISI was allowed to invest $4.5 million in Quest, Insight II and Insight Cayman II invested $5 million, or 20 percent of the total investment in Quest arranged by Insight. Further, UBS invested $15.5 million in Quest, or 62 percent of the total $25 million investment arranged by Insight.

56. After the Quest investment closed, Wexford learned that UBS was an affiliate of Insight for purposes of the Quest investment. Among other things, under agreements UBS made in connection with its co-investment with Insight, UBS appointed Insight to be its agent and representative in connection with the Quest Investment, with full authority to act for it. Accordingly, for purposes of the Quest investment, UBS and Insight were under common control and were affiliates.

57. Because UBS was an affiliate of Insight for purposes of the Quest Investment, under the Imprimis Consulting Agreement, Plaintiffs were entitled to at least 50 percent of the total investment made by UBS and Insight. Consequently, Plaintiffs were entitled to invest $12.5 million in Quest (50 percent of the total investment), instead of the $4.5 million that Insight represented was 50 percent of a $9 million Investment Opportunity available in Quest.

58. Plaintiffs believe that Insight and UBS will take the position that UBS was not Insight's affiliate for purposes of the Quest investment. If, in fact, that anticipated position is correct, then, under the WISI Agreement, WISI was entitled to a right of first refusal of up to 100 percent of the total investment in Quest that was not invested by Insight and its affiliates. The Consulting Agreements did not limit Plaintiffs right of first refusal to 50 percent of the total investment. Rather, under the Consulting Agreements, Plaintiffs' rights extend to the greater of 50 percent of Insight's investment or "the percentage of the Investment Opportunity not invested in by Insight, or its affiliates (including investors therein)."

59. Here, UBS was not an independent investor. Instead, among other things, UBS was specifically brought into the Quest transaction by Insight as a co-investor to participate in a financing arranged by Insight. Therefore, if UBS was not an affiliate of Insight, Plaintiffs had a right of first refusal of up to 100 percent of the total investment in Quest that was not taken by Insight and its affiliates, including the $15.5 million investment made by UBS. Thus, if UBS was not an affiliate of Insight for purposes of the Quest transaction, Plaintiffs were deprived of the right to invest a total of $20 million in Quest (*i.e.*, $25 million, less the aggregate of $5 million invested by

Insight II and Insight Cayman II), instead of the $4.5 million that Plaintiffs were permitted to invest.

60. In sum, if UBS is deemed to be an affiliate of Insight for purposes of the Quest Investment, Insight II, Insight Cayman II, and UBS wrongfully converted an aggregate of $8 million of Plaintiffs' Investment Opportunity rights to invest up to at least 50 percent of the Investment Opportunity of $25 million for the Quest investment ($12.5 million less Plaintiffs' $4.5 million investment). However, if UBS is deemed not to be an affiliate of Insight for purposes of the Quest investment, then Insight II, Insight Cayman II, and UBS wrongfully converted $15.5 million of Plaintiffs' Investment Opportunity rights to invest up to at least 100 percent of the amount of the Investment Opportunity of $25 million in Quest to the extent not invested by Insight or its affiliates ($20 million less Plaintiff's $4.5 million investment).

61. The investment in Quest was highly profitable. Quest completed its initial public offering on August 13, 1999, selling 4.4 million shares of common stock at $14 per share. That common stock, which had been purchased in April 1999 by Insight at the equivalent of $3.75 per share, rose to $102 on December 31, 1999.

62. On March 10, 2000, WISI sold 750,000 shares (pre-split) of Quest common stock for net proceeds of $100 million, and on June 14, 2000 WISI sold 50,000 shares (post-split) for net proceeds of $2.2 million.

63. Through their actions, Insight II, Insight Cayman II, and UBS wrongfully denied Plaintiffs their full right of first refusal to invest up to at least 50 percent in the Investment Opportunity in Quest if UBS was an affiliate of Insight, thereby

depriving Plaintiffs of at least a $196 million gain, or a greater amount if UBS was not an affiliate of Insight in connection with the Quest investment.

**The Wrongful Conversion of the Investment**
**Opportunity in Convergent Group**

64. Sometime prior to July 1998 – during the term of the WISI Consulting Agreement – Insight identified Convergent as an Investment Opportunity. Convergent is a provider of e-commerce systems integration services to the utility and public sectors.

65. Insight began meeting with Convergent prior to July 1998. Insight's expense records reveal that Insight performed its due diligence for an investment in Convergent no later than December 1998, during the term of the Imprimis Consulting Agreement. Indeed, Insight's due diligence on Convergent had progressed so far that, on or about March 12, 1999 – almost a month before April 3, 1999 – Insight prepared a draft letter of intent for an investment in Convergent. Moreover, Insight later billed Wexford for 50 percent of its due diligence expenses for Convergent, some of which occurred in July of 1998, clearly indicating that Insight believed the investment in Convergent was covered by the Consulting Agreements.

