SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IMPRIMIS INVESTORS LLC and
WI SOFTWARE INVESTORS LLC,

Plaintiffs,

-against-

INSIGHT VENTURE MANAGEMENT, INC.,
JEFFREY HORING, JERRY MURDOCK, ,
INSIGHT VENTURE ASSOCIATES II, LLC, and
INSIGHT VENTURE ASSOCIATES III, LLC,

Defendants.

Index No. 00-604431

Justice Cahn

INSIGHT VENTURE MANAGEMENT, INC.,
INSIGHT VENTURE ASSOCIATES II, LLC,
JEFFREY HORING, JERRY MURDOCK and
PETER SOBILOFF,

Counterclaim and
Third-Party Plaintiffs,

-against-

IMPRIMIS INVESTORS LLC, WI SOFTWARE
INVESTORS LLC, and WEXFORD CAPITAL
LLC f/k/a WEXFORD MANAGEMENT LLC,

Counterclaim and
Third-Party Defendants.

**AMENDED AND CONSOLIDATED COMPLAINT**

RAMANAN RAGHAVENDRAN,

Plaintiff,

- against -

IMPRIMIS INVESTORS LLC, WEXFORD
SPECIAL SITUATIONS 1997, L.P., WEXFORD
SPECIAL SITUATIONS INSTITUTIONAL, L.P.,
WEXFORD SPECTRUM INVESTORS LLC,
WEXFORD MANAGEMENT LLC, WEXFORD
INSIGHT SOFTWARE INVESTORS LLC and
DOES 1-10,

Defendants.

Index No. 02-600071

Justice Cahn

EXHIBIT
23

| | | |
|---|---|---|
| IMPRIMIS INVESTORS LLC and WI SOFTWARE INVESTORS LLC,<br><br>Plaintiff,<br><br>- against -<br><br>INSIGHT CAPITAL PARTNERS II, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) II, L.P., INSIGHT CAPITAL PARTNERS III, L.P., INSIGHT CAPITAL PARTNERS III CO-INVESTORS, L.P., INSIGHT CAPITAL PARTNERS (CAYMAN) III, L.P., RAMANAN RAGHAVENDRAN, PETER SOBILOFF, AND UBS CAPITAL II LLC,<br><br>Defendants. | : | Index No. 02-601619<br><br>Justice Cahn |

Plaintiffs Imprimis Investors LLC ("Imprimis") and WI Software Investors LLC ("WISI" and, collectively with Imprimis, "Plaintiffs"), as and for their Amended and Consolidated Complaint against defendants Insight Venture Management, Inc. ("Insight"), Jeffrey Horing ("Horing"), Jerry Murdock ("Murdock"), Ramanan Raghavendran ("Raghavendran"), Peter Sobiloff ("Sobiloff," and, collectively with Horing, Murdock and Raghavendran, the "Insight Principals"), Insight Venture Associates II, LLC, ("Insight Venture II"), Insight Venture Associates III, LLC ("Insight Venture III," and collectively with Insight, and Insight Venture II, the "Insight Entities"), Insight Capital Partners II, L.P. ("Insight II"), Insight Capital Partners (Cayman) II, L.P. ("Insight Cayman II"), Insight Capital Partners III, L.P. ("Insight III"), Insight Capital Partners III Co-Investors, L.P. ("Insight Co-Investors"), Insight Capital Partners (Cayman) III, L.P. ("Insight Cayman III" and, collectively with Insight III and Insight Co-Investors, the "New Funds," and, collectively with Insight III, Insight Co-investors, Insight

II, and Insight Cayman II, the "Insight Funds," and, collectively with the other Insight Funds, the Insight Entities and the Insight Principals, the "Insight Defendants"), and UBS Capital II LLC ("UBS") allege, on actual knowledge as to Plaintiffs' status, actions, and knowledge, and on information and belief as to all other matters, as follows:

**Nature of this Action**

1. Through these consolidated actions,[1] Plaintiffs seek redress from the Insight Defendants and UBS for the wrongful diversion of highly valuable Investment Opportunities (as defined below) that belonged to Plaintiffs, and for other tortious conduct committed by Defendants. In so doing, Insight, inter alia, breached contractual and fiduciary obligations to Imprimis and WISI; the Insight Defendants made repeated, material misrepresentations to Plaintiffs in an effort to hide their wrongdoing, and all Defendants converted Investment Opportunities. This wrongful conduct deprived Imprimis and WISI of more than $288.7 million in investment profits that properly should have flowed to Plaintiffs.

[1] In October, 2000, Plaintiffs initiated the action entitled Imprimis Investors LLC and WI Software Investors LLC v. Insight Venture Management, Inc., *et al.*, Index No. 00-604431 (Justice Cahn) ("the Original Action"). Plaintiffs subsequently initiated an action entitled Imprimis Investors LLC and WI Software Investors LLC v. Insight Capital Partners II, L.P., *et al.*, Index No. 02-601519, (Justice Cahn) (the "Related Action"). On or about January 7, 2002, Ramanan Raghavendran, one of the defendants in the Related Action, commenced the action entitled Ramanan Raghavendran v. Imprimis Investors LLC, *et al.*, Index No. 02-600071 (Justice Cahn) (the "Raghavendran Action") against Plaintiffs in the Original Action, as well as certain parties related to plaintiffs. By Stipulation and Order dated July 10, 2002 ("the Order"), this Court directed that the Original, Related and Raghavendran Actions be consolidated for purposes of discovery and all other pre-trial proceedings. Pursuant to ¶ 2 of the Order, Imprimis Investors LLC and WI Software Investors LLC have consolidated herein their complaints in the Original Action and the Related Action.

2. Defendants' wrongdoing stems from Defendant Insight's breaches of two contracts — the "Consulting Agreements" — with WISI and Imprimis, and tortious conduct by all Defendants. Under the Consulting Agreements, among other things, Insight was required to provide WISI and, subsequently, Imprimis, with a right of first refusal to participate in up to 50 percent (or more under certain circumstances) of investments in the software and related industries identified by Insight in accordance with the Consulting Agreements (the "Investment Opportunities").

3. Despite its clear obligations, Insight failed to provide Plaintiffs with numerous Investment Opportunities that it had identified, as required by the Consulting Agreements. Instead, Insight, along with the other Insight Defendants, "cherry picked" the investments and diverted certain particularly lucrative Investment Opportunities to their own existing and/or newly-formed managed limited partnerships, and to prospective investors in those partnerships. The Insight Defendants' scheme was intended, inter alia, to facilitate the marketing of these new partnerships by: (i) permitting favored affiliates and others, including UBS, to co-invest with Insight in the diverted Investment Opportunities; and (ii) allowing Insight to represent to prospective investors that its new funds would make investments in these lucrative Investment Opportunities. Key elements of this wrongful scheme include: (i) Insight's intentional failure to provide Plaintiffs with notice of certain of the diverted Investment Opportunities; (ii) Insight's failure to notify Plaintiffs of material changes in previously presented Investment Opportunities; (iii) delaying the closings of other diverted Investment Opportunities identified during the term of Consulting Agreements until after the April 3, 1999 date referenced in the Consulting Agreements; (iv) the Insight

Defendants' false representations that Plaintiffs had no right to participate in the diverted Investment Opportunities; and (v) the conversion of certain of these Investment Opportunities by the Insight Defendants and UBS.

4. Moreover, Horing, Murdock, Insight and Insight Venture II, for their own economic benefit, wrongfully caused valuable warrants acquired by WISI in connection with Plaintiffs' participation in one of the Investment Opportunities to be "assigned" to third parties. This "assignment" was entirely unauthorized by Plaintiffs and constituted the conversion of millions of dollars of WISI's property. Insight, Horing, Murdock, and Insight Venture II compounded this wrong by hiding this transaction and a related Investment Opportunity from Plaintiffs.

5. In addition, despite the obligations imposed by the Consulting Agreements, Insight, for its own benefit and for the benefit of its affiliates, including certain of the other Insight Defendants, failed to pay over to Plaintiffs their pro rata share of board fees, break-up fees, consulting fees, other fees, options, and other benefits that were allocable to investments covered by the Agreements, including allocations in "hot issue" initial public offerings received by the Insight Defendants and their affiliates from the various Investment Opportunities, or from underwriters as a quid pro quo for investment banking business arising from, inter alia, the Investment Opportunities.

6. The Insight Funds, the Insight Entities, and the Insight Principals also tortiously interfered with the consulting agreements between Plaintiffs and Insight, and through their agents and representatives, intentionally and/or negligently made misrepresentations to Plaintiffs, aided and abetted Insight and others in making

misrepresentations to Plaintiffs, and aided and abetted Insight's breach of fiduciary duties owed to Plaintiffs.

