CONFIDENTIAL
SUBJECT TO COURT ORDER

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

IMPRIMIS INVESTORS LLC and
WI SOFTWARE INVESTORS LLC,

Plaintiffs,

- against -

INSIGHT VENTURE MANAGEMENT, INC.,
JEFFREY HORING, JERRY MURDOCK,
INSIGHT VENTURE ASSOCIATES II, LLC and
INSIGHT VENTURE ASSOCIATES III, LLC,

Defendants.

---

INSIGHT VENTURE MANAGEMENT, INC. and
INSIGHT VENTURE ASSOCIATES II, LLC,

Counterclaim and
Third-Party Plaintiffs,

- against -

IMPRIMIS INVESTORS LLC,
WI SOFTWARE INVESTORS LLC and
WEXFORD CAPITAL LLC f/k/a
WEXFORD MANAGEMENT LLC,

Counterclaim and
Third-Party Defendants.

---

Index No. 00-604431

IAS Part 49

Justice Cahn

**MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION OF JEFFREY HORING, JERRY MURDOCK AND INSIGHT VENTURE ASSOCIATES II, LLC, FOR A PRELIMINARY INJUNCTION**

David B. Tulchin
Michael B. Miller
Daniel H.R. Laguardia,

Of Counsel.

April 10, 2001

SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
212) 558-4000

Attorneys for
Defendants/Counterclaim
and Third-Party Plaintiffs

EXHIBIT
43

# TABLE OF CONTENTS


Page

Preliminary Statement . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 7

A. The Imprimis Agreement . . . . . . . . . . . . . . . 7

1. The Allocation of Net Profits and Net Losses . . . . . . . . . . . . . . . . 8

2. The Distribution of Net Profits . . . . . 10

B. Imprimis' Current Conduct . . . . . . . . . . . . 11

1. Imprimis' Improper Allocation of Short-Term Capital Gains to Insight II . . 11

2. Imprimis' Wrongful Refusal to Distribute Net Cash Flow to Insight II . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 18

THE MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED . . . . . . . . . . . . . . 18

A. Insight II is Likely -- Indeed, Certain -- to succeed on the Merits of Its Claim That Its Contractual Rights Have Been Violated . . . 18

1. The Improper Allocation . . . . . . . . . . 19

2. The Failure to Make a Distribution . . . . 20

B. Insight II Has No Adequate Remedy At Law . . . 22

C. The Balance of Equities Favors Insight II . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

Page(s)

Cases:

Aetna Ins. Co. v. Capasso, 75 N.Y.2d 860, 552 N.E.2d 166, 552 N.Y.S.2d 918 (N.Y.1990) ......... 18

Beecher v. Petier A. Vogt Mfg., 227 N.Y. 468, 125 N.E. 831 ( N.Y. 1920) .......................... 20

Federal Deposit Ins. Corp. v. Bank of America Nat. Trust and Sav. Assoc., 701 F.2d 831 (9th Cir. 1983) .................................... 21

In re Prudential Lines, Inc., 148 B.R. 730, (Bankr. S.D.N.Y. 1992), rev'd in part on other grounds, 170 B.R. 222 (S.D.N.Y. 1994) ........ 20

Lines v. Bank of America Nat. Trust and Sav. Assoc., 743 F. Supp. 176 (S.D.N.Y. 1990) ................... 21

Paddock Const., Ltd. v. Automated Swimpools, Inc., 130 A.D.2d 894, 515 N.Y.S.2d 662, (3d Dep't 1987)... 23

Penstraw, Inc. v. Metropolitan Trans. Auth., 200 A.D.2d 442, 608 N.Y.S.2d 807 (1st Dep't 1994) ................................. 23

Poling Transp. Corp. v. A&P Tanker Corp., 84 A.D.2d 796, 443 N.Y.S.2d 895 (2d Dep't 1981)..... 24

Scherling v. Hellman Electric Corp., 181 B.R. 730 (Bankr. S.D.N.Y. 1995)................. 20

Windsor Com. Group, Inc. v. Harenton Printing Co., 79 B.R. 210 (Bankr. E.D.Pa. 1987).................. 21

Statutes:

IRC § 64.......................................10

IRC § 1222..................................... 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IMPRIMIS INVESTORS LLC and
WI SOFTWARE INVESTORS LLC,

Plaintiffs,

- against -

INSIGHT VENTURE MANAGEMENT, INC.,
JEFFREY HORING, JERRY MURDOCK,
INSIGHT VENTURE ASSOCIATES II, LLC and
INSIGHT VENTURE ASSOCIATES III, LLC,

Defendants.

