# In the United States Court of Federal Claims

**No. 07-209T**
**Filed: August 7, 2008**

* * * * * * * * * * * * * *

| | | |
|---|---|---|
| **IMPRIMIS INVESTORS LLC, WEXFORD SPECIAL SITUATIONS 1997 INSTITUTIONAL, L.P., TAX MATTERS PARTNER,** | * | **Federal Tax Dispute; Definition of "Ordinary Income"; Short Term Capital Gains; I.R.S. Inconsistent Positions; Tax Equity and Fiscal Responsibility Act (TEFRA); Partner's Distributive Share; 26 U.S.C. §§ 1, 64, 702, 703, 1222, 6226; Settlement Agreement.** |
| **Plaintiffs,** | * | |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * * * *

**Charles M. Ruchelman**, Caplin & Drysdale, Chartered, Washington, D.C., for the plaintiff partnership, Imprimis Investors LLC. Of counsel, **Christopher S. Rizek** and **Matthew C. Hicks**, Caplin & Drysdale, Chartered, Washington, D.C.

**Charles M. Ruchelman**, Caplin & Drysdale, Chartered, Washington, D.C., for the plaintiff tax matters partner, Wexford Special Situations 1997 Institutional, LP.

**William F. Nelson**, McKee Nelson, LLP, Washington, D.C., for the participating partner, Insight Venture Associates II, LLC. Of counsel, **Sheri A. Dillon** and **Ronald Buch, Jr.**, McKee Nelson, LLP, Washington, D.C.

**Jennifer P. Wilson**, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for the defendant. With her were **Nathan J. Hochman**, Assistant Attorney General, **David Gustafson**, Chief, and **Steven I. Frahm**, Assistant Chief, Court of Federal Claims Section, Tax Division.

# O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Plaintiffs, Imprimis Investors LLC ("Imprimis") and its tax matters partner, Wexford Special Situations 1997 Institutional, LP ("Wexford") filed suit against the United States seeking the readjustment of certain partnership items under Section 6226 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 6226 (2000) (hereafter IRC § 6226). Insight Venture Associates II, LLC ("Insight") filed a notice of election to participate and an amendment to the complaint, pursuant to IRC § 6226(c)(2) and Rule 4(b) of Appendix F (Procedures in Tax Partnership Cases) of the Rules of the United States Federal Claims (RCFC).[1] The primary dispute between the parties addressed in this opinion concerns whether the allocation of partnership tax items of "ordinary income" includes "short term capital gains" ("STCG") for the 2000 tax year.

Wexford is affiliated with Wexford Capital LLC ("Wexford Capital"). Wexford Capital is an investment advisor registered with the Securities and Exchange Commission that manages a series of hedge funds and private equity funds. Insight also is in the business of investments, and is treated as a partnership for federal income tax purposes. Insight is affiliated with Insight Venture Partners, which is a venture capital firm that offers investment advisory and venture capital services to investment firms. Insight Venture Management ("Insight Venture") is affiliated with Insight and Insight Venture Partners.

Effective as of September 30, 1998, Wexford and Insight entered into the Amended and Restated Limited Liability Company Agreement of Imprimis, herein referred to as the "Imprimis LLC Agreement."[2] The Imprimis LLC Agreement establishes that the purpose of Imprimis is to make investments and engage in any lawful activity in pursuit of such investments. The parties explain that Imprimis is essentially an "investment vehicle which makes, holds, and manages investments on behalf of certain investment funds for [Wexford Capital]." The Wexford Members provide the capital, and Wexford manages and controls Imprimis. Insight provides

[1] Consistent with how the parties have represented themselves, in this opinion, the parties Imprimis and Wexford will jointly be characterized as "plaintiffs" and referred to as such. Insight, although characterized as the "participating partner" for procedural purposes in this action, will be referred to simply as "Insight."

[2] During the tax year ended December 31, 2000, Imprimis membership consisted of Wexford, Wexford Special Situations 1997, LP, Wexford Spectrum Investors LLC, Wexford Partners Investment Company (collectively, the "Wexford Members") and Insight (the "non-participating member"), according to the Imprimis LLC Agreement. All parties to the Imprimis LLC Agreement are collectively referred to as the "Members." Also on September 30, 1998, Imprimis and Insight Venture entered into a separate consulting agreement ("Imprimis Consulting Agreement"), addressed below.

investment advice and is referred to as a "Non-Participating Member." Imprimis is treated as a partnership for federal income tax purposes. The relevant portions of the Imprimis LLC Agreement for this opinion are Section 7.3(a), Section 7.1 and Exhibit B, Section 3(f), addressed below.

Section 7.3(a) of the Imprimis LLC Agreement explains that net profits and losses are determined in accordance with the accounting methods of Imprimis. Except as provided on Exhibits B and C regarding Schedules 1 and 2,[3] respectively, Imprimis "shall make allocations of Net Profit or Net Loss to the Wexford Members pro rata in accordance with the Distribution Share of each Wexford Member with respect to the applicable Class."[4] Net profits and net losses of all Members (the Wexford Members and Insight) shall be determined in accordance with IRC § 703.[5]

Section 7.1 of the Imprimis LLC Agreement explains that distributions to Insight, called the "Insight Allocation" or "special allocation" shall be made only as set forth in Exhibits B and C. Exhibit B(3)(f) states:

> (f) thereafter, 80% to the Wexford Members and 20% to Insight; provided, however, that in the event any Net Profits consist of items of ordinary income, then, in lieu of the above allocations (i) a special gross income allocation shall be made to Insight of such items or ordinary income (to the extent thereof) equal to the Tentative Insight Allocation (as defined below) and (ii) the resulting Net Profits, computed without regard to the items of gross income allocated under the preceding clause (i), shall be allocated:
>
> (i) if the initial allocation made in clause (f)(i) above (the "Initial Insight Allocation") equals the Tentative Insight Allocation, to the Wexford Members, or
>
> (ii) if the initial Insight Allocation is less than the Tentative Insight Allocation, an amount equal to such shortfall to Insight and the remainder to the Wexford Members.
>
> For purposes of the preceding sentence the "Tentative Insight Allocation" shall mean the amount of Net Profits that would otherwise have

[3] Schedules 1 and 2 appear in Exhibit A of the Imprimis LLC Agreement.

[4] The Imprimis LLC Agreement explains that the Wexford Members are divided by class.

[5] IRC § 703 does not define "net profits" and "net losses," but refers to IRC § 702, which states in part, "[t]he character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share … shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership." IRC § 702(b).

> been allocated to Insight under this Agreement absent the proviso of such preceding sentence.[6]

(emphasis in original).

As noted, effective September 30, 1998, Imprimis and Insight Venture also entered into a consulting agreement ("Imprimis Consulting Agreement"). Insight agreed to provide Imprimis with a "right of first refusal for all investment opportunities in the software and related industries identified by [Insight] …."

Disputes arose out of both the Imprimis LLC Agreement and the Imprimis Consulting Agreement as to the contractual and fiduciary obligations between plaintiffs and Insight. On October 12, 2000, Imprimis and WI Software Investors LLC sued Insight, Insight Venture, Jeffery Horing, Jerry Murdock and Peter Sobiloff in New York State Court. The defendants in that action counter-claimed against the plaintiffs and third party defendant Wexford Capital. Several of the issues in dispute implicated whether the "ordinary income" described in the Insight Allocation of the Imprimis LLC Agreement included items of STCG for the 2000 tax year, which also is at issue before this court.