66. Thus, Murdock's representation on April 16, 1999, described above, made on behalf of the New Funds, Raghavendran, and Sobiloff, that Convergent fell outside the Consulting Agreements, was false and misleading when made. Plaintiffs did not know of the falsity of that representation, and relied on Murdock's statement that Convergent was not an Investment Opportunity under the Consulting Agreements.

67. Despite the clear terms of the Imprimis Consulting Agreement that granted Imprimis a right to receive a minimum 50 percent right of first refusal in

Convergent, and Murdock's statement on behalf of the New Funds, Raghavendran and Sobiloff, that Plaintiffs would be permitted to invest between $5 and $10 million in Convergent, Imprimis was allocated only $5 million of Insight's total $45.5 million investment in Convergent, or only 11 percent of the total financing for Convergent arranged by Insight.

68. While failing to provide Imprimis with its at least 50 percent right of first refusal (along with its right of first refusal to invest up to 100 percent if Insight, or its affiliates, did not take Insight's full 50 percent share), Insight allocated $17.273 million of the total investment to its New Funds (more than three times the amount allocated to Imprimis) and $17.273 million to UBS. In addition, GS Private Equity Partners II, L.P. ("GS Partners II"), GS Private Equity Partners II Offshore, L.P. ("GS Partners II Offshore"), GS Private Equity Partners III, L.P. ("GS Partners III"), GS Private Equity Partners III Offshore, L.P. ("GS Partners III Offshore"), and NBK/GS Private Equity Partners, L.P. ("NBK/GS Partners," and, collectively with GS Partners II, GS Partners II Offshore, GS Partners III, and GS Partners III Offshore, the "GS Investors") invested $5 million, and another co-investor invested $1 million.

69. Among other things, under agreements UBS, the GS Investors, and the other Insight co-investors made in connection with their co-investment with Insight, UBS, the GS Investors, and the other Insight co-investors appointed Insight to be their agent and representatives in connection with the Convergent investment, with full authority to act for them. Accordingly, for purposes of the Convergent investment, UBS, the GS Investors and the other Insight co-investors and Insight all were under common control and were Insight affiliates.

70. Because UBS, the GS Investors, and the other Insight co-investor were affiliates of Insight for purposes of Convergent investment, Plaintiffs were entitled to invest at least 50 percent ($22.75 million) of the Investment Opportunity of $45.5 million in Convergent made by Insight and its affiliates. Accordingly, the New Funds and UBS wrongfully converted at least $17.75 ($22.75 million less Plaintiffs' $5 million investment) million of the Investment Opportunity in Convergent.

71. However, Plaintiffs believe that Insight, and UBS will take the position that UBS was not Insight's affiliate for purposes of the Convergent investment. Nevertheless, even if that were true, UBS still was not independent. Instead, among other things, UBS was brought into the Convergent investment by Insight as part of the financing arranged by Insight. If UBS is deemed not to be an affiliate of Insight for purposes of the Convergent Investment, Plaintiffs had the right, under the Imprimis Consulting Agreement, to invest up to 100 percent of the amount of the Investment Opportunity of $45.5 million in Convergent to the extent not invested by Insight or its affiliates. In those circumstances, Plaintiffs had the right to invest $31.4 million in the Convergent investment, consisting of 50 percent of the investment of $28.2 million ($14.1 million) made by Plaintiffs, Insight, and the New Funds, plus the $17.273 million UBS investment. Thus, if UBS was not an affiliate of Insight, the New Funds, and UBS wrongfully converted approximately $26.4 million of Plaintiffs' Investment Opportunity right in Convergent ($31.4 million less Plaintiffs' $5 million investment).

72. Through their actions, the New Funds, and UBS, converted Plaintiffs' Investment Opportunity rights to acquire at least 50 percent of the Convergent investment, thereby depriving Plaintiffs of at least a $62.4 million gain, to which they are

entitled, or a greater amount if UBS was not an affiliate of Insight in connection with the Convergent investment.

**The Wrongful Conversion of the Investment Opportunity In Greenfield Online, Inc.**

73. Sometime prior to March 1999 — before the termination date of the Imprimis Consulting Agreement — Insight identified an Investment Opportunity in Greenfield Online, Inc. ("Greenfield Online"). Greenfield Online is a provider of internet-based marketing and research information services.

74. Instead of providing Imprimis with its at least 50 percent right of first refusal in the investment in Greenfield Online, as Insight was required to do under the Imprimis Consulting Agreement, on or about April 16, 1999, Murdock, on behalf of the New Funds, Raghavendran and Sobiloff, represented to Plaintiffs that Greenfield Online fell beyond the scope of the Consulting Agreement because the Consulting Agreement had expired. On April 20, 1999, Horing, on behalf of the New Funds, UBS, Raghavendran, and Sobiloff, reiterated that same representation to Plaintiffs.

75. Unknown to Plaintiffs at the time, these representations were false. In fact, after months of discussions, Insight signed a letter of intent for the investment in Greenfield Online on or about March 4, 1999 – a full month before the April 3, 1999 date referenced in the Imprimis Consulting Agreement. Indeed, on April 1, 1999, Insight prepared an investment memorandum analyzing the "opportunity for Insight to invest in" Greenfield Online, clearly establishing that Insight had identified Greenfield Online as an Investment Opportunity within the term of the Imprimis Consulting Agreement. Although Insight delayed closing the investment until after April 3, 1999, Insight later charged Plaintiffs for a percentage of the expenses incurred prior to April 3, 1999 for its

investment in Greenfield Online, further reinforcing that Insight believed that such investment was covered by the Imprimis Consulting Agreement.