7. In light of the foregoing, Plaintiffs are entitled to compensatory damages of at least $288.7 million as a result of Insight's breaches of contract and fiduciary duty, and compensatory and punitive damages as a result of the tortious interference and aiding and abetting (by all Defendants other than Insight and UBS) with the Consulting Agreements, as well as the conversion, affirmative misrepresentations, unjust enrichment, and other fraudulent conduct of the Insight Defendants, and the conversion and other wrongful conduct of UBS. Plaintiffs also are entitled to: (i) an accounting from all Defendants of all Investment Opportunities that should have flowed to Plaintiffs under the Consulting Agreements and of all fees, options, and other benefits, including allocations in "hot issue" public offerings, received by Defendants, and/or their affiliates from, or in connection with, those investments; (ii) a mandatory injunction requiring Defendants and their affiliates to turn over to Plaintiffs all securities or other property still in their possession that rightfully belong to Plaintiffs or the value of such converted securities and other property; and (iii) the imposition of a constructive trust over investments, fees, and benefits, or the proceeds thereof, with respect to Investment Opportunities as to which Plaintiffs were wrongfully denied their rights.

**The Parties**

8. Plaintiff Imprimis is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. Imprimis was formed for the purpose of making various investments, including investments in companies engaged in the software and related

industries. Wexford Management LLC (now known as Wexford Capital LLC) ("Wexford") is the Manager of Imprimis.

9. Plaintiff WISI is a Delaware limited liability company maintaining its principal place of business at 411 West Putnam Avenue, Suite 125, Greenwich, Connecticut 06830. WISI is a wholly-owned subsidiary of Imprimis and was formed for the purpose of making investments in the software and related industries. Wexford is the Manager of WISI.

10. Defendant Insight is a Delaware corporation maintaining its principal offices at 527 Madison Avenue, New York, New York 10022. Pursuant to various agreements, Insight provides management and investment services to certain limited partnerships engaged in the business of making investments in the software and related industries. These limited partnerships include, among others, defendants Insight II, Insight Cayman II, Insight III, Insight Co-Investors and Insight Cayman III.

11. Defendant Horing is an individual maintaining his principal place of business at 527 Madison Avenue, New York, New York 10022. Horing is a principal and control person of Insight, Insight Venture II, Insight Venture III, and the Insight Funds, and a limited partner of the Insight Funds.

12. Defendant Murdock is an individual maintaining places of business at 527 Madison Avenue, New York, New York 10022 and 300 Puppysmith Street, Suite 205, Aspen, Colorado 81611. Murdock is a principal and control person of Insight, Insight Venture II, Insight Venture III, and the Insight Funds, and a limited partner of the Insight Funds.

13. Defendant Raghavendran is an individual maintaining a place of business in New York, New York. At all relevant times, Raghavendran was a principal and control person of Insight and a member of Insight Venture II and Insight Venture III, the limited liability companies that are the general partners, of and control, the Insight Funds.

14. Defendant Sobiloff is an individual maintaining his principal place of business at 680 Fifth Avenue, New York, New York. At all relevant times, Sobiloff was a principal and control person of Insight and a member of Insight Venture II and Insight Venture III, the limited liability companies that are the general partners of and control the Insight Funds.

15. Defendant Insight Venture II is a Delaware limited liability company maintaining its principal place of business at 527 Madison Avenue, New York, New York, 10022. Insight Venture II is the general partner of Insight II and Insight Cayman II. Defendants Murdock and Horing are the managers of Insight Venture II and Raghavendran and Sobiloff are members thereof. Insight Venture II was a member of WISI and a party to the WISI Limited Liability Company Agreement (the "WISI LLC Agreement"), and is a member of Imprimis, and a party to the Imprimis Limited Liability Company Agreement (the "Imprimis LLC Agreement").

16. Defendant Insight Venture III is a limited liability company maintaining its principal place of business at 527 Madison Avenue, New York, New York 10022. Insight Venture III is the general partner of Insight III, Insight Co-Investors, and Insight Cayman II. Defendants Murdock and Horing are the managers of Insight Venture III and Raghavendran and Sobiloff are members thereof.

17. Defendant Insight II is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

18. Defendant Insight Cayman II is a limited partnership formed in the Cayman Islands with a place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

19. Defendant Insight III is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

20. Defendant Insight Co-Investors is a limited partnership maintaining its principal place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

21. Defendant Insight Cayman III is a limited partnership in the Cayman Islands that maintains a place of business at 680 Fifth Avenue, 8th Floor, New York, New York 10019.

22. In their various capacities, Horing, Murdock, Raghavendran, and Sobiloff dominated and controlled the Insight Entities and Insight Funds, and various wrongful acts and misrepresentations made by Horing and Murdock, described below, were made, inter alia, in their capacities as managers of the Insight Entities and Insight Funds, as partners with Raghavendran and Sobiloff, and on behalf of the Insight Entities and Insight Funds, Raghavendran, and Sobiloff. Accordingly, the wrongful acts of Horing and Murdock described below are fully attributable to the Insight Entities and Insight Funds, Raghavendran, and Sobiloff.

23. In connection with the transactions complained of herein, the Insight Entities, the Insight Funds, Horing, Murdock, Raghavendran, and Sobiloff were

all alter egos of each other. Among other things, in connection with these transactions: (i) Insight, Horing, Murdock, Raghavendran, and Sobiloff did not always preserve the formalities and paraphernalia that are part and parcel of the corporate existence of Insight; the limited liability company existence of Insight Venture II and Insight Venture III (the entities that Horing, Murdock, Raghavendran, and Sobiloff appointed as their nominees to act as nominal general partners of the Insight Funds); and the limited partnership existence of the Insight Funds; (ii) Insight was inadequately capitalized, the Insight Funds, Insight Venture II and Insight Venture III were its nominees/designees in various Insight transactions, including Insight Venture II's being the nominee/designee of Insight to receive performance-based fees due Insight in exchange for its having identified Investment Opportunities pursuant to the Consulting Agreements – but Insight Venture II did not keep those fees, which passed through it to Horing and Murdock, Raghavendran and Sobiloff; (iii) in numerous instances, funds and/or investments were put in and/or taken out of one of the Insight Entities or Insight Funds to be transferred or given to another one of the Insight Entities, Insight Funds, or to Murdock, Horing, Raghavendran and/or Sobiloff, for the personal benefit of Murdock, Horing, Raghavendran and/or Sobiloff, rather than for the benefit of the particular Insight Entity or Insight Fund; (iv) there was an overlap in ownership, officers, directors, members, and personnel among the Insight Entities and the Insight Funds; (v) the Insight Entities, the Insight Funds, Horing, Murdock, Raghavendran and Sobiloff all shared common office space, address, and telephone numbers; (vi) the Insight Entities and the Insight Funds had no independent business discretion, and virtually all decisions for those entities were made by Horing, Murdock, Raghavendran and Sobiloff; (vii) the Insight

Entities, the Insight Funds, Horing, Murdock, Raghavendran and Sobiloff did not deal with each other at arms' length; (viii) in numerous respects, Insight Venture II, Insight Venture III and the Insight Funds were not treated by Horing, Murdock, Raghavendran and Sobiloff as profit centers independent of Insight; (ix) Insight Venture II, Insight Venture III and the Insight Funds paid various monies owed to or by Insight as a result of actions taken by Horing, Murdock, Raghavendran and Sobiloff, including having performance based fees due Insight paid instead to Insight Venture II and passed through it to Horing, Murdock, Raghavendran and Sobiloff; and (x) Insight Venture II, Insight Venture III and the Insight Funds had their monies and other property used by Insight, Horing, Murdock, Raghavendran and Sobiloff as if it were their own, and monies or other properties paid to Insight Venture II and Insight Venture III, the general partners of the Insight Funds, passed through those entities to Horing, Murdock, Raghavendran, and Sobiloff.

24. Defendant UBS is a Delaware limited liability company with a place of business at 299 Park Avenue, New York, New York 10017.

## Venue

25. Venue is proper in this county pursuant to CPLR 503(a), (c), and (d) in that, inter alia, all of Defendants maintain their principal offices in this county.

## Facts Applicable to All Causes of Action

### The Relationship Among Insight and Plaintiffs

26. In late 1995, Horing was introduced to Wexford. Prior thereto, Horing and Murdock had established Insight to make investments in the software and related industries.

27. At the time Murdock and Horing were introduced to Wexford, Wexford had been in business since mid-1994, having been formed by experienced investment professionals, and Wexford had raised significant sums of money to make private equity investments. By late 1995, Wexford had established a significant reputation in the investment community and its principals were well known and respected.

28. After one of Wexford's principals made an initial small investment based on a recommendation by Horing and Murdock, Wexford and Insight agreed to establish a business relationship.

29. To develop their relationship further, Insight and Wexford agreed that they would enter into a consulting agreement pursuant to which Insight would provide advice to Wexford in connection with investments in the software and related industries, and Wexford would provide Insight with management fees and the reimbursement of expenses to help fund Insight's business. Wexford also initially provided Insight with office space in Wexford's offices and the utilization of support services.

30. On or about June 1, 1996, notwithstanding the fact that Insight and Wexford had not yet entered into a formal consulting agreement, Insight began providing certain of the services contemplated by the parties. Moreover, on or about September 20, 1996, Wexford advanced to Insight $83,333, as a pro rata portion of the first year's fee.

31. Thereafter, Wexford, on behalf of a newly-formed Delaware limited liability company named Wexford Insight LLC ("Wexford/Insight"), entered into a

consulting agreement with Insight, dated as of June 1, 1996, that required Insight to advise Wexford/Insight on investments in the software and other industries (the "Wexford/Insight Agreement").