INSIGHT VENTURE MANAGEMENT, INC. and
INSIGHT VENTURE ASSOCIATES II, LLC,

Counterclaim and
Third-Party Plaintiffs,

- against -

IMPRIMIS INVESTORS LLC,
WI SOFTWARE INVESTORS LLC and
WEXFORD CAPITAL LLC f/k/a
WEXFORD MANAGEMENT LLC,

Counterclaim and
Third-Party Defendants.

Index No. 00-604431

IAS Part 49

Justice Cahn

**MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION OF JEFFREY HORING, JERRY MURDOCK AND INSIGHT VENTURE ASSOCIATES II, LLC, FOR A PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

Background

This is a case in which plaintiffs -- two investment vehicles which are Limited Liability Companies

and are affiliated with, and managed by, third-party defendant Wexford Capital LLC (together, "the Wexford parties") -- sued Insight Venture Management, Inc. ("Insight Venture") for $540 million. The claim is based on two contracts to which Insight Venture is a party. Although none of the other defendants are parties to those contracts, plaintiffs Imprimis Investors LLC ("Imprimis") and WI Software Investors LLC nevertheless sued them as if they were. *This tactic -- including claims against* the two individual founders of Insight Venture, Jeffrey Horing and Jerry Murdock, as well as an investment fund named Insight Venture Associates II, LLC ("Insight II") -- is entirely unjustified, yet reveals the kind of hardball, take-no-prisoners approach to litigation that the Wexford parties often employ.

The case was filed last October. Plaintiffs' claims are almost entirely based on an extreme, and strained, reading of a contractual provision giving plaintiffs, during the period ending April 3, 1999, a right of first refusal as to certain investments made by Insight Venture. The investments specified in the Complaint were almost all made by Insight Venture after April 3, 1999. As a result, when the parties appeared for a pre-trial conference before the Court on March 1, 2001, the Court

invited defendants to move for summary judgment, and established a briefing schedule and a date in early June for oral argument.

In the meantime, and perhaps as a function of the fact that plaintiffs see their claims "going south," the Wexford parties have now engaged in another unjustified litigation tactic designed to "squeeze" the individual defendants.

This Motion

Plaintiff Imprimis issued a Form K-1 to Insight II (which has a 20% interest in Imprimis) on March 30, 2001 for its fiscal year 2000. (A copy of the "Insight II K-1" is annexed to the Affidavit of Alan T. Frankel, sworn to April 10, 2001 ("Frankel Aff.") as Exhibit A.) The Insight II K-1 shows more than $36 million in short-term capital gains. (Frankel Aff., ¶ 11.) Prior to receipt of the Insight II K-1, Imprimis never informed Insight II that it had realized huge gains in 2000 on which the tax liability of Insight II's Members would be calculated. (See Affidavit of David B. Tulchin, sworn to April 10, 2001 ("Tulchin Aff."), ¶ 4.)

Despite the allocation of $36 million to Insight II, Imprimis made no Distribution of money to

Insight II -- in the face of a contractual provision requiring that Members receive Distributions sufficient to pay the tax liability on the income shown on their Form K-1. (Frankel Aff., ¶ 14.) The impropriety of this failure to Distribute is confirmed by the fact that Imprimis apparently did make such Distributions to all its Members except Insight II. (See Tulchin Aff., ¶ 7.) Thus, the Members of Insight II owe taxes but (unlike the other investors in Imprimis) have no Distribution to pay them.

Moreover, the Form K-1's allocation of about $36 million of short-term capital gain to Insight II is based on a clearly improper ipse dixit: the declaration that "short-term capital gain" is the same thing as "ordinary income." As explained below, Imprimis was entitled to allocate only ordinary income to Insight II on a priority basis. Imprimis is clearly not entitled to allocate to Insight II a disproportionate share of Imprimis' short-term capital gain (which, although it is taxed at the same rate as ordinary income, is clearly a different concept under the Internal Revenue Code and otherwise). Capital gain of any character must be allocated to each Member of Imprimis in accordance with their proportional interest in Imprimis.