The tax allocation is of interest to the parties because the federal government taxes items of net income at different rates depending on the type of item. According to documents filed in the New York lawsuits, for the 2000 tax year the highest marginal federal tax rate applicable to long term capital gains ("LTCG") was 20%, while the highest federal tax rates applicable to STCG, interest and dividends were each 39.6%.

Following the October 12, 2000 commencement and July 9, 2002 consolidation of several interrelated civil actions in the State of New York, several parties, including the plaintiffs and Insight, entered into a settlement agreement ("Settlement Agreement") on July 14, 2003.[7] Plaintiffs, Imprimis and Wexford, paid Insight $30,000,000.00 as part

---

[6] Exhibit C(3)(d) of the Imprimis LLC Agreement contains identical language as that quoted from Exhibit B (3)(f). Whereas Exhibit B of the Imprimis LLC Agreement refers to the finances listed in Schedule 1, Exhibit C refers to the finances listed in Schedule 2.

[7] The first paragraph of the Settlement Agreement lists all parties to the Agreement. The paragraph reads:

> This Settlement Agreement and Mutual Release ("Settlement Agreement"), dated July 14, 2003, is by and among Imprimis Investors LLC, WI Software Investors LLC, Wexford Capital LLC f/k/a Wexford Management LLC, Wexford Insight LLC, Wexford Special Situations 1997, L.P., Wexford Special Situations Institutional L.P., Wexford Spectrum Investors LLC, Robert Holtz, Charles Davidson and Joseph Jacobs (collectively, the "Wexford Parties"), Ramanan Raghavendran ("Raghavendran") and Insight Venture Management Inc., Insight Venture Associates LLC, Insight Venture Associates II, LLC, Insight Venture

of the Settlement Agreement. The introduction to the Settlement Agreement states in relevant part:

> WHEREAS, the parties hereto desire to settle and terminate all of their disputes, including without limitation, their rights under the Relevant Agreements, all matters, claims, counterclaims and third party claims that have been asserted or that could have been asserted in the Actions;

Section 4 of the Settlement Agreement states:

> 4. Mutual Releases.
>
> (a) The Wexford Parties' Release of the Insight Parties and Raghavendran.
>
> Except for the obligations and rights created or arising under this Settlement Agreement, and effective as of the receipt by Imprimis of the payment described in 1(b) above, each of the Wexford Parties on behalf of each of themselves and all persons claiming rights derivative of any of them, hereby releases and forever discharges each of the Insight Parties and Raghavendran, together with each of their predecessors, successors, agents, consultants, assigns, subsidiaries, affiliates, legal representatives, attorneys, officers, directors, shareholders, members, investors, parent companies, employees, heirs, administrators and executors, from any and all rights, claims, debts, promises, damages, causes of action, costs, losses, attorneys' fees, expenses, compensation, demands, liabilities or obligations of whatever kind or nature, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, existing or contingent, concealed or hidden, at law or in equity, under statute, rule, regulation, at common law or otherwise, which any of the Wexford Parties now has or may have had against any of the Insight Parties and/or Raghavendran, from the beginning of time through the date of this Settlement Agreement, including but not limited to (a) claims, rights or obligations relating directly or indirectly to any of the Relevant Agreements and (b) any and all claims, counterclaims or third-party claims asserted or that could have been asserted in the Actions.
>
> (b) The Insight Parties' and Raghavendran's Release of the Wexford Parties.

---

Associates III, LLC, Insight Capital Partners II, L.P., Insight Capital Partners (Cayman) II, L.P., Insight Capital Partners III, LP., Insight Capital Partners III Co-Investors, L.P., Insight Capital Partners (Cayman) III, L.P., Jeffrey Horing, Jerry Murdock and Peter Sobiloff (collectively, the "Insight Parties").

> Except for the obligations and rights created or arising under this Settlement Agreement, and upon the receipt by Insight Venture II of the payment described in 1(c) above, each of the Insight Parties and Raghavendran on behalf of each of themselves and all persons claiming rights derivative of any of them, hereby releases and forever discharges each of the Wexford Parties, together with each of their predecessors, successors, agents, consultants, assigns, subsidiaries, affiliates, legal representatives, attorneys, officers, directors, shareholders, members, investors, parent companies, employees, heirs, administrators and executors from any and all rights, claims, debts, promises, damages, causes of action, costs, losses, attorneys' fees, expenses, compensation, demands, liabilities or obligations of whatever kind or nature, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, existing or contingent, concealed or hidden, at law or in equity, under statute, rule, regulation, at common law or otherwise, which any the Insight Parties or Raghavendran now has or may have had against any of the Wexford Parties, from the beginning of time through the date of this Settlement Agreement, including but not limited to (a) claims, rights or obligations relating directly or indirectly to any of the Relevant Agreements and (b) any and all claims, counterclaims or third-party claims asserted or that could have been asserted in the Actions.

Whether Insight forfeited its right to seek legal action against the government concerning issues arising out of the issues raised in the New York lawsuits is stipulated by the parties as an issue before this court and is discussed below.

Plaintiffs and Insight timely filed their respective Federal Partnership Tax Returns (Form 1065) with the I.R.S. for the 2000 tax year. Plaintiffs reported in the Imprimis Schedule K-1 an allocation to Insight in the amount of $797,260.00 in investment income (of which $797,243.00 was listed as “ordinary dividends”), $36,623,088 in STCG and $0 in LTCG. Insight filed a Form 8082 Notice of Inconsistent Treatment with the I.R.S. pursuant to IRC § 6222(b).[8] Insight reported an inconsistent treatment of capital gains from the Imprimis Schedule K-1, line 4d. Insight alleged that the proper allocation of capital gains should be $18,942,926.00 in STCG and $17,680,162.00 in LTCG, but did not dispute the amount of ordinary income.

After conducting a partnership level tax examination of Imprimis, the I.R.S. issued a Final Partnership Administrative Adjustment (“FPPA”) with two I.R.S. “Inconsistent Positions” on January 2, 2007. The I.R.S. has indicated it will accept an allocation of tax monies as reflected in either of the two Inconsistent Positions.

Inconsistent Position A rejects the allocation from the Insight tax return and accepts the allocation from the Imprimis tax return, stipulating Insight’s net income

[8] IRC § 6222(b) provides that a partner may file a tax return inconsistent with the partnership tax return if the partner files a statement with the Secretary identifying the inconsistency.

consists of, in relevant part, $36,623,088.00 in STCG and $0 in LTCG. Inconsistent Position B rejects both the Imprimis and Insight tax return allocations and stipulates that the monies should be reallocated for all partners, resulting in Insight's net income consisting of, in relevant part, $21,097,096.00 in STCG and a $15,525,992.00 in LTCG.

Plaintiffs have filed this lawsuit seeking I.R.S. acceptance of the tax allocation that Imprimis filed in the K-1 of its year 2000 tax return, or stated another way, to have the government accept Inconsistent Position A. Hence, the plaintiffs are seeking for the government to readjust the Insight tax return in accordance with the Imprimis tax return, thus raising Insight's tax burden. Insight has joined this lawsuit seeking I.R.S. acceptance of the tax allocation that Insight filed in its year 2000 tax return. Hence, Insight is seeking for the government to readjust the Imprimis tax return in accordance with the Insight tax return, thus raising the plaintiffs' tax burden.