76. In reliance on the false representations of Horing and Murdock, on behalf of the New Funds, Raghavendran, and Sobiloff, that the investment in Greenfield Online was outside the Imprimis Consulting Agreement, Imprimis agreed to invest $2.5 million or only 11% of the $22.5 million total investment in Greenfield Online arranged by Insight. Instead of providing Imprimis with its minimum 50 percent right of first refusal, and its right to invest a greater amount if Insight or its affiliates did not invest Insight's full share, Insight III invested $8.26 million, Insight Cayman III invested $2.5 million, and Insight Co-investors invested $1.38 million. UBS also invested $2.5 million. Insight allocated to other co-investors and/or affiliates a total of $5.35 million of the Greenfield Online investment. Certain officers of Greenfield Online also invested $500,000 at the same time.

77. Among other things, under agreements UBS and the other Insight co-investors made in connection with their co-investment with Insight, UBS and the other Insight co-investors appointed Insight to be their agent and representative in connection with the Greenfield Online investment with full authority to act for it. Accordingly, for purposes of the Greenfield Online investment, UBS, the other co-investors and Insight were under common control and were affiliates.

78. Because UBS and the other Insight co-investors were affiliates of Insight for purposes of the Greenfield Online investment, Plaintiffs were entitled to invest at least 50 percent of $22.5 million investment, or $11.25 million, made by Insight or its affiliates. Accordingly, the New Funds and UBS wrongfully converted $8.75

million of Plaintiffs' Investment Opportunity in Greenfield Online ($11.25 million, less Plaintiff's $2.5 million investment).

79. However, Plaintiff believes that Insight and UBS will take the position that UBS and certain other co-investors in Greenfield Online, were not Insight affiliates for purposes of the Greenfield Online investment. Nevertheless, even if that were true, UBS and those other co-investors still were not independent, and, among other things, were brought into the Greenfield Online investment by Insight to participate in of the financing arranged by Insight. If UBS and those other co-investors were deemed not to be affiliates of Insight for purposes of the Greenfield Online investment, Plaintiffs had the right, under the Imprimis Consulting Agreement, to invest up to 100 percent of the amount of the Investment Opportunity of $22.5 million in Greenfield Online to the extent not invested by Insight or its affiliates. In those circumstances, Plaintiffs had the right to invest at least $12.5 million in the Greenfield Online investment, consisting of 50 percent of the investment of $20 million ($10 million) made by Plaintiffs, Insight, the New Funds and other Insight affiliates, plus at least the $2.5 million UBS investment. Thus, if UBS and certain other co-investors were not affiliates of Insight, the New Funds and UBS wrongfully converted at least $10 million of Plaintiffs' Investment Opportunity right in Greenfield Online (at least $12.5 million less Plaintiff's $2.5 million investment).

80. Through their actions, the New Funds and UBS converted Plaintiffs' investment opportunity rights in Greenfield Online, thereby depriving Plaintiffs of a substantial gain, in an amount to be established at trial.

**The Wrongful Conversion of the Investment Opportunity In Click Interactive, Inc.**

81. At some point prior to February 1999 — again during the term of the Consulting Agreements — Insight identified Click Interactive, Inc. ("Click") as an Investment Opportunity. Click markets collaborative commerce solutions permitting automated information flows within multi-channel distribution networks for Fortune 1000 manufacturers.

82. As alleged above, in April 1999, when Plaintiffs agreed to a special arrangement with respect to the carry on Quest, Murdock, on behalf of the New Funds, *Raghavendran, and Sobiloff agreed to allow Plaintiffs to invest in Click, even though* Murdock, on behalf of the New Funds, Raghavendran, and Sobiloff falsely represented that Click fell beyond the scope of the Consulting Agreements. Insight had identified Click as an Investment Opportunity no later than February 1999, and, in fact, Insight later sought reimbursement from Plaintiffs for due diligence costs for this investment that were incurred in February 1999, *i.e.*, before the April 3, 1999 date referenced in the Imprimis Agreement.

83. In a telephone conversation between Plaintiffs and Horing on June 7, 1999, Horing, on behalf of the New Funds, Raghavendran, and Sobiloff asserted that there was "no room" for Plaintiffs in the Click investment, which Horing falsely described as a "$5 million deal."

84. In June and July, 1999, the New Funds invested an aggregate of $6 million in Series A Convertible Participating Preferred Stock in Click. Non-party Insight Venture III, the general partner of the New Funds, also acquired 11 percent of the Click investment. Plaintiffs believe other Insight co-investors may have also

participated in that investment. Neither Insight, Raghavendran, Sobiloff, nor the New Funds told the Plaintiffs about the closing of that investment.