32. As of June 1, 1996, the parties also entered into a limited liability company agreement, inter alia, to provide a means of paying carries to Insight in a potentially tax-advantaged manner. Under the Limited Liability Company Agreement of Wexford Insight LLC (the "Wexford/Insight LLC Agreement"), Wexford was appointed Manager of Wexford/Insight, and the members of Wexford/Insight were certain other Wexford entities and Insight. Insight was made a member of Wexford/Insight LLC at the request of Insight, Horing, and Murdock solely to receive any "carry" -- i.e., a performance fee that Insight was to receive in connection with Investment Opportunities it identified pursuant to the Wexford/Insight Agreement. Insight performed no other services for Wexford/Insight LLC, other than those under the Wexford/Insight Agreement.

33. Under the Wexford/Insight Agreement, for a period of one year, Insight was required to identify for Wexford/Insight at least three separate investment opportunities in the software and related industries and Wexford/Insight received a right of first refusal to the extent of at least 50 percent of the amounts invested over the first $1 million to be invested by Insight or its other affiliates.

34. In consideration of the right of first refusal and other rights granted to Wexford under the Wexford/Insight Agreement, Wexford agreed to pay Insight various fees and expenses, and provided Insight with certain proxy and indemnification rights.

35. The Wexford/Insight Agreement was a successful business arrangement for all parties concerned. Insight identified numerous investment opportunities in the software and related fields to Wexford/Insight and Wexford/Insight made several investments through the exercise of its first refusal rights under the Wexford/Insight Agreement.

36. As a result of the relationship that had developed between Wexford and Insight and the prospects of additional successes, WISI, another entity managed by Wexford, and Insight entered into a new consulting agreement as of April 3, 1997 (the "WISI Consulting Agreement").

37. Thereafter, on or about September 30, 1998, Wexford, on behalf of Imprimis, entered into a consulting agreement with Insight (the "Imprimis Consulting Agreement") that superseded and replaced the WISI Consulting Agreement. Collectively, these agreements are referred to herein as the "Consulting Agreements."

38. The relationship among the parties in the initial stages of WISI Consulting Agreement and Imprimis Consulting Agreement proceeded as contemplated. However, as more fully described below, when the Consulting Agreements were coming to a close, the Insight Defendants devised and implemented a scheme to divert lucrative Investment Opportunities from Plaintiffs to themselves, their affiliates and UBS. The stealing of those Investment Opportunities by Defendants led to this action.

**<u>The WISI Consulting Agreement</u>**

39. On or about April 3, 1997, WISI and Insight entered into the WISI Consulting Agreement, a two-year contract pursuant to which Insight agreed to advise WISI regarding investments in the software and related industries.

40. To implement the WISI Consulting Agreement, Wexford formed WISI as a Delaware limited liability company, and the parties entered into the WISI LLC Agreement, dated as of April 3, 1997, with Wexford as the Manager, and WI Software Holding LLC and Insight Venture II as the members. As set forth above, Insight Venture II was designated by Insight, Horing, and Murdock to be a member of WISI in order for it to receive performance based fees (i.e., a "carry" or share of profits) due Insight as a result of investments identified under the WISI Consulting Agreement. Insight Venture II performed no services for WISI.

41. Under the WISI Consulting Agreement, Insight, inter alia, agreed to identify for WISI "investment opportunities in the software and related industries" during the term of the WISI Agreement (each, an "Investment Opportunity"). The WISI Consulting Agreement further provided that:

> For each such Investment Opportunity, Insight or its affiliates shall give written notice to WISI of its right of first refusal to participate in such Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). WISI shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight.

WISI Consulting Agreement § 1. (A true and complete copy of the WISI Consulting Agreement is annexed hereto as Exhibit A and is incorporated by reference herein.)

42. Thus, pursuant to the WISI Consulting Agreement, for a two-year period commencing April 3, 1997, Insight was obligated to offer to WISI a right of first refusal to invest up to at least 50 percent of the total amount to be invested in all Investment Opportunities in software and related industries identified by Insight during the term of the WISI Consulting Agreement. Moreover, under the WISI Consulting

Agreement, WISI had a right of first refusal to invest up to 100 percent in an Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share.

43. The WISI Consulting Agreement also provided that after Insight furnished written notice of WISI's right of first refusal to participate in an Investment Opportunity, along with written details of the investment, if there was any change in the terms of the Investment Opportunity, Insight was required to notify WISI in writing of such "New Material Terms." WISI Consulting Agreement § 1.

44. Pursuant to the WISI Consulting Agreement, Insight also was obligated to allocate to WISI on a pro rata basis any "board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or any of its affiliates, but allocable in any manner to any investment by WISI in an Investment Opportunity pursuant to the terms of this agreement. . . ." WISI Consulting Agreement § 6.

45. This right of WISI to share fees and options arising out of Investment Opportunities identified under the WISI Consulting Agreement survived the termination of the Agreement. See WISI Consulting Agreement § 6.

46. In consideration of the rights and benefits afforded to WISI under the WISI Consulting Agreement, WISI agreed to pay Insight certain fees, reimburse on a pro rata basis certain due diligence expenses relating to Investment Opportunities, and provide Insight with certain proxy and indemnification rights. See WISI Agreement §§ 2, 5, 7, 8.

47. As a result of the various agreements among the parties, Insight owed fiduciary duties to WISI.

48. After the commencement of the WISI Consulting Agreement, Insight identified for WISI a number of Investment Opportunities in the software and related industries. WISI exercised its right of first refusal with respect to several such Investment Opportunities.

**The Imprimis Consulting Agreement**

49. On or about September 30, 1998, Imprimis and Insight entered into the Imprimis Consulting Agreement. (A true and complete copy of the Imprimis Consulting Agreement is annexed hereto as Exhibit B and is incorporated by reference herein.)

50. To implement the Imprimis Consulting Agreement, Wexford created a new class of membership interests in Imprimis to invest in Insight-identified deals, and the parties entered into an amended and restated limited liability company agreement, dated as of September 30, 1998, with Wexford as the Manager, and three of Wexford's affiliates and Insight Venture II as the members. Insight Venture II was designated by Insight, Horing and Murdock to be a member of Imprimis in order for it to receive performance-based fees (i.e., carries) payable to Insight as a result of investments made by Imprimis pursuant to its right of first refusal under the Imprimis Consulting Agreement. Insight Venture II performed no services for Imprimis.

51. The fact that the Horing/Murdock entity designated to become the member of WISI, and later Imprimis (Insight Venture II), was different from the Horing/Murdock entity that had entered into the WISI and Imprimis Agreements (Insight), was immaterial to Wexford. Insight, Horing and Murdock decided, for their own purposes, that Insight Venture II should be the member of WISI and Imprimis to

receive the performance-based fee for investments identified by Insight pursuant to the Consulting Agreements, just as they had previously decided that Insight would be the member of Wexford/Insight. Their decision to make Insight Venture II the entity that would receive the "carry" earned by Insight pursuant to the respective Consulting Agreements, in a manner that was potentially advantageous from a tax perspective to Horing, Murdock, Raghavendran and Sobiloff, was based purely on their internal considerations and Wexford was not involved in that decision. From Wexford's perspective, all of the Horing/Murdock entities were alter egos of Horing, Murdock, Raghavendran and Sobiloff, especially because Insight Venture II did not act in any capacity as a member of Imprimis other than as the nominee/designee of Insight to receive any carry that Insight might earn under the Consulting Agreements.

52. Significantly, Insight Venture II never purchased its membership interest in WISI or Imprimis, never contributed any capital, except for a nominal $1,000, (as compared to over $50 million contributed by the Wexford-related members), never performed any services for WISI or Imprimis (the only services were performed under the Consulting Agreements), never had any voting rights, and its sole entitlement to receive distributions from Imprimis was based on any carry earned by Insight under the Consulting Agreements.

53. The Imprimis Consulting Agreement, by its specific terms, superceded and replaced the WISI Consulting Agreement, and terminated on the same date the WISI Consulting Agreement would have ended, i.e., April 2, 1999. See Imprimis Consulting Agreement § 13.

54. Pursuant to the Imprimis Consulting Agreement, Insight, inter alia, agreed to "provide Imprimis with a right of first refusal for all investment opportunities in the software and related industries identified by Insight" during the term of the Imprimis Agreement (each, an "Investment Opportunity"). The Imprimis Consulting Agreement further provided that:

> For each Investment Opportunity, Imprimis' right of first refusal entitles it to participate in the Investment Opportunity to the extent of the greater of: (a) 50% of the amounts to be invested in the Investment Opportunity or (b) the percentage of the Investment Opportunity not invested in by Insight or its affiliates (including investors therein). Imprimis shall have the right, but not the obligation, to invest in all or any portion of the amount of the Investment Opportunity offered to it by Insight. For each proposed Investment Opportunity, Insight or its affiliates shall provide in a form satisfactory to Imprimis written details of such proposed Investment Opportunity.

Imprimis Consulting Agreement § 1.