Two of the four individual members of Insight II are defendants Jeff Horing and Jerry Murdock. Under the

Internal Revenue Code, the income on the Insight II K-1 "flows through" directly to them. (Frankel Aff., ¶¶ 4, 12.) Thus, Horing and Murdock -- who each have about a 40% interest in Insight II -- are, in the eyes of the Internal Revenue Service ("IRS"), recipients of the income shown on the Insight II K-1 in that proportion, and responsible for paying taxes on that income out of their own individual pockets.

The result of all this is as follows: plaintiff Imprimis has, wholly without justification, declared to the IRS on Form K-1 that Horing and Murdock owe taxes on about $14 million -- each individual's approximate share of $36 million -- at their highest marginal rate rather than the lower rate applicable to long-term capital gains. This is wrong and false. Further, Imprimis has made no Distributions to Horing and Murdock to pay the taxes. This is an independent wrong and was presumably a deliberate tactic to "squeeze" these individuals. On Monday, April 16, Mr. Horing and Mr. Murdock must pay many, many millions of dollars to the IRS, or be exposed to penalties and interest. (Even if individuals file for an extension, they must still settle their tax liability on their tax filing date, or face the same late payment penalties and interest applicable to late payment as if they never filed at all.)

Thus, defendants Insight II, Jeff Horing and Jerry Murdock seek on an emergency basis an Order enjoining Imprimis from refusing to (a) pay the contractual Distribution to Insight II with which taxes may be paid, and (b) issue a corrected Form K-1 which allocates correctly to Insight II their proper share of short-term and long-term capital gain.

Unless this Court grants the requested relief promptly, the Wexford parties will succeed in forcing Jeff Horing and Jerry Murdock to cough up to the tax authorities (on almost no notice) many millions of dollars (money which Imprimis concedes, in the Insight II K-1, belongs to Insight II but none of which Imprimis has paid over). This "hardball" tactic is apparently based on the wholly frivolous assertion that short-term capital gain <u>is</u> ordinary income, and on the further outrage of apparently treating Insight II differently from all other Members of Imprimis, since each of the other investors apparently was given a Distribution sufficient to pay their taxes.

The Court's grant of the requested relief would cause no significant harm to Imprimis because (a) it has the funds with which to make the Distribution, (b) the money <u>belongs</u> to Insight II, as the K-1 implicitly concedes, and (c) the accurate provision of information to the IRS could

not possibly present any harm to Imprimis. Moreover, the balance of equities clearly favors Insight II, Jeff Horing and Jerry Murdock.

## ***STATEMENT OF FACTS***

### A. The Imprimis Agreement

As is more fully described in the accompanying Frankel and Tulchin Affidavits, Imprimis is a limited liability company formed under the laws of Delaware and which is in the business of making investments. One of Imprimis' Members is Insight II. (Frankel Aff., ¶¶ 2-3.)

Insight II also is a limited liability company formed under the laws of Delaware. It is a member of Imprimis and has an approximately 20% interest in the profits of Imprimis. Its members are Jeffrey Horing, Jerry Murdock, Ramanan Rhagavendran and Peter Sobiloff. Limited liability companies receive the same tax treatment as partnerships, and thus their tax liability flows directly through to their members. (See Frankel Aff., ¶ 4.) Jeff Horing and Jerry Murdock each have about a 40% interest in Insight II. (Id., ¶ 3.)

In order to facilitate the determination and payment of any relevant tax liabilities, limited liability

companies report to their members and to the Internal Revenue Service details of each members' "Share of Income Credits, Deductions, etc." (Frankel Aff., ¶ 5.) This report is made on Schedule K-1 to Form 1065 ("Schedule K-1"). Schedule K-1 is a tax information filing only: limited liability companies are not themselves subject to tax on the amounts reported on Schedule K-1. (Frankel Aff., ¶ 5.)