The parties have stipulated to five **Issues** in the case filed in this court:

> 1. Whether the Amended and Restated Limited Liability Company Agreement of Imprimis Investors LLC, dated September 30, 1998 ("Imprimis LLC Agreement"), as applicable to the Imprimis 2000 tax year, provided a special allocation to Insight of items of short term capital gain.
>
> 2. What is the effect, if any, of the executed settlement of the claims by Insight and Imprimis in a lawsuit filed in the New York Supreme Court (the "Settlement Agreement") on the tax dispute at issue in this TEFRA proceeding, which arose from the allocation of partnership income to Insight as reflected in the Imprimis partnership tax return for the 2000 tax year and the related Schedule K-1 issued to Insight?
>
> 3. Whether this Court has jurisdiction in this TEFRA proceeding to hear an estoppel claim or argument.
>
> 4. If the answer to issue number 3 is in the affirmative, whether Insight is estopped from asserting in this proceeding that the Imprimis partnership return for the 2000 tax year and the related Schedule K-1 issued to Insight reflect an incorrect or improper allocation of ordinary income and short term capital gain to Insight.
>
> 5. Whether Internal Revenue Code § 704(b) mandates a reallocation of the ordinary income and/or short term capital gain that was allocated to Insight pursuant to the Imprimis partnership return for the 2000 tax year and the related Schedule K-1 issued to Insight.

This opinion addresses the first two issues.

## DISCUSSION

This is a partnership tax case brought under 28 U.S.C. § 1508 and IRC § 6226. Wexford, the tax matters partner, filed this action seeking a determination that the partnership tax return and related Schedule K-1 issued to Imprimis for the 2000 tax year should not be changed to reflect a greater tax burden for the plaintiffs, Imprimis and Wexford, and that this court should issue a judgment that I.R.S. "Inconsistent Position" A is correct.

The issues before this court concern how plaintiffs and Insight are to be allocated the taxable monies within net income.[9] The parties have jointly stipulated to the five issues before the court, listed above. Plaintiffs and Insight have each filed motions for summary judgment. Plaintiffs have moved for summary judgment against Insight on issues 1, 2 and 4 and have moved to dismiss Insight from the case. Insight has moved for summary judgment against the United States on issues 1 and 2. According to the government, "The United States agrees with the arguments in the motion filed by Insight and disagrees with the arguments in the motion filed by Imprimis." The parties agreed to proceed first with the summary judgment motions on issues 1 and 2.

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996), reh'g denied (Fed. Cir. 1997); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994); Atwood-Leisman v. United States, 72 Fed. Cl. 142, 147 (2006). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998)

[9] It should be noted the government will receive the same amount of money in taxes regardless of the outcome of this case. The effect of this case will simply impact what proportion of the money will be paid by plaintiffs and by Insight.

("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003); Becho, Inc. v. United States, 47 Fed. Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Rothe Dev. Corp. v. United States Dep't of Defense, 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (citing Pure Gold, Inc. v. Syntex, Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also U.S. Steel Corp. v. Vasco Metals Corp., 394 F.2d 1009, 1011 (C.C.P.A. 1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix, Ltd. v. Block-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir. 2007), petition for cert. filed (Mar. 27, 2008) (No. 07-1234); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration or otherwise stated in favor of the non-moving party. DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); see also Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir.), reh'g and

reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Telenor Satellite Servs, Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

**I. Issue 1**

Issue 1 involves the interpretation of the language of the Imprimis LLC Agreement. Contract interpretation is a question of law, which poses an appropriate question for summary judgment resolution. See H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (stating that matters of contract interpretation are questions of law); Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996), reh'g denied and en banc suggestion declined (Fed. Cir. 1996); C.W. Over & Sons, Inc. v. United States, 54 Fed. Cl. 514, 520 (2002).

"'It has been a fundamental precept of common law that the intention of the parties to a contract control [sic] its interpretation.'" Beta Sys. Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551 (Ct. Cl. 1971)); Alvin, Ltd. v. United States Postal Service, 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party.")

To determine the intent of the parties, the court first looks to the language of the contract. Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000). The United States Court of Appeals for the Federal Circuit stated:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Id. (citations omitted); see also Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006); Medlin Constr. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (looking at the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract …. The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993) (finding that contract interpretation

starts with analysis of the language of the written agreement); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (clarifying that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."); Enron Fed. Solutions, Inc. v. U.S., 80 Fed. Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving from it.").

The court, therefore, first must ascertain whether the language at issue was ambiguous. See NVT Tech., Inc. v. United States, 54 Fed. Cl. 330, 335 (2002) (finding that the threshold question is whether the solicitation is ambiguous), aff'd, 370 F.3d 1153 (Fed. Cir. 2004). The United States Court of Appeals for the Federal Circuit has stated that "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." NVT Tech., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). In order to demonstrate ambiguity, the interpretations offered by both parties must fall within a "zone of reasonableness." Id. (quoting Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999)). The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." H.B. Mac, Inc. v. United States, 153 F.3d at 1345.

When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning – extrinsic evidence is inadmissible to interpret them."); Sea-Land Serv., Inc. v. United States, 213 Ct. Cl. 555, 567, 553 F.2d 651, 658 (1977), cert. denied, 434 U.S. 1012 (1978); see also King v. Dep't of Navy, 130 F.3d 1031, 1033 (Fed. Cir. 1997) ("If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. See Cruz-Martinez v. Dep't of Homeland Sec., 410 F.3d 1366, 1371 (Fed. Cir. 2005) ("[M]eaning can almost never be plain except in a context" (quoting Restatement (Second) of Contracts § 212, cmt. b (1981)); Barron Bancshares, Inc. v. United States, 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 662 (2003).

There is a limit, however, to the authority given to extrinsic evidence. For example, extrinsic evidence must be used to interpret an agreement in a manner that gives meaning to all its provisions. See McAbee Constr., Inc. v. United States, 97 F.3d

1431, 1434 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996). Extrinsic evidence also "may not be used 'to justify reading a term into an agreement that is not found there.'" Warren v. Office of Pers. Mgmt., 407 F.3d 1309, 1314 (Fed. Cir. 2005) (quoting Fox v. Office of Pers. Mgmt., 100 F.3d 141, 145 (Fed. Cir.1996)); see also McAbee Constr., Inc. v. United States, 97 F.3d at 1434 ("[E]xtrinsic evidence … should not be used to introduce an ambiguity where none exists." (quoting Interwest Constr. v. Brown, 29 F.3d 611, 614 (1994)); see also David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.").

The first issue for resolution as stated by the parties is:

> Whether the Amended and Restated Limited Liability Company Agreement of Imprimis Investors LLC, dated September 30, 1998 ("Imprimis LLC Agreement"), as applicable to the Imprimis 2000 tax year, provided a special allocation to Insight of items of short term capital gain.

Insight and the government argue that the Imprimis LLC Agreement does not provide a special allocation of STCG to Insight, whereas the plaintiffs argue that it does. Section 3(f) of Exhibit B of the Imprimis LLC Agreement essentially explains that after allocating net profits and net losses as per sections 3(a)-(b) of Exhibit B, Imprimis should allocate 20% of the net profits and net losses to Insight. If the net profits consist of "items of ordinary income," then Insight should receive a special gross income allocation of such items of "ordinary income" equal to the amount Insight would otherwise receive, with the remainder to the Wexford Members. If the amount of ordinary income allocated to Insight is less than what Insight would otherwise receive, then Imprimis should allocate money other than ordinary income, such as capital gains, to make up the difference. The definition of "items of ordinary income" is not explicitly defined in any relevant agreement and remains at issue as to whether or not it includes STCG, which is the first issue stipulated by the parties and addressed below.