85. In January 2000, the New Funds purchased an additional 3,111,215 shares of Click stock for an aggregate price of approximately $16.33 million.

86. On January 30, 2000, Plaintiffs learned that Click had commenced the process for issuing an initial public offering. Plaintiffs sent an e-mail to Murdock on February 1, 2000, noting that, as part of the "special deal" on Quest Insight had agreed that Plaintiffs would be given an opportunity to invest in Click.

87. On February 1, 2000, in a telephone conversation among Plaintiffs and Murdock, Murdock, on behalf of the New Funds, Raghavendran, and Sobiloff attempted to excuse Insight's failure to provide Plaintiffs with an Investment Opportunity in Click by making an amorphous reference to an unidentified "problem" with Compaq. Murdock eventually conceded that Click would be a "hot IPO." Murdock, on behalf of the New Funds, Raghavendran, and Sobiloff then proposed to "make up," at least in part, for Plaintiffs' lost opportunity for a pre-IPO investment in Click by arranging to have Plaintiffs allocated an amount of Click stock in the initial public offering. Like many of the representations made by Murdock on behalf of the New Funds, Raghavendran, and Sobiloff, none of Murdock, Raghavendran, Sobiloff, or the New Funds ever made any Click stock available to Plaintiffs in Click's IPO.

88. In June 2000, Plaintiffs were permitted to purchase $500,000 of Click stock from Insight.

89. *The New Funds' investment in Click was extremely profitable.* By September 30, 2000, the New Funds' approximately $22 million investment in Click was worth an estimated $358 million.

90. Through their actions, the New Funds converted Plaintiffs' Investment Opportunity rights in Click to 50 percent of the total investment by the New Funds, in Click. Thus, Plaintiffs were deprived of a gain of at least $17.6 million, to which they are entitled.

**The Wrongful Conversion of The Investment**
***Opportunity In Authorize.Net***

91. Sometime prior to February 1999, Insight identified Authorize.Net as an Investment Opportunity. Authorize.Net is a leading payment authorization service for online businesses. On July 1, 1999, Authorize.Net was acquired by Go2Net.com, an internet portal company whose stock is publicly traded on the Nasdaq market.

92. *In violation of the Imprimis Consulting Agreement, neither Insight,* Raghavendran nor Sobiloff informed Imprimis of this Investment Opportunity, nor was Imprimis given an opportunity to participate in any investment in Authorize.Net. Plaintiffs later learned that Insight incurred due diligence expenses as early as February 1999 relating to this Investment Opportunity — well before the April 3, 1999 date referenced in the Imprimis Consulting Agreement.

93. In or around April 1999, Insight III made two investments in Authorize.Net totaling $1.4 million.

94. The investments in Authorize.Net by Insight III were highly profitable. In July, 1999, Insight III received $778,643 in cash as part of the transaction in which Go2Net acquired Authorize.Net. In August 1999, Insight III sold 45,289 shares

of Go2Net for total proceeds in excess of $3 million. In addition, Insight III retained shares of Authorize.Net.

95. Through its actions, Insight III converted Plaintiffs' rights to acquire 50 percent of the Investment Opportunity in Authorize.Net, thereby depriving Plaintiffs of at least a $1.4 million gain, to which they are entitled.

**Other Diverted Investment Opportunities**

96. Insight II, Insight Cayman II, and the New Funds, and/or their affiliates, designees, and nominees, converted other Investment Opportunities that Insight identified during the term of the Agreements, causing Plaintiffs additional damages, in amounts currently unknown to Plaintiffs.

**Defendants' Wrongful Diversion of the Fees and Options Due Plaintiffs That Flowed From Investment Opportunities**

97. As set forth above, pursuant to Section 6 of each of the WISI Consulting Agreement and the Imprimis Consulting Agreement, Insight and its affiliates, including Insight II, Insight Cayman II, the New Funds, Raghavendran, and Sobiloff were obligated to share on a *pro rata* basis with Plaintiffs any and all fees or other benefits paid to Insight or any of its affiliates in connection with any Investment Opportunity.

98. Insight II, Insight Cayman II, the New Funds, Raghavendran, and Sobiloff, and/or their affiliates, designees or nominees, may have received a number of substantial management, consulting, and board fees, and options, but, if so, have not provided Plaintiffs with their allocable share.

99. In addition, Insight II, Insight Cayman II, the New Funds, Raghavendran, Sobiloff, and UBS, and/or their affiliates, designees or nominees, may

have received allocations in "hot issue" IPOs as a result of business they directed to investment banks arising from Investment Opportunities in which Plaintiffs participated or were entitled to participate, as well as distributions of valuable "friends and family" stock in Investment Opportunities. Nevertheless, none of these defendants has turned over to Plaintiffs their share of the profits earned on any such allocations of "hot issue" IPO and "friends and family" stock.