55. Accordingly, pursuant to the Imprimis Consulting Agreement, Insight was obligated to provide Imprimis with its right of first refusal to invest up to at least 50 percent of the total amount to be invested in all Investment Opportunities in the software and related industries identified by Insight during the term of the Imprimis Consulting Agreement. Moreover, as with the WISI Consulting Agreement, under the Imprimis Consulting Agreement, Imprimis had a right of first refusal to invest up to a 100 percent investment in an Investment Opportunity if Insight (or its affiliates) did not invest Insight's full 50 percent share.

56. Like the WISI Consulting Agreement, the Imprimis Consulting Agreement required Insight to provide written notice of Imprimis's right of first refusal to participate in an Investment Opportunity, along with written details of the investment,

and, if there was any change in the Investment Opportunity thereafter, Insight was required to notify Imprimis in writing of any "New Material Terms."

57. Also, like the WISI Consulting Agreement, the Imprimis Consulting Agreement gave Imprimis the right to share, on a pro rata basis with Insight and its affiliates, all fees or other benefits paid to Insight or any of its affiliates by any third party in connection with an Investment Opportunity. As set forth in the Imprimis Agreement, § 6: "Any board fees, break-up fees, closing fees, consulting fees, advisory fees, options, transaction fees or other fees paid to Insight or an affiliate but allocable in any manner to any investment by Imprimis or WISI in any Investment Opportunity pursuant to the terms of this Agreement or the WISI Agreement shall be delivered by Insight to Imprimis in ten business days of Insight's receipt thereof. . . ."

58. In addition, again like the WISI Consulting Agreement, the Imprimis Consulting Agreement obligated Imprimis to pay Insight certain fees and share on a pro rata basis certain due diligence expenses incurred by Insight in connection with Investment Opportunities, and to provide certain proxy and indemnification rights to Insight. See Imprimis Consulting Agreement §§ 2, 5, 7, 8.

59. Under the terms of the Imprimis Consulting Agreement, Insight's obligation to turn over to Imprimis a pro rata share of fees and options arising out of Investment Opportunities survived the termination of the Imprimis Consulting Agreement. See Imprimis Consulting Agreement § 6.

60. As a result of the various agreements among the parties, Insight owed fiduciary duties to Imprimis.

61. After the commencement of the Imprimis Consulting Agreement, Insight identified for Imprimis a number of Investment Opportunities in the software and related industries. Imprimis exercised its right of first refusal with respect to several such Investment Opportunities.

**Defendants' Wrongful Actions and Inactions**

**The Wrongful Failure to Offer Wexford**
**Investment Opportunities in Illuminet and HUON**

62. Sometime prior to July 1998, during the term of the WISI Consulting Agreement, Insight identified Illuminet Holdings, Inc. ("Illuminet") as an Investment Opportunity. Illuminet provides advanced intelligent network, database, and billing services to the telecommunications industry.

63. Indeed, in or prior to July 1998, Insight was engaged in negotiations with Illuminet regarding an investment in Illuminet. Clearly, by that time, Insight had performed extensive due diligence and other financial analysis concerning a potential investment in Illuminet and thus had "identified" Illuminet as an Investment Opportunity during the term of the Consulting Agreements.

64. Nevertheless, neither Insight nor the Insight Principals informed Wexford that Insight had identified Illuminet as an Investment Opportunity, nor did Insight provide WISI with the opportunity to participate in any such Investment Opportunity.

65. Instead of complying with its obligations under the WISI Consulting Agreement to provide WISI with its 50 percent right of first refusal in the Investment Opportunity in Illuminet, Insight diverted such Investment Opportunity to Insight II. On or about August 31, 1998, during the term of the WISI Consulting Agreement, Insight

Venture II, as the general partner of Insight II, executed documents pursuant to which Insight Venture II caused Insight II to purchase 240,000 shares of Illuminet common stock at a cost of $1,335,000, thus wrongfully converting an Investment Opportunity that should have been provided to WISI.

66. At some point prior to December 10, 1998, during the term of the Imprimis Consulting Agreement, Insight identified an additional Investment Opportunity in Illuminet. Insight again failed to afford Imprimis its first refusal right to participate in this Investment Opportunity. Instead, on December 10, 1998, Insight diverted that Investment Opportunity to Insight II, and Insight Venture II, as the general partner of Insight II, executed documents pursuant to which Insight Venture II caused Insight II to purchase another 237,716 shares of Illuminet common stock at a cost of $958,590, thus wrongfully converting an Investment Opportunity that should have been provided to Imprimis.

67. Similarly, sometime prior to December 1998, during the term of the Agreements, Insight identified HUON Holdings ("HUON") as an Investment Opportunity. HUON is a vendor of enterprise-wide property and casualty insurance software. Nevertheless, Insight failed to afford Imprimis its first refusal right to participate in the Investment Opportunity in HUON.

68. On December 21, 1998, i.e., during the term of the Imprimis Consulting Agreement, Insight diverted the Investment Opportunity in HUON to Insight II, and Insight Venture II, as the general partner of Insight II, executed documents pursuant to which Insight Venture II caused Insight II to make a $4.8 million investment in HUON, thus wrongfully converting an Investment Opportunity that should have been

provided to Imprimis. Moreover, Insight diverted a portion of the HUON investment to co-defendant UBS, additionally exercising dominion and control over, and interfering with, Plaintiffs' rights to acquire up to 50% of Insight's investment in HUON. These actions constituted a conversion of the HUON stock that rightfully belonged to Plaintiffs.

69. Plaintiffs first discovered that Insight had failed to advise Plaintiffs of an Investment Opportunity in Illuminet on or about August 25 or 26, 1999. At that time, an Insight partner advised Wexford that Illuminet had filed a form S-1 registration statement in connection with an initial public offering. Because Plaintiffs had not been presented with the Investment Opportunity in Illuminet or HUON, Wexford began to make inquiries concerning Illuminet and HUON.

70. On August 29, 1999, in response to Wexford's inquiry requesting information regarding Illuminet and HUON, Defendant Horing, on his own behalf, and on behalf of Defendants Murdock, Raghavendran, Sobiloff, Insight, Insight II and Insight Venture II, first asserted that Illuminet had allegedly been "discussed" with Plaintiffs in January 1999. This statement, as Defendant Horing knew, or should have known, was completely false. Insight II's investments in Illuminet occurred in August and December 1998, and there was no reason for Horing and Murdock to have first discussed those investments with Plaintiffs in 1999, after the investments already were made. In any event, Insight later admitted that the alleged prior mention of Illuminet to Plaintiffs incorrectly described the size and desirability of an investment in Illuminet. Additionally, the alleged oral discussion did not comply with the express terms of the Consulting Agreements, which required Insight to present Plaintiffs with "written details" of each Investment Opportunity.

71. After receiving Insight's initial excuse, Plaintiffs responded that their files contained no information on Illuminet or HUON and asked to be provided with any documents on Illuminet that allegedly had been sent to Plaintiffs.

72. On October 5, 1999, Horing responded by claiming that Illuminet and HUON had been "discussed" with Plaintiffs sometime in 1998, stating:

> We discussed both . . . I told you on Illuminet that it was a small (< $1.5 mm) deal in common stock that given the size and the fact that we were only able to do it by buying a secondary position from a friend, who was unlikely to sell to anyone else, that we would do it solo.
>
> I also mentioned HUON, which was done with Warburg, priced rich and in Europe. You are not missing anything.

73. On October 6, 1999, Plaintiffs again advised Horing that it had no information in its files regarding either Illuminet or HUON and that neither of these Investment Opportunities had been offered to Plaintiffs as the Consulting Agreements required. Plaintiffs asked Horing for an explanation.

74. In a telephone discussion on October 8, 1999, Murdock, on his own behalf, and on behalf of Defendants Horing, Raghavendran, Sobiloff, Insight, Insight II and Insight Venture II, embellished on the purported discussions with Plaintiffs concerning Illuminet. In that communication, Murdock claimed that he told Plaintiffs about a potential Illuminet investment but recommended that Plaintiffs not participate because the investment was too small, Illuminet had no real financial statements, and had questionable management because its CEO had left. In addition, Murdock claimed that he told Plaintiffs in 1998 that the valuation of Illuminet was "tough."

75. Horing and Murdock had no such "discussions" with Plaintiffs about Illuminet in 1998 or early 1999. Even if there had been such "discussions," the

descriptions of the Illuminet investment allegedly given by Horing and Murdock were false and misleading. Contrary to the information these Defendants claimed to have given to Plaintiffs, and as these Defendants well knew, Illuminet was not a "small deal," Illuminet had real financial statements, and its chief executive officer had not left.

76. Moreover, such alleged oral "discussions" were insufficient under the Consulting Agreements, because Insight was required to provide written details of the proposed Investment Opportunity and it admittedly did not do so. In addition, its alleged excuse that Illuminet was initially a small deal that later grew in size was both irrelevant, because there was no minimum size for an investment to qualify as an Investment Opportunity, and pretextual, because, under the Consulting Agreements, Insight was required to advise Plaintiffs of any material changes in an Investment Opportunity and submit to Plaintiffs a written notice of any New Material Terms. Even Horing and Murdock did not attempt to offer an excuse for Insight's failure to advise Plaintiffs of the second tranche of the Illuminet investment or to provide Imprimis with its right of first refusal as to that Investment Opportunity.