The Imprimis Agreement (Frankel Aff., Ex. B) establishes the parties' rights and obligations with respect to, among other things, the Distribution of Net Cash Flow by the end of March so that the parties will be able to satisfy by April 15 any tax liabilities attributable to income from Imprimis. The relevant provisions of the Imprimis Agreement are discussed in greater detail below.

1. The Allocation of
<u>Net Profits and Net Losses</u>

Section 3 of Exhibit B to the Imprimis Agreement provides that Insight is entitled to 20% or more of Imprimis' Net Profits over and above certain established rates of return with respect to certain listed investments. (Frankel Aff., ¶ 7.)

Section 3(f) of Exhibit B provides that any Net Profits due to Insight be satisfied first from any ordinary

income earned by Imprimis. (Frankel Aff., ¶ 8.) In other words, any "ordinary income" earned by Imprimis in the year 2000 may be allocated 100% to Insight II (up to its share of Net Profits). (Frankel Aff., ¶ 8.) There is no similar provision entitling Imprimis to make any such allocation to Insight II *for capital gains generally or for short-term* capital gains specifically, or for any other type of income. (Id.)

Despite this, on the K-1 issued by Imprimis to Insight II, Imprimis declared that essentially all of Insight II's earnings as an investor (about $36 million) are short-term capital gain. This has the effect of dramatically increasing tax liabilities for movants. Insight II is entitled to its proportionate share of short-term and long-term capital gain; only ordinary income may be allocated to Insight II on a priority basis.

The terms "ordinary income" and "capital gains" have well established meanings, both generally as a matter of common usage and specifically as a matter of tax law. (Frankel Aff., ¶ 9.) A short-term capital gain is defined in § 1222(1) of the Internal Revenue Code (the "Code") as the gain earned from the sale or exchange of a capital asset held for not more than one year. (Frankel Aff., ¶ 9.) A long-term capital gain is defined in § 1222(3) of the Code

as the gain earned from the sale or exchange of a capital asset held for more than one year. (Frankel Aff., ¶ 9.) Section 64 of the Code states that the term "ordinary income" includes "any gain from the sale or exchange of *property which is neither a capital asset nor property* described in § 1231(b)." (Section 1231(b) property is certain property used in a trade or business that is subject to depreciation and held for more than one year.) (Id.) In other words, § 64 specifically excludes from the definition of "ordinary income" both short-term and long-term capital gains. Under no reasonable interpretation of the phrase could *"short-term capital gains"* be *characterized* "ordinary income." (Frankel Aff., ¶ 9.)

Thus, it was entirely wrongful for Imprimis to attempt to injure Insight II, Horing and Murdock by issuing a K-1 to the IRS that improperly allocates to them as short-term capital gain all $36 million of their share of the earnings, when there was no justification for such allocation.

2. The Distribution of Net Profits

The Imprimis Agreement contains a provision that ensures that the Members (and, ultimately, the individuals who actually incur the tax liabilities) are financially able to satisfy any tax liabilities resulting from their

participation in Imprimis. Section 5(a) of Exhibit B to the Imprimis LLC Agreement provides that, before any other Distribution is made, Imprimis will distribute a portion of the allocated Net Profits:

> first, to each Member, not later than 90 days after the close of each Fiscal Year, in an amount equal to the local, state, and Federal Income tax liability of such Member (calculated as if each Member was a individual taxpayer subject to the highest marginal rates applicable to residents of New York City) in respect of the excess of Net Profits over Net Losses allocated to such Member for such Fiscal Year (as shown on the Company's Federal income tax return), less all amounts distributed to such Member for the then current and all prior Fiscal Years pursuant to the Section 5.

(Frankel Aff., ¶ 14.) Under § 5(a)-(f) of Exhibit B to the Imprimis LLC Agreement, no other Distribution of Net Cash Flow may be made before that called for by § 5(a). (Id.)

## B. Imprimis' Current Conduct

### 1. Imprimis' Improper Allocation of Short-Term Capital Gains to Insight II

On March 30, 2001, Insight II received from Imprimis a Schedule K-1 to Form 1065 (Frankel Aff., Exh. A.) The Insight II K-1 shows that Insight II's share of Imprimis' interest income for 2000 totaled $797,243 and that its share of net short-term capital gain for 2000 totaled $36,623,088.