Insight argues that the preliminary allocation of "ordinary income" to Insight in Section 3(f) of Exhibit B and Section 3(d) of Exhibit C of the Imprimis LLC Agreement is exclusive of STCG. Such an allocation reflects the reporting in the Insight tax return as filed and in I.R.S. Inconsistent Position B, although the Insight tax return and I.R.S. Inconsistent Position B ultimately reflect different numerical proportions of STCG and LTCG. Insight argues it is entitled to summary judgment because "ordinary income" is unambiguously distinct from "capital gains," including STCG and LTCG, and that the plaintiffs' argument to interpret the definitions based on their applicable tax rates is unreasonable. The effect of a ruling for Insight would likely raise the plaintiffs' tax burden relative to its filed tax return, but nevertheless also may raise Insight's tax burden relative to its filed tax return, as reflected in I.R.S. Inconsistent Position B. Deciphering the exact computations is not necessary to resolving the issues on this summary judgment opinion.

Plaintiffs argue that the plain meaning of "ordinary income" is "income taxed at ordinary income tax rates." Plaintiffs argue that Section 3(f) of Exhibit B of the Imprimis LLC Agreement provides that the special allocation of "ordinary income" to Insight includes STCG because the federal government taxes STCG and tax items traditionally considered ordinary income at the same rate. Such an interpretation would mean that Insight is to receive its allocation of income as ordinary income, including STCG, prior to receiving income allocated as LTCG, which is taxed at a lower rate. Such an allocation reflects the reporting in the Imprimis K-1 as filed and I.R.S. Inconsistent Position A. Plaintiffs argue that they are entitled to summary judgment based on "a plain and fair reading of the operative provision of the Imprimis LLC Agreement (*i.e.,* the Insight Allocation)" and "the extrinsic evidence supporting Wexford's understanding of what that provision meant." The effect of a ruling for plaintiffs would increase Insight's tax burden relative to what Insight reported in its tax return.

We begin the analysis with the language of the contract. See Jowett, Inc. v. United States, 234 F.3d at 1368. The Insight Allocation or special allocation provided on Exhibits B and C in the Imprimis LLC Agreement mentions the term "items of ordinary income" without actually defining that term. In order to define that term, specifically considering whether or not the term includes STCG, we rely on the plain meaning of the term and how it has been interpreted. See id.

In this case, relevant sources for determining the plain meaning of "ordinary income" include the IRC, dictionaries and case law. The Imprimis LLC Agreement specifically refers to the IRC. Also the term "ordinary income" appears in a portion of the contract describing the distribution of taxable income, which would logically refer the reader to the IRC and the definitions it contains. Additionally, dictionaries may supplement the court's understanding of the plain meaning of a term. The dictionary is accepted as an appropriate source for ascertaining a common meaning. See Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1567 n.9 (Fed. Cir. 1994); Kolar, Inc. v. United States, 227 Ct. Cl. 445, 456, 650 F.2d 356, 263 (1981).

Insight argues that the parties intended to use the definition of "ordinary income" from the IRC, and that the IRC unambiguously defines "ordinary income" as distinct and different from STCG and LTCG. Insight refers to Section 7.3 of the Imprimis LLC Agreement, which explains that "net profits" is determined in accordance with IRC § 703. Section 7.3 of the Imprimis LLC Agreement states:

> The Net Profits and Net Losses for each Class set forth on the Exhibits hereto, as amended from time to time, shall be determined for each Fiscal Year in accordance with the accounting method used by the Company[10] for federal income tax purposes…. With respect to the Members, the terms "Net Profits" and "Net Losses" of the Company shall mean the net income or loss of the Company, allocable to a Class, determined in

[10] The Imprimis LLC Agreement states "Company" refers to Imprimis.

> accordance with Section 703 of the Code,[11] and on a basis consistent with prior periods subject to the following adjustments….

(emphasis added). The first reference in the quoted passage of the Imprimis LLC Agreement is clear that the accounting methods to be employed to determine net profits and net losses shall be in accordance with federal income tax calculations. The second reference is to IRC § 703.

As explained above, IRC § 703 does not define "net profits" but refers to § 702. Section 702 does not explicitly define "net profits" but without using the words "ordinary income" or "capital gains" uses similar language as is used in other sections of the IRC to define "ordinary income" and "capital gains." Section 702 states in relevant part:

> In determining his [or her] income tax, each Partner shall take into account separately his [or her] distributive share of the partnership's—
>
> (1) gains and losses from sales or exchanges of capital assets held for not more than 1 year,
> (2) gains and losses from sales or exchanges of capital assets held for more than 1 year,
>
> * * *
>
> (7) other items of income, gain, loss, deduction, or credit to the extent provided by regulations prescribed by the Secretary….

Other sections of the IRC, for example, define (1) "ordinary income" as "any gain from the sale or exchange of property which is neither a capital asset nor property," IRC § 64; (2) STCG as "gain from the sale or exchange of a capital asset held for not more than 1 year," IRC § 1222; (3) LTCG as "gain from the sale or exchange of a capital asset held for more than 1 year," IRC § 1222. Therefore, when considering the IRC as a whole, to which the Imprimis LLC Agreement refers regarding net profits, "ordinary income" appears to be defined in a distinct fashion from "capital gains."

Plaintiffs point out that the Imprimis LLC Agreement refers to some portions of the IRC and not to others. Plaintiffs argue it must follow that the plaintiffs and Insight intended a different meaning for the term "ordinary income" than the IRC provides because IRC § 64 was not specified in the Imprimis LLC Agreement. Plaintiffs rely on Craft Machine Works, Inc. v. United States, which held that the Federal Acquisition Regulations ("FAR") did not apply to a contract's definition of "supplies" though FAR definitions were incorporated elsewhere in the contract. See Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1115-16 (Fed. Cir. 1991). In Craft, the contract at issue specifically defined the term "supplies" in the applicable federal statute as "supplies to be furnished under this contract," meaning that "the contract [not the statute] provides the definition of 'supplies.'" Id. at 1113. Moreover, five clauses in the contract indirectly defined the term "supplies." Here, the Imprimis LLC Agreement does not distinguish the

[11] The Imprimis LLC Agreement states "Code" refers to the IRC.

definition of "ordinary income" from that in the IRC or suggest a definition other than that in the IRC. Rather, the Imprimis LLC Agreement is silent regarding the definition of "ordinary income" but makes a number of references to the IRC. Therefore, even though in specific circumstances a contract term may be interpreted differently than its general definition based on its context, there is no indication that the parties to the Imprimis LLC Agreement intended any other definition than the IRC definition of "ordinary income." To the contrary, there are a number of references that strongly suggest that the IRC is the correct context under which to interpret the language of the Imprimis LLC Agreement.