## The Damages to Plaintiffs

100. As a result of the foregoing, Plaintiffs have been denied the economic benefits to which they were entitled under the Consulting Agreements at least the following amounts:

| Investment Opportunity | Minimum Damages to Plaintiffs |
|---|---|
| Quest – Series A Preferred Stock | At least $178,878,358 |
| Quest – Series B Redeemable Preferred Stock | At least $600,000 |
| Convergent Group | At least $62,455,190 |
| Greenfield Online | Presently Unknown |
| Click | At least $17,613,067 |
| Authorize.Net | At least $1,462,348 |
| Board and Other fees | Presently Unknown |
| IPO and other allocations of securities | Presently Unknown |
| **TOTAL** | **At least $261,008,963** |

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, AND SOBILOFF

### (Tortious Interference)

101. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 100 of this Complaint as if set forth in full herein.

102. Each of Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff were aware of the contractual agreements between Insight and Plaintiffs as reflected in the Consulting Agreements.

103. Despite this knowledge, through the wrongful acts set forth herein, each of the Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff intentionally and knowingly acted to interfere with those relations by assisting in, or otherwise procuring: (i) Insight's breach of the Consulting Agreements through its failure to advise Plaintiffs regarding Investment Opportunities identified by Insight during the term of the Consulting Agreements and to provide Plaintiffs with their full rights of first refusal; and (ii) additional investors, including UBS, to participate in the conversion of Plaintiffs' Investment Opportunity rights in breach of the Consulting Agreements.

104. The actions of the Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in this regard were taken for the wrongful purpose of depriving Plaintiffs of their full rights of first refusal and diverting to Defendants or their co-investors valuable Investment

Opportunities that should have been made available to Plaintiffs pursuant to the Consulting Agreements.

105. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of the Defendants Insight, Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, jointly and severally, awarding Plaintiffs compensatory damages of at least $261 million, and punitive damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, AND SOBILOF**

**(Aiding and Abetting Breach of Fiduciary Duty)**

106. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 105 of this Complaint as if set forth in full herein.

107. Each of the Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff knew or recklessly disregarded the fact that Insight owed fiduciary and other obligations to Plaintiffs, and each of these Defendants knew, or recklessly disregarded, the fact that Insight was breaching those obligations by engaging in the conduct alleged herein.

108. With such knowledge, Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff provided substantial assistance to, aided and abetted, and conspired to bring about Insight's breaches of its fiduciary obligations to Plaintiffs by, *inter alia*, encouraging and

enabling their representatives and agents, Murdock, Horing, and Insight, to misrepresent Investment Opportunities available to Plaintiffs under the Agreements and to misrepresent Insight's investment relationships with its co-investors, including UBS.

109. Plaintiffs have been damaged by the wrongful conduct of Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in that such conduct, *inter alia*, caused Plaintiffs to be deprived of their full rights of first refusal under the Consulting Agreements to make investments in the Investment Opportunities identified by Insight that were diverted to Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff.

110. The conduct of Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff as alleged herein, was done purposely, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs.

111. By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, jointly and severally, awarding Plaintiffs compensatory damages of at least $261 million and punitive damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, AND SOBILOFF**

**(Fraud and Misrepresentation)**

112. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 111 of this Complaint as if set forth in full herein.

113. As more fully set forth above, Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, either directly or through their representatives and agents, Horing, Murdock, and Insight, made knowingly false and misleading statements of material facts, and omitted other facts necessary to make such statements not misleading, concerning certain Investment Opportunities, including, *inter alia*, the following:

- By first representing (through Murdock) that Quest was not an Investment Opportunity to which Plaintiffs had a right of first refusal under the Consulting Agreements and, later, by representing (through Murdock) that Plaintiffs were being afforded their full right of first refusal to invest 50 percent of Insight's opportunity to invest in Quest;
- By representing that UBS was an independent, third-party investor in Quest;
- By representing on or about April 16, 1999 (through Murdock) that Convergent Group was not an Investment Opportunity subject to the terms of the Consulting Agreements;

- By representing on or about April 16, 1999 (through Murdock) and on April 20, 1999 (through Horing) that Greenfield Online was not an Investment Opportunity subject to the terms of the Consulting Agreements;
- By representing on or about April 16, 1999 (through Murdock) and on April 20, 1999 (through Horing), that Click was not an Investment Opportunity subject to the terms of the Consulting Agreements;
- By representing on June 7, 1999 (through Horing) that there was no "room" for Plaintiffs in the Click investment, which was purported to be a "$5 million deal"; and
- By representing on February 1, 2000 (through Murdock) that Defendants' failure to provide Plaintiffs with an Investment Opportunity in Click was caused by some unidentified "problem" with Compaq.

114. Each of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff knew that the foregoing statements made on their behalf by Insight, Horing and Murdock constituted a fraud and deceit on Plaintiffs when made, and would result in, and did result in, Plaintiffs' reliance thereon and forbearance in seeking to enforce its rights under the Consulting Agreements in response to the improper conversion of Plaintiffs' Investment Opportunity rights, in whole or in part. In particular, as a result of the misrepresentations on which Plaintiffs relied, and did not know were false and misleading, Plaintiffs did not demand,

or forebore from asserting, their full investment rights with respect to the Investment Opportunities in Quest, Convergent Group, Greenfield Online, and Click.

115. Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, through their representatives and agents, Horing and Murdock, and Insight, made material misrepresentations, and omitted to disclose material facts, as alleged herein, with the intention of inducing Plaintiffs to acquiesce in Insight's allocations, in whole or in part, of Investment Opportunities to Plaintiffs in amounts less than Plaintiffs' full right of first refusal to which they were entitled under the Consulting Agreements, the consequence of which caused significant economic detriment to Plaintiffs. In addition, defendants Raghavendran, Sobiloff and Insight III, directly or through their agents and representatives, Horing and Murdock, and Insight intentionally failed to inform Plaintiffs of the Investment Opportunity in Authorize.Net, despite obligations to do so.

116. Defendants' fraudulent conduct, as alleged herein, was done purposely, maliciously, and without regard for the rights and interests of Plaintiffs.

117. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff awarding Plaintiffs compensatory damages of at least $261 million, and punitive damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, AND SOBILOFF

**(Aiding and Abetting Fraud or Misrepresentation)**

118. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 117 of this Complaint as if set forth in full herein.

119. Each of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff played a significant role in the fraudulent activities described herein, with knowledge or reckless disregard thereof. Each of Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff knowingly and substantially assisted in the fraud and misrepresentations perpetrated on Plaintiffs.

120. Thus, with full knowledge of Plaintiffs' rights pursuant to the Consulting Agreements, defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, *inter alia*, purchased and/or caused to be purchased, securities in Investment Opportunities that they knew or recklessly failed to know had been falsely represented to Plaintiffs as falling outside of the Consulting Agreements, and Insight III purchased shares of Authorize.Net when it knew or recklessly failed to know that such investment was hidden from Plaintiffs even though Authorize.Net had been identified by Insight as an Investment Opportunity prior to April 3, 1999. Such conduct aided and abetted the fraud and misrepresentations of Insight, Horing, Murdock and/or the other defendants herein.

121. The conduct of each of the defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff

proximately caused significant damages to Plaintiffs. The fraud and misrepresentations alleged herein could not have succeeded without the knowing and active participation of these defendants.

122. The conduct of each of the defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff was purposeful and malicious, or reckless, and it departed in the extreme from the norms expected of commercial parties and their representatives, and was in cavalier disregard of the interests of Plaintiffs.

123. Plaintiffs have been damaged by the wrongful conduct of each of the defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff.

124. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of the defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, jointly and severally, awarding Plaintiffs compensatory damages of at least $261 million and punitive damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT, CAYMAN III, RAGANHAVENDRAN AND SOBILOFF**

**(Conversion of Investment Opportunities and Related Entitlements)**

125. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 124 of this Complaint as if set forth in full herein.

126. Upon the closing of the Quest transaction, defendants Insight II and Insight Cayman II exercised dominion and control over 888,889 shares of Quest Series A Preferred Stock. Through that dominion and control over Quest stock, defendants Insight II and Insight Cayman II interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Quest by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Quest stock, and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

127. Upon the closings of the Convergent transactions, defendants Insight III, Insight Co-investors, and Insight Cayman III exercised dominion and control of 15,920,106 shares of Convergent stock. Through that dominion and control over Convergent stock, defendants Insight III, Insight Co-investors, and Insight Cayman III interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Convergent by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Convergent stock and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

128. Upon the closing of the Greenfield Online transaction, defendants Insight III, Insight Co-investors, and Insight Cayman III exercised dominion and control over 528.26 Member Units of Greenfield Online. Through that dominion and control over Greenfield Online Units, defendants Insight III, Insight Co-investors, and Insight Cayman III interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Greenfield Online by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and

converted Greenfield Online Units, and/or the right to acquire such Units, that rightfully belonged to Plaintiffs.

129. Upon the closings of the Click transactions, defendants Insight III, Insight Co-investors, and Insight Cayman III exercised dominion and control over 4,415,563 shares of Click stock. Through that dominion and control over the Click stock, defendants Insight III, Insight Co-investors, and Insight Cayman III interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Click by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Click stock, and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

130. Upon the closing of the Authorize.Net transaction, defendant Insight III exercised dominion and control over 45,289 shares of Authorize.Net stock. Through that dominion and control over the Authorize.Net stock, defendant Insight III interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Authorize.Net stock by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted of Authorize.Net stock, and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

131. Defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and/or Sobiloff, also converted fees and options due Plaintiffs that flowed from Investment Opportunities and allocations in "hot issue" IPOs, and of valuable "friends and family" stock, in which Plaintiffs were entitled to participate. By exercising such dominion and control over these fees, options, allocations, and distributions, defendants Insight II, Insight Cayman II, Insight III, Insight

Co-investors, Insight Cayman III, Raghavendran, and/or Sobiloff converted these fees, options, allocations, and other valuable benefits belonging to Plaintiffs in violation of Plaintiffs' rights under the Consulting Agreements.

132. The conduct of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff was outrageous, malicious, and evidenced a reckless disregard of Plaintiffs' rights under the under the Consulting Agreements.