77. In the October 8, 1999 telephone conversation, Defendant Murdock, on his own behalf, and on behalf of Defendants Horing, Raghavendran, Sobiloff, Insight, Insight II and Insight Venture II, effectively admitted that Insight's purported description of Illuminet in 1998 was inaccurate. Murdock also conceded that the Illuminet deal had grown in size and that Insight had not informed Wexford of either the increase in size of the investment or the second tranche of the investment that was purchased by Insight II in December 1998.

78. Also on October 8, 1999, Horing apologized to Plaintiffs about Insight's handling of the Illuminet Investment Opportunity, stating: "*I am sorry about the confusion as well as the poor communication. I am sure that we will have ample* opportunity to make it up to you."

79. On or about October 20, 1999, Horing, on his own behalf, and on behalf of Defendants Murdock, Raghavendran, Sobiloff, Insight, Insight II and Insight Venture II, confirmed to Plaintiffs that Insight should have provided Plaintiffs with the Investment Opportunity in Illuminet. As a result of various discussions between Plaintiffs and Insight concerning Insight's failure to provide a right of first refusal for Illuminet, Insight promised to "make up" to Plaintiffs for such failure by permitting Plaintiffs to participate in at least $1.5 million in "cherries," i.e., investments that had a high potential of a near-term liquidity event at a minimum ten times profit that otherwise would not be available to Plaintiffs because the Agreements had expired. Nonetheless, Insight only afforded Plaintiffs the opportunity to invest $500,000 in one in one such "cherry" and therefore failed to live up to its promise.

80. The Investment Opportunity in Illuminet that Insight diverted to Insight II was extremely profitable to Insight II. Insight II's total cost of its investment in Illuminet was $2,293,590. Imprimis should have received a right of first refusal in 50 percent of that investment. Illuminet completed an initial public offering on October 7, 1999 at $19 per share and the value of Illuminet shares increased significantly thereafter. Insight's failure to offer Imprimis its minimum 50 percent right of first refusal in Illuminet deprived Plaintiffs of a gain of at least $9.7 million.

81. Plaintiffs at present lack knowledge or information sufficient to ascertain their damages, if any, as a result of the Defendants' wrongful failure to present HUON to them as an Investment Opportunity.

**The Wrongful Failure to Offer Plaintiffs the**
***Revised Investment Opportunity in LPA Software***

82. On or about August 31, 1998, Insight prepared and sent to Wexford an investment memorandum describing "the opportunity to invest up to an initial total of $27.0 million in LPA Software." LPA Software ("LPA") is engaged in business-to-business e-commerce and supply chain management. The investment memorandum stated that the majority of the funds was to be used to provide LPA's co-founder liquidity ($25 million) and the remainder was to be used to fund LPA's working capital needs ($2.0 million). The investment memorandum further stated that the investment would be in "participating preferred stock at a pre-money valuation of $38.5 million." The investment memorandum further stated that Insight had agreed to invest $12 million in the initial round of financing with an unrelated entity to provide the remaining $15 million.

83. Based upon the information provided by Insight in the investment memorandum and related documents, on or about September 14, 1998, Wexford notified Insight that Imprimis declined to invest in LPA.

84. On September 21, 1998, only one week after Wexford declined to invest in LPA, Insight notified certain other potential investors that it had "re-cut terms with LPA on our transaction." The new proposed investment was "for $17MM in equity at a lower valuation than the prior deal, with $1MM going to the Company and $16M going to founders." The memorandum to these other investors stated that "[t]he new

transaction reduces our effective price per share, increases the value per share to the founders, based on performance, and gives them greater ownership going forward in the Company."

85. Insight did not provide the memorandum concerning the "re-cut" terms to Plaintiffs nor otherwise notify Plaintiffs in any manner that there were revised deal terms that had materially and favorably changed the proposed investment. Thus, *Defendants did not reoffer the LPA Investment Opportunity to Imprimis – as the* Imprimis Consulting Agreement expressly requires. Based on those new material terms, Plaintiffs would have re-evaluated the investment and agreed to participate to the full extent of Imprimis' first refusal right under the Imprimis Consulting Agreement.

86. On October 23, 1998, Insight diverted the Investment Opportunity in LPA, on the revised terms, to Insight II, and Insight Venture II, as the general partner of Insight II, executed documents pursuant to which Insight Venture II caused Insight Venture II to make a $4.2 million investment in LPA, thus wrongfully converting an Investment Opportunity that should have been provided to Imprimis. Moreover, Insight diverted a portion of the LPA investment to co-defendant UBS, additionally exercising dominion and control over, and interfering with, Plaintiffs' rights to acquire up to 50% of Insight's investment in LPA. *These actions constituted a conversion of the LPA stock* that rightfully belonged to Plaintiffs.

87. On December 29, 1998, Insight again diverted an Investment Opportunity in LPA to Insight II, and Insight Venture II executed documents pursuant to which Insight Venture II caused Insight II to make a $748,015 investment in LPA, thereby wrongfully converting an Investment Opportunity that should have been

provided to Imprimis. On this same date, Insight again diverted a portion of the LPA investment to co-defendant UBS, additionally exercising dominion and control over, and interfering with, Plaintiffs' rights to acquire up to 50% of Insight's investment in LPA. These actions constituted a conversion of the LPA stock that rightfully belonged to Plaintiffs.

88. Plaintiffs at present lack knowledge or information sufficient to ascertain their damages, if any, as a result of the Defendants' wrongful failure to reoffer LPA to them as an Investment Opportunity.

**The Scheme to Divert**
**Investment Opportunities**

89. By the fall of 1998, Insight's then-existing investment partnerships were close to being fully invested. Accordingly, Insight, Insight Venture II, Horing and Murdock, Raghavendran and Sobiloff decided to create a new series of funds, named Insight Co-Investors, Insight Cayman III, and Insight III, each of which would have Insight Venture III as its general partner. Horing and Murdock were the managers of, and controlled, Insight Venture II and its actions as general partner of the New Funds. Raghavendran and Sobiloff were also new members of Insight Venture III, and held themselves out as general partners of the New Funds.

90. Around the same time that the New Funds were formed, the Agreements with Plaintiffs were coming to a close. As a result of these factors, Insight, Murdock, Horing, Raghavendran and Sobiloff, aided and abetted by, and with the active assistance of, Insight Venture II and Insight Venture III, their existing funds, including Insight II and Insight Cayman II, and the New Funds, devised and implemented a scheme to divert from Plaintiffs certain Investment Opportunities that had been

identified during the term of the Consulting Agreements and to convert those Investment Opportunities to themselves and their co-investors, including Defendant UBS. The purpose of this scheme was, inter alia, to use the diversion of such Investment Opportunities to: (i) enhance the value of Insight's then-existing funds, including Insight II and Insight Cayman II; and (ii) to facilitate the marketing of the New Funds by creating opportunities to invest for those funds, and for certain favored Insight co-investors, including Defendant UBS, who were in a position to make significant investments in the New Funds, recommend to their clients and others that they make investments in the New Funds, and/or separately co-invest with Insight in Investment Opportunities that rightfully belonged to Plaintiffs.

91. In furtherance of this scheme, Insight, Horing, Murdock, Raghavendran, and Sobiloff, on behalf of Insight II, Insight Cayman II, and the New Funds, represented to prospective investors in the New Funds that such New Funds would participate in certain lucrative Investment Opportunities. Moreover, through misrepresentations made by Insight, Horing, and Murdock, on behalf of Raghavendran, Sobiloff, Insight II, Insight Cayman II, the New Funds, Insight Venture II and Insight Venture III, Insight, Horing and Murdock made Plaintiffs believe that they had no right to participate in certain Investment Opportunities, hid the existence of certain Investment Opportunities from Plaintiffs, and delayed closings until after the April 3, 1999 date referenced in the Imprimis Consulting Agreement, thereby affording the Insight Funds and favored co-investors, including UBS, the opportunity to invest in Investment Opportunities that rightfully belonged to Plaintiffs.

92. UBS became a participant in this scheme in or around late 1998, during the term of the Consulting Agreements, when it co-invested with Insight in HUON and LPA. Although UBS and Insight did not formally memorialize their co-investor relationship until 1999, UBS was well aware of the Consulting Agreements and Plaintiffs' rights thereunder well before then. Indeed, at least one draft of the UBS/Insight Co-Investment Agreement specifically acknowledged UBS's awareness of Imprimis's right of first refusal regarding Investment Opportunities identified by Insight.

**The Wrongful Diversion of the**
**Investment Opportunity in Quest Software**

93. In the fall of 1998 — well within the term of the Imprimis Consulting Agreement — Insight identified Quest as an Investment Opportunity. Quest is engaged in the business of providing database tools and e-commerce infrastructure.