Late on Friday, April 6, 2001, Imprimis finally provided Insight II with certain information regarding Imprimis' 2000 results. (A copy of the schedules containing this information, along with the April 6 letter to counsel, is attached to the Frankel Affidavit as Exhibit C and to the Tulchin Affidavit as Exhibit D.) According to the information contained on these schedules provided by Imprimis, in 2000 it earned $797,243 in "Interest Income," $97,991,181 in "short-term capital gains," and $91,458,825 in "long-term capital gains." (Id.) After deduction of Imprimis' expenses, its total 2000 income was about $188 million. About half the total was long-term capital gains available for allocation to Insight II pursuant to § 3 of Exhibit B to the Imprimis Agreement.

Nevertheless, on the Form K-1, Imprimis allocated about $36 million in short-term capital gains to Insight II and nothing in long-term gain -- rather than the proportional share of both. (Frankel Aff., Ex. A and ¶¶ 10-12.) This overstates Insight II's tax liability substantially (and also to understate significantly the tax liabilities of the other Members of Imprimis). (Frankel Aff., ¶ 12.) This is because the highest marginal federal tax rate applicable to capital gains differs based on whether the gain is short-term or long-term. The short-term

marginal rate is 39.6%; the long-term marginal rate, by contrast, is 20%. (Id.) Thus, by allocating to Insight II more than $36 million in short-term capital gain (instead of -- as required by the contract -- approximately $18 million in short-term and $18 million in long-term capital gains), Imprimis improperly informed the Internal Revenue Service that Insight II's Members owe many millions of dollars more in taxes than they actually owe.

The schedules attached to the Frankel Affidavit as Exhibit C, which revealed important information regarding Imprimis' improper allocation of short-term capital gains to Insight II, were received for the first time by Insight II's counsel after 5:30 p.m. on Friday afternoon, April 6, 2001. (Tulchin Aff., ¶ 11.)

Imprimis' only possible justification for the profit allocation it gave Insight II is the bizarre notion that short-term capital gains are ordinary income. This is wrong. (Frankel Aff., ¶¶ 8-9.) Of course, even if Imprimis were correct -- and it is not -- Imprimis was still obligated to Distribute monies sufficient to pay the taxes on the $36 million in gains allocated to Insight II. Imprimis' failure to make the required Distributions -- which was wrongful no matter how it characterizes the profits allocable to Insight II -- is discussed below.

2. Imprimis' Wrongful Refusal to Distribute Net Cash Flow to Insight II

As noted above, the Imprimis Agreement provides that Imprimis is required to make "Distributions" of Net Cash Flow to each of its Members, within 90 days of the close of each fiscal year, "in an amount equal to the local, state and Federal Income tax liability of such Member...." (Frankel Aff., ¶ 14.) Imprimis thus was required to distribute by March 31, 2001, an amount sufficient to pay all taxes on the amount shown on the Insight II K-1, "calculated as if [Insight II] was an individual taxpayer subject to the highest marginal rates applicable to residents of New York City...." (Frankel Aff., ¶¶ 14-16.) This would be about $18 million of the $36 million of short-term capital gain. (Frankel Aff., ¶ 16; Tulchin Aff., ¶ 7.)

On April 3, 2001, Insight II demanded that Imprimis make this tax distribution. (Tulchin Aff., ¶ 4.) Insight II also demanded "under Section 10.1 [of the Imprimis Agreement], inspection of the books and records of Imprimis" to obtain necessary facts. (Tulchin Aff., ¶ 14 and Ex. A.) Insight II asked that such inspection take place at Wexford's offices on Friday, April 6, at 10:00 a.m. (Id.)

Imprimis' counsel responded on April 3. (Tulchin

Aff., ¶ 6 and Ex. B.) Counsel did not argue that Insight II is not entitled to an immediate tax Distribution from Imprimis. (Tulchin Aff., ¶ 6 and Ex. B.) Instead, Imprimis asserted only that it was entitled to set-off amounts currently owing to Insight II on the ground that it had claims pending against Insight II in litigation. Imprimis thus asserted that "we believe that any amounts that may otherwise be due to Imprimis are subject to Imprimis' rights of setoff and recoupment." (Tulchin Aff., ¶ 6 and Ex. B.) According to Imprimis' lawyer, this is the only reason that "no distributions will be made to Insight at this time." (Id.) Imprimis also declined to permit the requested inspection -- in total disregard of its obligation under Section 10.1 of the Imprimis Agreement.