Plaintiffs argue that the IRC is inconsistent regarding whether "ordinary income" is defined by its revenue source or its tax rate. Plaintiffs allege that IRC § 1 characterizes "ordinary income" by both its source and tax rate, such that the plaintiffs' interpretation of the definition is reasonable. Although § 1 provides the tax rates at certain income levels, it does not follow that the IRC defines the tax terms by their applicable tax rate, nor does it define "ordinary income." Although IRC § 1(h)(7)(A)(i) discusses how to treat LTCG as ordinary income in certain circumstances, the issue for instant purpose is not whether income in some circumstances may be treated under a different tax type than how its derived source would indicate it should be treated. As explained above, the IRC defines "ordinary income" distinctly from how it defines capital gains. Also, the IRC does not contain inconsistent definitions of the tax terms "ordinary income" and "capital gains."

The government argues that the Insight interpretation of the definition of "ordinary income" is reasonable and the plaintiffs' interpretation is unreasonable. The government argues that the Imprimis LLC Agreement specifies use of the IRC definition for "ordinary income," and in the alternative, the IRC still stands as the "most logical source for a definition of ordinary income." The government argues "ordinary income" is defined by the IRC in § 64 as different from "capital gains" as defined in IRC § 1222, as quoted above. The government also explains that it is unreasonable to define "ordinary income" and "capital gains" by their tax rates when Congress changes their tax rates from time to time.

The government further argues that the plaintiffs' position that "ordinary income" means income taxed at ordinary income rates is unreasonable because the plaintiffs' position would require the insertion of additional words into Section 3(f) of Exhibit B of the Imprimis LLC Agreement, which is contrary to contract law (citing George Hyman Constr. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987)). In addition, the government points out that Wexford officers are in the business of making investments and would have known the definitions of the terms "ordinary income" and "capital gains," as used in the IRC.

In addition to the IRC, Insight relies on the 6th edition of Black's Law Dictionary, which explains that the definitions of the terms "ordinary income" and "capital gains" concern the sources of the income and not the applicable tax rates. See Black's Law Dictionary 209, 1098 (6th ed. 1990). Black's Law Dictionary defines "ordinary income":

> *Ordinary income.* As [sic] tax term used in connection with a business, means earnings from the normal operations or activities of a business. In terms of an individual, ordinary income is income from such sources as wages, commissions, interest, etc.

Black's Law Dictionary 1098 (6th ed. 1990). "Capital gain" is defined as:

> *Capital gain.* The profit realized on the sale or exchange of a capital asset. I.R.C. § 1201. The gain is the difference between the cost or the adjusted basis of an asset and the net proceeds from the sale or exchange of such asset.

Black's Law Dictionary 209 (6th ed. 1990).

This definition of "ordinary income" contradicts plaintiffs' proposed interpretation that ordinary income is "income taxed at ordinary tax rates" and clarifies that the source of the money, and not its tax rate, is used to classify the money. This definition comports with this court's interpretation of the definition of "ordinary income" based on the IRC, as discussed above.

Plaintiffs, however, attempt to rely on a portion of the definition of "ordinary income" from the 5th edition of Black's Law Dictionary, which refers to "income taxed at ordinary rates in contrast to income taxed at the more advantageous rates of capital gains." Black's Law Dictionary, 990 (5th ed. 1979). Because at the time of the formation of the contract, STCG and ordinary income were taxed at the same rate, plaintiffs conclude from this definition that "ordinary income" means income taxed at ordinary rates, which includes STCG, interest and dividends.

This court finds plaintiffs' interpretation of the definition in Black's misleading. As Insight points out, plaintiffs cite to only a portion of the definition, which when read alone appears to contradict the full definition of the word. The entire definition from the 5th edition of Black's Law Dictionary is as follows:

> *Ordinary income*. For income tax purposes, reportable income not qualifying as capital gains. Term used to describe income taxed at ordinary rates in contrast to income taxed at the more advantageous rates of capital gains. Term embraces income from regular sources such as wages, commissions, interest, dividends and the like.

Black's Law Dictionary 990 (5th ed. 1979) (emphasis added). Taking the definition as a whole, Black's Law Dictionary explicitly differentiates "ordinary income" from "capital gains," which includes STCG and LTCG. Hence, the very definition that the plaintiffs offer in order to show that their interpretation of the definition of "ordinary income" is reasonable actually demonstrates that their interpretation is unreasonable.

Plaintiffs also argue in their reply brief that Barron's Law Dictionary supports plaintiffs' interpretation that "ordinary income" includes STCG. Barron's Law Dictionary definition of "ordinary income" is as follows:

> ORDINARY INCOME for tax purposes, income subject to being taxed at the highest rates, as opposed to **capital gains**, which may be taxed at lower rates. Generally, only **capital losses** may be deducted against capital gains, and only ordinary income may be offset by the other **deductions**.

See Barron's Law Dictionary 355 (4th ed. 1996) (emphasis in original). Although this definition describes "ordinary income" partly in terms of its tax rate, it also differentiates "ordinary income" from "capital gains," thus not supporting plaintiffs' interpretation that "ordinary income" may include STCG.

Courts in various locations have held "ordinary income" and "capital gains" are legally distinguishable. See, e.g., Corn Prods. Refining Co. v. Comm'r, 350 U.S. 46, 52, 53-54 (1955) ("Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss."), reh'g denied, 350 U.S. 943 (1956); United States v. Maginnis, 356 F. 3d 1179, 1182 (9th Cir. 2004) (discussing the differentiation between ordinary income and capital gains); Cenex, Inc. v. United States, 156 F.3d 1377, 1379-81 (1998) (describing the difference in ordinary income and capital gain), cert. denied, 525 U.S. 1146 (1999); United States v. Wenger, 455 F.2d 308, 309 (2d Cir.) (describing the defendant's misstating STCG as ordinary income as a "transparent sham"), cert. denied sub nom. Wenger v. United States, 407 U.S. 920, reh'g denied, 409 U.S. 899 (1972); Roth v. Comm'r, 321 F.2d 607, 609-10, 611 (9th Cir. 1963) (discussing how Congress intended to differentiate ordinary income from capital gains in § 751, although § 751 does not use those terms); First Nat'l Bank of Kansas v. Comm'r, 309 F.2d 587, 590 (8th Cir. 1962) ("It is manifestly clear that one cannot transform into capital gain what would have otherwise constituted ordinary income through the simple expedient of a sale or transfer."); Dyer v. Comm'r, 294 F.2d 123, 126 (10th Cir. 1961) ("Ordinary income derived from an income-producing capital asset is taxable as ordinary income, not capital gain."); Gotfredson v. Comm'r, 217 F.2d 673, 675 (6th Cir. 1954) (differentiating ordinary income and capital gains), cert. denied, 350 U.S. 846 (1955).

Plaintiffs make two additional, unconvincing arguments to support the reasonableness of interpreting the definition of "ordinary income" as "income taxed at ordinary rates." Plaintiffs cite to the legislative history when the concept of capital gain was introduced to argue that because "[h]istorically, Congress viewed short term capital gains as speculative 'trading' akin to ordinary income, as opposed to long term 'buy and hold activity akin to investment income," Congress chose "to apply ordinary income tax rates to short term capital gain." H.R. Rep. No. 1860, 75th Cong., 3d Sess., at 7 (1938). Even though Congress may have chosen to apply similar tax burdens on ordinary income and STCG, it does not follow, however, that the definition of the terms are synonymous or inclusive of one another.