133. By reason of the foregoing, Plaintiffs are entitled to a judgment against defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including but not limited to lost opportunity damages represented by, in the case of securities still possessed by said defendants, the difference between the highest intermediate value of the securities during the period of conversion and their value as of the date of judgment, and in the case of securities disposed of by said defendants, the highest intermediate value of the securities during the period of conversion, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A SIXTH CAUSE OF**
**ACTION AGAINST DEFENDANT UBS**

**(Conversion of Investment Opportunities and Related Entitlements)**

134. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 133 of this Complaint as if set forth in full herein.

135. Upon the closing of the Quest transaction, defendant UBS exercised dominion and control over 977,778 shares of Quest Series A Preferred Stock,

and 1,777,778 shares of Quest Series B Redeemed Preferred Stock. Through that dominion and control over the Quest stock, defendant UBS interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Quest by Insight or its affiliates, or 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Quest securities, and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

136. Upon the closing of the Convergent transaction, defendant UBS exercised dominion and control of 15,920,076 shares of Convergent stock. Through that dominion and control over such Convergent stock, defendant UBS interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Convergent by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Convergent stock, and/or the right to acquire such stock, that rightfully belonged to Plaintiffs.

137. Upon the closing of the Greenfield Online transaction, defendant UBS exercised dominion and control over 108.70 Member Units of Greenfield Online. Through that dominion and control over the Greenfield Online Units, defendant UBS interfered with Plaintiffs' rights to acquire at least 50 percent of the investment to be made in Greenfield Online by Insight or its affiliates, or up to 100 percent of the investment to the extent not taken by Insight or its affiliates, and converted Greenfield Online stock, and/or the right to acquire such Units, that rightfully belonged to Plaintiffs.

138. Additionally, the defendant UBS may have converted fees, options, allocations, and other valuable benefits that rightfully belonged to Plaintiffs under the Consulting Agreements.

139. By reason of the foregoing, Plaintiffs are entitled to a judgment against defendant UBS, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including but limited to lost opportunity damages represented by, in the case of securities still possessed by said defendant, the difference between the highest intermediate value of the securities during the period of conversion and their value as of the date of judgment, and in the case of securities disposed of by said defendants, the highest intermediate value of the securities during the period of conversion, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, SOBILOFF AND UBS**

**(Unjust Enrichment)**

140. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 139 of this Complaint as if set forth in full herein.

141. By virtue of the wrongful conversion by each of the defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, UBS, Raghavendran, and Sobiloff of Investment Opportunities, and related entitlements and benefits, that rightfully should have been allocated to Plaintiffs as set forth herein, said Defendants have been unjustly enriched in an amount to be determined at trial.

142. By reason of the foregoing, Plaintiffs are entitled to a judgment against defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS, awarding them compensatory damages

in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, SOBILOFF, AND UBS**

**(Value Had and Received)**

143. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 142 of this Complaint as if set forth in full herein.

144. As a result of their wrongful diversion and conversion of Investment Opportunities that rightfully should have been presented to Plaintiffs, and their failure to turn over to Plaintiffs fees, options, allocations in "hot issue" IPOs, and distributions of valuable "friends and family" stock that flowed from Investment Opportunities, and thus were due Plaintiffs, defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS came into possession of money and securities belonging to Plaintiffs that in equity and good conscience should not be retained by said Defendants.

145. Plaintiffs have been damaged by the wrongful retention of such money and securities by said defendants.

146. By reason of the foregoing, Plaintiffs are entitled to an order requiring that such money and securities be turned over to Plaintiffs, together with interest, costs, and attorneys' fees as allowed by law, or, in addition to, or in the alternative, to judgment against defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS in an

amount to be determined at trial, reflecting the value of such money and securities, together with interest, costs, and attorneys' fees as allowed by law.

**AS AND FOR A NINTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN AND SOBILOFF AND UBS**

**(Mandatory Injunction)**

147. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 146 of this Complaint as if set forth in full herein.

148. As a result of the wrongful actions, as set forth herein, of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, and UBS, said defendants wrongfully acquired or retained property, in the form of securities, options, and other non-cash property, rightfully belonging to Plaintiffs.

149. A mandatory injunction should be issued requiring defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff and UBS, to turn over to Plaintiffs all such wrongfully obtained and/or retained securities, options, and other non-cash property, and/or the value of thereof.

150. Plaintiffs have no adequate remedy at law to obtain these securities, options, and other non-cash property because some or all of these securities, options, and other non-cash property has increased significantly in value since their acquisition by defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, and UBS, and the opportunity to acquire those investments at the price and the terms under which they were acquired by defendants Insight II, Insight

Cayman II, Insight III, Insight Co-investors, Insight Cayman III, and UBS, no longer exists, and the opportunity to profit therefrom has been significantly reduced or eliminated.

**AS AND FOR A TENTH CAUSE OF ACTION AGAINST DEFENDANTS INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, AND INSIGHT CAYMAN III, RAGHAVENDRAN, AND SOBILOFF**

**(Imposition of a Constructive Trust)**

151. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 150 of this Complaint as if set forth in full herein.