94. Insight negotiated a potential investment with Quest and, on December 11, 1998, Insight presented Plaintiffs with a deal memorandum for a proposed $33 million investment in Quest that anticipated a closing in January 1999. That deal memorandum stated: "Insight Venture Associates has the opportunity to invest $33.0 million in Quest Software, Inc. . . ." (Emphasis added.)

95. Upon receiving the Quest deal memorandum in December 1998, in accordance with the parties past practice relating Plaintiff's exercise of their right of first refusal, Wexford advised Insight that it would exercise its right of first refusal to the fullest extent for the opportunity to invest in Quest.

96. In January 1999, Insight advised Wexford that the investment in Quest was "dead." However, shortly thereafter, Insight advised Wexford that the Quest Investment had merely "changed" and, on February 16, 1999, in response to an inquiry

from Wexford asking to be brought up to date on the Quest Investment, Horing sent an e-mail stating: "Quest will be pretty close to the same . . . ."

97. On April 9, 1999, only six days after the termination date of the Imprimis Consulting Agreement, Imprimis was notified that "the [Quest] deal is back on" and that Imprimis had to tell Insight how much it wanted to invest by the following week. That same day, Insight e-mailed Wexford deal documents for the Quest investment. Among those documents was a deal memorandum for the revived investment in Quest. That modified deal memorandum states: "InSight Venture Associates has the opportunity to invest $25.0 million in Quest Software, Inc.. . . ." (Emphasis added.)

98. The "opportunity to invest" in Quest contained in the April 9, 1999 deal memorandum was virtually the same as that contained in the December 11, 1998 deal memorandum, except that the total size of the investment was reduced from $33 million to $25 million and the price of the preferred shares to be issued was lowered by 10 percent. In all other material respects, the economic terms of the revived "opportunity to invest" in Quest were substantially the same as to the December 1998 "opportunity to invest in Quest." Indeed, the "deal documents" used at closing for the revived Quest investment were substantially identical to the deal documents that Insight had forwarded to Wexford for the opportunity to invest in Quest in December 1998.

99. Although the April 9, 1999 deal memorandum stated that "InSight Venture Associates has the opportunity to invest $25 million in Quest Software, Inc.," on April 12, 1999, Horing, on his own behalf, and on behalf of Defendants Murdock, Raghavendran, Sobiloff, Insight, Insight II, Insight Cayman II and Insight Venture II, told Plaintiffs that the total Insight investment in Quest would be only $10 million, and he

proposed that Insight take $7 million and Imprimis take $3 million. Horing, on his own behalf, and on behalf of Defendants Murdock, Raghavendran, Sobiloff, Insight, Insight II, Insight Cayman II and Insight Venture II, also stated that the other $15 million investment in Quest was to be made by UBS, whom he represented to be an independent third-party, unrelated to Insight. On that same day, Plaintiffs responded to Horing by e-mail stating that Wexford was entitled to $5 million, or 50 percent, of what Plaintiffs believed was a $10 million Insight investment in Quest.

100. *In a telephone conference on* April 16, 1999 *between Wexford and* Murdock, Murdock, on his own behalf, and on behalf of Defendants Horing, Raghavendran, Sobiloff, Insight, Insight II, Insight Cayman II and Insight Venture II, initially took the position that the Quest investment was outside the Imprimis Agreement. Murdock also raised a number of other purported "excuses" for failing to offer Imprimis its full 50 percent participation in Quest, all of which were pretextual. Murdock initially stated that Insight wanted to offer Plaintiffs the opportunity to invest $2.5 million of what was then represented to be an $8.5 million total investment by Insight and its affiliates, which amount was later changed to $9 million.

101. In the April 16, 1999 telephone conference, Wexford insisted that the Quest Investment Opportunity was covered by the Imprimis Consulting Agreement and that Plaintiffs were entitled to a full 50 percent participation. By the end of that conversation, Murdock agreed with Wexford. Moreover, Insight subsequently demonstrated its belief that the Quest investment was covered by the Imprimis Consulting Agreement by charging Plaintiffs for 50 percent of the due diligence costs for Quest, including expenses incurred in December 1998, as it was entitled to do only if

the Quest deal were an Investment Opportunity under the Imprimis Consulting Agreement.

102. In that April 16, 1999 conference, Murdock proposed that if Wexford would modify Insight's carry with respect to Quest, Plaintiffs would be permitted to: (i) invest between $5 and $10 million in another Investment Opportunity, Convergent Group ("Convergent"); and (ii) make significant investments in two other Investment Opportunities, Greenfield Online and Click Interactive (later known as Click Commerce ("Click"), which Murdock, and later Horing, on their own behalf, and on behalf of Defendants Raghavendran, Sobiloff, Insight, Insight Venture II, Insight Venture III and the New Funds, falsely represented fell outside of the Imprimis Consulting Agreement. Wexford agreed to Murdock's proposal and, therefore, agreed to modify Insight's carry on the Quest investment.

103. The changes requested by Insight and agreed to by Wexford also significantly increased the benefits to Insight, Horing, Murdock, Raghavendran and Sobiloff upon a liquidation of the Quest investment, through the payment of a carry to Insight Venture II, in its capacity as the nominee/designee member of Imprimis.

104. When Wexford agreed to the changes in the "carry" to be paid to Insight Venture II, and to the allocation to it of a $4.5 million investment in the Quest deal, it did not know that, contrary to Horing's representations, on behalf of Murdock, Insight, Insight II, Insight Cayman II, Raghavendran, Sobiloff, and Insight Venture III, UBS was not an independent, third-party investor for purposes of the Quest investment.

105. Wexford also did not know at that time of the falsity of the representations by Murdock, and later Horing, which were made on their own behalf,

and on behalf of Defendants Raghavendran, Sobiloff, Insight, Insight Venture II, Insight Venture III and the Insight Funds, that Convergent, Greenfield Online, and Click were not covered by the Imprimis Agreement. In fact, as Wexford later learned, Convergent, Greenfield Online, and Click all had been identified by Insight as Investment Opportunities before April 3, 1999, and thus were covered by the right of first refusal afforded Plaintiffs under the Imprimis Consulting Agreement.

106. After Murdock agreed that Wexford, on behalf of WISI, would be entitled to the full 50 percent first refusal right on Insight's $9 million investment in Quest, Wexford asked him for copies of the deal documents so that it could review them. Instead, late in the evening on April 20, 1999, Wexford received what a Wexford executive described at the time as a "panicked call from Jerry Murdock, . . . telling me he needed to have me sign signature pages for the Quest deal right away. When I told him we hadn't received final documents yet, he told me if we don't sign tonight the deal would blow-up."

107. Prior to the Quest closing, Wexford believed that WISI was receiving 50 percent of a $9 million investment by Insight, and that the remaining $15.5 million investment by UBS was being taken by an unaffiliated third-party investor.

108. However, the purported "accommodation" that Insight allegedly gave Plaintiffs regarding Quest was illusory. Notwithstanding Murdock's representation, on behalf of Insight, Horing, Raghavendran, Sobiloff, Insight II, Insight Cayman II and Insight Venture II, that Plaintiffs' $4.5 million investment would be 50 percent of Insight's total investment in Quest, Plaintiffs actually were permitted to invest only 18 percent of the total $25 million Quest financing arranged by Insight. At the same time that WISI

was allowed to invest $4.5 million in Quest, Insight II and Insight Cayman II invested $5 million, or 20 percent of the total investment in Quest arranged by Insight. Further, UBS invested $15.5 million in Quest, or 62 percent of the total $25 million investment arranged by Insight.

109. In addition, at some point, Defendant Murdock personally acquired at least 265,000 shares of Quest common stock, either by outright purchases or in the form of options.

110. After the Quest investment closed, Wexford learned that UBS was an affiliate of Insight for purposes of the Quest investment. Among other things, under agreements UBS made in connection with its co-investment with Insight, UBS appointed Insight to be its agent and representative in connection with the Quest Investment, with full authority to act for it. Accordingly, for purposes of the Quest investment, UBS and Insight were under common control and were affiliates.

111. Because UBS was an affiliate of Insight for purposes of the Quest Investment, under the Imprimis Consulting Agreement, Plaintiffs were entitled to at least 50 percent of the total investment made by UBS and Insight. Consequently, Plaintiffs were entitled to invest $12.5 million in Quest (50 percent of the total investment), instead of the $4.5 million that Insight represented was 50 percent of a $9 million Investment Opportunity available in Quest.

112. Plaintiffs believe that Insight and UBS will take the position that UBS was not Insight's affiliate for purposes of the Quest investment. If, in fact, that anticipated position is correct, then, under the WISI Agreement, WISI was entitled to a right of first refusal of up to 100 percent of the total investment in Quest that was not

invested by Insight and its affiliates. The Consulting Agreements did not limit Plaintiffs right of first refusal to 50 percent of the total investment. Rather, under the Consulting Agreements, Plaintiffs' rights extend to the greater of 50 percent of Insight's investment or "the percentage of the Investment Opportunity not invested in by Insight, or its affiliates (including investors therein)."