The claims to which Imprimis referred in its letter are those asserted in this action. They purportedly arise out of a Consulting Agreement dated September 30, 1998, between Imprimis and Insight Venture Management, Inc. (the "Consulting Agreement"). (A copy of the Consulting Agreement is attached to the Tulchin Affidavit as Exhibit C.) Neither Insight II, Mr. Horing nor Mr. Murdock is a party to the Consulting Agreement.

Imprimis has made no Distribution to Insight II on account of the year 2000. (Tulchin Aff., ¶ 4; Frankel Aff.,

¶ 15.)

Imprimis' failure to make a Distribution to Insight II is an independent wrong. Thus, even if Imprimis' allocation of short-term capital gains as Insight II's share of Net Profit were correct -- and it is not -- Imprimis must nevertheless Distribute monies sufficient to pay the taxes on this $36 million. Of the $188 million earned by Imprimis (see Frankel Aff., Exh. C), Imprimis allocated about $37 million of Net Profits to Insight II (under the terms of Exhibit B to the Imprimis Agreement). According to Imprimis, $797,243 of this amount was allocated from Imprimis' interest income, $17 was allocated from Imprimis' other portfolio income, and $36,623,088 was allocated from Imprimis' net short-term capital gains. (Frankel Aff., Exh. A, lines 4(a), (d), (f).) Thus, even if -- contrary to fact -- Imprimis' allocations could be justified under the Imprimis Agreement, Insight II should be entitled to a tax Distribution from Imprimis in the amount of $18,795,904. (Frankel Aff., ¶ 16.)

The only proffered justification for the refusal to make such Distribution is the equitable doctrine of set-off. (Tulchin Aff., ¶ 6.) There is nothing whatever equitable about applying it here, especially given that Imprimis proposes to hold money it concedes belongs to the

applicants and which Mr. Horing and Mr. Murdock must immediately pay to the IRS.

Indeed, it appears that Imprimis made the tax Distributions to its investors other than Insight II. (Tulchin Aff., ¶ 7.) This is apparently a litigation tactic designed to injure movants.

On April 10, 2001, prior to 9:00 a.m., counsel for Insight II phoned counsel for Imprimis to notify him of Insight II's intention to seek relief by Order to Show Cause. (Tulchin Aff., ¶ 10.) Imprimis' counsel was not available, and counsel for Insight II left a detailed voice mail that provided them notice of this application. (Id.)

* * *

In sum, Imprimis concedes that it is holding $36 million belonging to Insight II. It has improperly characterized that sum as short-term capital gain, making it appear that Mr. Horing and Mr. Murdock owe substantially more in taxes than they actually do. Perhaps even worse, Imprimis refuses to distribute the money to Insight II with which these taxes could be paid, although it has apparently made such Distributions to other Members.

# ARGUMENT

## THE MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED.

In order to obtain a preliminary injunction, a party must "show a probability of success, danger of irreparable injury in the absence of an injunction, and a balance of equities in [its] favor." Aetna Ins. Co. v. Capasso, 75 N.Y.2d 860, 862, 552 N.E.2d 166, 167, 552 N.Y.S.2d 918, 919 (N.Y. 1990). Here, each of these factors strongly favors the issuance of a preliminary injunction barring Imprimis from refusing to make the Distribution of funds sufficient to cover Insight II's Members' tax liabilities and from refusing to correct the erroneous Schedule K-1.

### A. Insight II Is Likely -- Indeed, Certain -- to Succeed on the Merits of Its Claim That Its Contractual Rights Have Been Violated.

Imprimis' apparent goal was to injure Insight II, Jeff Horing and Jerry Murdock by issuing a false and overstated tax liability while at the same time denying Horing and Murdock the means by which they could satisfy that liability. Imprimis improperly allocated short-term capital gains to Insight II on a disproportionate basis, when § 3(f) of the Imprimis Agreement entitled Insight II to its share of both short-term and long-term capital gains.