Plaintiffs also argue that IRC § 707(a) allows a partnership to recalculate capital gains as salary or wages. IRC § 707(a) allows a partnership to treat a partner who engages in activity outside of its "capacity as a member of such partnership" as a non-partner. Plaintiffs argue that Insight was hired to provide investment advice and was not a true partner because it did not provide investment capital. The notion that Insight, providing investment advice and not capital, in accordance with its role described in the Imprimis LLC Agreement, somehow means Insight is acting outside its capacity with respect to the partnership is unreasonable. Even if IRC § 707(a) were applicable, it would not serve to redefine the term "ordinary income."

This court holds that the definition of "ordinary income" unambiguously does not include STCG. As discussed above, this court relies on the definitions in the IRC, Black's Law Dictionary and relevant case law. Defining the terms "ordinary income" and "capital gains" by the source of the income rather than the tax rate, as Black's Law Dictionary indicates, comports with what IRC § 702 provides. As explained above, the Imprimis LLC Agreement refers to IRC § 703, which references § 702. Section 702 states in part, "[t]he character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share … shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership." IRC § 702(b). This court concludes that the Imprimis LLC Agreement provided a special allocation in Section 3(f) of Exhibit B of the Imprimis LLC Agreement for ordinary income to be allocated to Insight, and did not provide a special allocation of capital gains, including STCG and LTCG.[12]

## II. Issue 2

Issue 2 requires the interpretation of the Settlement Agreement and whether the language results in a release that bars Insight from joining in this lawsuit. One who has a contractual right against another has the power to discharge such rights and the other's duty by executing a release. See Cairo, Truman & S. R.R. Co. v. United States, 267 U.S. 350, 351 (1925); Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370-71 (Fed. Cir. 1999). A release is an instrument terminating one's rights under a contract and bars the later assertion of claims with respect to that contract. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1392; J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801, 805-06 (1963); A. L. Coupe Construction Co., Inc. v. United States, 134 Ct. Cl. 392, 398-399, 139 F. Supp. 61, 65, cert. denied, 352 U.S. 834 (1956); Jacobson Bros. Co. v. United States, 98 Ct. Cl. 1, 26-27 (1942); Dairyland Power Coop. v. United States, 27 Fed. Cl. 805, 811 (1993) aff'd, 16 F.3d 1197 (Fed. Cir. 1994); A & A Insulation Contractors, Inc. v. United States, 26 Cl. Ct. 371, 373 (1992).

The United States Court of Federal Claims stated in Kenbridge Constr. Co. v. United States:

[12] The issue as to whether plaintiffs, after allocating items of ordinary income, may nevertheless have the authority to delegate STCG prior to LTCG is not part of the two issues addressed in this opinion.

> As a general rule, "a contractor who executes a general release is thereafter barred from maintaining a suit for damages or for additional compensation under the contract based upon events that occurred prior to the execution of the release." B.D. Click Co. v. United States, 222 Ct. Cl. 290, 305, 614 F.2d 748 (1980). See H.L.C. & Assocs. Constr. Co. v. United States, 176 Ct. Cl. 285, 295, 367 F.2d 586 (1966); J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. at 805. A contractor's execution of a release that is complete on its face "reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties." Clark Mechanical Contractors, Inc. v. United States, 5 Cl. Ct. 84, 86 (1984) (citing Inland Empire Builders, Inc. v. United States, 191 Ct. Cl. 742, 752, 424 F.2d 1370 (1970)).

Kenbridge Constr. Co. v. United States, 28 Fed. Cl. 762, 765 (1993).

To determine if a claim is barred by a release, it is necessary to consider the scope of the release. The United States Supreme Court has stated, "[t]o rightly understand the scope of this release we must consider the conditions of the contract, and especially the clause in it which calls for a release." United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 126 (1907).

Settlement Agreements and releases are contractual in nature and are interpreted under the same rules as contracts, and their interpretation is a matter of law. See Mays v. United States Postal Service, 995 F.2d 1056, 1059 (Fed. Cir. 1993) (citing Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988)); Kenbridge Constr. Co. v. United States, 38 Fed. Cl. at 765. Courts determine the intent of the parties by considering the language of the contract. See Jowett, Inc. v. United States, 234 F.3d at 1368. To determine which claims a release is intended to bar, courts consider the entirety of the instrument of the release and the "facts and circumstances attending its execution." See Thorn Wire Hedge Co. v. Washburn & M. Mfg. Co., 159 U.S. 423, 441 (1895). While "[t]he general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face," if a contract is found to be uncertain or ambiguous, then parties may assert extrinsic evidence and the interpretation becomes a matter of fact. Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (citing S.C.M. Corp. v. United States, 230 Ct. Cl. 199, 206, 675 F.2d 280, 284 (1982)); see also H.L.C. & Assocs. Constr. Co. v. United States, 176 Ct. Cl. at 295; J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. at 807.

General language in a release may bar a party from asserting any claims arising out of the contract and intended by the parties. See United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. at 127-28; Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d at 1373 (holding a plaintiff is barred from bringing a claim when the settlement agreement and release included all claims that could have been brought and the plaintiff failed to make manifest his intention to exclude this claim); Johnson, Drake & Piper, Inc. v. United States, 209 Ct. Cl. 313, 330, 531 F.2d 1037,

1047 (1976) ("[A] general release bars claims based upon events occurring prior to the date of the release."); Dairyland Power Coop. v. United States, 27 Fed. Cl. at 811; A & A Insulation Contractors, Inc. v. United States, 26 Cl. Ct. at 373.

Regarding general releases, the United States Court of Appeals for the Federal Circuit stated in Augustine:

> The rule for releases is that absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release. *And no exception to this rule should be implied for a claim whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation.*

Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d at 1373 (quoting Johnson, Drake & Piper, Inc. v. United States, 209 Ct. Cl. at 330, 531 F.2d at 1047) (emphasis added in Augustine).

The execution of a general release without exceptions discharges the released party "from all claims and demands in law and equity arising out of the contract." Hellander v. United States, 147 Ct. Cl. 550, 561, 178 F. Supp. 932, 939 (1959) (citation omitted). "If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it." Dairyland Power Coop. v. United States, 27 Fed. Cl. at 811 (citing Mingus Constructors, Inc. v. United States, 812 F.2d at 1393-94, 1396). In Kenbridge the court stated:

> Where a contractor fails to exercise its right to reserve claims from the operation of a release, "it is neither improper nor unfair, absent some vitiating or aggravated circumstance, to preclude the contractor from maintaining a suit based on events which occurred prior to the execution of the release."

Kenbridge Constr. Co. v. United States, 28 Fed. Cl. at 765 (quoting Clark Mechan. Contractors, Inc. v. United States, 5 Cl. Ct. at 86) (citing H.L.C. & Assocs. Constr. Co. v. United States, 176 Ct. Cl. at 293, 367 F.2d at 590)).