152. By virtue of the investment advisor relationship between Insight and Plaintiffs, and the inextricable interconnections among Insight and defendants Insight II, Insight Cayman II, Insight III, Insight Co-Investors, Insight Cayman III, Raghavendran, and Sobiloff, each of those defendants was, or should be deemed to have been, in a confidential and/or fiduciary relationship with Plaintiffs.

153. As a consequence of the wrongs alleged herein, defendants Insight II, Insight Cayman II, Insight III, Insight Co-Investors, Insight Cayman III, Raghavendran, and Sobiloff caused to be transferred to themselves or their affiliates Investment Opportunities, fees and other valuable benefits rightfully belonging to Plaintiffs.

154. As a result of the wrongful diversion to themselves or their co-investors of Investment Opportunities, fees, and other valuable benefits that rightfully should have been allocated to Plaintiffs as set forth herein, defendants Insight II, Insight Cayman II, Insight III, Insight Co-Investors, Insight Cayman III, Raghavendran, and Sobiloff have been unjustly enriched and are in the possession of securities, options,

and other non-cash property that rightfully belong to Plaintiffs, or if they have liquidated those investments, of the proceeds thereof.

155. As a consequence of the foregoing, Plaintiffs are entitled to the imposition of a constructive trust on all investments, fees, and benefits, and/or any proceeds or profits therefrom, made or received by defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff with respect to Investment Opportunities as to which Plaintiffs were wrongfully denied their rights under the Consulting Agreements.

156. Plaintiffs have no adequate remedy at law.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION AGAINST INSIGHT, INSIGHT II, INSIGHT CAYMAN II, INSIGHT III, INSIGHT CO-INVESTORS, INSIGHT CAYMAN III, RAGHAVENDRAN, SOBILOFF AND UBS**

**(Accounting)**

157. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 156 of this Complaint as if set forth in full herein.

158. In light of the wrongful actions of defendants Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, and UBS, as set forth herein, Plaintiffs are entitled to an accounting from said defendants regarding all Investment Opportunities in which they invested, or diverted to affiliates, co-investors, or others, setting forth all investments made in such Investment Opportunities, the profits and/or appreciation received therefrom or in connection therewith, and regarding all board, break-up fees, closing fees, consulting fees, advisory fees, transaction fees, other fees, options, "hot issue" IPO allocations, or other benefits

paid to or received by defendants, or any of their affiliates, designees or nominees, that in any way arose from Investment Opportunities subject to the Consulting Agreements.

159. Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully demand judgment as follows:

i. on the First Cause of Action, compensatory damages of at least $261 million and punitive damages against each of Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

ii. on the Second Cause of Action, compensatory damages of at least $261 million and punitive damages against Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iii. on the Third Cause of Action, compensatory damages of at least $261 million and punitive damages against Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iv. on the Fourth Cause of Action, compensatory damages of at least $261 million and punitive damages against Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III,

Raghavendran, and Sobiloff in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

v. on the Fifth Cause of Action, compensatory and punitive damages against Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff in an amount to be established at trial, including but not limited to compensation for lost opportunities to redeem the securities at their highest intermediate value during the period of conversion, together with interest, costs, and attorneys' fees as allowed by law;

vi. on the Sixth Cause of Action, compensatory and punitive damages against UBS in an amount to be established at trial, including but not limited to compensation for lost opportunities to redeem the securities at their highest intermediate value during the period of conversion, together with interest, costs, and attorneys' fees as allowed by law;

vii. on the Seventh Cause of Action, compensatory and punitive damages against Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

viii. on the Eighth Cause of Action, an Order requiring Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS to turn over money and

securities that belong to Plaintiffs, together with interest, costs and attorneys' fees as allowed by law, or, in addition to, or in the alternative, a money judgment for the value thereof, in an amount to be determined at trial, together with interest, costs, and attorneys' fees as allowed by law;

ix. on the Ninth Cause of Action, for a mandatory injunction requiring Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS to turn over to Plaintiffs all securities, options, or other non-cash property that rightfully belong to Plaintiffs or the value thereof;

x. on the Tenth Cause of Action, imposing a constructive trust on all investments, and/or proceeds or profits flowing therefrom, made by Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, and Sobiloff, or their affiliates, in connection with Investment Opportunities that wrongfully were denied to Plaintiffs;

xi. on the Eleventh Cause of Action, for an accounting from Insight II, Insight Cayman II, Insight III, Insight Co-investors, Insight Cayman III, Raghavendran, Sobiloff, and UBS regarding all Investment Opportunities covered by the Consulting Agreements and all fees, options, "hot issue" IPO allocations, and other benefits received by any of said defendants, or their affiliates, designees or nominees

that in any way arose from Investment Opportunities subject to the Consulting Agreements; and

xii. for such other and further relief as to the Court deems just and proper.

Dated: New York, New York
April 19, 2002

BROWN RUDNICK BERLACK ISRAELS LLP

By:________________________________
Martin S. Siegel, Esq.
Andrew Dash, Esq.

120 West 45th Street
New York, New York 10036
(212) 704-0100

Attorneys for Plaintiffs

8071530-V5