113. Here, UBS was not an independent investor. Instead, among other things, UBS was specifically brought into the Quest transaction by Insight as a co-investor to participate in a financing arranged by Insight. Therefore, if UBS was not an affiliate of Insight, Plaintiffs had a right of first refusal of up to 100 percent of the total investment in Quest that was not taken by Insight and its affiliates, including the $15.5 million investment made by UBS. Thus, if UBS was not an affiliate of Insight for purposes of the Quest transaction, Plaintiffs were deprived of the right to invest a total of $20 million in Quest (*i.e.*, $25 million, less the aggregate of $5 million invested by Insight II and Insight Cayman II), instead of the $4.5 million that Plaintiffs were permitted to invest.

114. In sum, if UBS is deemed to be an affiliate of Insight for purposes of the Quest Investment, Insight, Horing, Murdock, Insight Venture II, Insight II, Insight Cayman II, and UBS wrongfully converted an aggregate of $8 million of Plaintiffs' Investment Opportunity rights to invest up to at least 50 percent of the Investment Opportunity of $25 million for the Quest investment ($12.5 million less Plaintiffs' $4.5 million investment). However, if UBS is deemed not to be an affiliate of Insight for purposes of the Quest investment, then Insight, Horing, Murdock, Insight Venture II, Insight II, Insight Cayman II, and UBS wrongfully converted $15.5 million of Plaintiffs'

Investment Opportunity rights to invest up to at least 100 percent of the amount of the Investment Opportunity of $25 million in Quest to the extent not invested by Insight or its affiliates ($20 million less Plaintiff's $4.5 million investment).

115. The investment in Quest was highly profitable. Quest completed its initial public offering on August 13, 1999, selling 4.4 million shares of common stock at $14 per share. That common stock, which had been purchased in April 1999 by Insight at the equivalent of $3.75 per share, rose to $102 per share on December 31, 1999.

116. On March 10, 2000, WISI sold 750,000 shares (pre-split) of Quest common stock for net proceeds of $100 million, and on June 14, 2000 WISI sold 50,000 shares (post-split) for net proceeds of $2.2 million. However, through their actions, Insight, Horing, Murdock, Insight Venture II, Insight II, Insight Cayman II, and UBS wrongfully denied Plaintiffs their full right of first refusal to invest up to at least 50 percent in the Investment Opportunity in Quest if UBS was an affiliate of Insight, thereby depriving Plaintiffs of at least a $196 million gain, or a greater amount if UBS was not an affiliate of Insight in connection with the Quest investment.

**The Wrongful Diversion of the**
**<u>Investment Opportunity In Convergent</u>**

117. *Sometime prior to July 1998 – during the term of the WISI* Consulting Agreement – Insight identified Convergent as an Investment Opportunity. Convergent is a provider of e-commerce systems integration services to the utility and public sectors.

118. Insight began meeting with Convergent prior to July 1998. Insight's expense records reveal that Insight performed its due diligence for an investment in

Convergent no later than December 1998, during the term of the Imprimis Consulting Agreement. Indeed, Insight's due diligence on Convergent had progressed so far that, on or about March 12, 1999 – almost a month before April 3, 1999 – Insight prepared a draft letter of intent for an investment in Convergent. Moreover, Insight later billed Wexford for 50 percent of its due diligence expenses for Convergent, clearly indicating that Insight believed this investment was within the Consulting Agreements.

119. Thus, Murdock's April 16, 1999 representation that Convergent was outside the Consulting Agreements, described above, was false and misleading when made. Murdock made this false and misleading statement on his own behalf, and on behalf of Defendants Horing, Raghavendran, Sobiloff, Insight, Insight Venture II, Insight Venture III and the New Funds. Plaintiffs did not know of the falsity of that representation, and relied on Murdock's statement that Convergent was not an Investment Opportunity under the terms of the Consulting Agreements.

120. Despite (i) the clear terms of the Imprimis Consulting Agreement that granted Imprimis a right to receive a minimum 50 percent right of first refusal in Convergent, and (ii) Murdock's statement that Plaintiffs would be permitted to invest between $5 and $10 million in Convergent – a statement made on his behalf and on behalf of Defendants Horing, Raghavendran, Sobiloff, Insight, Insight Venture II, Insight Venture III and the New Funds – Imprimis was allocated only $5 million of Insight's total $45.5 million investment in Convergent, or only 11 percent of the total financing for Convergent.

121. While failing to provide Imprimis with its entitlement under the Imprimis Consulting Agreement – a minimum 50 percent right of first refusal in the

investment, or a 100 percent right of first refusal if Insight or its affiliates did not elect to take their 50 percent share – Insight III, as the general partner of Insight Co-Investors and Insight Cayman III, executed documents pursuant to which Insight Venture III caused these limited partnerships to invest $17.273 million of the total investment (more than three times the amount allocated to Imprimis), Insight Venture III invested $5 *million of the total investment and UBS invested $17.273 million. In addition, non-*parties GS Private Equity Partners II, L.P. ("GS Partners II"), GS Private Equity Partners II Offshore, L.P. ("GS Partners II Offshore"), GS Private Equity Partners III, L.P. ("GS Partners III"), GS Private Equity Partners III Offshore, L.P. ("GS Partners III Offshore"), and NBK/GS Private Equity Partners, L.P. ("NBK/GS Partners," and, collectively with GS Partners II, GS Partners II Offshore, GS Partners III, and GS Partners III Offshore, the "GS Investors") invested $5 million, and another co-investor invested $1 million.

122. Among other things, under agreements UBS, the GS Investors, and the other Insight co-investors made with Insight in connection with their co-investment in Convergent, UBS, the GS Investors, and the other Insight co-investors appointed Insight to be their agent and representatives in connection with the Convergent investment, with full authority to act for them. Accordingly, for purposes of the Convergent investment, UBS, the GS Investors and the other Insight co-investors all were under common control with Insight and were Insight affiliates.

123. Because UBS, the GS Investors, and the other Insight co-investor were affiliates of Insight for purposes of Convergent investment, Plaintiffs were entitled to invest at least 50 percent ($22.75 million) of the Investment Opportunity of $45.5 million in Convergent made by Insight and its affiliates. Accordingly, the New Funds

and UBS wrongfully converted at least $17.75 ($22.75 million less Plaintiffs' $5 million investment) million of the Investment Opportunity in Convergent.

124. However, Plaintiffs believe that Insight, and UBS will take the position that UBS was not Insight's affiliate for purposes of the Convergent investment. Nevertheless, even if that were true, UBS still was not an independent, third-party investor. Instead, among other things, UBS was brought into the Convergent investment by Insight as part of the financing arranged by Insight. If UBS is deemed not to be an affiliate of Insight for purposes of the Convergent Investment, Plaintiffs had the right, under the Imprimis Consulting Agreement, to invest up to 100 percent of the amount of the Investment Opportunity of $45.5 million in Convergent to the extent not invested by Insight or its affiliates. In those circumstances, Plaintiffs had the right to invest $31.4 million in the Convergent investment, consisting of 50 percent of the investment of $28.2 million ($14.1 million) made by Plaintiffs, Insight, and the New Funds, plus the $17.273 million UBS investment. Thus, if UBS was not an affiliate of Insight, the New Funds, and UBS wrongfully converted at least $26.4 million of Plaintiffs' Investment Opportunity right in Convergent ($31.4 million less Plaintiffs' $5 million investment).

125. Through their actions, Insight, Horing, Murdock, Raghavendran, Sobiloff, Insight Venture III, the New Funds and UBS failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Convergent, thereby depriving Plaintiffs of at least a $62.4 million gain, to which they are entitled, or a greater amount if UBS was not an affiliate of Insight in connection with the Convergent investment.

**The Wrongful Diversion of the Investment Opportunity in Greenfield Online**

126. Sometime prior to March 1999 — before the termination date of the Imprimis Consulting Agreement — Insight identified an Investment Opportunity in Greenfield Online. Greenfield Online is a provider of internet-based marketing and research information services.

127. Instead of providing Imprimis with its 50 percent right of first refusal in the investment in Greenfield Online, as Insight was required to do under the Imprimis Consulting Agreement, on or about April 16, 1999, Murdock represented to Plaintiffs that Greenfield Online was outside of the agreement because the Imprimis Consulting Agreement had expired. The same representation was made to Plaintiffs by Horing on April 20, 1999. Murdock's and Horing's statements were made both on their own behalf, and on behalf of Defendants Raghavendran, Sobiloff, the New Funds, Insight, Insight Venture II, and Insight Venture III.

128. Unknown to Plaintiffs at the time, these representations were false. In fact, after months of discussions, Insight signed a letter of intent for the investment in Greenfield Online on or about March 4, 1999 – a month before the termination date of the Imprimis Consulting Agreement. Indeed, on April 1, 1999, Insight prepared an investment memorandum analyzing the "opportunity for Insight to invest in" Greenfield Online, clearly establishing that Insight had identified Greenfield Online as an Investment Opportunity within the term of the Imprimis Consulting Agreement. Although Insight delayed closing the investment until after April 3, 1999, Insight later charged Plaintiffs for a percentage of the expenses incurred prior to April 3, 1999 for its

investment in Greenfield Online, clearly indicating that Insight believed that such investment was covered by the Imprimis Consulting Agreement.