Further, Imprimis failed to Distribute to Insight II funds sufficient to satisfy its properly allocated tax liability, in violation of § 5(a) of the Imprimis Agreement, while it apparently made Distributions to its other members.

1. The Improper Allocation

The Imprimis Agreement provides that any Net Profits allocable to Insight II be allocated first from any ordinary income earned by Imprimis (up to Insight II's share of Net Profits). To the extent that Insight II's share of Imprimis' Net Profits exceeds Imprimis' ordinary income for the year (as was the case in the year 2000), Insight II is entitled to its proportionate share of short-term and long-term capital gains. Imprimis cannot avoid this inescapable conclusion by conflating the terms "ordinary income" and "short-term capital gains." These terms have specific and well understood meanings, both as a matter of common usage and as a matter of tax law. Insight II was entitled to receive its pro rata share of Imprimis' long-term capital gains. In other words, Insight II's Schedule K-1 showed correctly that all $797,260 of interest income earned by Imprimis in 2000 was to be allocated to it, but thereafter Insight II should have received its proportional share (approximately 20%) of both short-term and long-term capital gain.

2. The Failure to Make a Distribution

Imprimis has not disputed that (a) Insight II's share of 2000 profits is $36 million, and (b) that it must Distribute enough to pay the taxes on those earnings. Instead, Imprimis contends (Tulchin Aff., Ex. B) that it is entitled to set-off amounts owed to Insight II against amounts that it contends are owed it arising out of the Consulting Agreement. This situation is far removed on its facts from a justifiable application of the equitable doctrine of set-off. See In re Prudential Lines, Inc., 148 B.R. 730, 750-53 (Bankr. S.D.N.Y. 1992), rev'd in part on other grounds, 170 B.R. 222 (S.D.N.Y. 1994).

First, New York law permits set-off only when the debts are "mutual." Under New York law, debts are mutual when they are due to and from the same persons in the same capacity. See Scherling v. Hellman Electric Corp., 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995); Beecher v. Petier A. Vogt Mfg., 227 N.Y. 468, 473, 125 N.E. 831, 833 (N.Y. 1920). Here, the Consulting Agreement — the agreement which Imprimis contends gives rise to its claims — is an agreement between Imprimis and Insight Venture Management, Inc. Insight II is not a party to the Consulting Agreement. Nor does Imprimis' complaint in this matter allege separately any actions take by Insight II that give rise to any

liability on its part. Thus, Imprimis' claim for set-off and recoupment seeks to set off against one party amounts that it claims it is due from another. Imprimis' claim fails the mutuality test, and Imprimis is not entitled to a set-off.

Second, and more fundamentally, set-off is an equitable doctrine. It is "restricted in its application by both legal and equitable principles," Windsor Communications Group, Inc. v. Haverton Printing Co., 79 B.R. 210, 215 (Bankr. E.D.Pa. 1987), and "must be denied in a situation where it would be inequitable to allow it." Lines v. Bank of America Nat. Trust & Sav. Assoc., 743 F. Supp. 176, 183 (S.D.N.Y. 1990); see also Federal Deposit Ins. Corp. v. Bank of America Nat. Trust & Sav. Assoc., 701 F.2d 831, 836-37 (9th Cir. 1983) ("Set-off will not be permitted when it would be inequitable or contrary to public policy to do so."). "Courts therefore have uniformly held that a creditor who obtains a debtor's property wrongfully is not entitled to set off their liability for that wrongful conduct against a claim that the creditor holds against the debtor." Lines, 743 F. Supp. at 183.

Here, Imprimis has obtained and is holding Insight II's property wrongfully: it is holding the amounts due to Insight II under § 5(a) of the Imprimis Agreement in direct

violation of that provision. Its continuing to do so would be inequitable, leaving the Members of Insight II with a substantial and overstated tax liability, but deprived by Imprimis of the funds which could be used to satisfy that liability.

Insight II is likely to succeed on the merits of its claim that Imprimis has breached its contractual obligations to Insight II, and that it will continue to do so, all to the detriment of Insight II.