The burden to identify and specify claims to be excepted from a general release lies with the parties before signing the release. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1393-94 (citing Inland Empire Builders, Inc. v. United States, 424 F.2d at 1376). Exceptions to releases are viewed narrowly and are strictly construed against the contractor. Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 801 (1991) (citing Mingus Constructors, Inc. v. United States, 812 F.2d at 1394). "Vague, broad exceptions … are insufficient as a matter of law to constitute 'claims' sufficient to be excluded from the required release." Mingus Constructors, Inc. v. United States, 812 F.2d at 1394 (citing Vann v. United States, 190 Ct. Cl. 546, 555, 420 F.2d 968, 972 (1970) ("A claim not specifically delineated in an exception to a release is thereafter barred.")). "The rationale behind construing exceptions in releases narrowly is that the

purpose of a release is to put an end to the matter in controversy." Mingus Constructors, Inc. v. United States, 812 F.2d at 1394. A "blunderbuss exception" that does not reasonably notify the party receiving the release of the intent of the party issuing the release will not suffice. See Dairyland Power Coop. v. United States, 27 Fed. Cl. at 811 (quoting Mingus Constructors, Inc. v. United States, 812 F.2d at 1394). If a party executing a general release has knowledge of facts sufficient to constitute a claim and wishes to except that claim from the release, the party must clearly manifest its intent to do so with an explicit reservation. See Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d at 1373 (citation omitted).

There are, however, circumstances when a party may bring a claim despite the execution of an otherwise applicable release. Such circumstances include economic duress, fraud, mutual mistake, lack of consideration, lack of performance and other special circumstances that would invalidate a contract or otherwise indicate that the parties intended to allow some claims to remain despite the release. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1395; Axion Corp. v. United States, 68 Fed. Cl. 468, 475 (2005) (citing Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 93 (2004)). "[W]here it is shown that, by reason of a mutual mistake, neither party intended that the release cover a certain claim, the court will reform the release." J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. at 806 (citations omitted); Harrison Eng'g & Constr. Co. v. United States, 107 Ct. Cl. 205, 208, 68 F. Supp. 350, 351 (1946). However, a unilateral mistake does not allow for an exception to a general release unless the other party knew of the mistake. Rocky River Co., Inc. v. United States, 169 Ct. Cl. 203, 207-08 (1965) (citations omitted). If a court finds a release does not express the intent of the parties, it may reform the release in accordance with the parties' intentions. Nippon Hodo Co., Ltd. v. United States, 142 Ct. Cl. 1, 4, 160 F. Supp. 501, 502 (1958).

The second issue for resolution as stated by the parties is:

> What is the effect, if any, of the executed settlement of the claims by Insight and Imprimis in a lawsuit filed in the New York Supreme Court (the "Settlement Agreement") on the tax dispute at issue in this TEFRA proceeding, which arose from the allocation of partnership income to Insight as reflected in the Imprimis partnership tax return for the 2000 tax year and the related Schedule K-1 issued to Insight?

Plaintiffs argue that the Settlement Agreement precludes Insight from participating in any civil action based on the allocation of the tax monies at issue, including this federal tax dispute against the United States. Insight and the government assert that the Settlement Agreement does not prohibit Insight from taking legal action against the government. For the following reasons, this court holds that the Settlement Agreement does not bar Insight from participating in this action against the government.

We begin the analysis with the language of the Settlement Agreement. In interpreting the language this court seeks to identify the claims that the parties intended

to bar in the execution of the release. The relevant portion of the Settlement Agreement states:

> WHEREAS, the parties hereto desire to settle and terminate all of their disputes, including without limitation, their rights under the Relevant Agreements, all matters, claims, counterclaims and third party claims that have been asserted or that could have been asserted in the Actions.

The parties' arguments regarding whether Insight is barred from litigating this issue against the government raise two questions about the language of the Settlement Agreement: whether the claims before this court were asserted or could have been asserted in the "Actions,"[13] and whether Insight released its right to litigate against the plaintiffs alone or also against the government?

It is intuitively obvious that the claims presented before this court could not have been asserted in the "Actions," or brought before the New York State Courts, because the instant claims are brought against the United States, which was not a party to the New York lawsuits. Although a number of issues raised in the New York lawsuits involved the allocation of the same income, the claims are distinguishable based on the different parties involved. In their briefs presented to this court, Insight and the government argue this distinction and assert that the Settlement Agreement is thus inapplicable to the present case.

New York State Courts do not have jurisdiction to hear the federal tax claims that are at issue before this court. IRC § 6226(a) specifies that the only courts with jurisdiction over final partnership administrative adjustments for federal tax returns are the United States Tax Court, the United States District Court in the district in which the partnership's principal place of business is located, or the United States Court of Federal Claims. Hence, this action against the United States could not have been brought in the New York "Actions" because the New York State Courts do not have jurisdiction over federal tax issues.

Plaintiffs, however, argue that the Settlement Agreement was not limited to the New York State Court actions, but intended to put an end to all disputes between the parties based on the Imprimis LLC Agreement. Therefore, according to the plaintiffs, Insight should not be allowed to participate in the current lawsuit. Among other iterations, in oral argument, plaintiffs asserted that the reason they have filed suit in this court is that Insight breached the Settlement Agreement. Plaintiffs explained that "the breach is the failure to advise us of the inconsistent return and go[ing] to the United States and say[ing], the original K-1s were correct." In this regard, plaintiffs appear to be asserting what essentially amounts to a breach of contract claim. However, the United States Court of Federal Claims does not have jurisdiction to hear breach of contract claims between private parties. See 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any

[13] This parties agree that "Actions" unambiguously refer to the New York lawsuits described above.

claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.").

Plaintiffs argue that according to the Settlement Agreement, Insight terminated its rights regarding the tax allocation issue arising out of the Imprimis LLC Agreement, including the right to join this lawsuit. Insight does not dispute that it settled its claims against the Wexford Members, but disputes that the Settlement Agreement terminated Insight's rights against the United States. Plaintiffs rely heavily in their filings with this court, and in oral argument, on Metro Riverboat Associates, Inc. v. United States, to demonstrate that a participating partner cannot bring a claim under IRC § 6226 that has been extinguished by a settlement agreement. Metro Riverboat Assocs., Inc. v. United States, No. CIVA 05-3109, 2006 WL 2803053 (E.D. La. Sept. 27, 2006), recons. denied, 2006 WL 3068827 (Oct. 25, 2006), aff'd, 264 F. App'x 461 (5th Cir. 2008). In the first place, Metro Riverboat is an unreported decision and cannot be cited as precedent. Moreover, although in Metro Riverboat, the court held that a settlement agreement between the plaintiff and defendant extinguished the plaintiff's right to seek judicial remedies in a partnership tax case, Metro Riverboat is distinguishable from the present case. Unlike the defendants in Metro Riverboat, which were treated as "a party" in the lawsuit and "subject to the determinations of [the] court," the defendant in the present case, the United States, was not a party to the lawsuits or to the Settlement Agreement at issue. See Metro Riverboat Assocs., Inc. v. United States, 2006 WL 2803053, at * 11 n. 27, *12.

When interpreting which claims are barred by a release, the United States Supreme Court has stated that courts should focus on the clause that calls for the release. See United States v. William Cramp & Sons Ship & Engine Building Co., 206 U.S. at 126. The language of Section 4(b) of the Settlement Agreement is sufficiently broad as to encompass the tax allocation issue and would likely bar Insight from litigating the issue against the plaintiffs, but should not bar a lawsuit against the United States. The language of Section 4(b) of the Settlement Agreement describing the release states that:

> each of the Insight Parties … on behalf of each of themselves and all persons claiming rights derivative of any of them, hereby releases and forever discharges each of the Wexford Parties, together with each of their predecessors, successors, agents, consultants, assigns, subsidiaries, affiliates, legal representatives, attorneys, officers, directors, shareholders, members, investors, parent companies, employees, heirs, administrators and executors from any and all rights, claims, debts, promises, damages, causes of action, costs, losses, attorneys' fees, expenses, compensation, demands, liabilities or obligations of whatever kind or nature, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, existing or contingent, concealed or hidden, at law or in equity, under statute, rule, regulation, at common law or otherwise, which any the

> Insight Parties … now has or may have had against any of the Wexford Parties, from the beginning of time through the date of this Settlement Agreement, including but not limited to (a) claims, rights or obligations relating directly or indirectly to any of the Relevant Agreements and (b) any and all claims, counterclaims or third-party claims asserted or that could have been asserted in the Actions.