129. In reliance on Murdock's and Horing's false representation to Plaintiffs that the investment in Greenfield Online was outside the Imprimis Consulting Agreement, Imprimis agreed to invest only $2.5 million or 12 percent of the total investment arranged by Insight in Greenfield Online of $22.5 million. While failing to provide Imprimis with its entitlement under the Imprimis Consulting Agreement – a minimum 50 percent right of first refusal in the investment, or a greater percentage if *Insight or its affiliates did not invest Insight's full share – Insight allocated $8.25 million* of the investment to Insight III, $2.5 million of the investment to Insight Cayman III, and $1.37 million of the investment to Insight Co-Investors III and Insight Venture III, as the general partner of these limited partnerships, executed documents to cause those Investment Opportunities to be diverted from Plaintiffs to those limited partnerships. Insight Venture III also acquired an additional 11 percent of the total investment. UBS was allocated, and invested, $2.5 million. Insight also allocated to other co-investors and/or affiliates a total of $5.35 million of the Greenfield Online investment.

130. Among other things, under agreements UBS and the other Insight co-investors made in connection with their co-investment with Insight, UBS and the other Insight co-investors appointed Insight to be their agent and representative in connection with the Greenfield Online investment with full authority to act for it. Accordingly, for purposes of the Greenfield Online investment, UBS, the other co-investors and Insight were under common control and were affiliates.

131. Because UBS and the other Insight co-investors were affiliates of Insight for purposes of the Greenfield Online investment, Plaintiffs were entitled to invest at least 50 percent of $22.5 million investment, or $11.25 million, made by Insight or its affiliates. Accordingly, Insight, Horing, Murdock, Raghavendran, Sobiloff, the New Funds, Insight Venture III and UBS wrongfully converted $8.75 million of Plaintiffs' Investment Opportunity in Greenfield Online ($11.25 million, less Plaintiff's $2.5 million investment).

132. However, Plaintiff believes that Insight and UBS will take the position that UBS, and certain other co-investors in Greenfield Online, were not Insight affiliates for purposes of the Greenfield Online investment. Nevertheless, even if that were true, UBS and those other co-investors still were not independent, third-party investors, and, among other things, were brought into the Greenfield Online investment by Insight to participate in the financing arranged by Insight. If UBS and those other co-investors were deemed not to be affiliates of Insight for purposes of the Greenfield Online investment, Plaintiffs had the right, under the Imprimis Consulting Agreement, to invest up to 100 percent of the amount of the Investment Opportunity of $22.5 million in Greenfield Online to the extent not invested by Insight or its affiliates. In those circumstances, Plaintiffs had the right to invest at least $12.5 million in the Greenfield Online investment, consisting of 50 percent of the investment of $20 million ($10 million) made by Plaintiffs, Insight, the New Funds and other Insight affiliates, plus at least the $2.5 million UBS investment. Thus, if UBS and certain other co-investors were not affiliates of Insight, the New Funds and UBS wrongfully converted at least $10 million of

Plaintiffs' Investment Opportunity right in Greenfield Online (at least $12.5 million less Plaintiff's $2.5 million investment).

133. Through their actions, Insight, Horing, Murdock, Raghavendran, Sobiloff, Insight Venture III, the New Funds and UBS failed to provide Plaintiffs with their full right of first refusal in the Investment Opportunity in Greenfield Online, thereby depriving Plaintiffs of a substantial gain, in an amount that is presently unknown to Plaintiffs, to which they are entitled.

**The Wrongful Diversion of**
**<u>the Investment Opportunity in Click</u>**

134. At some point prior to February 1999 — again during the term of the Consulting Agreements — Insight identified Click as an Investment Opportunity. Click markets collaborative commerce solutions permitting automated information flows within multi-channel distribution networks for Fortune 1000 manufacturers.

135. As alleged above, in April 1999, when Plaintiffs agreed to a special agreement with respect to the carry on Quest to be paid to Insight Venture II as a member of Imprimis, Murdock agreed to allow Plaintiffs to invest in Click, even though Murdock represented on or about April 16, 1999 that an investment in Click was not covered by the Agreements. Murdock made this misrepresentation on his own behalf, and on behalf of Defendants Horing, Insight, Insight Venture II, Insight Venture III, the New Funds, Raghavendran and Sobiloff. As noted above, that assertion was false and misleading when made. Insight had identified Click as an Investment Opportunity no later than February 1999, and Insight later sought reimbursement from Plaintiffs for due diligence costs for this investment that were incurred in February 1999, <u>i.e.</u>, before the April 3, 1999 date referenced in the Imprimis Agreement.

136. In a telephone conversation between Plaintiffs and Defendant Horing on June 7, 1999, Horing, on behalf of Murdock, Insight, Insight Venture III, the New Funds, Raghavendran and Sobiloff asserted that there was "no room" for Plaintiffs in the Click investment, which Horing falsely described as a "$5 million deal."

137. In June and July 1999, Insight Venture III, as the general partner of Insight III, Insight Co-Investors, and Insight Cayman III, executed documents pursuant to which Insight Venture III caused these limited partnerships to purchase from Click an aggregate of 5,217,392 shares of its Series A Convertible Participating Preferred Stock for $6 million. Insight Venture III also acquired 11 percent of the total investment. Plaintiffs believe other Insight co-investors may have also participated in that investment. Neither Insight, Insight Venture III, Murdock, Horing, Raghavendran, Sobiloff nor the New Funds told Plaintiffs of the closing of that investment.

138. On December 20, 1999, after learning that Insight had closed on an investment in Click, Plaintiffs inquired of Defendant Murdock as to why Plaintiffs were not given the opportunity to invest in Click, as Murdock had promised. No reply was received to that communication.

139. In January 2000, Insight, Horing, Murdock, Insight Venture III, and their affiliates participated in a further financing for Click, and Insight Venture III caused the New Funds to purchase an additional 3,111,215 shares of Click stock for an aggregate price of approximately $16.33 million.

140. On January 30, 2000, Plaintiffs learned that Click had commenced the process for an initial public offering. Plaintiffs sent an e-mail to Defendant Murdock

on February 1, 2000, noting that, as part of the "special deal" on Quest, Insight had agreed that Plaintiffs would be given an opportunity to invest in Click.

141. In a February 1, 2000 telephone conversation, Murdock, on behalf of himself, Insight, Insight Venture III, Horing, Raghavendran, Sobiloff and the New Funds, attempted to explain away Defendants' failure to provide Plaintiffs with an Investment Opportunity in Click by making an amorphous reference to an unidentified "problem" with Compaq. He went on to concede that Click would be a "hot IPO." Murdock then proposed to make up, at least in part, for Plaintiffs' lost opportunity for a pre-IPO investment in Click by arranging to allocate to Plaintiffs an amount of Click stock in the initial public offering. Like many of Defendants' representations, Murdock never made good on this promise.

142. No stock in Click's IPO was made available to Plaintiffs, although there was a discussion of Plaintiffs' being allowed to purchase $500,000 of Click stock from Insight. However, on April 11, 2000, Horing added a new condition and insisted that any allocation of Click stock to Plaintiffs be contingent upon a release of Plaintiffs' claims against Insight, a condition that the Insight Defendants knew would be unacceptable to Plaintiffs. Ultimately, the Insight Defendants abandoned their demand for a release of claims. In June 2000, Plaintiffs were permitted to purchase $500,000 of Click stock from Insight (i.e., 3 percent of the $16.33 million in Click stock purchased by Insight in January 2000).

143. The investment in Click by the New Funds and Insight Venture III was extremely profitable. By September 30, 2000, the approximately $22 million investment in Click by these Defendants was worth an estimated $358 million.

144. Through their actions, Insight, Horing, Murdock, Raghavendran, Sobiloff, Insight Venture III and the New Funds converted Plaintiffs' Investment Opportunity rights in Click to 50 percent of the total investment by the New Funds and Insight Venture III. Thus, Plaintiffs were deprived of a gain of at least $17.6 million, to which they are entitled.

**The Wrongful Diversion of the**
**Investment Opportunity in Authorize.Net**

145. Sometime prior to February 1999, Insight identified Authorize.Net as an Investment Opportunity. Authorize.Net is a leading payment authorization service for online businesses. On July 1, 1999, Authorize.Net was acquired by Go2Net.com, an internet portal company whose stock is publicly traded on the Nasdaq market.

146. In violation of the Imprimis Agreement, Insight did not inform Imprimis of this Investment Opportunity, nor was Imprimis given an opportunity to participate in any investment in Authorize.Net. Plaintiffs later learned that Insight incurred due diligence expenses as early as February 1999 relating to this Investment Opportunity — well before the April 3, 1999 date referenced in the Imprimis Agreement.

147. Indeed, in or around April 1999, Insight Venture III, as the general partner of Insight III, made two investments for Insight III in Authorize.Net totaling $1.4 million.

148. The investments in Authorize.Net by Insight III were highly profitable. In July, 1999 Insight received $778,643 in cash as part of the transaction in which Go2Net acquired Authorize.Net. In August 1999, Insight III sold 45,289 shares of Go2Net for total proceeds in excess of $3 million. In addition, Insight III retained shares of Authorize.Net.