**B. <u>Insight II Has No Adequate Remedy At Law.</u>**

Insight II, Horing and Murdock also are entitled to immediate relief because without the Court's intervention, they have no adequate remedy at law. The rights that Insight II, Horing and Murdock seek to protect relate to their relationship with the tax authorities, their need for an accurate tax reporting and their right to a distribution sufficient to satisfy their tax liability on April 16, 2001. It is obviously no coincidence that Imprimis issued Insight II's K-1 on March 30, without any prior notice whatever and roughly two weeks before the tax returns of Insight II's individual members need to be filed with the IRS. (Tulchin Aff., ¶¶ 4-5.) The goal was clearly to put as much pressure as possible on Insight II at a time

of year when Insight II and its individual members were particularly susceptible to such pressure.

Not only are the interests Insight II is seeking to protect inherently time-sensitive, the damage it would suffer absent the issuance of a preliminary injunction is also difficult to calculate. These inherent uncertainties involve avoidance of a dispute with the IRS. See Penstraw, Inc. v. Metropolitan Trans. Auth., 200 A.D.2d 442, 608 N.Y.S.2d 807 (1st Dep't 1994) (irreparable harm suffered where calculation of future damages would be "unreliable and risky"). Indeed, § 5(a) is aimed at protecting the Imprimis Members from precisely those uncertain and unascertainable costs which may be associated with unexpected tax liabilities.

The Members' decision to create a contractual tax Distribution provision -- and the difficulty of calculating damages from a breach -- is sufficient to constitute irreparable injury. See Paddock Const., Ltd. v. Automated Swimpools, Inc., 130 A.D.2d 894, 897, 515 N.Y.S.2d 662, 664 (3d Dep't 1987) (noting that contractual provision breached by defendants "must have [had] some worth to defendants beyond money damages" and thus holding that irreparable harm was established).

For these reasons, even if Insight II has some

legal damage remedy, that does not mean that injunctive relief is inappropriate. "[T]he legal remedy must be as complete, practicable and efficient as the equitable one." Poling Transp. Corp. v. A&P Tanker Corp., 84 A.D.2d 796, 797, 443 N.Y.S.2d 895, 897 (2d Dep't 1981). Because of the highly sensitive and uncertain nature of valuing Insight II's exposure to problems with the IRS, Insight II's legal remedy would be, by definition, incomplete.

### C. The Balance of Equities Favors Insight II.

In these circumstances there can be no doubt that the balance of equities favors Insight II. All that Insight II requires is an accurate reporting of its tax liability to the IRS, and the release of sufficient funds (which belong, by definition, to Insight II!) to cover its accurately calculated tax liability. This is not a situation where the entity seeking injunctive relief is essentially seeking the right to hold the funds in dispute while the litigation is pending: Insight II's individual members must satisfy their tax liabilities on April 16, 2001. As soon as Insight II receives the funds from Imprimis, Insight II will pay those to Jeff Horing and Jerry Murdock so that those funds can be used to pay taxes owing to the IRS and state tax authorities.

Finally, the relief Insight II seeks is modest in its scope and burdens. In essence, Insight II seeks an accurate calculation of its tax liability, and the transfer of sufficient funds (which belong to it in the first place) to cover that tax liability. Imprimis' interest in holding the money is negligible, since it admittedly owes this money to Insight II, and Horing and Murdock (members of Insight II) have a compelling interest in using this money to satisfy their tax liability. In this regard, it is instructive to note that Insight II is not seeking in this application a full payment of all monies owed it by Imprimis: instead, it seeks only the Distribution expressly required under § 5(a) of the Imprimis Agreement. It appears that the other Members of Imprimis all received this Distribution.

## CONCLUSION

For the foregoing reasons, this Court should grant Insight II's motion for a preliminary injunction so that Imprimis will (a) make a tax Distribution to Insight II as required by the Imprimis Agreement and (b) correct the Schedule K-1 issued to Insight II.

Dated: New York, New York
April 10, 2001

Respectfully submitted,

David B. Tulchin
Michael B. Miller
Daniel H.R. Laguardia
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
(212) 558-4000

Attorneys for Defendants/
Counterclaim and Third-Party
Plaintiffs
Insight Venture Management, Inc.,
Jeffrey Horing, Jerry Murdock,
Insight Venture Associates II, LLC and
Insight Venture Associates III, LLC