Although general releases, worded broadly, as this one, require parties to make explicit any exception to the agreement, no case supports the notion that a general release should extend to bind actions against non-parties to the agreement, especially when not made explicit in the agreement. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1394 (citing Inland Empire Builders, Inc. v. United States, 424 F.2d at 1376); Kenbridge Constr. Co. v. United States, 28 Fed. Cl. at 765. Moreover, as Insight and the government argue, Insight has not filed a claim against the plaintiffs, but rather has joined an action that the plaintiffs filed against the government, as permitted in IRC § 6226(c)(2) and RCFC Appendix F, Rule 4(b). As broad as the language of the mutual release within the Settlement Agreement may be regarding what issues may arise out of or relate to the Relevant Agreements (i.e., the Imprimis LLC Agreement) and the Actions (i.e., the New York lawsuits), the language is specific as to which parties, both Insight and the plaintiffs, are barred from bringing such actions against, namely, each other.

Reduced to its bare components, section 4(b) states that "Insight…hereby releases and forever discharges each of the Wexford Parties…from any and all rights… which…Insight…now has or may have had against any of the Wexford Parties …." The Settlement Agreement makes no mention of any claims asserted against non-parties to the Settlement Agreement. Therefore, even though the language of the Settlement Agreement is broad as to which claims would be barred, its specificity regarding against whom those claims are to be asserted does not bar Insight from participating in this action.

Plaintiffs also try to rely on Urbanizadora Santa Clara, S.A. v. United States, 207 Ct. Cl. 297, 518 F.2d 574 (1975), to demonstrate that Insight is barred from asserting any and all claims that have their genesis in the Imprimis LLC Agreement. In Urbanizadora, the plaintiff brought an action in Spain seeking an eviction order against the government. Id. at 299, 518 F.2d at 574-75. The parties eventually entered into a settlement agreement regarding the termination of the lease. Id. at 300, 518 F.2d at 575. The plaintiff subsequently filed suit in the United States Court of Claims seeking just compensation under the Fifth Amendment to the United States Constitution. Id. at 302, 518 F.2d at 576-77. Despite a settlement agreement that stated, "the contractor does hereby fully release, discharge and settle any and all claims and disputes of every kind whatsoever, known and unknown, under this contract which the contractory [sic] may have against the Government," the plaintiff argued that it had recourse under the Fifth Amendment. Id. at 304, 518 F.2d at 578. The court held that the broad and inclusive language of "all claims" in the settlement agreement barred plaintiff from recovery. Id. at 305, 518 F.2d at 578. The plaintiffs here argue that, similarly, but for

the lease agreement the plaintiff in Urbanizadora would have no claim, and but for the Imprimis LLC Agreement, Insight would have no claim.

The present case is distinguishable from Urbanizadora for the same reason that it is distinguishable from Metro Riverboat. In Urbanizadora the plaintiff brought an action under a different legal theory against the same defendant with which it had settled. Here, Insight did not bring an action against the plaintiffs with whom Insight settled. Rather, Insight joined an action, against the United States, and the government was not a party to, nor mentioned in, the Settlement Agreement. The Settlement Agreement states that Insight releases all rights, claims, etc. against the Wexford Parties. Therefore, even though the language of the Settlement Agreement is broad regarding the issues, it does not bar Insight from participating in the instant action against the government, in a federal court, where federal tax matters must be litigated.

Plaintiffs also argue that even though Insight is not asserting claims against the plaintiffs directly, if Insight were to prevail in this action, the resulting tax reallocation would pose a financial detriment to the Wexford Members, which arguably conflicts with the intent of the Settlement Agreement. However, the issue is not whether Insight's actions would harm the plaintiffs, but whether or not Insight gave up its right to join this federal action. If the issue were that Insight's actions would harm the plaintiffs, then it would follow from the plaintiffs' argument that the plaintiffs are also barred from bringing this lawsuit against the government because such action, if plaintiffs were to prevail, could also harm Insight. As a matter of fact, the Settlement Agreement contains mirror image release clauses, 4(a) and 4(b), that bar not only Insight from bringing claims, but bar the plaintiffs as well. If this court were to hold that Insight's action against the government is barred by the Settlement Agreement, then this court also must hold that the plaintiffs' action against the government is barred as well. Fortunately for the plaintiffs, this court does not find the plaintiffs' argument persuasive.

Plaintiffs also rely on Alliant Techsystems v. United States, 74 Fed. Cl. 566, 579 (2007), which prohibits parties from re-litigating the same issues. Plaintiffs offer the extrinsic evidence of Insight's motion for a preliminary injunction in the New York lawsuits and correspondences between the parties prior to and after the execution of the Settlement Agreement to demonstrate the parties' intent to settle the tax allocation issue. The court will not consider such extrinsic evidence in light of a Settlement Agreement that unambiguously does not mention Insight as barred from claims against anyone but the Wexford Members.

Finally, it does not make sense to infer that Insight intended to release its right to assert claims against the federal government when Insight released its right to assert claims against the plaintiffs. Partners have a legal obligation to report financial statements to the I.R.S. in good faith. See IRC § 7201 ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of

prosecution.”). Insight filed a Notice of Inconsistent Treatment (form 8082) with the I.R.S. in addition to its year 2000 tax return in accordance with how Insight computed its tax obligation. To hold that a release against a private party trumps the legal obligation to report information accurately to the I.R.S. and in good faith would simply be bad public policy and could never be the intent of the statute.

This court, therefore, holds that the Settlement Agreement does not bar Insight from joining this lawsuit as a participating partner against the government. Insight joined the case pursuant to IRC § 6226 (c)(2) and RCFC Appendix F, Rule 4 (b), which allow a partner to participate in a partnership level proceeding. Claims against the United States were not raised and could not have been raised in the New York lawsuits because New York State Courts do not have jurisdiction to hear issues of federal tax law. The mutual release of the Settlement Agreement specifies that Insight released its rights and claims against the Wexford Members, and it is not reasonable that the parties intended also to include claims against the Unites States. Even regarding issues arising out of the same facts that grounded the tax allocation issues raised in the New York lawsuits, the Settlement Agreement does not prohibit Insight from arguing its position with or against the government.

## CONCLUSION

The Settlement Agreement does not prohibit Insight from joining in this action against the United States. The term “items of ordinary income” unambiguously does not include capital gains. Plaintiffs, Imprimis and Wexford, must allocate items of ordinary income to Insight prior to allocating any STCG or LTCG. Therefore, Insight’s summary judgment motion on issues 1 and 2 is granted, and the plaintiffs’ summary judgment motion on issues 1 and 2 is denied.

**IT IS SO ORDERED.**

s/ Marian Blank Horn

**MARIAN BLANK HORN**
**Judge**